1 | ROBBINS GELLER RUDMAN
    & DOWD LLP
2 | DARREN J. ROBBINS (168593)
    DAVID C. WALTON (167268)
3 | BRIAN O. O'MARA (229737)
    655 West Broadway, Suite 1900
4 | San Diego, CA 92101
    Telephone: 619/231-1058
5 | 619/231-7423 (fax)
    darrenr@rgrdlaw.com
6 | davew@rgrdlaw.com
    bomara@rgrdlaw.com
7 |    – and –
    CHRISTOPHER M. WOOD (254908)
8 | Post Montgomery Center
    One Montgomery Street, Suite 1800
9 | San Francisco, CA 94104
    Telephone: 415/288-4545
10 | 415/288-4534 (fax)
    cwood@rgrdlaw.com

11 | Attorneys for Plaintiff

12 | [Additional counsel appear on signature page.]

13 | UNITED STATES DISTRICT COURT

14 | CENTRAL DISTRICT OF CALIFORNIA

15 | WESTERN DIVISION

16 |

| | | |
|---|---|---|
| ANTHONY ANDRADE, Individually and on Behalf of All Others Similarly Situated, | ) ) ) | **VIA FAX** No. **CV10 6352** |
| Plaintiff, | ) ) ) | **CLASS ACTION** |
| vs. | ) ) ) | **COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS** |
| AMERICAN APPAREL, INC., DOV CHARNEY, ADRIAN KOWALEWSKI, MARTIN BAILEY and JOYCE E. CRUCILLO, | ) ) ) ) | |
| Defendants. | ) ) | **DEMAND FOR JURY TRIAL** |

FILED
10 AUG 25 PM 2:25
CLERK U.S. DISTRICT COURT
CENTRAL DIST OF CALIF.
LOS ANGELES
BY:

**JURISDICTION AND VENUE**

1. The claims asserted herein arise under §§10(b), 14(a) and 20(a) of the Securities Exchange Act of 1934 ("1934 Act") and Rule 10b-5. Jurisdiction is conferred by §27 of the 1934 Act. Venue is proper pursuant to §27 of the 1934 Act. American Apparel, Inc.'s headquarters are located in Los Angeles, California. False statements were made in this District and acts giving rise to the violations complained of occurred in this District.

**INTRODUCTION AND OVERVIEW**

2. This is a class action for violations of the anti-fraud provisions of the federal securities laws on behalf of all purchasers of American Apparel, Inc. ("American Apparel" or the "Company") common stock between December 20, 2006 and August 17, 2010, inclusive (the "Class Period"), and who were damaged thereby (the "Class").[1]

3. American Apparel purports to be a vertically integrated manufacturer, distributor, and retailer of branded fashion basic apparel. The Company designs, manufactures and sells clothing for women, men, children and pets through retail, wholesale and online distribution channels. American Apparel primarily manufactures its apparel in Los Angeles. Throughout the Class Period, such manufacturing was largely done using an undocumented immigrant workforce. Investors were not informed of this fact nor of the risk it posed to American Apparel's future.

4. During the Class Period, defendants made false and misleading statements about the Company's hiring practices and the effect of such hiring practices on the Company's financial performance. Specifically, defendants falsely

---

[1] Prior to December 13, 2007, American Apparel was known as Endeavor Acquisition Corp. ("Endeavor"), which had entered into an agreement as of the beginning of the Class Period to acquire American Apparel.

1  stated that they made "diligent efforts" to comply with employment and labor
2  regulations, and failed to disclose, and made false statements to shareholders
3  regarding, the effect of the Company's illegal hiring practices on its operating costs
4  and margins.

5       5.    Beginning in July 2009, after the Company revealed that it was being
6  investigated by U.S. Immigration and Customs Enforcement ("ICE") regarding its
7  compliance with U.S. immigration law, the true financial condition of the Company
8  began to be revealed.  However, defendants assured investors that such investigation
9  would not have a material effect on American Apparel.

10       6.    On May 19, 2010, the Company issued a press release entitled "American
11  Apparel Reports Preliminary First Quarter 2010 Financial Results."  The release
12  detailed that the Company's operating losses had skyrocketed, while its gross margins
13  had plummeted, in substantial part due to a reduction in labor efficiency as "a result of
14  the dismissal of over 1,500 experienced manufacturing employees in the third and
15  fourth quarters of 2009 following the completion of an I-9 inspection by [ICE]."  The
16  release stated in part:

17          Gross margin for the first quarter of 2010 was 50.4% as compared
18          to 57.2% for the prior year first quarter.  Gross margin was negatively
19          impacted by a shift in mix from retail to wholesale net sales, which
20          generate lower margins, and by *reduced labor efficiency at the*
21          *company's production facilities in the first quarter of 2010 compared*
22          *to the prior year period.  The reduction in labor efficiency was a result*
23          *of the dismissal of over 1,500 experienced manufacturing employees in*
24          *the third and fourth quarters of 2009 following the completion of an I-*
25          *9 inspection by U.S. Immigration and Customs Enforcement*, as well as
26          the impact of an increase in the mix of more complex retail styles
27          produced.

28                     *      *      *

1        ***For the first quarter of 2010, the impact of lower manufacturing***
2   ***efficiency is estimated to have reduced operating income by***
3   ***approximately $4.4 million.  The company currently expects that the***
4   ***reduced manufacturing efficiency at the company's production***
5   ***facilities beginning during the fourth quarter of 2009 could likely***
6   ***continue through the end of 2010, and could impact the company's***
7   ***financial results at least through early 2011.***

8        7.     As a result of this disclosure, American Apparel's stock price plummeted
9 41% in one day, on trading volume of over 2.8 million shares – over 7 times higher
10 than the Company's average.  But the worst was not over for American Apparel
11 shareholders.

12        8.     On July 28, 2010, the Company filed a Form 8-K with the United States
13 Securities and Exchange Commission ("SEC").  The Form 8-K announced that
14 Deloitte and Touche, LLP, the Company's independent registered public accountant,
15 had resigned effective July 22, 2010.  The Form 8-K further stated that "Deloitte
16 advised the Company that certain information has come to Deloitte's attention, that if
17 further investigated may materially impact the reliability of either its previously issued
18 audit report or the underlying consolidated financial statements for the year ended
19 December 31, 2009 included in the Company's 2009 Form 10-K."

20        9.     On August 17, 2010, the Company issued a press release entitled
21 "American Apparel Reports Preliminary Second Quarter 2010 Financial Results."
22 The press release reported that the Company expected to report a loss of $5 million to
23 $7 million in the second quarter of 2010 on net sales of $132 million to $143 million.
24 A significant factor in such losses was "lower labor efficiency at the Company's
25 production facilities in the second quarter of 2010 compared to the prior year period.
26 The lower labor efficiency was primarily a result of the hiring of over 1,600 net new
27 manufacturing workers during the second quarter of 2010."

28

1        10.    The August 17, 2010, press release also stated that as results of the

2  Company's poor performance, its very existence was now in doubt:

3           The Company expects to report a substantial loss from operations

4           and negative cash flows from operating activities for the six months

5           ended June 30, 2010.  Based on this, and trends occurring in the

6           Company's business after the second quarter and projected for the

7           remainder of 2010, *the Company may not have sufficient liquidity*

8           *necessary to sustain operations for the next twelve months*.  The

9           Company's current operating plan indicates that losses from operations

10          are expected to continue through at least the third quarter of 2010. These

11          factors, among others, *raise substantial doubt that the Company will be*

12          *able to continue as a going concern.*

13        11.    By August 18, 2010, as this news was digested by the market, American

14  Apparel's stock price had declined rapidly, from a close of $1.39 per share on August

15  16, 2010, to a close of just $0.81 per share on August 18, 2010 – a decline of over

16  41%

17                        **THE PARTIES**

18        12.    Plaintiff Anthony Andrade purchased American Apparel common stock

19  during the Class Period as set forth in the attached certification and was damaged

20  thereby.

21        13.    Defendant American Apparel purports to be a vertically integrated

22  manufacturer, distributor, and retailer of branded fashion basic apparel. The Company

23  designs, manufactures and sells clothing for women, men, children and pets through

24  retail, wholesale and online distribution channels.  As of December 31, 2009, the

25  Company operated 281 retail stores in 20 countries.  The Company also operates a

26  wholesale business, which is a leading supplier of T-shirts and other casual wear to

27  screen printers and distributors.  American Apparel went public through a reverse

28  merger with Endeavor, which had gone public as a shell corporation in 2005.

14.     Defendant Dov Charney ("Charney") has served as Chairman of the Board, Chief Executive Officer, President and a director of American Apparel since December 12, 2007. Previously, Charney was founder, a director, Chief Executive Officer and President of Old American Apparel (the Company's predecessor) and its predecessor companies since their formation in Columbia, South Carolina, in 1989.

15.     Defendant Adrian Kowalewski ("Kowalewski") is the Company's Executive Vice President and Chief Financial Officer. From June 2006 to December 2008, Kowalewski served as the Company's Director of Corporate Finance and Development, where his responsibilities included finance, corporate strategy, and investor relations. Kowalewski has been a director of the Company since December 12, 2007.

16.     Defendant Martin Bailey ("Bailey") has served as Chief Manufacturing Officer of the Company since December 12, 2007. Previously, Bailey had served as President of Manufacturing of Old American Apparel since 2002, overseeing operations of textile and apparel production and the planning, purchasing, sourcing, product development, quality-assurance and distribution departments, as well as non-related support departments.

17.     Defendant Joyce E. Crucillo ("Crucillo") has served as Chief Litigation Counsel of American Apparel since February 17, 2009. As Chief Litigation Counsel, Crucillo heads the Company's trial team in all aspects of American Apparel's litigation matters. In addition, Crucillo is responsible for ensuring the Company's compliance with governmental regulatory requirements, handling employment-related claims, and advising management and the Board of Directors on various legal matters. Crucillo served as the Company's General Counsel until 2009 and previously served as General Counsel of Old American Apparel starting in December 2006.

18.     The defendants referenced above in ¶¶14-17 are referred to herein as the "Individual Defendants."

19.     The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of American Apparel's quarterly reports, press releases and presentations to securities analysts, money and portfolio managers and institutional investors, *i.e.*, the market.  They were provided with copies of the Company's reports and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Because of their positions with the Company, and their access to material non-public information available to them but not to the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public and that the positive representations being made were then materially false and misleading.  The Individual Defendants are liable for the false statements pleaded herein.

20.     American Apparel was founded in 1989 by defendant Charney. American Apparel became a public company in December 2007 through a reverse merger.  On December 19, 2006, American Apparel announced a merger with Endeavor, a "special-purpose acquisition company" formed for the sole purpose of seeking out private companies and taking them public.  This reverse merger was completed in December 2007, and Endeavor immediately changed its name to American Apparel.

21.     Since 2000, American Apparel's primary manufacturing facility has been an 800,000-square-foot factory located in downtown Los Angeles, where it employs thousands of people in manufacturing its t-shirts and garments.  For a garment company, American Apparel enjoyed high gross profit margins.  In 2007, American Apparel had an 80% gross margin, well above the industry average of 60%.

22.     However, in 2009 and 2010, the Company's margins were crippled after it was revealed that a third of its manufacturing staff in Los Angeles could not verify their eligibility for employment in the United States.  Indeed, after the investigation by

1    ICE was completed, the Company announced that it had been employing such

2    workers for as long as ten years.   Having been forced to fire a third of its

3    manufacturing staff, the Company's operations were thrown into disarray, threatening

4    its very existence.

## FALSE AND MISLEADING
## STATEMENTS DURING THE CLASS PERIOD

23.    On December 20, 2006, Endeavor filed a Form 8-K with the SEC
announcing that, on December 18, 2006, Endeavor had entered into an agreement and
plan of reorganization by which it would acquire American Apparel and its affiliated
companies.   The Form 8-K stated that Endeavor had received representations and
warranties regarding a number of issues related to American Apparel's business,
including:

> The Agreement contains representations and warranties of each of
> American Apparel and Endeavor relating to, among other things,
> (a) proper corporate organization and similar corporate matters, . . .
> (f) financial information and absence of undisclosed liabilities, . . .
> (l) employee matters, (m) compliance with laws, [and] (n) compliance
> with applicable provisions of securities laws . . . .

24.    The December 20, 2006 Form 8-K included a press release issued by
American Apparel which discussed its employees:

> All manufacturing is done under one roof at its downtown Los Angeles
> factory and headquarters.   Committed to its employees as crucial
> components of the Company's success and stability as well as the quality
> of its garments, American Apparel is a leader in employer/employee
> relations, offering benefits to all employees.

25.    On January 23, 2007, American Apparel issued a press release entitled
"American Apparel Announces $41 Million Debt Financing."   Defendant Charney
was quoted in the release:

"As the first major investment of institutional capital into American Apparel, this financing represents an important validation of our vertically-integrated business model . . . . This transaction places the company on a firm financial footing and allows us to pursue our ambitious growth plans, as well as our proposed merger with Endeavor Acquisition Corp. The hard work and dedication of our employees, and the support of our customers, vendors, and creditors, have been critical during American Apparel's rapid growth."

26.    On April 4, 2007, Endeavor issued a press release entitled "Endeavor Acquisition Corp. Announces Transaction with American Apparel to Move Forward," which stated that American Apparel had advised Endeavor that it would post at least $30 million for the fiscal year ending December 31, 2006 in adjusted Earnings Before Interest, Taxes, Depreciation, Amortization after giving effect to one-time charges ("pro forma adjusted EBITDA").   This satisfied terms of the merger agreement wherein American Apparel was required to demonstrate pro forma adjusted EBITDA of at least $30 million for the fiscal year ending December 31, 2006.

27.    The release quoted Charney:

"I am pleased that American Apparel continues to flourish with strong same store sales this quarter.  The merger with Endeavor will provide the equity capital necessary to fuel our continued growth and expansion of our operations in several of the most influential metropolitan centers around the world . . . .  Until the merger is completed, we continue to prepare the company for this influx of capital," said Charney.

28.    On June 11, 2007, Endeavor filed a preliminary merger proxy statement with the SEC.  The proxy statement reported that American Apparel's workers were documented and authorized to work in the United States:

1        *Many of American Apparel's workers are documented*
2    *immigrants and authorized to work in the United States; however,*
3    *changes in immigration and labor laws could affect such labor force.*

4        Many of American Apparel's workers are documented
5    immigrants, authorized to work in the United States. Changes to existing
6    U.S. immigration laws or labor laws could affect this labor force and
7    could make it harder for members of such force to remain or legally
8    work in the United States. Any changes in U.S. laws having such an
9    affect could make it harder for American Apparel to maintain and
10   expand its work force, which would be adverse to American Apparel's
11   manufacturing capabilities and harm American Apparel's operations and
12   financial results.

13   29.    On August 20, 2007, Endeavor filed a preliminary revised proxy
14   statement with the SEC, which repeated that American Apparel's workers were
15   documented and authorized to work in the United States:

16       Many of American Apparel's workers are documented immigrants
17   and authorized to work in the United States; however, changes in
18   immigration and labor laws could affect such labor force.

19       Many of American Apparel's workers are documented
20   immigrants, authorized to work in the United States. Changes to existing
21   U.S. immigration laws or labor laws could affect this labor force and
22   could make it harder for members of such force to remain or legally
23   work in the United States. Any changes in U.S. laws having such an
24   affect could make it harder for American Apparel to maintain and
25   expand its work force, which would be adverse to American Apparel's
26   manufacturing capabilities and harm American Apparel's operations and
27   financial results.

28

30.     These statements asserting that American Apparel's immigrant workers were documented and authorized to work in the United States were repeated verbatim in Endeavor's (i)   October 5, 2007 preliminary revised proxy statement;   (ii)   November 9, 2007 preliminary revised proxy statement; (iii)   November 20, 2007 revised preliminary proxy statement; and (iv) November 28, 2007 definitive proxy statement.

31.     These statements contained in the Company's proxy solicitations were materially false and misleading because many of the Company's workers **were not** documented immigrants, and were not authorized to work in the United States. Rather, defendants knew, or were deliberately reckless in not knowing, that a third of the Company's manufacturing employees were not authorized to work in the United States.

32.     On August 20, 2007, Endeavor issued a press release entitled "Endeavor Acquisition Corp. Reports American Apparel's Second Quarter 2007 Financial Results," which stated in part:

> American Apparel reported unaudited combined sales for the 2007 second quarter ended June 30, 2007 of $95.6 million, a 35% increase over sales of $71.0 million for the three month period ended June 30, 2006. Retail sales increased 51% to $52.6 million for the second quarter of 2007 as compared to $34.9 million for the same period in 2006, with same-store sales for stores open at least 12 months rising 24%.  At June 30, 2007, American Apparel had 156 stores as compared to 131 stores at June 30, 2006.  Wholesale results were $43.0 million for the 2007 second quarter as compared to $36.3 million for the 2006 second quarter, an increase of 19%.
>
> *        *        *
>
> Dov Charney, Chief Executive Officer of American Apparel stated: "After reviewing the financial results for the first half of 2007, I

1   am very excited about the growth that the company has experienced so
2   far this year.  Despite a challenging retail environment, the second
3   quarter was the most successful period in American Apparel's history.
4   We are pleased that our product offering has appealed to so many
5   customers and we are eager to introduce the vibrant, emerging brand we
6   have developed to metropolitan adults around the world. In the months
7   ahead, we look forward to building upon the strong financial
8   performance of the first half of 2007."

9   "The fortuitous timing of our refinancing this past July is
10   providing us with the liquidity to continue to enhance the value of the
11   American Apparel business, while we work patiently towards closing the
12   merger with Endeavor," added Adrian Kowalewski, American Apparel's
13   Director of Corporate Finance and Development.

14   33.   On November 12, 2007, Endeavor issued a press release entitled
15   "Endeavor Acquisition Corp. Reports American Apparel's Third Quarter 2007
16   Financial Results," which stated in part:

17   American Apparel reported unaudited combined sales for the 2007
18   third quarter ended September 30, 2007 of $106.5 million, a 34%
19   increase over sales of $79.4 million for the three month period ended
20   September 30, 2006. Retail sales increased 43% to $55.9 million for the
21   third quarter of 2007 as compared to $39.1 million for the same period in
22   2006, with same-store sales for stores open at least 12 months rising
23   27%.  At September 30, 2007, American Apparel had 165 stores as
24   compared to 142 stores at September 30, 2006. Wholesale results were
25   $50.6 million for the 2007 third quarter as compared to $40.3 million for
26   the 2006 third quarter, an increase of 25%.

27                              *      *      *

28

1         Dov Charney, Chief Executive Officer of American Apparel

2    stated: "I am very proud of the financial results we have delivered in the

3    third quarter, which were made possible by the important contributions

4    of everyone at the company.  I look forward to the completion of our

5    merger with Endeavor which will result in American Apparel becoming

6    a public company, and will allow our employees and the public to share

7    in the future success of our business."

8        34.    On March 17, 2008, the Company issued a press release entitled

9    "American Apparel Reports Fourth Quarter and Full Year 2007 Financial Results –

10   Fourth quarter 2007 net sales of $111.2 million up 48% over the fourth quarter of

11   2006."  In the press release, the Company reported:

12       _    Net income for the fourth quarter of 2007 of $3.0 million versus a

13   loss of $1.5 million in the fourth quarter of 2006; net income for 2007 of

14   $15.5 million, compared to a net loss of $1.6 million in 2006.

15       35.    Also on March 17, 2008, the Company filed a Form 10-K with the SEC

16   for the year ended December 31, 2007.  In the 2007 Form 10-K, the Company

17   reported its gross profit and operating expenses as follows:

18       ***Gross Profit***: Gross profit increased from $145.6 million for the

19   year ended December 31, 2006 to $215.5 million for the year ended

20   December 31, 2007, which represents an increase of 48.0%. The overall

21   increase in gross profit is a result of growth in retail sales which realize

22   higher margins.  This increase in gross profit is also a result of an

23   increased amount of sales being generated from the International

24   segments and the portion of the U.S. Wholesale segment related to

25   online sales.  In the International segment, there was growth in online

26   sales and the addition of new retail stores contributed to sales which

27   generated higher margins.

28

***Operating Expenses***:  The following table sets forth American Apparel's operating expenses for the year ended December 31, 2007 as compared to December 31, 2006.

| | Year Ended December 31, 2007 | | Year Ended December 31, 2006 | | $ Change | % Change |
|---|---|---|---|---|---|---|
| | Amount | % | Amount | % | Amount | % |
| OPERATING EXPENSES | $184,351 | 100% | $135,064 | 100% | $49,287 | 36.5% |
| Selling | 115,602 | 62.7% | 83,957 | 62.2% | 31,645 | 37.7% |
| Warehouse and Distribution | 10,663 | 5.8% | 9,721 | 7.2% | 942 | 9.7% |
| General and Administrative | 58,086 | 31.5% | 41,386 | 30.6% | 16,700 | 40.4% |
| | 184,351 | 100% | 135,064 | 100% | 49,287 | |

36.    The 2007 Form 10-K also discussed the Company's compliance with immigration regulations in the hiring of employees, stating that "***[t]he Company makes diligent efforts to comply with all employment and labor regulations, including immigration laws, in the many jurisdictions in which the Company conducts operations***."

37.    The 2007 Form 10-K was accompanied by certifications signed by defendant Charney and the Company's CFO, Ken Cieply ("Cieply"), which stated:

I, [Charney/Cieply], certify that:

1.    I have reviewed this annual report on Form 10-K of American Apparel, Inc.;

2.    Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.    Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

1    4.  The registrant's other certifying officer and I are responsible

2 for establishing and maintaining disclosure controls and procedures (as

3 defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal

4 control over financial reporting (as defined in Exchange Act Rules 13a-

5 15(f) and 15d-15(f)) for the registrant and have:

6    (a)  Designed such disclosure controls and procedures, or

7 caused such disclosure controls and procedures to be designed under our

8 supervision, to ensure that material information relating to the registrant,

9 including its consolidated subsidiaries, is made known to us by others

10 within those entities, particularly during the period in which this report is

11 being prepared;

12    (b)  Designed such internal control over financial

13 reporting, or caused such internal control over financial reporting to be

14 designed under our supervision, to provide reasonable assurance

15 regarding the reliability of financial reporting and the preparation of

16 financial statements for external purposes in accordance with generally

17 accepted accounting principles;

18    (c)  Evaluated the effectiveness of the registrant's

19 disclosure controls and procedures and presented in this report our

20 conclusions about the effectiveness of the disclosure controls and

21 procedures, as of the end of the period covered by this report based on

22 such evaluation; and

23    (d)  Disclosed in this report any change in the registrant's

24 internal control over financial reporting that occurred during the

25 registrant's most recent fiscal quarter (the registrant's fourth fiscal

26 quarter in the case of an annual report) that has materially affected, or is

27 reasonably likely to materially affect, the registrant's internal control

28 over financial reporting; and

5.     The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

(a)     All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

(b)     Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

38.     On May 13, 2008, the Company issued a press release entitled "American Apparel Reports First Quarter 2008 Financial Results."  In the press release, the Company announced:

Total retail sales across all segments increased 65% to $63.1 million for the first quarter of 2008 as compared to $38.3 million for the same period in 2007, with same-store sales for stores open at least 12 months rising 36%. . . .

Gross margin in the quarter declined 280 basis points to 55.3%. . . .  The company also incurred additional training and startup costs relating to increased hiring to support an expansion in production capacity starting in the first quarter.

Operating expenses increased 170 basis points to 51.4% of sales, partly as a result of a shift in mix due to the growth of the company's retail operations. . . .

1    Net income for the first quarter was $1.1 million versus $1.7

2    million in the same period a year ago, or $0.02 per diluted share versus

3    $0.03 per diluted share a year ago.

4    39.    On May 16, 2008, the Company filed a Form 10-Q with the SEC.  In the

5    May 16, 2008 Form 10-Q, the Company reported its gross profits and operating

6    expenses as follows:

7    ***Gross Profit***: Gross profit percentage decreased from 58.1% of net

8    sales for the three months ended March 31, 2007 to 55.3% of net sales

9    for the three months ended March 31, 2008.  One of the factors leading

10    to the decrease in gross profit was the product sales mix for the three

11    months ended March 31, 2008, which included a relatively higher

12    amount of costlier winter styles.  In addition, gross profit decreased as a

13    result of the above described startup expenses, moving costs; increased

14    hiring, freight and duty, and ERP cutover costs.

15    ***OPERATING EXPENSES***: The following table sets forth American

16    Apparel's operating expenses for the three months ended March 31,

17    2008 as compared to the three months ended March 31, 2007 (dollars in

18    thousands).

| OPERATING EXPENSES | Three months ended March 31, 2008 | | Three months ended March 31, 2007 | | Change | |
|---|---|---|---|---|---|---|
| | Amount | % of operating expense | Amount | % of operating expense | Amount | % |
| OPERATING EXPENSES | $57,384 | 100% | $36,498 | 100% | $20,886 | 57.2% |
| Selling | 36,782 | 64.1% | 22,183 | 60.8% | 14,599 | 65.8% |
| Warehouse and Distribution | 3,167 | 5.5% | 2,255 | 6.2% | 912 | 40.4% |
| General and Administrative | 17,435 | 30.4% | 12,060 | 33.0% | 5,375 | 44.6% |
| | $57,384 | 100% | $36,498 | 100% | $20,886 | |

40.    The May 16, 2008 Form 10-Q was signed by defendant Charney and CFO Cieply.

- 16 -

41.   On August 14, 2008, the Company issued a press release entitled "American Apparel Reports Second Quarter 2008 Financial Results." In the press release, the Company stated:

> Gross margin for the second quarter of 2008 increased to 59.5% from 56.5% for the prior year second quarter. The increase in gross margin was primarily the result of an increase in the mix of sales coming from retail sales and online consumer sales, which generate a higher gross margin than wholesale sales. This benefit was partially offset by the impact of hiring of approximately 1,400 new manufacturing employees in the second quarter of 2008 to support increased production. During the period, American Apparel began operating a fabric dyeing and finishing facility in Garden Grove, California, which it purchased in May. Gross margin for the U.S. Wholesale segment decreased to 28.4% in the second quarter of 2008, versus 28.9% in the second quarter of 2007.

42.   On August 15, 2008, the Company filed a Form 10-Q with the SEC. In the August 15, 2008 Form 10-Q, the Company reported gross profits and operating expenses as follows:

> ***Gross profit***: Gross profit percentage increased from 56.5% of net sales for the three months ended June 30, 2007 to 59.5% of net sales for the three months ended June 30, 2008. Gross margin benefited from an increase in the mix of sales coming from retail sales versus wholesale, along with an increase in online consumer sales. This benefit was partially offset by the hiring of a significant number of new manufacturing employees to support increased production which continued through the second quarter.
>
> ***OPERATING EXPENSES***: The following table sets forth the Company's operating expenses for the three months ended June 30, 2008

as compared to the three months ended June 30, 2007 (dollars in thousands).

| | Three Months Ended | | | | Change | |
| | June 30, 2008 | | June 30, 2007 | | | |
| | Amount | % of operating expenses | Amount | % of operating expenses | Amount | % |
|---|---|---|---|---|---|---|
| Selling | $39,257 | 61.9% | $28,307 | 67.4% | $10,950 | 38.7% |
| Warehouse and Distribution | 4,069 | 6.4% | 1,998 | 4.8% | 2,071 | 103.7% |
| General and Administrative | 20,116 | 31.7% | 11,688 | 27.8% | 8,428 | 72.1% |
| Total operating expenses | $63,442 | 100.0% | $41,993 | 100.0% | $21,449 | 51.1% |

43.    On October 29, 2008, the Company filed a proxy statement with the SEC. The proxy statement included a Report of the Audit Committee, which discussed the Audit Committee's role in ensuring the Company's compliance with legal regulatory requirements:

The Audit Committee assists the Board in fulfilling its responsibilities for general oversight of the integrity of the Company's financial statements, the Company's compliance with legal and regulatory requirements, the Company's system of internal control over financial reporting and the qualifications, independence and performance of the Company's internal audit function and independent auditor.

*        *        *

Based on the reviews and discussions referred to above, we recommended to the Board of Directors, and the Board of Directors has approved, that the audited financial statements be included in the Company's Annual Report on Form 10-K for the fiscal year ended December 31, 2007 for filing with the SEC.

44.    On November 10, 2008, the Company filed a Form 10-Q with the SEC. In the November 10, 2008 Form 10-Q, the Company reported its gross profits and operating expenses as follows:

*Gross profit*: Gross profit percentage decreased from 55.2% of net sales for the three months ended September 30, 2007 to 50.1% of net

sales for the three months ended September 30, 2008.  Gross margin was negatively impacted by the $13.2 million of expenses from the stock award to manufacturing employees and related employer payroll taxes. The $13.2 million of expenses decreased our gross margin by 8.5%. Excluding the impact of the aforementioned expenses related to the stock award, our gross margin increased from 55.2% for the three months ended September 30, 2007 to 58.6% for the three months ended September 30, 2008.  The increase in our gross margin was due to an increase in the mix of sales coming from retail sales versus wholesale and an increase in online consumer sales.  Gross profit was also favorably impacted from a reduction in inventory reserves of $1.1 million which increased our gross profit percentage by 0.7% during the three months ended September 30, 2008.  The reduction in the inventory reserve was primarily the result of the opening of two closeout stores in key markets and expansion of certain existing closeout stores to increase inventory for sale. Popular styles among the Company's slow-moving stock were actively merchandized in these closeout stores, resulting in higher inventory turnover of potentially obsolete inventory. These benefits were partially offset by the hiring of additional manufacturing employees, as described above, to support increased production which continued through the third quarter ended September 30, 2008.

45.    Also on November 10, 2008, the Company issued a press release entitled "American Apparel Reports Third Quarter 2008 Financial Results."   In the press release, the Company stated:

American Apparel reported net sales for the quarter ended September 30, 2008 of $154.8 million, a 45.2% increase over net sales of $106.6 million for the quarter ended September 30, 2007.

1                                    *       *       *

2              Gross margin for the third quarter of 2008 was 50.1% versus

3       55.2% for the prior year third quarter, including the impact of the merger

4       related stock based compensation expense. . . .

5              Operating expenses for the third quarter of 2008 increased to

6       45.7% of net sales, versus 44.2% for the third quarter of 2007.

7       Operating expenses increased due to higher payroll, rent and occupancy

8       expense related to the growth in the number of retail stores from 163 as

9       of September 30, 2007 to 228 as of September 30, 2008.  Pre-opening

10      expenses for retail stores were $4.4 million in the third quarter of 2008,

11      versus $0.9 million in the prior year third quarter. . . .

12              . . . Operating margin for the third quarter of 2008 was 4.4%,

13      versus 11.0% in the quarter a year ago.

14      46.    On March 17, 2009, the Company issued a press release entitled

15      "American Apparel Reports Fourth Quarter and Full Year 2008 Financial Results."

16      The press release stated:

17              Gross margin for the fourth quarter of 2008 was 55.4% versus

18      54.0% for the prior year fourth quarter. . . .

19              Operating expenses for the fourth quarter of 2008 decreased to

20      49.1% of net sales, versus 53.4% for the fourth quarter of 2007.  Pre-

21      opening expenses for retail stores were $3.6 million in the fourth quarter

22      of 2008, versus $1.6 million in the prior year fourth quarter.

23              Operating income for the fourth quarter of 2008 was $9.2 million,

24      versus $0.6 million in the prior year fourth quarter.  Operating margin for

25      the fourth quarter of 2008 was 6.3%, versus 0.6% in the fourth quarter

26      2007.

27                                   *       *       *

28

Net income for the fourth quarter of 2008 was $3.9 million, or $0.05 per diluted share. Net income for the fourth quarter of 2007 was $3.0 million, or $0.06 per diluted share.

*       *       *

Gross margin for the year ended December 31, 2008 was 54.9% versus 55.7% for the year ended December 31, 2007, including the impact of a $13.2 million stock based compensation expense booked to cost of sales in 2008 related to the grant of 1.9 million shares of stock to manufacturing workers pursuant to the merger agreement between Endeavor Acquisition Corp. and American Apparel, Inc. . . .

Operating expenses for the year ended December 31, 2008 increased to 48.3% of net sales, versus 47.6% for the year ended December 31, 2007. Operating expenses increased due to higher payroll, rent and occupancy expense related to the growth in the number of retail stores from 182 as of December 31, 2007 to 260 as of December 31, 2008.

47.    On March 16, 2009, the Company filed a Form 10-K with the SEC for the year ended December 31, 2008. The 2008 Form 10-K was signed by defendants Charney and Kowalewski and stated that "*[t]he Company makes diligent efforts to comply with all employment and labor regulations, including immigration laws, in the many jurisdictions in which the Company conducts operations*."

48.    In the 2008 Form 10-K, the Company reported its gross profits and operating expenses as follows:

*Gross Profit*: Gross profit percentage decreased from 55.7% of net sales for the year ended December 31, 2007 to 54.9% of net sales for the year ended December 31, 2008. Gross margin was negatively impacted by the $13.2 million of expenses from the stock award to manufacturing employees, including related employer payroll taxes. The $13.2 million

- 21 -

of expenses decreased our gross margin by 2.4%. Excluding the impact of the aforementioned expenses related to the stock award, our gross margin for the year ended December 31, 2008 increased from 55.7% for the year ended December 31, 2007 to 57.3% for the year ended December 31, 2008. This increase in our gross margin was primarily due to an increase in the mix of sales coming from retail sales versus wholesale, along with an increase in online consumer sales. This benefit was partially offset by the hiring of a significant number of new manufacturing employees to support increased production.

***Operating Expenses***: The following table sets forth American Apparel's operating expenses for the year ended December 31, 2008 as compared to December 31, 2007 (dollars in thousands).

| | Year Ended December 31, 2008 | | Year Ended December 31, 2007 | | $ Change | % Change |
| --- | --- | --- | --- | --- | --- | --- |
| OPERATING EXPENSES | Amount | % | Amount | % | Amount | % |
| | $263,051 | 100% | $184,351 | 100% | $78,700 | 42.7% |
| Selling | 168,516 | 64.1% | 115,602 | 62.7% | 52,914 | 45.8% |
| Warehouse and Distribution | 15,606 | 5.9% | 10,663 | 5.8% | 4,943 | 46.4% |
| General and Administrative | 78,929 | 30.0% | 58,086 | 31.5% | 20,843 | 35.9% |
| | 263,051 | 100% | 184,351 | 100% | 78,700 | |

49.     On April 29, 2009, the Company filed a proxy statement with the SEC. The 2009 proxy statement included a Report of the Audit Committee, which discussed the Audit Committee's role in ensuring the Company's compliance with legal regulatory requirements:

The Audit Committee assists the Board in fulfilling its responsibilities for general oversight of the integrity of the Company's financial statements, the Company's compliance with legal and regulatory requirements, the Company's system of internal control over financial reporting and the qualifications, independence and performance of the Company's internal audit function and independent auditor.

*       *       *

1    Based on the reviews and discussions referred to above, the Audit
2    Committee recommended to the Board of Directors that the audited
3    financial statements be included in the Company's Annual Report on
4    Form 10-K for the fiscal year ended December 31, 2008 for filing with
5    the SEC.

6    50.    On May 18, 2009, the Company issued a press release entitled "American
7    Apparel Reports First Quarter 2009 Financial Results." In the press release, the
8    Company stated:

9    Gross margin for the first quarter of 2009 increased to 57.2% from
10   55.3% for the first quarter of 2008. Gross margin in the period benefited
11   from an increase in the proportion of retail sales, which generate a higher
12   gross margin than wholesale sales. Total wholesale sales declined to
13   24.6% of total sales compared to 32.3% of sales in the first quarter of
14   2008.

15                         *        *        *

16   Operating expenses for the first quarter of 2009 increased to
17   60.6% of net sales, versus 51.4% for the first quarter of 2008. . . .

18   Operating loss for the first quarter of 2009 was $3.9 million,
19   versus operating income of $4.4 million in the prior year first quarter.
20   Operating margin for the first quarter of 2009 was negative 3.4%, versus
21   3.9% in the first quarter 2008.

22   51.    On June 30, 2009, the Company filed a Form 8-K with the SEC authored
23   by defendant Charney. The Form 8-K disclosed that the Company had notified ICE
24   that "it was unable to verify the employment eligibility of approximately 200 current
25   employees because of discrepancies in these employees' records. Additionally, ICE
26   notified the Company that another approximately 1,600 current employees appear not
27   to be authorized to work in the United States and appear to have obtained employment

28

1   by providing, on Form I-9, documentation which ICE believes, based on its
2   proprietary databases, to be suspect and not valid."

3       52.    The June 30, 2009 Form 8-K also falsely sought to reassure investors that
4   the Company did not believe that the loss of the employees in question would have a
5   material effect on its financial results, stating: "[E]ven if the Company were to lose
6   substantially all of the 1,800 identified employees (which represent approximately
7   one-third of the 5,600 employees the Company currently employs in its manufacturing
8   operations in the Los Angeles area), *the Company does not presently believe that the*
9   *loss of employees would have a materially adverse impact on its financial results*."

10      53.    On July 1, 2009, the Company issued a press release entitled "American
11  Apparel Announces Developments Regarding Inspection by U.S. Immigration and
12  Customs Enforcement."   The press release falsely reiterated that "[E]ven if the
13  Company were to lose substantially all of the employees identified by ICE (which
14  represent approximately one-third of the 5,600 employees the Company employs in its
15  manufacturing operations in the Los Angeles area), *the Company does not currently*
16  *believe that the loss of these employees would have a materially adverse impact on*
17  *its financial results*."

18      54.    Further, the July 1, 2009 press release stated falsely that, notwithstanding
19  the fact that a third of the Company's workforce appeared to be ineligible to work in
20  the United States, the Company had a policy in place to verify the employment
21  eligibility of prospective employees:

22          It has been the Company's policy to fully comply with its
23      obligations to establish the employment eligibility of prospective
24      employees under immigration laws, and the Company intends to
25      continue its cooperation with the ICE inspection in all respects.  Howard
26      Shapiro, outside immigration counsel for American Apparel at Mitchell
27      Silberberg & Knupp, stated: "In early 2008, our review of the

28

1    Company's policies and procedures with respect to the immigration laws
2    found American Apparel to be in substantial compliance."

3        55.    The press release also again falsely stated that the potential loss of the
4    identified employees would not have a material adverse effect on the Company's
5    operations, and suggested that such terminations might actually improve the
6    Company's bottom line, as they would only have to hire "for a fraction of those
7    employees that would be terminated":

8            The Company believes that its current surplus levels of inventory
9        and production capacity will mitigate the adverse impact of any
10       disruption to its manufacturing activities that may potentially result from
11       the loss of these employees.  To the extent that the Company may need
12       to hire replacement workers, the Company presently believes it would
13       only need to hire for a fraction of those employees that would be
14       terminated.

15       56.    Analysts who covered the Company took management at their word, and
16   reported that they did not expect that the loss of employees would materially affect the
17   Company's operations.  On July 1, 2009, KeyBanc Capital Markets issued a report
18   entitled "APP: Immigration Issues Near-Term Distraction, Unfortunately Expected."
19   The report stated:

20       KEY INVESTMENT POINTS
21       *There's some paper, but thankfully no paddy wagons*.    This
22       determination was met with a notice, and thankfully led to no mass arrest
23       or deportation of employees.  In fact, the employees have a period of
24       remediation when they can demonstrate their eligibility to work.
25       *Management was clear in emphasizing that even if a significant*
26       *number of the 1,800 employees are deemed ineligible to work, the*
27       *Company should not see a material financial impact.*

28

57.     Notwithstanding management's reassurances, between June 30 and July 2, 2009, as partial revelations of the Company's prior and false statements and omissions came to light, the Company's stock price fell $0.60 a share, or almost 15%.

58.     On August 13, 2009, the Company issued a press release entitled "American Apparel Reports Second Quarter 2009 Financial Results."  In the press release, the Company stated:

> Gross profit for the second quarter of 2009 was 59.0% versus 58.6% for the prior year second quarter. . . .
>
> Operating expenses for the second quarter of 2009 increased to 53.6% of net sales, versus 46.9% for the second quarter of 2008. Operating expenses increased due to higher payroll, rent, occupancy, and depreciation expenses related to the increase in the number of retail stores in operation from 195 as of June 30, 2008 to 272 as of June 30, 2009.  Pre-opening expenses for retail stores were $0.9 million in the second quarter of 2009, versus $2.3 million in the prior year second quarter.
>
> Operating income for the second quarter of 2009 was $7.3 million, versus $15.6 million in the prior year second quarter.  Operating margin for the second quarter of 2009 was 5.4%, versus 11.7% in the second quarter of 2008.

59.     Also on August 13, 2009, the Company filed a Form 10-Q with the SEC. The Form 10-Q was signed by defendants Charney and Kowalewski.  In the Form 10-Q, the Company reported its gross profits and operating expenses as follows:

> ***GROSS PROFIT***: Gross profit increased from 54.6% of net sales for the three months ended March 31, 2008 to 57.2% of net sales for the three months ended March 31, 2009.  The increase in gross profit was primarily due to the change in sales mix for the three months ended March 31, 2009, which included a higher percentage of sales through our

retail distribution channels, which generate higher gross profit, compared to sales generated through our third party wholesale customers. Due to the more rapid growth of our retail channels, the U.S. Wholesale segment represented only 24.5% of net sales in the three months ended March 31, 2009 compared to 33.5% of net sales in the three months ended March 31, 2008. The benefit of the shift in sales mix was partially offset by a decline in gross margin at the U.S. Wholesale segment. In the U.S. Wholesale segment, the gross profit decreased to 18.0% from 18.6% as a result of lower capacity utilization of the Company's manufacturing facilities in light of lower wholesale demand and the Company's constrained liquidity position during the three months ended March 31, 2009 which necessitated lower than planned production volumes. Gross profit also decreased due to an increase in production of styles with more complex construction patterns, as well as unfavorable currency shifts as a result of the appreciation of the U.S. dollar in the International and Canadian business segments.

*OPERATING EXPENSES*: The following table sets forth our operating expenses for the three months ended March 31, 2009 as compared to the three months ended March 31, 2008:

|  | Three months ended March 31, 2009 | | Three months ended March 31, 2008 | | Change | |
|---|---|---|---|---|---|---|
|  | Amount | % of operating expense | Amount | % of operating expense | Amount | % |
| Selling | $41,443 | 59.8% | $36,782 | 65.0% | $4,661 | 12.7% |
| Warehouse and Distribution | 3,900 | 5.6% | 3,167 | 5.6% | 733 | 23.1% |
| General and Administrative | 23,953 | 34.6% | 16,665 | 29.4% | 7,288 | 43.7% |
| OPERATING EXPENSES | $69,296 | 100% | $56,614 | 100% | $12,682 | 22.4% |

60.   In the August 13, 2009 Form 10-Q, the Company also falsely stated that "[i]t is the Company's policy, and has been at all times, to fully comply with its obligations to establish the employment eligibility of prospective employees under

1   immigration laws, and the Company intends to continue its cooperation with the ICE

2   inspection in all respects."

3       61.   During a conference call on August 13, 2009, in which defendants

4   Kowalewski and Charney participated, Kowalewski once again sought to reassure

5   analysts that employees fired as a result of immigration issues would not negatively

6   impact the Company:

7           **Edward Yruma – *KeyBanc Capital Markets – Analyst***

8               . . . Could you give us a quick update on the status of production,

9           particularly given some of the immigration issues that you suffered

10          from?  Did you see any disruption?  And what were the expenses in the

11          quarter associated with that?

12              [Kowalewski:]    Well, given that we received an updated

13          communication from ICE towards the end of the quarter, this would have

14          had no financial impact on the second quarter.

15          **Edward Yruma – *KeyBanc Capital Markets – Analyst***

16              Got you.  But your guidance does embed some type of – I guess

17          maybe if you could just give an update on what impact you've seen, I

18          guess quarter to date.

19              [Kowalewski:]  When we disclosed the ICE notice on July 1, we

20          indicated that at the time, despite the fact that it was difficult to estimate

21          what the impact would be on our results, we didn't believe it would have

22          a material impact, given the fact that we had effectively hired significant

23          amounts of people at the end of Q2 '08.

24              And so, with the decline, also, we were in a situation where we

25          had more labor than was really justified by the amount of business or

26          unit volume that we were seeing.  So by – if we were forced to reduce

27          our workforce, the way we would mitigate that would be by increasing

28          the days per week of our employees on the selling floor; so that would

- 28 -

1    virtually pick up all of the reduction in labor that we might see if we had

2    a loss in workers.

3                    *        *        *

4           I think at this point, we don't have an update on what the financial

5    impact would be. I think we would basically just reiterate what we said

6    at the beginning of July, which is at this point difficult to estimate, ***but***

7    ***we do not believe that it's material***.

8    62.    By this time, American Apparel's stock had dropped $11.80 per share

9    from its Class Period high. However, it continued to be inflated by management's

10   assurances that any enforcement of immigration laws would not have a materially

11   adverse effect on the Company.

12   63.    On September 11, 2009, the Company filed a proxy statement with the

13   SEC. The 2009 proxy statement included a Report of the Audit Committee, which

14   discussed the Audit Committee's role in ensuring the Company's compliance with

15   legal regulatory requirements:

16          The Audit Committee assists the Board in fulfilling its

17   responsibilities for general oversight of the integrity of the Company's

18   financial statements, the Company's compliance with legal and

19   regulatory requirements, the Company's system of internal control over

20   financial reporting and the qualifications, independence and performance

21   of the Company's internal audit function and independent auditor.

22                    *        *        *

23          Based on the reviews and discussions referred to above, the Audit

24   Committee recommended to the Board of Directors that the audited

25   financial statements be included in the Company's Annual Report on

26   Form 10-K for the fiscal year ended December 31, 2008 for filing with

27   the SEC.

28

1    64.    On November 10, 2009, the Company filed a Form 10-Q with the SEC.

2 The Form 10-Q was signed by defendants Charney and Kowalewski.  In the Form 10-

3 Q, the Company reported its gross profits and operating expenses as follows:

4        ***GROSS PROFIT***: Gross profit as a percentage of net sales

5        increased to 58.1% of net sales for the nine months ended September 30,

6        2009 from 53.8% of net sales for the nine months ended September 30,

7        2008, primarily as a result of the aforementioned shift in mix towards

8        retail sales, the share based compensation expense and related payroll tax

9        charges recorded in the third quarter of 2008 as well as due to effect of

10       unfavorable currency shifts caused by the appreciation of the U.S. dollar

11       against various foreign currencies in the current period versus the

12       comparable prior year period. Without giving effect to the stock award to

13       manufacturing employees, gross profit as a percentage of net sales for

14       the nine months ended September 30, 2008 would have been 57.1%.

15       ***OPERATING EXPENSES***: The following table sets forth our

16       operating expenses for the nine months ended September 30, 2009 as

17       compared to the nine months ended September 30, 2008:

18

| | **Nine months ended September 30,** | | | | **Change** | |
|---|---|---|---|---|---|---|
| | **2009** | | **2008** | | | |
| | | **% of operating** | | **% of operating** | | |
| | **Amount** | **expenses** | **Amount** | **expenses** | **Amount** | **%** |
| Selling | $134,861 | 61.8% | $122,212 | 64.9% | $12,649 | 10.4% |
| Warehouse and Distribution | 12,155 | 5.6% | 11,559 | 6.2% | 596 | 5.2% |
| General and Administrative | 71,261 | 32.6% | 54,405 | 28.9% | 16,856 | 31.0% |
| OPERATING EXPENSES | $218,277 | 100.0% | $188,176 | 100.0% | $30,101 | 16% |

23   65.    The November 10, 2009 Form 10-Q also stated that the Company had

24 fired all employees whose immigration status could not be verified, and that the

25 Company had been fined by ICE:

26       The Company has terminated the employment of those persons

27       identified by ICE who were not able to resolve the discrepancies in their

28       work records, or present valid identification and employment eligibility

- 30 -

1  documents. In the fourth quarter of 2009, as a result of the inspection,
2  the Company was fined by ICE for an amount that was deemed
3  immaterial, and the amount was accrued in the accompanying condensed
4  consolidated balance sheet as of September 30, 2009.

5  It is the Company's policy, and has been at all times, to fully
6  comply with its obligations to establish the employment eligibility of
7  prospective employees under immigration laws.

8  66.   Also on November 10, 2009, the Company issued a press release entitled
9  "American Apparel Reports Third Quarter 2009 Financial Results."   In the press
10  release, the Company stated:

11  Gross margin for the third quarter of 2009 was 58.1% as compared
12  to 49.1% for the prior year third quarter. The gross margin in the third
13  quarter of 2008 was negatively impacted by $13.2 million in share based
14  compensation expense relating to the award of approximately 1.9 million
15  shares of stock to manufacturing employees during the third quarter of
16  2008, granted pursuant to the 2007 merger between American Apparel,
17  Inc. (formerly Endeavor Acquisition Corp.) and American Apparel, Inc.,
18  a California corporation ("Old American Apparel"). . . .

19  Operating expenses, including selling, warehouse and distribution,
20  and general and administrative expenses, increased to 50.6% of net sales
21  for the third quarter of 2009, compared to 44.7% for the third quarter of
22  2008.   Operating expenses increased due to higher payroll, rent,
23  occupancy, and depreciation expenses related to the greater number of
24  retail stores in operation in the period versus the same period last year. . .

25  Operating income for the third quarter of 2009 was $11.2 million.
26  This compares to $6.8 million in the third quarter of 2008, which
27  included the merger related share based compensation expense of $13.2

28

million.  Operating margin for the third quarter of 2009 was 7.5% versus 4.4% for the third quarter of 2008.

67.    Also on November 10, 2009, the Company held a conference call in which defendants Kowalewski and Charney participated.  During the conference call, defendants in part revealed the problems the Company was having as a result of its practice of hiring workers who were ineligible for employment in the U.S., but continued to reassure investors that the departures would not materially affect operations:

> [Kowalewski:]  Finally, in the third quarter, we had to deal with the difficult task of letting go approximately 1,500 manufacturing workers who were identified by US Immigration and Customs Enforcement as having provided the Company with suspect documents in order to gain employment.  Many of these workers had worked for the Company for as long as 10 years and had been some of our best employees.
>
> *     *     *
>
> **Edward Yruma – *KeyBanc Capital Markets Inc. – Analyst***
>
> Great.  And my final question, can you help us quantify the impact of the 1,500 departures in your manufacturing facility, how is the performance in the existing facility now in your workers, and have you been able to replace the ones that you have lost?  Thank you.
>
> [Kowalewski:]  I think what we said back in July when we had this issue was we didn't think it was going to have a material impact to our financial results.  And one of the reasons was because we had been operating with a higher number of workers than maybe we would have needed under normal circumstances.  So we do think some of the head count has improved our overhead situation, because we have more workers working shorter work weeks and working more hours per week;

but as I mentioned in my remarks, a lot of the workers that we lost were some of our most efficient people. If you look at it on a year over year basis versus where we were last year when we were hiring a lot of people, there was a lot of training cost that the Company bore, so *I think on a year over year basis the efficiency in labor is probably pretty comparable*.

*        *        *

[Charney:] We appreciate also a lot of the efforts that are being made at the factory level. Marty has done a terrific job in the transition we went through in the last couple of months, virtually seamless based on losing the amount of workers we lost and the amount of workers we had coming in.

68.    On March 25, 2010, the Company issued a press release entitled "American Apparel Reports Fourth Quarter and Full Year 2009 Financial Results." In the press release, the Company reported:

Gross margin for the fourth quarter of 2009 was 55.0% as compared to 54.5% for the prior year fourth quarter. Gross margin was favorably impacted by the depreciation of the U.S. dollar against foreign currencies in the fourth quarter of 2009 compared to the fourth quarter of 2008, and by a continuing shift in mix from wholesale to retail sales, which generate higher gross margins. *These factors were largely offset by a substantial reduction in manufacturing efficiency at the company's production facilities in the fourth quarter of 2009 compared to the prior year period. The reduction in manufacturing efficiency was principally a result of the forced termination of over 1,500 experienced manufacturing employees in the third and fourth quarters of 2009 following the completion of the previously disclosed I-9 inspection by U.S. Immigration and Customs Enforcement.*

- 33 -

\*   \*   \*

Gross margin for 2009 was 57.3% as compared to 54.0% in 2008. The gross margin for 2008 was negatively impacted by $13.2 million in stock based compensation expense relating to the award of approximately 1.9 million shares of stock to manufacturing employees during the third quarter of 2008, granted pursuant to the 2007 merger between American Apparel, Inc. (formerly Endeavor Acquisition Corp.) and American Apparel Inc., a California corporation ("Old American Apparel"). The net impact of the stock based compensation expense was to negatively impact gross margin in 2008 by approximately 240 basis points. Gross margin for 2009 was favorably impacted by a shift in mix from wholesale to retail sales, as retail increased from 62.6% of total net sales in 2008 to 67.9% of total net sales in 2009. The favorable impact from the shift in mix was partially offset by the negative impact of the appreciation of the U.S. dollar versus foreign currencies for the full year 2009 relative to the full year 2008. ***Additionally, gross margin was also negatively impacted by lower capacity utilization of the company's manufacturing facilities in the first half of 2009, and the substantial reduction in manufacturing efficiency experienced in the fourth quarter of 2009 at the company's production facilities.***

Operating expenses for 2009 were $295.5 million, or 52.9% of net sales, as compared to $258.4 million, or 47.4% for 2008. The increase in operating expenses was primarily caused by increased occupancy, payroll, and depreciation expenses incurred as a result of operating an additional 21 net stores at the end of 2009 compared to the end of 2008, as well as due to the full year impact of increased operating expenses from the additional 78 net stores opened in 2008.

69.    The March 25, 2010 press release also stated that because of its practice of hiring workers who were ineligible for employment in the U.S., the Company was unable to provide annual financial guidance:

> Based on the substantial impact of the reduced manufacturing efficiency experienced at the company's production facilities beginning in the fourth quarter of 2009, and the high level of uncertainty surrounding the duration of the reduction in efficiency, as well as due to uncertainty stemming from the company's constrained ability to undertake additional investments in its business as a result of certain restrictive financial covenants under the company's credit facilities, the company has determined to defer providing annual financial guidance for 2010 until it reports its first quarter 2010 financial results in early May.

70.    Also on March 25, 2010, the Company held a conference call in which defendants Kowalewski and Charney participated.   During the conference call, Kowalewski detailed the problems the Company was having due to its previously undisclosed hiring practices:

> [Kowalewski:]  Aside from the global recessionary environment, we faced a number of Company specific challenges in 2009 including the refinancing extension of our credit facilities in March, a sharp decline in wholesale sales in Q1 which led to lower capacity utilization of our production facilities, significant declines in same-store sales that were exacerbated due to cannibalization following the accelerated store rollout in 2008 *and perhaps most significantly, the dismissal of over 1,500 experienced manufacturing employees in Q3 and Q4 in the wake of the previously disclosed I-9 inspection by US Immigration and Customs enforcement as well as the impact this has had on our manufacturing efficiency.*

1            *      *      *

2         Turning to gross profit, for the fourth quarter gross margin

3    increased 50 basis points to 55% of net sales as compared to 54.5% in

4    the fourth quarter of 2008. Despite a favorable currency swings [sic] and

5    the continued shift in mix towards retail sales, *these factors were largely*

6    *offset by a significant reduction in production efficiency in the fourth*

7    *quarter of '09 due to the dismissals in Q3 and Q4 following the results*

8    *of the I9 inspection.   While the increase in manufacturing costs*

9    *impacted Q4, it was also expected to impact our gross margins going*

10   *forward especially to the extent that the Company is not able to quickly*

11   *return to its previous levels of manufacturing efficiency.*  While our

12   production team has worked ceaselessly to transition our manufacturing

13   plants in the face of such unprecedented disruption and will continue to

14   work to bring efficiency levels back to where they were prior to the

15   layoff, there is considerable uncertainty about the length of the period of

16   lower efficiency.

17        71.    Following these announcements, which partially revealed the truth

18   regarding the Company's financial condition, on March 26, 2010, the Company's

19   stock price dropped $0.67 on trading of over 1.8 million shares.

20        72.    On March 31, 2010, the Company filed a Form 10-K with the SEC. The

21   Form 10-K was signed by defendants Charney and Kowalewski. In the Form 10-K,

22   defendants detailed the serious impact of the Company's practice of hiring workers

23   who were ineligible for employment in the U.S.:

24         *Cost of sales*: Cost of sales as a percentage of net sales was 42.7%

25         and 46.0% for the years ended December 31, 2009 and 2008,

26         respectively. . . .  The favorable impact from the shift in mix was

27         partially offset by the negative impact of the appreciation of the U.S.

28         dollar versus foreign currencies for the full year 2009 relative to the full

year 2008.  Additionally, cost of sales was also negatively impacted by lower capacity utilization of our manufacturing facilities in the first half of 2009, and the *substantial reduction in manufacturing efficiency experienced in the fourth quarter of 2009 at our production facilities*.

*Gross profit*: Gross margin for 2009 was 57.3% as compared to 54.0%, or 56.4% excluding the impact of the 2008 Grant, in 2008.  The increase in gross margin was due to a favorable shift in mix from wholesale towards retail sales, as retail sales generate a higher gross margin.  *This increase was partially offset due to an increase in inventory costs caused by a reduction in labor efficiency in the second half of 2009* and a continued shift in production mix towards more complex retail styles.  *We expect that the effects of lower production efficiency will continue into 2010*.

                              *          *          *

*Operating expenses*: Operating expenses increased $37.1 million, or 14.4%, to $295.5 million for the year ended December 31, 2009 as compared to $258.4 million for the year ended December 31, 2008.  The increase in operating expenses was primarily caused by increased occupancy, payroll, and depreciation expenses incurred as a result of operating an additional 21 net stores at the end of 2009 compared to the end of 2008, as well as due to the full year impact of increased operating expenses from the additional 78 net new stores opened in 2008.  Operating expenses were also higher in 2009 due to $3.3 million in non-cash retail store impairment charges recorded in 2009 compared to $0.6 million in 2008.  Pre-opening expenses for retail stores were $2.4 million in 2009 versus $10.3 million in 2008.

73.    On May 11, 2010, the Company filed a Form NT 10-Q with the SEC announcing that it was unable to timely file its Form 10-Q.  The Form NT 10-Q was

1   signed by defendant Kowalewski.  The Form NT 10-Q reported the Company's
2   continuing poor performance as a result its practice of hiring workers who were
3   ineligible for employment in the U.S.:

4         Net sales are expected to increase for the quarter ended March 31,
5         2010 compared to the quarter ended March 31, 2009, primarily as a
6         result of an increase in net sales to the Company's wholesale customers,
7         and also a result, although to a lesser extent, of an increase in net sales in
8         the Company's retail business.  The increase in retail sales was due to a
9         larger number of retail store locations in operation in the first quarter of
10        2010 as compared to the first quarter of 2009.  The Company operated
11        280 retail store locations as of March 31, 2010, as compared to 264 retail
12        store locations as of March 31, 2009.  The increase in retail net sales was
13        partially offset by negative comparable retail store sales in the first
14        quarter of 2010.  *The Company expects to report a larger net loss in the*
15        *first quarter of 2010 as compared to the first quarter of 2009, primarily*
16        *as a result of higher cost of sales due to increased manufacturing*
17        costs, and higher operating expenses related to the higher number of
18        retail stores in operation in the first quarter of 2010 compared to the first
19        quarter of 2009.

20        It is expected that gross margin will decrease for the quarter ended
21        March 31, 2010 compared to the quarter ended March 31, 2009,
22        primarily due to a change in the overall sales mix to a higher level of
23        wholesale net sales which generate lower gross margins than the
24        Company's retail net sales, and *due to increased manufacturing costs.*
25        Additionally, compensation expense related to a stock grant to the
26        Company's manufacturing employees in the first quarter of 2010 was
27        also recorded in cost of sales for the quarter.

28   74.   On May 18, 2010, American Apparel's stock closed at $2.74 per share.

75.     On May 19, 2010, the Company issued a press release entitled "American Apparel Reports Preliminary First Quarter 2010 Financial Results."  In the press release, the Company disclosed the continuing fallout from its immigration violations:

American Apparel reported net sales for the first quarter ended March 31, 2010 of $121.8 million, a 6.6% increase over net sales of $114.3 million for the first quarter ended March 31, 2009.  Total retail net sales increased 1.5% to $79.1 million for the first quarter of 2010 as compared to $78.0 million for the same period in 2009, with comparable store sales for stores open at least 12 months declining 10% on a constant currency basis.  American Apparel ended the quarter with 280 retail stores, having closed two retail stores and opened one during the first quarter of 2010, as compared to 264 retail stores at the end of the first quarter of 2009.  Total wholesale net sales increased 21.6% to $34.2 million for the first quarter of 2010 compared to $28.1 million for the first quarter of 2009, largely due to an increase in sales to distributor customers.  Online consumer sales increased 3.6% to $8.4 million for the first quarter of 2010 compared to $8.2 million for the first quarter of 2009.

Gross margin for the first quarter of 2010 was 50.4% as compared to 57.2% for the prior year first quarter.  Gross margin was negatively impacted by a shift in mix from retail to wholesale net sales, which generate lower margins, *and by reduced labor efficiency at the company's production facilities in the first quarter of 2010 compared to the prior year period.  The reduction in labor efficiency was a result of the dismissal of over 1,500 experienced manufacturing employees in the third and fourth quarters of 2009 following the completion of an I-9 inspection by U.S. Immigration and Customs Enforcement,* as well as the impact of an increase in the mix of more complex retail styles

produced.  The unfavorable decline in gross margin was partially offset by the effect of the depreciation of the U.S. dollar versus foreign currencies in the first quarter of 2010 as compared to the first quarter of 2009.

\*     \*     \*

*For the first quarter of 2010, the impact of lower manufacturing efficiency is estimated to have reduced operating income by approximately $4.4 million.  The company currently expects that the reduced manufacturing efficiency at the company's production facilities beginning during the fourth quarter of 2009 could likely continue through the end of 2010, and could impact the company's financial results at least through early 2011.  The company experienced an improvement in production efficiency in the first quarter of 2010 versus the fourth quarter of 2009, but anticipates a temporary worsening in efficiency during the second quarter of 2010 as additional manufacturing workers will need to be hired and trained to meet a seasonal increased demand for the company's products.  The duration and ultimate financial impact of the inefficiencies is difficult to estimate, and the financial impact in future quarters could differ significantly from the level experienced during the first quarter of 2010.*

76.   Also on May 19, 2010, the Company held a conference call with analysts in which defendants Kowalewski and Charney participated.  During the conference call, defendants partially revealed the truth regarding the Company's financial condition:

[Kowalewski:] Our gross margins continue to face pressure due to lower production efficiency probably associated with the dismissal of 1,500 manufacturing employees following the I-9 inspection by US

Immigration and Customs Enforcement in 2009. Dov, along with Marty Bailey our President of Manufacturing and Chief Manufacturing Officer, continue to work to train our new employees and increase efficiency and lead us back to our historical gross margin.

While improvements in our production efficiency were experienced in the first quarter, we believe it will take at least several quarters to return to prior levels of efficiency and the impact on our reported gross margins may continue into the early part of 2011 as we continue to sell-through goods that have this higher cost of labor associated with them.

\*       \*       \*

Turning to gross profit, for the first quarter gross margin decreased 680 basis points to 50.4% of net sales compared to 57.2% in the first quarter of 2009. Despite favorable currency shifts on a year-over-year basis, particularly with respect to the Canadian dollar, our gross margin was negatively impacted by a shift in mix from retail to wholesale net sales and by *reduced labor efficiency at our production facilities. Our estimate of the P&L impact [of] abnormal labor variances for the first quarter of 2010 was approximately $4.4 million.*

77.    Following these announcements, which partially revealed the truth regarding the Company's financial condition, on May 19, 2010, the Company's stock price dropped $1.11 per share to close at $1.63 per share, on trading of over 2.8 million shares.

78.    On July 28, 2010, the Company filed a Form 8-K with the SEC. The Form 8-K announced that Deloitte and Touche, LLP, the Company's independent registered public accountant, had resigned effective July 22, 2010. The Form 8-K further stated that "Deloitte advised the Company that certain information has come to Deloitte's attention, that if further investigated may materially impact the reliability of

1    either its previously issued audit report or the underlying consolidated financial
2    statements for the year ended December 31, 2009 included in the Company's 2009
3    Form 10-K."

4    　　　　79.　　On August 17, 2010, the Company issued a press release entitled
5    "American Apparel Reports Preliminary Second Quarter 2010 Financial Results."
6    The press release reported that the Company expected to report a loss of $5 million to
7    $7 million in the second quarter of 2010 on net sales of $132 million to $143 million.
8    A significant factor in such losses was "lower labor efficiency at the Company's
9    production facilities in the second quarter of 2010 compared to the prior year period.
10   The lower labor efficiency was primarily a result of the hiring of over 1,600 net new
11   manufacturing workers during the second quarter of 2010."　　The press release
12   continued:

13   　　　　　Gross margin for the second quarter of 2010 is expected to be in
14   　　　　the range of 50% to 52%, as compared to 59.0% for the prior year
15   　　　　second quarter. Gross margin was negatively impacted by a shift in mix
16   　　　　from retail to wholesale net sales, which generate lower margins, and by
17   　　　　*lower labor efficiency at the Company's production facilities in the*
18   　　　　*second quarter of 2010 compared to the prior year period. The lower*
19   　　　　*labor efficiency was primarily a result of the hiring of over 1,600 net*
20   　　　　*new manufacturing workers during the second quarter of 2010*, as well
21   　　　　as the impact of an increase in the mix of more complex retail styles
22   　　　　produced.

23   　　　　　Loss from operations for the second quarter of 2010 is expected to
24   　　　　be in the range of $5 million to $7 million, as compared to income from
25   　　　　operations of $7.3 million in the second quarter of 2009.

26   　　　　80.　　The August 17, 2010, press release also stated that as results of the
27   Company's poor performance, its very existence was now in doubt:

28

1    The Company expects to report a substantial loss from operations
2    and negative cash flows from operating activities for the six months
3    ended June 30, 2010. Based on this, and trends occurring in the
4    Company's business after the second quarter and projected for the
5    remainder of 2010, *the Company may not have sufficient liquidity*
6    *necessary to sustain operations for the next twelve months*.   The
7    Company's current operating plan indicates that losses from operations
8    are expected to continue through at least the third quarter of 2010. These
9    factors, among others, *raise substantial doubt that the Company will be*
10   *able to continue as a going concern*.

11   81.    By August 18, 2010, as this news was digested by the market, American
12   Apparel's stock price declined rapidly, from a close of $1.39 per share on August 16,
13   2010, to a close of just $0.81 per share on August 18, 2010 – a decline of over 41%

14   **DEFENDANTS' FALSE STATEMENTS**
     **WERE MADE WITH SCIENTER**
15

16   82.    Defendants' statements set forth above were materially false and
     misleading   because   defendants   failed   to   disclose,   and   made   material
17
     misrepresentations regarding, their practice of hiring employees who defendants
18
     knew, or were deliberately reckless in not knowing, were not eligible to work in the
19
     United States.
20
21   83.    When this practice was brought to light and the Company was forced to
     fire over 1,500 workers, or a third of its Los Angeles workforce, the true financial
22
     condition of the Company became known and investors lost tens of millions of dollars
23
     as the impact of such practices became apparent.
24
25   84.    During the Class Period, the defendants had both the motive and
     opportunity to conduct fraud.  They also had actual knowledge of the misleading
26
     nature of the statements made, or acted in reckless disregard of the true information
27
     known to them at the time.  In so doing, the defendants participated in a scheme to
28

1  defraud and committed acts, practices and participated in a course of business that

2  operated as a fraud or deceit on purchasers of American Apparel common stock

3  during the Class Period.

## LOSS CAUSATION/ECONOMIC LOSS

5       85.    During the Class Period, as detailed herein, defendants made false and

6  misleading statements and engaged in a scheme to deceive the market.   This

7  artificially inflated American Apparel's stock price and operated as a fraud or deceit

8  on the Class.   Later, when defendants' prior misrepresentations and fraudulent

9  conduct began to be revealed to the market, American Apparel's stock price fell

10  precipitously, as the prior artificial inflation came out of the stock price over time.  As

11  a result of their purchases of American Apparel common stock during the Class

12  Period, plaintiff and other members of the Class suffered economic loss, *i.e.*, damages,

13  under the federal securities laws.

## APPLICABILITY OF PRESUMPTION OF RELIANCE:
## FRAUD ON THE MARKET

16       86.    Plaintiff will rely upon the presumption of reliance established by the

fraud-on-the-market doctrine in that, among other things:

18       (a)    Defendants made public misrepresentations or failed to disclose

material facts during the Class Period;

20       (b)    The omissions and misrepresentations were material;

21       (c)    The Company's stock traded in an efficient market;

22       (d)    The misrepresentations alleged would tend to induce a reasonable

investor to misjudge the value of the Company's stock; and

24       (e)    Plaintiff and other members of the Class purchased American

Apparel common stock between the time defendants misrepresented or failed to

disclose material facts and the time the true facts were disclosed without knowledge of

the misrepresented or omitted facts.

- 44 -

87.     At all relevant times, the market for American Apparel common stock was efficient for the following reasons, among others:

(a)     As a regulated issuer, American Apparel filed periodic public reports with the SEC; and

(b)     American Apparel regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the major news wire services and through other wide-ranging public disclosures, such as communications with the financial press, securities analysts and other similar reporting services.

## CLASS ACTION ALLEGATIONS

88.     Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons who purchased American Apparel common stock during the Class Period (the "Class").  Excluded from the Class are defendants and members of their families, directors and officers of American Apparel and their families and affiliates.

89.     The members of the Class are so numerous that joinder of all members is impracticable.  The disposition of their claims in a class action will provide substantial benefits to the parties and the Court.  American Apparel had more than 71 million shares of stock outstanding, owned by thousands of persons.

90.     There is a well-defined community of interest in the questions of law and fact involved in this case.  Questions of law and fact common to the members of the Class, which predominate over questions which may affect individual Class members, include:

(a)     Whether the 1934 Act was violated by defendants;

(b)     Whether defendants omitted and/or misrepresented material facts;

(c)     Whether defendants' statements omitted material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading;

(d)     Whether defendants knew or recklessly disregarded that their statements were false and misleading;

(e)     Whether the price of American Apparel common stock was artificially inflated; and

(f)     The extent of damage sustained by Class members and the appropriate measure of damages.

91.    Plaintiff's claims are typical of those of the Class because plaintiff and the Class sustained damages from defendants' wrongful conduct.

92.    Plaintiff will adequately protect the interests of the Class and has retained counsel who are experienced in class action securities litigation.  Plaintiff has no interests which conflict with those of the Class.

93.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## NO SAFE HARBOR

94.    American Apparel's verbal "Safe Harbor" warnings accompanying its oral forward-looking statements ("FLS") issued during the Class Period were ineffective to shield those statements from liability.

95.    The defendants are also liable for any false or misleading FLS pleaded because, at the time each FLS was made, the speaker knew the FLS was false or misleading and the FLS was authorized and/or approved by an executive officer of American Apparel who knew that the FLS was false.  None of the historic or present tense statements made by defendants were assumptions underlying or relating to any plan, projection or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made, nor were any of the projections or forecasts made by defendants expressly related to or stated to be dependent on those historic or present tense statements when made.

# COUNT I

### For Violations of Section 10(b) of the 1934 Act
### and Rule 10b-5 Against All Defendants

96.    Plaintiff incorporates ¶¶1-95 by reference.

97.    During the Class Period, defendants disseminated or approved the false statements specified above, which they knew or recklessly disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

98.    Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they:

(a)    Employed devices, schemes, and artifices to defraud;

(b)    Made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(c)    Engaged in acts, practices, and a course of business that operated as a fraud or deceit upon plaintiff and others similarly situated in connection with their purchases of American Apparel common stock during the Class Period.

99.    Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for American Apparel common stock.  Plaintiff and the Class would not have purchased American Apparel common stock at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by defendants' misleading statements.

100.   As a direct and proximate result of these defendants' wrongful conduct, plaintiff and the other members of the Class suffered damages in connection with their purchases of American Apparel common stock during the Class Period.

# COUNT II

### For Violation of Section 20(a) of the 1934 Act
### Against All Defendants

101.   Plaintiff incorporates ¶¶1-100 by reference.

- 47 -

102.   The Individual Defendants acted as controlling persons of American Apparel within the meaning of §20 of the 1934 Act.  By virtue of their positions and their power to control public statements about American Apparel, the Individual Defendants had the power and ability to control the actions of American Apparel and its employees.  American Apparel controlled the Individual Defendants and its other officers and employees.  By reason of such conduct, defendants are liable pursuant to §20(a) of the 1934 Act.

## COUNT III

### For Violation of Section 14(a) of the 1934 Act
### Against All Defendants

103.   Plaintiff incorporates ¶¶1-102 by reference.

104.   Rule 14a-9, promulgated pursuant to §14(a) of the 1934 Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading."  17 C.F.R. §240.14a-9.

105.   American Apparel and Endeavor's proxy statements alleged herein violated §14(a) and Rule 14a-9 because they omitted material facts, including the fact that American Apparel routinely hired employees who were not authorized to work in the United States, a fact which defendants were aware of and participated in.

106.   In the exercise of reasonable care, defendants should have known that American Apparel and Endeavor's proxy statements were materially false and misleading.

107.   The misrepresentations and omissions in the proxy statements were material to plaintiff and American Apparel's shareholders and to their voting on each proxy statement.  The proxy statements were an essential link in the accomplishment of defendants' continued practice of knowingly hiring workers who were not authorized to work in the United States.

- 48 -

1   108. As senior executives and Board members, the Individual Defendants had

2 duties with respect to the Company's compliance with United States immigration law.

3   109. As a result, defendants are liable for the damages that have been

4 sustained by plaintiff and the Class.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff prays for judgment as follows:

A. Declaring this action to be a proper class action pursuant to Fed. R. Civ.

P. 23;

B. Awarding plaintiff and the members of the Class damages and interest;

C. Awarding plaintiff's reasonable costs, including attorneys' fees; and

D. Awarding such equitable/injunctive or other relief as the Court may deem

just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

DATED:  August 25, 2010    ROBBINS GELLER RUDMAN
                  & DOWD LLP
               DARREN J. ROBBINS
               DAVID C. WALTON
               BRIAN O. O'MARA

                      DAVID C. WALTON

               655 West Broadway, Suite 1900
               San Diego, CA  92101
               Telephone:  619/231-1058
               619/231-7423 (fax)

               ROBBINS GELLER RUDMAN
                  & DOWD LLP
               CHRISTOPHER M. WOOD
               Post Montgomery Center
               One Montgomery Street, Suite 1800
               San Francisco, CA  94104
               Telephone:  415/288-4545
               415/288-4534 (fax)

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

ABRAHAM, FRUCHTER
  & TWERSKY, LLP
JACK G. FRUCHTER
MITCHELL M.Z. TWERSKY
ARTHUR J. CHEN
One Pennsylvania Plaza, Suite 2805
New York, NY  10119
Telephone:  212/279-5050
212/279-3655 (fax)

Attorneys for Plaintiff

S:\CptDraft\Securities\CPT American Apparel.doc

CERTIFICATION OF ANTHONY ANDRADE
IN SUPPORT OF CLASS ACTION COMPLAINT

Anthony Andrade ("plaintiff") declares, as to the claims asserted under the federal securities laws, that:

1.     Plaintiff has reviewed the complaint prepared by counsel in the above-captioned case and has authorized its filing.

2.     Plaintiff did not purchase the security that is the subject of the complaint at the direction of plaintiff's counsel or in order to participate in any private action arising under the federal securities laws.

3.     Plaintiff is willing to serve as a representative party on behalf of a class, including providing testimony at deposition and trial, if necessary.

4.     During the proposed Class Period, plaintiff executed the following transactions in the securities of American Apparel, Inc.  See Attachment A.

5.     In the past three years, plaintiff has not served, nor sought to serve, as a representative party on behalf of a class in an action filed under the federal securities laws.

6.     Plaintiff will not accept payment for serving as a representative party on behalf of a class beyond plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the Class as ordered or approved by the Court.

I declare under penalty of perjury that the foregoing is true and correct.  Executed this ___ day of August, 2010.

_____
Anthony Andrade

## Attachment A

| Date | Action<br>(purchase or sale) | Number of Shares | Price per Share |
|------|------------------------------|------------------|-----------------|
| 08/14/2009 | Purchase | 1,000 | $3.99 |
| 09/02/2009 | Purchase | 500 | $3.5465 |
| 10/05/2009 | Purchase | 500 | $3.1795 |
| 11/03/2009 | Purchase | 250 | $2.69 |
| 11/10/2009 | Purchase | 250 | $2.50 |
| 01/27/2010 | Purchase | 200 | $2.8084 |
| 03/19/2010 | Purchase | 500 | $3.27 |
| 03/26/2010 | Purchase | 100 | $3.1083 |
| 03/26/2010 | Purchase | 200 | $3.0997 |

Name & Address:

### UNITED STATES DISTRICT COURT
### CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| ANTHONY ANDRADE, Individually and on Behalf of All Others Similarly Situated<br><br>PLAINTIFF(S)<br><br>v.<br><br>AMERICAN APPAREL, INC., DOV CHARNEY, ADRIAN KOWALEWSKI, MARTIN BAILEY and JOYCE E. CRUCILLO<br><br>DEFENDANT(S). | CASE NUMBER<br><br>CV10  6352■ MMM (RCx)<br><br><br><br>SUMMONS |

TO:     DEFENDANT(S): _____

_____

A lawsuit has been filed against you.

Within __21__ days after service of this summons on you (not counting the day you received it), you must serve on the plaintiff an answer to the attached ☑ complaint ☐ _____ amended complaint ☐ counterclaim ☐ cross-claim or a motion under Rule 12 of the Federal Rules of Civil Procedure.  The answer or motion must be served on the plaintiff's attorney, David C. Walton _____, whose address is Robbins Geller, et al., 655 West Broadway, Suite 1900, San Diego, CA  92101 _____.  If you fail to do so, judgment by default will be entered against you for the relief demanded in the complaint.  You also must file your answer or motion with the court.

Clerk, U.S. District Court

Dated: ___AUG 2 5 2010___

By: _____

Deputy

(Seal of the Court)

*[Use 60 days if the defendant is the United States or a United States agency, or is an officer or employee of the United States. Allowed 60 days by Rule 12(a)(3)].*

## UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA
### CIVIL COVER SHEET

| I (a) PLAINTIFFS (Check box if you are representing yourself ☐) | DEFENDANTS |
|---|---|
| ANTHONY ANDRADE, Individually and on Behalf of All Others Similarly Situated | AMERICAN APPAREL, INC., DOV CHARNEY, ADRIAN KOWALEWSKI, MARTIN BAILEY and JOYCE E. CRUCILLO |

| (b) Attorneys (Firm Name, Address and Telephone Number. If you are representing yourself, provide same.) | Attorneys (If Known) |
|---|---|
| David C. Walton (167268)<br>Robbins Geller Rudman & Dowd LLP<br>655 West Broadway, Suite 1900, San Diego, CA 92101   619.231.1058 | |

**II. BASIS OF JURISDICTION** (Place an X in one box only.)

☐ 1 U.S. Government Plaintiff   ☒ 3 Federal Question (U.S. Government Not a Party)

☐ 2 U.S. Government Defendant   ☐ 4 Diversity (Indicate Citizenship of Parties in Item III)

**III. CITIZENSHIP OF PRINCIPAL PARTIES** - For Diversity Cases Only (Place an X in one box for plaintiff and one for defendant.)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business in this State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. ORIGIN** (Place an X in one box only.)

☒ 1 Original Proceeding   ☐ 2 Removed from State Court   ☐ 3 Remanded from Appellate Court   ☐ 4 Reinstated or Reopened   ☐ 5 Transferred from another district (specify):   ☐ 6 Multi-District Litigation   ☐ 7 Appeal to District Judge from Magistrate Judge

**V. REQUESTED IN COMPLAINT:   JURY DEMAND:** ☒ Yes  ☐ No (Check 'Yes' only if demanded in complaint.)

**CLASS ACTION under F.R.C.P. 23:** ☒ Yes  ☐ No          ☐ MONEY DEMANDED IN COMPLAINT: $_____

**VI. CAUSE OF ACTION** (Cite the U.S. Civil Statute under which you are filing and write a brief statement of cause. Do not cite jurisdictional statutes unless diversity.)

Complaint for Violation of the Federal Securities Laws  15 U.S.C. §§78j(b), 78n(a) and 78t(a)

**VII. NATURE OF SUIT** (Place an X in one box only.)

| OTHER STATUTES | CONTRACT | TORTS PERSONAL INJURY | TORTS PERSONAL PROPERTY | PRISONER PETITIONS | LABOR |
|---|---|---|---|---|---|
| ☐ 400 State Reapportionment | ☐ 110 Insurance | ☐ 310 Airplane | ☐ 370 Other Fraud | ☐ 510 Motions to Vacate Sentence Habeas Corpus | ☐ 710 Fair Labor Standards Act |
| ☐ 410 Antitrust | ☐ 120 Marine | ☐ 315 Airplane Product Liability | ☐ 371 Truth in Lending | | ☐ 720 Labor/Mgmt. Relations |
| ☐ 430 Banks and Banking | ☐ 130 Miller Act | ☐ 320 Assault, Libel & Slander | ☐ 380 Other Personal Property Damage | ☐ 530 General | ☐ 730 Labor/Mgmt. Reporting & Disclosure Act |
| ☐ 450 Commerce/ICC Rates/etc. | ☐ 140 Negotiable Instrument | ☐ 330 Fed. Employers' Liability | ☐ 385 Property Damage Product Liability | ☐ 535 Death Penalty | |
| ☐ 460 Deportation | ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 340 Marine | BANKRUPTCY | ☐ 540 Mandamus/ Other | ☐ 740 Railway Labor Act |
| ☐ 470 Racketeer Influenced and Corrupt Organizations | | ☐ 345 Marine Product Liability | ☐ 422 Appeal 28 USC 158 | ☐ 550 Civil Rights | ☐ 790 Other Labor Litigation |
| ☐ 480 Consumer Credit | ☐ 151 Medicare Act | ☐ 350 Motor Vehicle | ☐ 423 Withdrawal 28 USC 157 | ☐ 555 Prison Condition | ☐ 791 Empl. Ret. Inc. Security Act |
| ☐ 490 Cable/Sat TV | ☐ 152 Recovery of Defaulted Student Loan (Excl. Veterans) | ☐ 355 Motor Vehicle Product Liability | CIVIL RIGHTS | FORFEITURE / PENALTY | PROPERTY RIGHTS |
| ☐ 810 Selective Service | | ☐ 360 Other Personal Injury | ☐ 441 Voting | ☐ 610 Agriculture | ☐ 820 Copyrights |
| ☐ 850 Securities/Commodities/ Exchange | ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 362 Personal Injury-Med Malpractice | ☐ 442 Employment | ☐ 620 Other Food & Drug | ☐ 830 Patent |
| ☐ 875 Customer Challenge 12 USC 3410 | ☐ 160 Stockholders' Suits | ☐ 365 Personal Injury-Product Liability | ☐ 443 Housing/Acco-mmodations | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 840 Trademark |
| ☐ 890 Other Statutory Actions | ☐ 190 Other Contract | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 444 Welfare | | SOCIAL SECURITY |
| ☐ 891 Agricultural Act | ☐ 195 Contract Product Liability | | ☐ 445 American with Disabilities - Employment | ☐ 630 Liquor Laws | ☐ 861 HIA (1395ff) |
| ☐ 892 Economic Stabilization Act | ☐ 196 Franchise | REAL PROPERTY | ☐ 446 American with Disabilities - Other | ☐ 640 R.R. & Truck | ☐ 862 Black Lung (923) |
| ☐ 893 Environmental Matters | REAL PROPERTY | ☐ 210 Land Condemnation | IMMIGRATION | ☐ 650 Airline Regs | ☐ 863 DIWC/DIWW (405(g)) |
| ☐ 894 Energy Allocation Act | ☐ 210 Land Condemnation | ☐ 220 Foreclosure | ☐ 462 Naturalization Application | ☐ 660 Occupational Safety /Health | ☐ 864 SSID Title XVI |
| ☐ 895 Freedom of Info. Act | ☐ 220 Foreclosure | ☐ 230 Rent Lease & Ejectment | ☐ 463 Habeas Corpus-Alien Detainee | ☐ 690 Other | ☐ 865 RSI (405(g)) |
| ☐ 900 Appeal of Fee Determi-nation Under Equal Access to Justice | ☐ 230 Rent Lease & Ejectment | ☐ 240 Torts to Land | ☐ 465 Other Immigration Actions | | FEDERAL TAX SUITS |
| ☐ 950 Constitutionality of State Statutes | ☐ 240 Torts to Land | ☐ 245 Tort Product Liability | ☐ 440 Other Civil Rights | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) |
| | ☐ 245 Tort Product Liability | ☐ 290 All Other Real Property | | | ☐ 871 IRS-Third Party 26 USC 7609 |
| | ☐ 290 All Other Real Property | | | | |

## CV10 6352

FOR OFFICE USE ONLY:   Case Number: _____

**AFTER COMPLETING THE FRONT SIDE OF FORM CV-71, COMPLETE THE INFORMATION REQUESTED BELOW.**

CV-71 (05/08)                    CIVIL COVER SHEET                    Page 1 of 2

**UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA**
CIVIL COVER SHEET

**VIII(a).  IDENTICAL CASES:** Has this action been previously filed in this court and dismissed, remanded or closed? ☑ No   ☐ Yes
If yes, list case number(s): _____

**VIII(b).  RELATED CASES:** Have any cases been previously filed in this court that are related to the present case? ☑ No   ☐ Yes
If yes, list case number(s): _____

**Civil cases are deemed related if a previously filed case and the present case:**
(Check all boxes that apply)   ☐ A.  Arise from the same or closely related transactions, happenings, or events; or
                               ☐ B.  Call for determination of the same or substantially related or similar questions of law and fact; or
                               ☐ C.  For other reasons would entail substantial duplication of labor if heard by different judges; or
                               ☐ D.  Involve the same patent, trademark or copyright, _and_ one of the factors identified above in a, b or c also is present.

**IX. VENUE:**  (When completing the following information, use an additional sheet if necessary.)

(a)   List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which EACH named plaintiff resides.
☐    Check here if the government, its agencies or employees is a named plaintiff.  If this box is checked, go to item (b).

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| Los Angeles County | |

(b)   List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which EACH named defendant resides.
☐    Check here if the government, its agencies or employees is a named defendant.  If this box is checked, go to item (c).

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| Los Angeles County | |

(c)   List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which EACH claim arose.
     **Note: In land condemnation cases, use the location of the tract of land involved.**

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| Los Angeles County | |

**\* Los Angeles, Orange, San Bernardino, Riverside, Ventura, Santa Barbara, or San Luis Obispo Counties**
Note: In land condemnation cases, use the location of the tract of land involved

X. SIGNATURE OF ATTORNEY (OR PRO PER): _~~signature~~_   Date August 25, 2010

**Notice to Counsel/Parties:**  The CV-71 (JS-44) Civil Cover Sheet and the information contained herein neither replace nor supplement the filing and service of pleadings
or other papers as required by law.  This form, approved by the Judicial Conference of the United States in September 1974, is required pursuant to Local Rule 3-1 is not filed
but is used by the Clerk of the Court for the purpose of statistics, venue and initiating the civil docket sheet.  (For more detailed instructions, see separate instructions sheet.)

Key to Statistical codes relating to Social Security Cases:

| Nature of Suit Code | Abbreviation | Substantive Statement of Cause of Action |
|---|---|---|
| 861 | HIA | All claims for health insurance benefits (Medicare) under Title 18, Part A, of the Social Security Act, as amended. Also, include claims by hospitals, skilled nursing facilities, etc., for certification as providers of services under the program. (42 U.S.C. 1935FF(b)) |
| 862 | BL | All claims for "Black Lung" benefits under Title 4, Part B, of the Federal Coal Mine Health and Safety Act of 1969. (30 U.S.C. 923) |
| 863 | DIWC | All claims filed by insured workers for disability insurance benefits under Title 2 of the Social Security Act, as amended; plus all claims filed for child's insurance benefits based on disability.  (42 U.S.C. 405(g)) |
| 863 | DIWW | All claims for widows or widowers insurance benefits based on disability under Title 2 of the Social Security Act, as amended.  (42 U.S.C. 405(g)) |
| 864 | SSID | All claims for supplemental security income payments based upon disability filed under Title 16 of the Social Security Act, as amended. |
| 865 | RSI | All claims for retirement (old age) and survivors benefits under Title 2 of the Social Security Act, as amended.  (42 U.S.C. (g)) |

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

### NOTICE OF ASSIGNMENT TO UNITED STATES MAGISTRATE JUDGE FOR DISCOVERY

This case has been assigned to District Judge Margaret M. Morrow and the assigned discovery Magistrate Judge is Rosalyn M. Chapman.

The case number on all documents filed with the Court should read as follows:

**CV10- 6352 MMM (RCx)**

Pursuant to General Order 05-07 of the United States District Court for the Central District of California, the Magistrate Judge has been designated to hear discovery related motions.

All discovery related motions should be noticed on the calendar of the Magistrate Judge

===========================================================

**NOTICE TO COUNSEL**

*A copy of this notice must be served with the summons and complaint on all defendants (if a removal action is filed, a copy of this notice must be served on all plaintiffs).*

Subsequent documents must be filed at the following location:

| | | |
|---|---|---|
| [X] **Western Division**<br>312 N. Spring St., Rm. G-8<br>Los Angeles, CA 90012 | [ ] **Southern Division**<br>411 West Fourth St., Rm. 1-053<br>Santa Ana, CA 92701-4516 | [ ] **Eastern Division**<br>3470 Twelfth St., Rm. 134<br>Riverside, CA 92501 |

Failure to file at the proper location will result in your documents being returned to you.