1  SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
   HARRIET S. POSNER (Bar No. 116097)
2  harriet.posner@skadden.com
   PETER B. MORRISON (Bar No. 230148)
3  peter.morrison@skadden.com
   GILA D. JONES (Bar No. 248213)
4  gila.jones@skadden.com
   300 South Grand Avenue
5  Los Angeles, California 90071-3144
   Telephone:  (213) 687-5000
6  Facsimile:   (213) 687-5600

7  Attorneys for Defendant
   American Apparel, Inc.

8
                    UNITED STATES DISTRICT COURT
9
                  CENTRAL DISTRICT OF CALIFORNIA
10

11

12 | IN RE AMERICAN APPAREL, INC.        ) Case No. CV-10-6352 MMM (RCx)
   | SHAREHOLDER LITIGATION              )
13 |                                     ) (1)  DEFENDANT AMERICAN
   |                                     ) APPAREL, INC.'S NOTICE OF MOTION
   | _____ ) AND MOTION TO DISMISS
14 |                                     ) CONSOLIDATED CLASS ACTION
   | This Document Relates To:           ) COMPLAINT;
15 |                                     )
   | ALL ACTIONS                         ) (2)  MEMORANDUM OF POINTS AND
16 |                                     ) AUTHORITIES;
   |                                     )
17 |                                     ) (3)  [PROPOSED] ORDER GRANTING
   |                                     ) MOTION TO DISMISS (separate cover);
18 |                                     )
   |                                     ) (4)  REQUEST FOR JUDICIAL NOTICE
19 |                                     ) (separate cover);
   |                                     )
20 |                                     ) (5)  DECLARATION OF GILA D. JONES
   |                                     ) (separate cover); and
21 |                                     )
   |                                     ) (6)  [PROPOSED] ORDER GRANTING
22 |                                     ) REQUEST FOR JUDICIAL NOTICE
   |                                     ) (separate cover).
23 |                                     )
   |                                     ) Date:  September 12, 2011
24 |                                     ) Time:  10:00 a.m.
   |                                     ) Courtroom:  780
25 |                                     )
   |                                     ) Hon. Margaret M. Morrow
26 |                                     ) Complaint Filed:  April 29, 2011
   |                                     ) Trial Date:  TBD
27 | _____ )

28

─────────────────────────────────────────────────────────
                    MOTION TO DISMISS CAC

**TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:**

**PLEASE TAKE NOTICE** that on September 12, 2011, at 10:00 a.m., or as soon thereafter as the matter may be heard, in Courtroom 780 of the above-referenced court, before the Honorable Margaret M. Morrow, Defendant American Apparel, Inc. will, and hereby does move this Court, pursuant to Federal Rule of Civil Procedure 12(b)(6), for an order dismissing the Consolidated Class Action Complaint filed in the above-captioned action.   This Motion is made following the conference of counsel pursuant to L.R. 7-3, which took place on May 23, 2011.

The Motion will be based on this Notice, the Memorandum of Points and Authorities attached hereto, Request for Judicial Notice, Declaration of Gila D. Jones, all of the pleadings, records and files in this action, all matters of which this Court may take judicial notice, and such other documents and argument as may be presented on or prior to the date set for decision.

DATED:  May 31, 2011          SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP


                              By: _____
                                         s/Harriet S. Posner
                                         Harriet S. Posner
                                       Attorneys for Defendant
                                       American Apparel, Inc.

i

MOTION TO DISMISS CAC

# TABLE OF CONTENTS

**Page(s)**

I.  PRELIMINARY STATEMENT ...................................................................1

II.  FACTUAL BACKGROUND ...................................................................3

  A.  Defendant American Apparel, Inc. ...............................................3

  B.  Immigration and Customs Enforcement Investigation ..................3

  C.  History Of Internal Control Over Financial Reporting ................7

III.  ARGUMENT ........................................................................................8

  A.  The CAC Must Meet The PSLRA's Heightened Pleading
      Requirements ..............................................................................8

  B.  Plaintiff Fails To Plead Actionable False Or Misleading
      Statements ..................................................................................9

    1.  Plaintiff Fails To Allege That Disclosures Regarding Labor
        Issues Were Materially False Or Misleading.............................9

      (a)  The Company Disclosed The ICE Investigation And
           Its Potential Impact ........................................................9

      (b)  The PSLRA's Safe Harbor Protects The Company's
           Forward-Looking Statements Concerning The
           Impact Of The ICE Investigation ...................................11

      (c)  Plaintiff Fails To Plead A False Statement
           Concerning The Company's Compliance With
           Immigration Laws .........................................................13

    2.  Plaintiff Fails To Plead That Internal Controls Disclosures
        Were Misleading.................................................................15

  C.  Plaintiff Fails To Plead Facts Creating A Strong Inference of
      Scienter .....................................................................................16

    1.  Allegations Regarding Immigration Law Compliance And
        The ICE Investigation Do Not Establish Scienter.....................17

    2.  Plaintiff's Allegations Regarding Internal Controls Do Not
        Plead Scienter ....................................................................22

    3.  Plaintiff's Failure To Identify Motive For Fraud
        Undermines Scienter ...........................................................24

IV.  CONCLUSION .....................................................................................25

MOTION TO DISMISS CAC

1

# TABLE OF AUTHORITIES

2

## CASES

3

<u>**Page(s)**</u>

4

In re Acterna Corp. Securities Litigation,
    378 F. Supp. 2d 561 (D. Md. 2005)................................................24

5

In re Allergan Inc. Securities Litigation,
6
    No. SACV 89-643ASH (RWR),
    1993 WL 623321 (C.D. Cal. Nov. 29, 1993)........................................25

7

In re Autodesk, Inc. Securities Litigation,
8
    132 F. Supp. 2d 833 (N.D. Cal. 2000) ................................................21

9

Basic, Inc. v. Levinson,
    485 U.S. 224 (1988)................................................11

10

Brashears v. 1717 Capital Management, Nationwide Mutual Insurance Co.,
11
    No Civ.A. 02-1534-KAJ,
    2004 WL 1196896 (D. Del. May 21, 2004)........................................24

12

Brodsky v. Yahoo! Inc.,
13
    630 F. Supp. 2d 1104 (N.D. Cal. 2009) ................................................14

14

California Public Employees' Retirement System v. Chubb Corp.,
    394 F.3d 126 (3d Cir. 2004)................................................20

15

In re Cutera Securities Litigation,
16
    610 F.3d 1103 (9th Cir. 2010)................................................12, 13

17

DSAM Global Value Fun v. Altris Software, Inc.,
    288 F.3d 385 (9th Cir. 2002)................................................23, 24

18

In re Downey Securities Litigation,
19
    No. CV 08-3261-JFW (RZx),
    2009 U.S. Dist. LEXIS 83443 (C.D. Cal. Aug. 21, 2009) .....................2, 9, 11, 15

20

Employers Teamsters Local Nos. 175 & 505 Pension Trust Fund v. Clorox Co.,
21
    353 F.3d 1125 (9th Cir. 2004)................................................16

22

Eshelman v. Orthoclear Holdings, Inc.,
    No. C 07-1429 JSW,
23
    2008 U.S. Dist. LEXIS 6826 (N. D. Cal. Jan. 18, 2008)........................2, 9

24

In re FVC.com Securities Litigation,
    136 F. Supp. 2d 1031 (N.D. Cal. 2000)................................................25

25

In re Hansen National Corp. Securities Litigation,
26
    527 F. Supp. 2d 1142 (C.D. Cal. 2007)................................................23

27

In re Hypercom Corp. Securities Litigation,
    No. CV-05-0455-PHX-NVW,
28
    2006 WL 1836181 (D. Ariz. July 5. 2006) ................................................22

iii

*In re ICN Pharmaceuticals Inc. Securities Litigation,*
    299 F. Supp. 2d 1055 (C.D. Cal. 2004) ........................................................ 2, 19

*In re Impac Mortg. Holdings, Inc. Securities Litigation,*
    554 F. Supp. 2d 1083 (C.D. Cal. 2008) .............................................. 12, 13, 16, 25

*In re InVision Technologies Inc. Securities Litigation,*
    549 F.3d 736 (9th Cir. 2008) .................................................................. 17, 18, 20

*Lipton v. Pathogenesis Corp.,*
    284 F.3d 1027 (9th Cir. 2002) ........................................................... 19, 21, 24, 25

*In re Maxim Integrated Products, Inc. Securities Litigation,*
    639 F. Supp. 2d 1038 (N.D. Cal. 2009) .......................................................... 23

*Metzler Investment GMBH v. Corinthian Colleges, Inc.,*
    540 F.3d 1049 (9th Cir. 2008) ................................................................ 14, 19, 20

*Morgan v. AXT, Inc.,*
    No. C 04-4362 MJJ,
    2005 U.S. Dist. LEXIS 42346 (N.D. Cal. Sept. 23, 2005) ..................................... 23

*In re Navarre Corp. Securities Litigation,*
    299 F.3d 735 (8th Cir. 2002) ...................................................................... 11

*In re Netflix, Inc. Securities Litigation,*
    No. C04-2978 FMS,
    2005 U.S. Dist. LEXIS 18765 (N.D. Cal. June 28, 2005) .................................... 9, 15

*In re Northpoint Communications Group, Inc. Securities Litigation,*
    184 F. Supp. 2d 991 (N.D. Cal. 2001) ..................................................... 11, 21, 22, 24

*Osher v. JNI Corp.,*
    183 Fed. App'x 604 (9th Cir. 2006) ............................................................. 9

*In re Pacific Gateway Exchange, Inc. Securities Litigation,*
    No. C-00-1211,
    2002 WL 851066 (N.D. Cal. Apr. 30, 2002) ...................................................... 25

*In re PetSmart, Inc. Securities Litigation,*
    61 F. Supp. 2d 982 (D. Ariz. 1999) .......................................................... 9, 11

*In re Rackable System, Inc. Securities Litigation,*
    No. C 09-0222 CW,
    2010 U.S. Dist. LEXIS 88927 (N.D. Cal. Aug. 27, 2010) ..................................... 15

*In re Read-Rite Corp. Securities Litigation,*
    335 F.3d 843 (9th Cir. 2003) ..................................................................... 18, 22

*Ronconi v. Larkin,*
    253 F.3d 423 (9th Cir. 2001) ...................................................................... 21

*Shurkin v. Golden State Vintners, Inc.,*
    471 F. Supp. 2d 998 (N.D. Cal. 2006) ........................................................... 11

_In re Siebel System, Inc. Securities Litigation,_
    No. C 04-0983 CRB,
    2005 WL 3555718 (N.D. Cal. Dec. 28, 2005) ...................................................20

_In re Silicon Graphics, Inc. Securities Litigation,_
    183 F.3d 970 (9th Cir. 1999) ............................................ 9, 16, 21, 24

_In re Software Toolworks, Inc. Securities Litigation,_
    50 F.3d 615 (9th Cir. 1994) ...........................................................23

_In re Stac Electrics Securities Litigation,_
    89 F.3d 1399 (9th Cir. 1996) ...........................................................9

_Tellabs, Inc. v. Makor Issues & Rights, Ltd.,_
    551 U.S. 308 (2007) .....................................................................16

_In re United States Aggregates, Inc. Securities Litigation,_
    235 F. Supp. 2d 1063 (N.D. Cal. 2002) ...........................................20

_In re Vantive Corp. Securities Litigation,_
    283 F.3d 1079 (9th Cir. 2002) .................................................._passim_

_In re Veritas Software Corp. Securities Litigation,_
    No. C-03-0283, slip op. at 9 (N.D. Cal. Dec. 10, 2003) ......................20

_Weiss v. Amkor Technologies Inc.,_
    527 F. Supp. 2d 938 (D. Ariz. 2007) .................................................9

_In re Wet Seal Securities Litigation,_
    518 F. Supp. 2d 1148 (C.D. Cal. 2007.) ....................................._passim_

_Zucco Partners, LLC v. Digimarc Corp.,_
    552 F.3d 981 (9th Cir. 2009) ...............................................17, 24, 25

**STATUTES**

15 U.S.C. § 78u-4(b)(1)(B) ...............................................................1, 11, 8

15 U.S.C. § 78u-4(b)(2)(A) ........................................................................1

17 C.F.R. § 240.10b-5(b) ...........................................................................8

v

## I.      PRELIMINARY STATEMENT

In this securities class action, Plaintiff Charles Rendelman alleges that between November 28, 2007 and August 17, 2010 (the "Class Period"), Defendant American Apparel, Inc. ("American Apparel" or the "Company") made false and misleading statements regarding (i) its compliance with the Immigration Nationality Act and the impact that an Immigration and Customs Enforcement ("ICE") I-9 audit would have on American Apparel's financial performance if the Company were required to terminate a significant part of its workforce and (ii) the adequacy of the Company's internal control over financial reporting in violation of Section 10(b) of the Securities Exchange Act of 1934.  This Court should dismiss the Consolidated Class Action Complaint ("CAC") at this stage because it violates the stringent requirements of the Private Securities Litigation Reform Act ("PSLRA") and controlling Ninth Circuit authority.  The PSLRA requires Plaintiff to plead with particularity facts demonstrating why each challenged statement is misleading and, if the allegation is based on information and belief, all facts upon which that belief is founded.  15 U.S.C. § 78u-4(b)(1)(B).  Plaintiff must also plead facts that raise a strong inference that the Company knew, or was deliberately reckless in not knowing, that the Company's disclosures were false at the time made.  15 U.S.C. § 78u-4(b)(2)(A).  Plaintiff has done neither.

The CAC is long on rhetoric and innuendo – featuring, among other things, sweeping homilies on corporate ethics, GAAP accounting principles and President Obama's immigration policies – and short on what is actually stated in the Company's public filings and other public statements.  Indeed, entirely absent from the CAC are the particularized allegations of fraud that are required to survive a motion to dismiss under the PSLRA.  Although Plaintiff repeatedly intones that American Apparel made knowingly false statements, was deliberately misleading, and/or was engaged in some sort of "immigration scheme" (see, e.g., CAC ¶¶ 10, 12, 24, 69, 110), these claims are unsupported by any facts demonstrating either the falsity of the disclosures at issue or the Company's intent to defraud.  That is because Plaintiff has taken more than artistic license setting out what American Apparel and its officers actually said to the market before, during, and after the Class Period.

With respect to both the immigration issues and those relating to internal control over financial reporting, the Company made timely and forthcoming disclosures. Starting before it became a public company and continuing throughout the Class Period, American Apparel disclosed its heavy reliance on immigrant labor and that potential disruptions in its business might result from the enforcement of federal labor laws, which is what ultimately transpired here. Similarly, the Company disclosed in great detail, from its first public filing, both the deficiencies in its internal control over financial reporting and the status of its remediation efforts. Where, as here, a company has disclosed the purportedly concealed facts, a Section 10(b) claim fails. See In re Downey Sec. Litig., No. CV 08-3261-JFW (RZx), 2009 U.S. Dist. LEXIS 83443, at *17-18 (C.D. Cal. Aug. 21, 2009) (plaintiff failed to plead actionable statements where defendant's underwriting practices and sale of stated loans were disclosed throughout class period); Eshelman v. Orthoclear Holdings, Inc., No. C 07-1429 JSW, 2008 U.S. Dist. LEXIS 6826, at *12-13 (N.D. Cal. Jan. 18, 2008) (defendant did not make misleading statement where risk expressly disclosed).

Plaintiff fares no better in his attempt to plead scienter, as there are no facts in the CAC even remotely indicating that American Apparel made the allegedly false statements with an intent to defraud. Plaintiff's bare assertions that the Company knew its statements relating to the immigration and internal control issues were not true are insufficient to raise any inference of scienter, let alone a strong inference. See In re ICN Pharm. Inc. Sec. Litig., 299 F. Supp. 2d 1055, 1065 (C.D. Cal. 2004) (dismissing complaint for failing to "provide detailed evidence of the contemporaneous decision-making behind the alleged accounting errors that would combine to show the required scienter.") (emphasis added). Indeed, the numerous and comprehensive public disclosures – which both apprised the market that the Company could not predict the effects of the ICE audit and described the outstanding internal control issues – negate, rather than support, any inference of an intent to defraud investors. See In re Wet Seal Sec. Litig., 518 F. Supp. 2d 1148, 1172 (C.D. Cal. 2007) (no scienter where "information was disclosed to the market and therefore [it is] not any more likely that Defendants' statements of optimism were designed to defraud."). In fact, the CAC fails to

2

MOTION TO DISMISS CAC

allege any cogent motive for the Company to engage in the purported fraud, which wholly undermines a finding of scienter.  The CAC should be dismissed.

## II.   FACTUAL BACKGROUND

### A.   Defendant American Apparel, Inc.

American Apparel is a vertically-integrated manufacturer, distributor, and retailer of basic apparel based in downtown Los Angeles, California.  (CAC ¶ 63.)  The Company went public on December 12, 2007, and gained brand recognition for its American-made products and the "Sweatshop Free" environment in which its garments are manufactured.  (Id. ¶¶ 6, 64.)

Marcum LLP ("Marcum") served as the Company's independent registered public accounting firm until April 2009.  On April 9, 2009, the Company announced in a Form 8-K that, effective April 3, 2009, it had engaged Deloitte & Touche ("Deloitte") to replace Marcum.  Deloitte served as the Company's auditor from April 2009 to July 22, 2010, when it resigned.  (Id. ¶¶ 34, 126.)  The Company reengaged Marcum (Id. ¶ 37, n.8), which continues to serve as the Company's auditor.  Five months after resigning, in December 2010, Deloitte withdrew its audit opinion for the Company's 2009 financial statements and stated that its prior opinion should not be relied upon.  (Id. ¶ 36.)  The Company timely disclosed this development.  (Id.)  Marcum then re-audited the Company's 2009 financial statements. (Jones Decl. Ex. 24 at 140.) Marcum's new audit report was contained in a Form 10-K/A for fiscal year ended 2009 and removed the notation that the 2009 financials were unaudited, which resulted when Deloitte pulled its opinion in December 2010.  (Id.)  Marcum's re-audit of the Company's 2009 financials did not result in a restatement of any kind.  (Id.)[1]

### B.   Immigration and Customs Enforcement Investigation

Within weeks of going public, American Apparel received a notice from ICE

---

[1]      Both Marcum and Deloitte audited the Company's financial results, including its internal control over financial reporting.  (Jones. Decl. Exs. 10 at 43-44; 20 at 112-13; 23 at 135-37.)  Contrary to Plaintiff's suggestion, Marcum was not replaced in April 2009 "after disclosing 'material weaknesses' in American Apparel's internal control over financial reporting."  (CAC ¶ 37, n.8.)  Such allegation makes little sense considering the Company fully disclosed its internal control weaknesses throughout the Class Period.  Rather, the CAC admits that the Company hired Deloitte, a "Big Four" accounting firm, simply to reassure investors "about the Company's controls and financial reporting."  (Id. ¶¶ 31, 127.)

3

1    requesting an inspection of employee I-9 forms (the "ICE Investigation").  (Jones Decl. Ex. 4
2    at 13.)  That notice and the resulting investigation culminated 18 months later (in June 2009)
3    in a second notification indicating that ICE had identified discrepancies in the documentation
4    of about 1800 employees.  (CAC ¶ 80.)  The June 2009 notice resulted in about 1500
5    experienced Company employees being dismissed in the third and fourth quarters of 2009 (Id.
6    ¶ 102), which ultimately contributed to the Company's inability to sustain its productivity and
7    meet customer demand.  (See, e.g., id. ¶¶ 97, 129.)  Notwithstanding Plaintiff's misleading
8    allegations to the contrary, from the time the Company received the first ICE notice in late
9    2007 to the time the Company realized that the dismissal of employees had contributed to a
10   decline in the Company's performance, American Apparel made timely, complete, and
11   accurate disclosures about the Company's immigrant labor pool, the ICE Investigation, the
12   dismissal of allegedly undocumented workers, and the effect such dismissals might have on
13   the Company's business.

14          Indeed, even before the Company went public, American Apparel disclosed in a
15   November 28, 2007 proxy statement that it relied on immigrant labor and that potential
16   disruptions in the business might result from enforcement of federal labor laws.  (Jones Decl.
17   Ex. 2 at 7 ("U.S. immigration laws . . . could make it harder for members of [the work force]
18   to remain or legally work in the United States . . . , which would be adverse to American
19   Apparel's manufacturing capabilities and harm American Apparel's operations and financial
20   results.").)    Similar  disclosures  were  included  in  subsequent  public  filings,  including
21   American Apparel's 2007-2010 Annual Reports.  (See, e.g., id. Exs. 10 at 36 ("We rely
22   heavily  on  immigrant  labor  [and]  .  .  .  inspections  or  investigations  by  immigration
23   authorities . . . could negatively impact the availability and cost of personnel and labor to
24   American Apparel.") (emphasis added); 20 at 104 (same).)

25          In its first filed Annual Report for FYE December 31, 2007, the Company timely
26   reported both receipt of the first ICE notice and that, in January 2008, it had provided ICE
27   with access to requested documents.  (Id. Ex. 4 at 13.)  Plaintiff suggests that by waiting "four
28   full months to disclose the I-9 notice of audit," management failed to fulfill its reporting

4

MOTION TO DISMISS CAC

obligations under Regulation S-K, Item 303. (CAC ¶ 86.) However, as Plaintiff acknowledges, Item 303 only requires the Company to include in its <u>yearly</u> and <u>quarterly</u> disclosures information to "'enable the reader to assess material changes in financial condition'" (<u>Id.</u> (citation omitted).) Here, the Company notified the market about the audit in the FYE 2007 Form 10-K – <u>the first opportunity to make such a periodic disclosure</u>:

> <u>As a result of the ICE investigation, even if no violations are found, American Apparel could experience very substantial turnover of employees on short or no notice, which could result in manufacturing and other delays</u>. American Apparel also may also [sic] have difficulty attracting or hiring new employees in a timely manner, resulting in further delays. These delays could materially adversely affect our revenues and ability to compete. If American Apparel is not able to continue to attract and retain sufficient employees, American Apparel's manufacturing capabilities, operations and financial results would be adversely affected.

(Jones Decl. Ex. 4 at 13 (emphasis added).)

On June 24, 2009, ICE issued a second notification that it was unable to verify the employment eligibility of about 200 workers and that an additional 1600 employees did not appear to be authorized to work in the United States. (CAC ¶ 80.) The notification, which the Company timely <u>disclosed to the market six days later</u>, did not indicate that ICE believed that the Company had knowingly hired unauthorized aliens and no criminal charges were (or have ever been) filed. (Jones Decl. Ex. 13 at 57.) In public statements issued shortly thereafter – in June, July and August 2009 – the Company's management attempted to estimate how the termination of a significant number of workers, if required, would impact American Apparel's financial results in the future. Based on then-prevailing business trends, the belief was that surpluses in inventory and production capacity would "mitigate" any adverse effects of a significant layoff. (<u>See</u> <u>id.</u>; 14 at 64.) Significantly, these disclosures were couched in cautionary language that no assurances could be made as to the ultimate impact of any firings. For example, in a June 30, 2009 Form 8-K, the Company reported:

> <u>At the present time, because of the uncertainty regarding how many of these employees will have their work authorization ultimately verified by ICE, the Company is not able to accurately assess what the resultant impact of the loss of employees would have on its operations</u>. However, even if the Company were to lose substantially all of the 1,800 identified employees . . . the Company does not presently believe that the loss of employees would have a materially adverse impact on its financial results . . . . <u>As the ultimate impact is difficult to predict at this time, no assurances can be given as to how, if at all, the loss of a significant number of manufacturing employees will affect its</u>

1   business and operations.

2   (Id. Ex. 13 at 57 (emphasis added).)   During an August 13, 2009 earnings call, the

3   Company's Chief Financial Officer posited:

4   When we disclosed the ICE notice on July 1st, we indicated that at the time, despite the
    fact that it was difficult to estimate what the impact would be in our results . . . . [I]f we

5   were forced to reduce our work force, the way that we would mitigate that would be by
    increasing the days per week of our employees on the selling force . . . . I think at this

6   point we don't have an update on what the financial impact would be.   I think we would
    basically just reiterate what we said at the beginning of July, which was at this point [it

7   is] difficult to estimate but we do not believe that it's material.

8   (Id. Ex. 15 at 68 (emphasis added).)   Tellingly, all such cautionary language is omitted from

9   the CAC.

10          Ultimately, as a result of the investigation, the Company announced in its November

11  10, 2009 Form 10-Q that it had terminated the employment of workers who were unable to

12  present valid eligibility documents.   (Id. Ex. 18 at 92.)   The Company also disclosed that it

13  had been fined an "immaterial" amount by ICE.   (Id.)   The CAC falsely states that the

14  Company waited six months to reveal the total number of terminated workers. (CAC ¶ 20.)

15  In fact, the number was disclosed during a November 10, 2009 earnings call (see Jones Decl.

16  Ex. 17 at 85) – the transcript of which Plaintiff cites in the CAC.  (CAC ¶ 100.)

17          On March 25, 2010, when the Company reported its preliminary results for the fourth

18  quarter of 2009, it disclosed that gross margin had been negatively affected by a "substantial

19  reduction in manufacturing efficiency at the company's production facilities in the fourth

20  quarter of 2009 compared to the prior year period."  (Id. ¶ 147.)  The Company attributed the

21  decline in efficiency to the "forced termination of over 1,500 experienced manufacturing

22  employees in the third and fourth quarters of 2009" following the ICE Investigation.  (Id.)

23  The CAC suggests that the Company knew or should have known the actual impact of the

24  terminations earlier in the Class Period.  (Id. ¶ 81.)  But as the lay-offs occurred in the third

25  and fourth quarters, the effects of the terminations could not have been known until the

26  financial results of those quarters became known.

27          In fact, the full extent of the terminations' impact was not felt until after the Company

28  finalized its results for the first quarter of 2010. On May 19, 2010, the Company reported that

1  gross margin for Q1 2010 was 50.4% as compared to 57.2% for the prior year's first quarter.

2  (Id. ¶ 150.)   Although the CAC attributes this decline singularly to the terminations,

3  according to the Company's public filings, margin was negatively impacted by:  (i) an

4  increased proportion of wholesale (versus retail) net sales (i.e., sales sold in bulk versus

5  products sold in the Company's stores and on-line), which generate lower margins, and (ii)

6  reduced labor efficiency resulting from the dismissal of manufacturing employees.  (Jones

7  Decl. Ex. 21 at 119.)   Similar results were reported for Q2 2010 on August 17, 2010 – the

8  last day of the Class Period.  (CAC ¶¶ 20, 129.)

9          **C.    History Of Internal Control Over Financial Reporting**

10         Plaintiff's suggestion that American Apparel concealed problems relating to its

11 control over financial reporting is disingenuous, at best.  Since its inception as a public

12 company, American Apparel identified and publicly disclosed material weaknesses in its

13 internal control over financial reporting in each of the Company's Form 10-Ks for fiscal

14 years ended 2007, 2008, 2009 and 2010, as well in interim quarterly reports. (See, e.g.,

15 Jones Decl. Exs. 4 at 20-22; 10 at 39-44; 18 at 93-95; 20 at 108-13; 23 at 132-37.)  For

16 example, the FYE 2007 Form 10-K states:  "Based on its review of the internal and

17 disclosure controls of the Company . . . , management has concluded that, as of

18 December 31, 2007, the Company did not maintain effective ICFR [internal control over

19 financial reporting]."  (Id. Ex. 4 at 20.)  The disclosure describes in detail each of the five

20 then-existing control deficiencies, which included:  (i) no assessment of effectiveness of

21 Company's internal controls; (ii) ineffective entity level controls and, more specifically,

22 failure to hire trained personnel to anticipate and identify risks to financial reporting; (iii) lack

23 of adequately trained accounting personnel with GAAP expertise; (iv) inadequate

24 independent review by Company personnel of reconciliations and other processes in United

25 States and foreign operations;  and (v) financial systems containing too many manual

26 processes, which might cause the Company to fail to meet regulatory filing requirements on a

27 timely and accurate basis.  (Id. at 21-22.)  Similarly, in its FYE 2008 Form 10-K, the

28 Company disclosed:

Management evaluated our ICFR as of December 31, 2008.  In making this assessment, management used the criteria established in Internal Control-Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO) . . . . As a result of this assessment and based on the criteria in the COSO framework, management has concluded that, as of December 31, 2008, our ICFR was not effective . . . .

(<u>Id.</u> Ex. 10 at 40; <u>see also</u> Ex. 20 at 108 (same).)  The Company has worked diligently to remediate its reported control weaknesses.  By the end of 2009, all but two of the weaknesses had been remediated.  (<u>Id.</u> at 108-9.)

## III.   <u>ARGUMENT</u>

### A.   <u>The CAC Must Meet The PSLRA's Heightened Pleading Requirements</u>

Section 10(b) and Rule 10b-5 make it unlawful for one to "make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading."  17 C.F.R. § 240.10b-5(b).  To state a claim under Section 10(b), plaintiff must allege that defendants (1) made a false statement or omission of material fact, (2) with scienter, (3) in connection with the purchase or sale of securities, (4) upon which the plaintiff justifiably relied, (5) that proximately caused damages.  <u>See</u> <u>In re Wet Seal</u>, 518 F. Supp. 2d at 1159.

When seeking to plead these elements, Plaintiff must comply with the stringent requirements of the PSLRA, which requires Plaintiff to "specify each statement alleged to have been misleading [and] the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed."  15 U.S.C. § 78u-4(b)(1)(B).  The PSLRA further requires Plaintiff to plead with particularity "that the defendant made false or misleading statements either intentionally or with deliberate recklessness or, if the challenged representation is a forward looking statement, with 'actual knowledge . . . that the statement was false or misleading' when made."  <u>In re Vantive Corp. Sec. Litig.</u>, 283 F.3d 1079, 1085 (9th Cir. 2002).

The PSLRA "erect[ed] [these] procedural barriers to prevent plaintiffs from asserting baseless securities fraud claims."  <u>In re Silicon Graphics, Inc. Sec. Litig.</u>, 183 F.3d 970, 977

8

1  (9th Cir. 1999).  Accordingly, the PSLRA's standard "'is not an easy standard to comply with

2  – it is not intended to be – and the plaintiffs must be held to it.'"  Weiss v. Amkor Techs. Inc.,

3  527 F. Supp. 2d 938, 944 (D. Ariz. 2007) (citation omitted); see also Osher v. JNI Corp., 183

4  Fed. App'x 604, 605 (9th Cir. 2006) (noting that the "heightened pleading requirements

5  imposed by the PSLRA are so difficult to meet.").  The CAC does not meet these stringent

6  standards, failing to plead either (i) an actionable false or misleading statement or (ii) that

7  American Apparel acted with scienter.  For both reasons, the Court should dismiss the CAC.

8  **B.  Plaintiff Fails To Plead Actionable False Or Misleading Statements**

9      The allegedly false and misleading statements concern (i) the impact of the ICE

10 Investigation on American Apparel's financial results and the Company's compliance with

11 immigration laws (CAC ¶¶ 72, 81, 82, 84), and (ii) the Company's internal financial reporting

12 controls.  (Id. ¶¶ 108-114.)  Plaintiff fails to identify an actionable statement in either category.

13     1.  Plaintiff Fails To Allege That Disclosures Regarding Labor Issues Were Materially
           False Or Misleading

14         (a) The Company Disclosed The ICE Investigation And Its Potential Impact

15     American Apparel's timely, comprehensive disclosures regarding the ICE

16 Investigation and its potential impact on the Company's financial results completely

17 undermine Plaintiff's attempt to plead a violation of Section 10(b).  Since the market was

18 well-aware of the very information Plaintiff claims was concealed, Plaintiff's claim fails.  In

19 re Downey Sec. Litig., 2009 U.S. Dist. LEXIS 83443, at *17-18 (plaintiff failed to plead

20 actionable statements where defendant's underwriting practices and sale of stated loans were

21 disclosed throughout class period); Eshelman, 2008 U.S. Dist. LEXIS 6826, at *12-13

22 (defendant did not make a misleading statement where risk was expressly disclosed).[2]

23     Here, Plaintiff alleges that the Company failed to disclose timely the ICE Investigation

24

25 _____
   [2]   See also In re Netflix, Inc. Sec. Litig., No. C04-2978 FMS, 2005 U.S. Dist. LEXIS
26 18765, at *21 (N.D. Cal. June 28, 2005) (market not misled about risk of competition where
   defendant disclosed risk); In re PetSmart, Inc. Sec. Litig., 61 F. Supp. 2d 982, 996 (D. Ariz.
27 1999) ("As a matter of law, the price of PetSmart's stock cannot be overinflated based on an
   omission if the market was otherwise aware of the information."); In re Stac Elecs. Sec. Litig.,
28 89 F.3d 1399, 1409 (9th Cir. 1996) (plaintiff not misled where prospectus adequately
   disclosed allegedly concealed information).

and its results, as well as falsely stated that any ICE-related terminations "would not materially impact the Company." (CAC ¶ 81.) The CAC is wrong. As shown in Section II.B, supra, in its very first Annual Report for FYE 2007, the Company disclosed that "ICE had requested to inspect the I-9 forms of the employees of American Apparel, Inc." and specifically apprised the market about the risk and uncertainty caused by the audit: "As a result of the ICE investigation, . . . American Apparel could experience very substantial turnover of employees on short or no notice, which could result in manufacturing and other delays." (Jones Decl. Ex. 4 at 13.)[3] Moreover, the Company never made any representation – and Plaintiff can point to none – that the ICE Investigation definitively "would not materially impact the Company." To the contrary, in late June 2009, when ICE notified the Company that it was unable to confirm the employment eligibility of about 1800 workers (CAC ¶ 80), the Company disclosed that: "[a]s the ultimate impact is difficult to predict at this time, no assurances can be given as to how, if at all, the loss of a significant number of manufacturing employees will affect its business and operations." (Jones Decl. Exs. 13 at 57; 14 at 64 (same).)[4]

The allegation that the Company concealed the ultimate outcome of the investigation and its effects (CAC ¶ 85) is equally unsupported. The Company timely disclosed on November 10, 2009 that it had terminated the employment of approximately 1500 workers who were unable to provide adequate employment documentation. (Jones Decl. Ex. 17 at 85.) After the terminations were completed in Q4 2009, and the financial impact of the layoffs became clear, American Apparel timely reported on March 25, 2010 that its fourth quarter 2009 results were negatively affected by a "substantial reduction in manufacturing

---

[3]     Plaintiff suggests that the Company had an obligation to disclose the existence of the investigation earlier. (CAC ¶¶ 72, 86.) Item 303 of Regulation S-K governs the type of disclosure a company must make in its Forms 10-K or 10-Q. The Company disclosed the fact of the ICE Investigation in the very first public filing after the Company received notice of the audit, thereby satisfying any purported obligation under Item 303 of Regulation S-K.

[4]     Plaintiff trumpets that the Company did not "update investors **even once** between January 2008 and June 30, 2009. (CAC ¶ 85.) However, the CAC fails to allege what, if any, information the Company concealed during this interim period.

efficiency."  (CAC ¶ 147.)[5]  Similar disclosures followed in May and August 2010.  (Id. ¶¶ 20, 129.)

In short, American Apparel diligently and contemporaneously issued substantive disclosures concerning the ICE Investigation, and the potential and actual effects thereof.  To the extent Plaintiff alleges that the Company's disclosures were false because it should have known what the impact of any layoffs would be, such allegations fail.  Not only did the Company not purport to predict conclusively what would happen as a result of the audit, prescience is not required under the securities laws.  See In re Downey, 2009 U.S. Dist. LEXIS 83443, at *13-14 (falsity not shown by  "'[m]erely alleging that . . . reasonable predictions turn out to be wrong.  Instead, plaintiffs must allege with particularity facts that show the initial prediction was a falsehood.'") (citation omitted); In re Northpoint Commc'ns Grp., Inc. Sec. Litig., 184 F. Supp. 2d 991, 1004 (N.D. Cal. 2001) (management's "lack of foresight" is not "actionable as securities fraud."); In re Navarre Corp. Sec. Litig., 299 F.3d 735, 743 (8th Cir. 2002) ("'Corporate officials need not be clairvoyant; they are only responsible for revealing those material facts reasonabl[y] available to them.'") (citation omitted); In re PetSmart, 61 F. Supp. 2d at 992 ("defendants' lack of clairvoyance simply does not constitute securities fraud.") (citation omitted).  Where, as here, a plaintiff alleges only that a company's conjecture about the future later proves incorrect, the complaint fails to satisfy the pleading requirements of the PSLRA.  See 15 U.S.C. § 78u-4(b)(1)(B); In re Vantive, 283 F.3d at 1084-85 (PSLRA prohibits fraud by hindsight).

(b)  The PSLRA's Safe Harbor Protects The Company's Forward-Looking Statements Concerning The Impact Of The ICE Investigation

Plaintiff's claim fails for yet another reason – the PSLRA's safe harbor provisions

_____

[5]  Plaintiff also alleges that the Company deliberately withheld "crucial adverse financial information" – monthly financial reports for January and February 2010 – during a March 25, 2010 investor call.  (CAC ¶¶ 122, 125.)  Silence, absent a duty to disclose, however, does not give rise to a claim for securities fraud.  Shurkin v. Golden State Vintners, Inc., 471 F. Supp. 2d 998, 1018 (N.D. Cal. 2006); see also Basic, Inc. v. Levinson, 485 U.S. 224, 239, n.17 (1988).  As Plaintiff acknowledges, Regulation S-K creates a duty to disclose "material changes in financial condition" on a quarterly and annual basis.  (CAC ¶ 86.)  Thus, the Company's alleged withholding of two months of financials for an open quarter was not a misleading omission.

render inactionable the Company's forward-looking statements about the <u>future</u> impact of any employee terminations on the business since these disclosures were couched in meaningful cautionary language. The PSLRA expressly shields such forward-looking statements from liability "if they were identified as forward-looking . . . and [are] accompanied by meaningful cautionary language . . . or if the investors fail to prove the projections were made with <u>actual</u> knowledge that they were materially false or misleading . . . ." <u>In re Cutera Sec. Litig.</u>, 610 F.3d 1103, 1112 (9th Cir. 2010); <u>see also</u> <u>In re Wet Seal</u>, 518 F. Supp. 2d at 1167, n.5 (provision explaining that statements were "forward-looking" and involved "'material risks and uncertainties'" brought statements within PSLRA's safe harbor provision) (citation omitted); <u>In re Impac Mortg. Holdings, Inc. Sec. Litig.</u>, 554 F. Supp. 2d 1083, 1098 (C.D. Cal. 2008) (meaningful cautionary language included an oral warning that conference call participants would make forward-looking statements, but actual results might differ).

Here, purportedly false and misleading disclosures made on June 30, July 1 and August 13, 2009 (regarding the potential impact of any ICE-related terminations) fall within the PSLRA's safe harbor.  First, each disclosure is forward-looking and expressly cautions that the Company could not provide any assurances that the ICE Investigation would not adversely impact the Company's future financial performance.  (<u>See</u> Section II.B, <u>supra</u>.)  Moreover, the disclosures contained detailed written and verbal "Safe Harbor Statements" apprising investors that the statements were forward-looking and involved risks and uncertainties.  (Jones Decl. Exs. 14 at 64-65 ("This press release may contain forward-looking statements which are based upon the current beliefs and expectations of our management, but are subject to risks and uncertainties . . . . [You] are cautioned not to place undue reliance on such forward-looking statements . . . ."; 15 at 66 (same).)

The safe harbor also protects the Company's statements because Plaintiff has pled no facts demonstrating that American Apparel knew that the disclosures were false when made. <u>See</u> <u>In re Impac Mortg. Holdings</u>, 554 F. Supp. 2d at 1099 (defendant's statements fell within safe harbor because plaintiff failed to plead "that the statements were made with actual

knowledge of their falsity."). Plaintiff offers nothing more than one generic allegation that: "at the time each forward-looking statement was made, the speaker knew the forward-looking statement was false or misleading and the forward-looking statement was authorized and/or approved by an executive officer of American Apparel who knew that the forward-looking statement was false." (CAC ¶ 181.) The Ninth Circuit has rejected virtually identical language because such boilerplate "lack[ed] specificity" and was "conclusory." <u>In re Cutera</u>, 610 F.3d at 1112. This Court should do the same.

        (c)   <u>Plaintiff Fails To Plead A False Statement Concerning The Company's Compliance With Immigration Laws</u>

Left without an actionable statement regarding the ICE audit, Plaintiff shifts his focus to alleging that the Company falsely stated that it "'**makes diligent efforts to comply with all employment and labor regulations**.'" (CAC ¶ 73 (quoting American Apparel, Inc. Annual Report (Form 10-K) (March 17, 2008).) In doing so, Plaintiff cherry-picks and partially quotes disclosures from the Company's public statements in order to manufacture a false representation. For example, Plaintiff attacks the accuracy of American Apparel's immigration compliance disclosure by asserting that the Company made "unequivocal prior statements that <u>all</u> of the Company's manufacturing employees were 'documented immigrants and authorized to work in the United States'. . . ." (<u>Id.</u> ¶ 13.) But the CAC conveniently omits a citation to where and when these "unequivocal prior statements" were allegedly made. Instead, it appears that Plaintiff intentionally misquotes a single sentence from the Company's November 28, 2007 proxy, which states, "<u>Many</u> of American Apparel's workers are documented immigrants and authorized to work in the United States." (Jones Decl. Ex. 2 at 7 (emphasis added).) The proxy makes no representation regarding <u>how many</u> employees were documented or whether those employees were manufacturing workers based in the Los Angeles factory that was later the subject of the ICE Investigation.

Plaintiff's remaining allegations fail because the CAC makes no effort to plead in sufficient detail that the Company's statements regarding its compliance efforts were misleading. <u>See In re Vantive</u>, 283 F.3d at 1091 (falsity must be "pled with particularity");

1  Metzler Inv. GMBH v. Corinthian Colls., Inc., 540 F.3d 1049, 1070 (9th Cir. 2008) ("A

2  litany of alleged false statements, <u>unaccompanied by the pleading of specific facts indicating</u>

3  <u>why those statements were false</u>, does not meet [the PSLRA's] standard.") (emphasis added);

4  Brodsky v. Yahoo! Inc., 630 F. Supp. 2d 1104, 1114 (N.D. Cal. 2009) (plaintiff failed to

5  plead falsity where complaint "merely juxtaposes public statements expressing enthusiasm

6  for Yahoo! with paragraphs referring to myriad internal problems at Yahoo!"). <u>First</u>, Plaintiff

7  suggests that the Company's purported failure to use E-Verify, a Department of Homeland

8  Security ("DHS") endorsed document verification system, demonstrates that statements

9  regarding the Company's efforts to comply with immigration laws were false. (CAC ¶ 73

10 (statement that Company "**makes diligent efforts to comply with all employment and**

11 **labor regulations** . . . was false because Defendants . . . failed to use E-Verify during the

12 Class Period . . . .").)  But the CAC does not allege that E-Verify is necessary or required to

13 ensure that employees are authorized to work in the United States.  Nor does the CAC contain

14 any specific allegations about the Company's actual verification processes, which might lend

15 support to the conclusion that the Company was not "mak[ing] diligent efforts."

16       <u>Second</u>, Plaintiff draws on various public statements made by Mr. Charney regarding

17 federal immigration policy, amnesty for undocumented workers, and immigrant labor in the

18 apparel industry to allege that the Company misled investors about its compliance efforts.

19 (<u>See, e.g.</u>, CAC ¶ 8 ("Charney boasted, with respect to the Company's immigrant

20 employment practices, it '[d]oesnt matter what the [I-9] documents say, they're American

21 workers'") (citation omitted); ¶ 9 ("amnesty for undocumented workers 'is at the core of my

22 company, at the core of my soul") (citation omitted).)  If one refers to the full text of the

23 quoted statements, however, it is evident that Mr. Charney was not discussing the American

24 Apparel work force, but rather immigrant labor <u>in general</u>.  (Jones Decl. Ex. 1 at 4; 3 at 8.)[6]

25

26 _____

[6]       For example, in the April 20, 2006 <u>Los Angeles Times</u> article, selectively quoted by
Plaintiff, the statement that it "doesn't matter what the documents say" refers to immigrants,
27 generally.  As Mr. Charney later stated, "<u>Our rule is if you present the proper ID and it</u>
<u>appears to be proper, we hire the worker</u> . . . Everybody's documented here." (Jones Decl. Ex.
28 1 at 4.)  The January 18, 2008 <u>New York Times</u> article reports that "Mr. Charney said the

*(cont'd)*

1   Thus, the statements do nothing to inform whether <u>the Company</u> misrepresented that it was
2   diligently complying with immigration laws.

3       All that is left is the suggestion that the Company misstated its compliance efforts
4   because ICE ultimately determined that the Company had employed allegedly undocumented
5   workers.   (CAC ¶ 74.)   This is a classic attempt to plead fraud by hindsight, which is
6   prohibited under the PSLRA.  <u>See</u> <u>In re Vantive</u>, 283 F.3d at 1084-85 ("The purpose of [the
7   PSLRA's] heightened pleading requirement was . . . particularly to put an end to the practice
8   of pleading 'fraud by hindsight.'") (citation omitted); <u>In re Rackable Sys., Inc. Sec. Litig.</u>, No.
9   C 09-0222 CW, 2010 U.S. Dist. LEXIS 88927, at *15-16 (N.D. Cal. Aug. 27, 2010)
10   ("'problems and difficulties are the daily work of business people.  That they exist does not
11   make a lie out of any alleged false statement.'") (citation omitted).

12       2.  <u>Plaintiff Fails To Plead That Internal Controls Disclosures Were Misleading</u>

13       Plaintiff alleges that American Apparel made false representations regarding the status
14   of its internal controls and efforts to achieve compliance with reporting requirements.  (CAC
15   ¶ 109 ("Despite Defendants' Class Period attempts to assure investors that American Apparel
16   was committed to the highest level of financial responsibility, . . . Defendants were nowhere
17   near financial compliance.").)   Once again, these allegations fail because, as detailed in
18   Section II.C, <u>supra</u>, <u>the Company disclosed in each of its Annual Reports and Quarterly</u>
19   <u>Reports the purportedly concealed facts</u> regarding its internal control deficiencies.  <u>See</u> <u>In re</u>
20   <u>Downey</u>, 2009 U.S. Dist. LEXIS 83443, at *17-18; <u>In re Netflix</u>, 2005 U.S. Dist. LEXIS
21   18765, at *21.

22       Recognizing that the Company did, in fact, disclose this information, Plaintiff resorts
23   to claiming that American Apparel misled the market about the amount of time needed to
24   remedy the issues.  (<u>See, e.g.</u>, CAC ¶ 113 (in 2008, CFO "told investors that the Company's
25   internal controls progress was <u>still on track</u>" and the Company "expect[s] to demonstrate

26

27   <i>(cont'd from previous page)</i>
    company was careful to make sure that its workers presented the necessary documentation for
28   employment." (<u>Id.</u> Ex. 3 at 9.)

1   significant progress intermediating deficiencies by <u>yearend</u>."); ¶ 110 (statements were

2   "misleading because Defendants knew that the Company could not possibly be on track to

3   remedy its control problems by the end of 2008 . . . .").)  To be clear, Plaintiff does not assert

4   that the Company assured investors that it would remediate its control issues by a date certain.

5   Rather, the CAC alleges "significant progress" – not completion – and American Apparel

6   shareholders were apprised that "end of 2008" was a goal, not a guarantee.  Moreover,

7   statements that the Company was "on track" to remedy the control weaknesses "are best

8   characterized as inactionable puffery," and, thus, not false or misleading as a matter of law.

9   <u>In re Impac Mortg. Holdings</u>, 554 F. Supp. 2d at 1097 n.10 (citation omitted and quotation

10  omitted); <u>In re Wet Seal</u>, 518 F. Supp. 2d at 1168 (vague statements of corporate optimism,

11  such as "measurable progress" and "continuing improvements," not actionable) (citation

12  omitted); <u>see also</u> <u>Emp'rs Teamsters Local Nos. 175 & 505 Pension Trust Fund v. Clorox Co.</u>,

13  353 F.3d 1125, 1132 (9th Cir. 2004) (approximation that inventory problems would be

14  corrected by year end inactionable).

15     **C. <u>Plaintiff Fails To Plead Facts Creating A Strong Inference of Scienter</u>**

16         To establish liability under Section 10(b) and Rule 10b-5, Plaintiff must allege "that

17  the defendant acted with scienter, 'a mental state embracing intent to deceive, manipulate, or

18  defraud.'"  <u>Tellabs, Inc. v. Makor Issues & Rights, Ltd.</u>, 551 U.S. 308, 319 (2007) (citation

19  omitted).  The PSRLA requires Plaintiff to plead with particularity "that the defendant made

20  false or misleading statements either intentionally or with deliberate recklessness or, if the

21  challenged representation is a forward looking statement, with 'actual knowledge . . . that the

22  statement was false or misleading'" when made.  <u>In re Vantive</u>, 283 F.3d at 1089 (citation

23  omitted).  To be intentional or deliberate[ly] reckless, a defendant must act with a "degree of

24  intentional or conscious misconduct."  <u>In re Silicon Graphics</u>, 183 F.3d at 977 ("To repeat,

25  recklessness in the § 10(b) context is, in the words of the Supreme Court, a form of

26  intentional conduct."); <u>In re InVision Techs. Inc. Sec. Litig.</u>, 549 F.3d 736, 748 (9th Cir. 2008)

27  (allegation defendant <u>should</u> have known fails to meet requirements of the PSLRA).

28         The Ninth Circuit has adopted a two step inquiry to determine whether scienter has

been pled adequately:

> first, [the court] will determine whether any of the plaintiff's allegations, standing alone, are sufficient to create a strong inference of scienter; second, if no individual allegations are sufficient, we will conduct a 'holistic' review of the same allegations to determine whether the insufficient allegations combine to create a strong inference of intentional conduct or deliberate recklessness.

Zucco Partners, LLC v. Digimarc Corp., 552 F.3d 981, 992 (9th Cir. 2009). [7]  A plaintiff's suggested inference of scienter must be "cogent and at least as compelling as any opposing inference" that may be gleaned from the complaint.  Tellabs, 551 U.S. at 314.

Here, of the few facts – as opposed to mere conclusory allegations – contained in the CAC, none demonstrate that the Company intentionally or recklessly issued false or misleading statements.  Even when subjected to the Tellabs "holistic" review, the CAC fails to allege scienter.  "Although the allegations in this case are legion, even together they are not as cogent or compelling as a plausible alternative inference" (Zucco, 552 F.3d at 1007) – i.e., that American Apparel was reacting to an unprecedented labor event and, despite its attempts to update the market with the best available information, the ultimate outcome could not be predicted.  Additionally, while the Company was tasked from its very first day as a public company[8] to implement various internal controls, the process of developing a robust finance and accounting function cannot be accomplished overnight.  The Company worked diligently to improve its control issues, and timely disclosed to the market its progress.

1. Allegations Regarding Immigration Law Compliance And The ICE Investigation Do Not Establish Scienter

The CAC asserts that the Company knew that the following statements concerning its immigrant labor force were false and misleading: (i) that the Company was making "diligent efforts" to comply with labor and employment regulations (CAC ¶¶ 73, 84); and (ii) that,

---

[7]    The Zucco court further observed that Tellabs "does not materially alter the particularity requirements for scienter claims established in our previous decisions, but instead only adds an additional 'holistic' component to those requirements." Zucco, 552 F.3d at 987.

[8]    See CAC ¶ 108 (quoting the CFO, who stated on March 17, 2008 "'[u]nlike a company that went public through a standard IPO, which would have a year to get in compliance, because American Apparel merged with an already public company we had to be in compliance from the beginning.'") (emphasis added).

1  once ICE identified discrepancies in employee documentation in June 2009, the Company did

2  not believe at that time that the loss of employees would have a materially adverse impact on

3  financial results. (Id. ¶ 82.)  Plaintiff's effort to plead that the Company knew or recklessly

4  disregarded the falsity of these statements fails.

5      As an initial and dispositive matter, the suggestion that American Apparel attempted to

6  defraud the market regarding its efforts to comply with immigration laws and the possible

7  impact of the ICE Investigation is belied by the Company's timely and forthcoming public

8  disclosures, detailed in Section II.B, supra.  See In re Wet Seal, 518 F. Supp. 2d at 1172

9  (finding no inference of scienter where "information was disclosed to the market and

10 therefore [it is] not any more likely that Defendants' statements" were designed to defraud);

11 In re InVision Techs., 549 F.3d at 748 ("[T]he material misrepresentations at issue . . .

12 appeared in the public filing . . . . This fact undercuts any inference that [defendant knew

13 about the fraud] because such knowledge would have required him to make false

14 representations knowingly . . . .").  If American Apparel sought to intentionally mislead the

15 market about the risk of relying on immigrant labor and the possible impact of any layoffs on

16 its financial condition, it is unfathomable that the Company would have disclosed the very

17 same information.

18     Moreover, to plead that the Company knew its statements about legal compliance and

19 the possible effects of the ICE Investigation were misleading, Plaintiff must allege specific

20 facts that the Company had "contemporaneous knowledge" of their falsity.  In re Read-Rite

21 Corp. Sec. Litig., 335 F.3d 843, 847 (9th Cir. 2003) (citation omitted); In re Vantive, 283

22 F.3d at 1090-91 (complaint must contain allegations of "specific contemporaneous conditions

23 known to the defendants that would strongly suggest that the defendants understood" what

24 the impact of their actions would be); In re ICN Pharm., 299 F. Supp. 2d at 1065 (same).  The

25 law requires that Plaintiff plead that Defendants had access to specific information, such as

26 internal reports, communications, or financial data, that reveal the fraud.  See Metzler, 540

27 F.3d at 1067-68 (scienter not established "absent some additional allegation of specific

28 information conveyed to management and related to the fraud."); Lipton v. Pathogenesis

18

1  Corp., 284 F.3d 1027, 1036 (9th Cir. 2002) (no scienter where plaintiffs failed to identify

2  internal reports or specific content of reports allegedly revealing fraud).

3         Here, with respect to American Apparel's alleged failure to comply with immigration

4  laws, the CAC contains no particularized allegations that the Company had information

5  indicating that it was not acting diligently to confirm the eligibility of its employees.  For

6  example, there are no specific allegations regarding the Company's hiring practices, what

7  documents the Company collected from its prospective employees, its attempts to verify the

8  genuineness of such documentation, or its policies related to completion of I-9 Forms.

9  Plaintiff merely identifies "diligent hiring practices" recommended by ICE, and concludes

10 that because the Company purportedly did not adopt the recommendations, it knowingly

11 failed to comply with immigration laws.  (See CAC ¶¶ 67-68.)  But the only "best practice"

12 allegedly not adopted by the Company was E-Verify, which Plaintiff does not – and cannot –

13 assert to be a legal requirement for compliance with immigration laws.  Further, and more

14 importantly, the ICE "best practices" are, as Plaintiff admits, "advise[d]" not mandated.  (Id.

15 at ¶¶ 67-68.)  Thus, the adoption or rejection of a guideline does not indicate whether the

16 Company was diligently seeking to comply with immigration laws.[9]

17        Plaintiff's additional assertion that, because Mr. Charney supposedly "hired people at

18 random," the Company knew it employed undocumented workers fails to support an

19 inference of scienter.  First, the CAC offers but one example of such a "random hire":

20        A former American Apparel Customer Service Representative who worked at the
         Company's downtown Los Angeles factory . . . was also told that [Dov] Charney met [a]
21       woman on the street in downtown Los Angeles and offered her a job . . . . [T]he woman
         did not speak English and was scantily clothed when she showed up for work.
22

23 (Id. ¶ 68.)  The hearsay statement of one "witness" regarding a single event is woefully

24 inadequate to support Plaintiff's allegation of scienter.  See Metzler, 540 F.3d at 1069 ("[A]

25 plaintiff cannot avoid dismissal by reliance on an isolated statement that stands in contrast to

26 ─────────────────
   [9]     Plaintiff also contends that the Company knew it was hiring undocumented workers
27 because it could not fill "low-skilled" positions with "U.S. citizens or other documented
   workers."  (CAC ¶ 78.)  There is simply no support for this "allegation," which can only be
28 described as a reflection of Plaintiff's own biases about immigrant labor and manufacturing
   workers.

                                    19
                        MOTION TO DISMISS CAC

1  a host of other insufficient allegations."); <u>In re Siebel Sys., Inc. Sec. Litig.</u>, No. C 04-0983
2  CRB, 2005 WL 3555718, at *7 (N.D. Cal. Dec. 28, 2005) (finding insufficient evidence
3  for scienter when "[t]he only specific allegation that comes close to suggesting scienter . . .
4  describes only <u>one incident</u>.") (emphasis added).[10]

5       Second, the CAC fails to allege that the "witness" had first-hand knowledge regarding
6  this one woman's immigration status or how <u>the Company</u> verified the eligibility of its
7  <u>thousands of other workers</u>.  <u>See</u> <u>In re U.S. Aggregates, Inc. Sec. Litig.</u>, 235 F. Supp. 2d 1063,
8  1075 (N.D. Cal. 2002) (rejecting confidential witness allegations where none had first-hand
9  knowledge of basis of company's accounting decisions).  This is no surprise, however, since
10 the "witness" was allegedly employed in the Customer Service department – not Human
11 Resources.  Similar attempts at relying on statements of persons not alleged to have worked
12 in the relevant division of a company have been routinely rejected by courts.  <u>See</u> <u>In re</u>
13 <u>Veritas Software Corp. Sec. Litig.</u>, No. C-03-0283, slip op. at 9 (N.D. Cal. Dec. 10, 2003)
14 (dismissing complaint involving restatement where witnesses did not have positions that
15 would make them knowledgeable about the company's accounting); <u>Cal. Pub. Emps.' Ret.</u>
16 <u>Sys. v. Chubb Corp.</u>, 394 F.3d 126, 152-53 (3d Cir. 2004) (affirming dismissal where
17 plaintiffs fail to "demonstrate how a former employee working in a customer service capacity
18 would know that, nationally, 25% of Chubb's reserves were manipulated downward").[11]

19      Regarding the impact of the ICE-related terminations, Plaintiff fails to allege any facts
20

---

21 [10]  Allegations that Defendants knew they were not complying with labor laws because
22 management and the Company's manufacturing employees worked in the same building
   (CAC ¶ 71), and the CEO considered workers to be "family" (<u>id.</u> ¶ 74) are also insufficient to
23 support an inference of scienter.  <u>See</u> <u>In re InVision Techs.</u>, 549 F.3d at 746 (observing that
   the Ninth Circuit has rejected the theory that a defendant "<u>must</u> have known" about a fraud
24 because of management's "interaction with other officers and employees") (citations and
   internal quotations omitted).
25 [11]  The CAC quotes Mr. Charney as stating on April 20, 2006, that he "[thought] over
   50% of the workers in my industry are falsely documented" (CAC ¶ 8), and other opinions
26 regarding immigration policy, to assert that the Company knew it was not complying with
   labor laws.  (<u>See, e.g.</u>, <u>id.</u> ¶ 9.)  As described in note 6, <u>supra</u>, many of these comments are
27 taken out of context, and, in all instances, do not specifically refer to American Apparel's
   employees.  Accordingly, the statements fail to establish <u>what the Company knew about its</u>
28 <u>compliance efforts</u>.

1    supporting the conclusion that "[d]efendants knew but failed to disclose that losing one-third

2    of the Company's manufacturing employees had an immediate and severely negative impact

3    on the Company's financial performance." (CAC ¶ 85.) The CAC contains no allegations of

4    internal memos, financial reports, or discussions about financial results that would support an

5    inference that the Company knew or could accurately predict the financial impact of the ICE

6    Investigation before the March 25, 2010 disclosure of production inefficiencies resulting from

7    the terminations. The CAC is simply bereft of the detailed, factual allegations that the

8    PSLRA requires. See In re Northpoint, 184 F. Supp. 2d at 997 (providing examples of

9    sufficient factual evidence of scienter, such as "contemporaneous receipt of a report with

10   information directly at odds with an alleged misrepresentation . . . statements by witnesses

11   that they told the actor the true facts before the false statement was made . . . ."); see also

12   Ronconi v. Larkin, 253 F.3d 423, 433 (9th Cir. 2001) (affirming dismissal because "alleging

13   in substance that [defendant] underestimated the difficulties it would face if it fired 300

14   salespeople does not make out a fraud case.").[12]

15        Worse, the CAC affirmatively takes statements out of context in an attempt to give the

16   impression of pleading scienter. Specifically, the CAC relies on statements made by Mr.

17   Charney in May and November 2008 – over a year before the terminations – regarding

18   challenges associated with training new employees. (CAC ¶ 90.) Plaintiff concludes that "if

19   Charney knew in May and November 2008 that absorbing new workers took a toll on the

20   Company when the economy was struggling, Charney also knew in 2009 that losing one-

21

22   [12]    Plaintiff's allegation that management generally had access to inventory reports does
     not establish that Defendants knowingly misrepresented that any terminations would be
23   absorbed by surplus inventory. (CAC ¶ 98.) See In re Autodesk, Inc. Sec. Litig., 132 F. Supp.
     2d 833, 844 (N.D. Cal. 2000) (allegations that defendants had knowledge due to their "hands
24   on" positions at the company and the existence of internal reports – without specific
     allegations of the contents of the reports or how the contents contradicted defendants' public
25   statements – were insufficient to raise a strong inference of scienter); Lipton, 284 F.3d at
     1036 (conclusory allegations that "defendants had access to internal data demonstrating a
26   decline in sales" insufficient to demonstrate scienter); In re Silicon Graphics, 183 F.3d at 984-
     85 n.14 (allegations that corporate officers reviewed daily reports containing manufacturing,
27   sales and financial data insufficient to show scienter). The CAC fails to allege who reviewed
     the Company's inventory reports and when, and what those reports stated such that one might
28   conclude that the Company was misleading investors.

1  third of his manufacturing employees would have an adverse material impact on the

2  Company . . . ."  (Id.)  But the June, July, August and November 2009 disclosures reflect a

3  belief that the loss of any workers would be absorbed by then existing surplus inventory and

4  production levels.  Accordingly, Mr. Charney's earlier statements regarding training new

5  employees shed no light on what the Company or management believed with respect to the

6  termination of existing employees.

7        2.  Plaintiff's Allegations Regarding Internal Controls Do Not Plead Scienter

8        The CAC alleges that the Company knowingly misled investors regarding when it

9  would remediate weaknesses in internal control over financial reporting.  (Id. ¶ 110.)  Again,

10  Plaintiff points to no facts – no reports, no witness statements, no public statements, no

11  internal memoranda – indicating that the Company knew or should have known that it could

12  not correct its control deficiencies by any particular date.  See In re Read-Rite Corp., 335 F.3d

13  at 847 (dismissing complaint where plaintiffs did not allege "any specific evidence, such as

14  contemporaneous reports or statements" in support of scienter); In re Northpoint, 184 F. Supp.

15  2d at 997 (pleading scienter requires "at a minimum, a showing (with all requisite

16  particularity) that the critical facts were actually known within the company.").  Indeed, the

17  Company's repeated and regular disclosures – including nine public filings during the Class

18  Period – regarding its internal control deficiencies undermine any inference of an intent to

19  defraud.  See In re Hypercom Corp. Sec. Litig., No. CV-05-0455-PHX-NVW, 2006 WL

20  1836181, at *9 (D. Ariz. July 5, 2006) (dismissing complaint with prejudice for failure to

21  allege scienter following express disclosure of internal control weaknesses); In re Wet Seal,

22  518 F. Supp. 2d at 1172.  If American Apparel intended to mislead the market, it defies logic

23  that it would have made repeated and comprehensive disclosures describing what those

24  weaknesses were and whether they had been remediated.[13]

25  _____
[13]        The fact that the SEC, DOJ and FBI have commenced investigations into the
26  Company's internal control issues is of no moment.  (CAC ¶¶ 12, 130.)  The allegation of a
government investigation does not create an inference of scienter.  See In re Hansen Natural
27  Corp. Sec. Litig., 527 F. Supp. 2d 1142, 1162 (C.D. Cal. 2007) ("'[T]he mere existence of [an]
investigation cannot support any inferences of wrongdoing or fraudulent scienter on the part
28  of [a] company or its senior management.'") (citation omitted); In re Maxim Integrated Prods.,

*(cont'd)*

1    The CAC also seeks to allege scienter by including conclusory allegations of GAAP

2  violations.  (see CAC ¶ 168 ("Defendants violated GAAP . . . by failing to make adequate

3  disclosures regarding the Company's liquidity and ability to continue as a going concern and

4  its failure to comply with immigration regulation . . .").)   But GAAP violations, by

5  themselves, are insufficient to establish scienter.   See DSAM Global Value Fund v. Altris

6  Software, Inc., 288 F.3d 385, 390 (9th Cir. 2002) (allegations of GAAP violations, without

7  more, insufficient to plead fraud); In re Software Toolworks, Inc. Sec. Litig., 50 F.3d 615,

8  627-28 (9th Cir. 1994) (same).   Moreover, the CAC fails even to plead a GAAP violation,

9  which requires Plaintiff to allege "that (1) specific accounting decisions were improper; and

10  (2) the defendants knew specific facts at the time that rendered their accounting

11  determinations fraudulent."   Morgan v. AXT, Inc., No. C 04-4362 MJJ, 2005 U.S. Dist.

12  LEXIS 42346, at *41 (N.D. Cal. Sept. 23, 2005).   Plaintiff's GAAP allegations fail at the gate

13  because the CAC does not identify a single accounting decision alleged to be improper.

14    Finally, the CAC suggests that scienter may be inferred from a restatement of the

15  Company's financials for FYE December 31, 2008.  (CAC ¶ 33.)  First, the restatement was

16  unrelated to any of the issues with which Plaintiff is purportedly concerned.  As detailed in

17  the public filings, the restatement involved reclassification of the Company's revolving credit

18  facility from a long term to a current liability and had no effect on the Company's reported

19  revenues, net income, net cash flows, cash position, or comparable store sales.  (Jones Decl.

20  Ex. 16 at 75-76.)  Plaintiff's resort to asserting allegations relating to a restatement unrelated

21  to this action reveals the wholly deficient nature of the CAC.   Moreover, financial

22  restatements, in themselves, are insufficient to establish scienter.  See Zucco, 552 F.3d at

23  1000 ("In general, the mere publication of a restatement is not enough to create a strong

24  inference of scienter."); DSAM Global, 288 F.3d at 390 ("Publication of inaccurate

25

26  _(cont'd from previous page)_
    Inc. Sec. Litig., 639 F. Supp. 2d 1038, 1047 (N.D. Cal. 2009) (An SEC investigation and
27  subpoenas from the U.S. Attorneys Office of the Northern District of California did not reveal
    the alleged fraud because the disclosures "do not themselves indicate anything more than a
28  'risk' or 'potential' that Defendants engaged in widespread fraudulent conduct.").

23

1  accounting figures, or a failure to follow GAAP" insufficient to establish scienter); see also In

2  re Northpoint, 184 F. Supp. 2d at 998 (scienter "not established merely by the publication of

3  inaccurate accounting figures, or failure to follow generally accepted accounting principles").

4  Accordingly, the CAC fails to plead scienter with regard to the Company's purported internal

5  control issues.

6      3.  Plaintiff's Failure To Identify Motive For Fraud Undermines Scienter

7      Plaintiff's complete failure to identify any logical and cogent motive for the alleged

8  fraud wholly undermines a finding of scienter.  See Lipton, 284 F.3d at 1038 ("generalized

9  assertions of motive, without more, are inadequate to meet the heightened pleading

10  requirements of [In re Silicon Graphics]"); In re Silicon Graphics, 183 F.3d at 979 ("plaintiffs

11  proceeding under the PSLRA can no longer aver intent in general terms of mere 'motive and

12  opportunity.'"); In re Acterna Corp. Sec. Litig., 378 F. Supp. 2d 561, 577 (D. Md. 2005)

13  ("[I]f a motive to commit fraud can be a relevant [although not dispositive] circumstance

14  supporting a claim of scienter, it would seem that an inability to show motive can be a

15  relevant circumstance indicating the lack of scienter.") (internal citation and quotation

16  omitted); Brashears v. 1717 Capital Mgmt., Nationwide Mut. Ins. Co., No Civ. A. 02-1534-

17  KAJ, 2004 WL 1196896, at *8 (D. Del. May 21, 2004) ("paucity of allegations about the

18  [d]efendants' motivation for engaging in the supposed scheme" and lack of specificity

19  "significantly undermine[] the [p]laintiff's effort to raise a strong inference of scienter.").

20      Here, Plaintiff alleges that "Defendants' false and misleading statements and material

21  omissions had their intended effect, causing American Apparel's stock to trade at artificially

22  inflated prices throughout the Class Period."  (CAC ¶ 142.)  But it is utterly insufficient to

23  allege that Defendants desired to increase the value of the Company because "[i]f simple

24  allegations of pecuniary motive were enough to establish scienter, 'virtually every company

25  in the United States that experiences a downturn in stock price could be force to defend

26  securities fraud actions.'"  See Zucco, 552 F.3d at 1005 (citation omitted); Lipton, 284 F.3d at

27  1038 (same); In re Pac. Gateway Exch., Inc. Sec. Litig., No. C-00-1211, 2002 WL 851066, at

28  *18 (N.D. Cal. Apr. 30, 2002) ("Simply alleging that officers and directors possess motive

24

MOTION TO DISMISS CAC

1    and opportunity to enhance a company's business prospects does not suffice to assert a claim

2    for fraud.").

3        What is lacking is <u>a reason why Defendants would seek to artificially inflate the stock</u>.

4    Whereas a plaintiff typically suggests that a defendant inflated the stock price in order to sell

5    high, the CAC contains <u>no allegations of insider trading</u>.  This is no doubt because neither of

6    the individual defendants sold any stock during the Class Period.  Indeed, Mr. Charney

7    <u>purchased</u> 855,000 shares of Company stock in 2009 (Jones Decl. Ex. 12), a fact that

8    affirmatively negates an inference of scienter and suggests Defendants' good faith belief in

9    their public statements.  <u>See In re Impac Mortg. Holdings</u>, 554 F. Supp. 2d at 1100 n.11 (no

10   inference of scienter where defendants held or increased their shares); <u>In re FVC.com Sec.

11   Litig.</u>, 136 F. Supp. 2d 1031, 1039-40 (N.D. Cal. 2000) (lack of sales by CEO negates

12   scienter); <u>In re Allergan Inc. Sec. Litig.</u>, No. SACV 89-643ASH (RWR), 1993 WL 623321,

13   at *37 (C.D. Cal. Nov. 29, 1993) (scienter allegations "economically implausible" in light of

14   insiders' stock purchases).[14]

15   **IV.   CONCLUSION**

16       For the foregoing reasons, the Court should dismiss the CAC.

17   DATED:  May 31, 2011            SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP

18

19                        By: _____  s/Harriet S. Posner
                                        Harriet S. Posner
20                                   Attorneys for Defendant
                                     American Apparel, Inc.

21

22

23

---

24   [14]    Plaintiff's assertion that the Company lied about its immigration compliance to
     preserve its "Made in USA" brand image is wholly illogical. (CAC ¶ 94.)  The suggestion is
25   that American Apparel desired to make clothes in the United States but could only do so by
     employing cheap, illegal immigrant labor.  (<u>Id.</u>¶ 70.)  But Plaintiff admits that the Company
26   "offers $9-$12 hourly wages, health care, subsidized meals, and other additional benefits" to
     all of its employees.  (<u>Id.</u> ¶¶ 6, 64.)  American Apparel thus had no need to employ illegal
27   immigrants in order to maintain its "Made in USA" status, or for any other reason for that
     matter.
28