KESSLER TOPAZ
MELTZER & CHECK, LLP
Ramzi Abadou (222567)
rabadou@ktmc.com
Eli R. Greenstein (217945)
egreenstein@ktmc.com
Stacey M. Kaplan (241989)
skaplan@ktmc.com
Erik D. Peterson (257098)
epeterson@ktmc.com
580 California Street, Suite 1750
San Francisco, CA 94104
Telephone:  (415) 400-3000
Facsimile:  (415) 400-3001

*Lead Counsel for Lead Plaintiff and the Class*

**UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
WESTERN DIVISION**

| | |
|---|---|
| IN RE AMERICAN APPAREL, INC. SHAREHOLDER LITIGATION | ) Case No. CV-10-6352 MMM (JCG) ) (**Consolidated**) ) ) **LEAD PLAINTIFF'S OMNIBUS** ) **MEMORANDUM OF LAW IN** ) **OPPOSITION TO DEFENDANTS'** ) **MOTIONS TO DISMISS** ) |
| This Document Relates To: ALL ACTIONS | ) ) ) ) ) ) ) ) ) ) |

# **TABLE OF CONTENTS**

I.      INTRODUCTION ................................................................................. 1

II.     STATEMENT OF FACTS ..................................................................... 4

    A.     Background to the Class Period ................................................. 4

    B.     Defendants' Immigration Compliance Fraud .......................... 6

    C.     The Deloitte Debacle .............................................................. 10

III.    ARGUMENT ...................................................................................... 13

    A.     Legal Standard ....................................................................... 13

    B.     The Complaint Adequately Alleges Violations of Section 10(b) ....... 13

    C.     The Complaint Pleads Actionable False and Misleading Statements and Omissions ................................................... 14

        1.     The Complaint Adequately Alleges False and Misleading Statements and Omissions Regarding American Apparel's Immigration Law Compliance ................................................. 15

        2.     The Complaint Adequately Alleges False and Misleading Statements and Omissions About the *Effects* of the ICE Sanctions ................................................. 18

        3.     The Complaint Adequately Alleges False and Misleading Statements and Omissions Regarding the Company's Internal Controls ................................................. 22

    D.     The Complaint Raises a Strong Inference of Scienter ...................... 24

        1.     Plaintiff Has Adequately Pled Scienter For Defendants' Immigration Compliance Statements ................................................. 27

        2.     Plaintiff has Adequately Pled Scienter for Defendants' Statements Regarding the Effects of Their Immigration Violations ................................................. 30

        3.     Plaintiff Adequately Pleads Scienter For Defendants' False Financial Reporting Statements ................................................. 36

        4.     Defendants had Motive to Commit Fraud ............................... 42

i

E.    Defendants' False and Misleading Statements Are Not Protected by the PSLRA's Safe Harbor ................................................................ 46

F.    The Complaint Adequately Pleads Control Liability Under §20(a) ... 48

IV.    CONCLUSION .................................................................................... 50

## <u>TABLE OF AUTHORITIES</u>

Page(s)

CASES

*In re Acterna Corp. Sec. Litig.*,
   378 F. Supp. 2d 561 (D. Md. 2005) ...................................................... 42

*In re Adaptive Broadband Sec. Litig.*,
   2002 U.S. Dist. LEXIS 5887 (N.D. Cal. 2002)...................................... 41

*In re Allergan Inc. Sec. Litig.*,
   1993 WL 623321 (C.D. Cal. 1993) ...................................................... 45

*In re Amylin Pharm., Inc. Sec. Litig.*,
   2003 U.S. Dist. LEXIS 7667 (S.D. Cal. 2003) ..................................... 47

*In re Apollo Grp. Inc. Sec. Litig.*,
   395 F. Supp. 2d 906 (D. Ariz. 2005) .................................................... 17

*Ashcroft v. Iqbal*,
   129 S. Ct. 1937 (2009) ........................................................................ 13

*Atlas v. Accredited Home Lenders Holding Co.*,
   556 F. Supp. 2d 1142 (S.D. Cal. 2008) ................................................ 22

*Backe v. Novatel Wireless, Inc.*,
   607 F. Supp. 2d 1145 (S.D. Cal. 2009) ................................................ 40

*Batwin v. Ocean Networks, Inc.*,
   2008 U.S. Dist. LEXIS 52365 (C.D. Cal. 2008) ...................... 38, 44, 48, 49

*Berson v. Applied Signal Tech., Inc.*,
   527 F.3d 982 (9th Cir. 2008) ....................................................... *passim*

*Binder v. Gillespie*,
   184 F.3d 1059 (9th Cir. 1999)............................................................. 14

*Brashears v. 1717 Capital Mgmt.*,
   2004 U.S. Dist. LEXIS 28400 (D. Del. 2004) ...................................... 42

*In re Bristol Myers Squibb Co. Sec. Litig.*,
   586 F. Supp. 2d 148 (S.D.N.Y. 2008)................................................... 42

*Brodsky v. Yahoo! Inc.*,
   630 F. Supp. 2d 1104 (N.D. Cal. 2009) ...................................................... 16, 36

*In re Cadence Design Sys., Inc. Sec. Litig.*,
   692 F. Supp. 2d 1181 (N.D. Cal. 2010) ...........................................................46

*Chamber of Commerce of the U.S. v. Whiting*,
   179 L. Ed. 2d 1031 (2011)..............................................................................29

*In re Clorox Co. Sec. Litig.*,
   238 F. Supp. 2d 1139 (N.D. Cal. 2002) ...........................................................47

*In re CornerStone Propane Partners, L.P. Sec. Litig.*,
   355 F. Supp. 2d 1069 (N.D. Cal. 2005) ...................................................... 40, 43

*In re Countrywide Fin. Corp. Sec. Litig.*,
   588 F. Supp. 2d 1132 (C.D. Cal. 2008).........................................................27, 36

*In re Cutera Sec. Litig.*,
   610 F.3d 1103 (9th Cir. 2010).........................................................................48

*In re Cylink Sec. Litig.*,
   178 F.Supp. 2d 1077 (N.D. Cal. 2001) ...........................................................45

*In re Daou Sys., Inc., Sec. Litig.*,
   411 F.3d 1006 (9th Cir. 2005).........................................................................27

*Desaigoudar v. Meyercord*,
   223 F.3d 1020 (9th Cir. 2000).........................................................................14

*In re Downey Sec. Litig.*,
   2009 U.S. Dist. LEXIS 83443 (C.D. Cal. 2009) ..........................................15, 18

*DSAM Global Value Fund v. Altris Software, Inc.*,
   288 F.3d 385 (9th Cir. 2002) .....................................................................38, 40

*Dura Pharm., Inc. v. Broudo*,
   544 U.S. 336 (2005) .......................................................................................14

*Emp'rs Teamsters Local Nos. 175 & 505 Pension Trust Fund v. Clorox Co.*,
   353 F.3d 1125 (9th Cir. 2004).........................................................................23

*In re Entropin, Inc., Sec. Litig.*,
   487 F. Supp. 2d 1141 (C.D. Cal. 2007)............................................................45

1
2

*Epstein v. Itron, Inc.*,
    993 F. Supp. 1314 (E.D. Wash. 1998) .............................................................. 33

3
4

*Eshelman v. OrthoClear Holdings, Inc.*,
    2008 U.S. Dist. LEXIS 6826 (N.D. Cal. 2008).................................................. 15

5
6

*In re Faro Techs. Sec. Litig.*,
    534 F. Supp. 2d 1248 (M.D. Fla. 2007) .......................................................... 38

7

*Fecht v. Price Co.*,
    70 F.3d 1078 (9th Cir. 1995)........................................................................... 35

8
9

*In re Foundry Networks, Inc. Sec. Litig.*,
    2003 U.S. Dist. LEXIS 18200 (N.D. Cal. 2003)............................................. 23

10
11

*Frank v. Dana Corp.*,
    2011 U.S. App. LEXIS 10437 (6th Cir. 2011).............................................*passim*

12
13

*In re FVC.com Sec. Litig.*,
    136 F. Supp. 2d 1031 (N.D. Cal. 2000) ........................................................... 45

14
15

*Garfiel v. NDCHealth Corp.*,
    466 F.3d 1255 (11th Cir. 2006).......................................................................... 40

16

*Gelfer v. Pegasystems, Inc.*,
    96 F. Supp. 2d 10 (D. Mass. 2000)................................................................... 38

17
18

*Glazer Capital Mgmt., LP v. Magistri*,
    549 F.3d 736 (9th Cir. 2008) ................................................................26, 28, 40

19
20

*Hanon v. Dataproducts Corp.*,
    976 F.2d 497 (9th Cir. 1992).......................................................17, 18, 24, 44

21
22

*In re Hansen Natural Corp. Sec. Litig.*,
    527 F. Supp. 2d 1142 (C.D. Cal. 2007)...................................................42, 49, 50

23
24

*Higginbotham v. Baxter Int'l Inc.*,
    495 F.3d 753 (7th Cir. 2007)............................................................................. 45

25
26

*Hollinger v. Titan Capital Corp.*,
    914 F.2d 1564 (9th Cir. 1990).......................................................................... 46

27
28

*Howard* v. Everex Sys., Inc.,
    228 F.3d 1057 (9th Cir. 2000).................................................................30, 44, 49

*In re Hypercom Corp. Sec. Litig.*,
    2006 U.S. Dist. LEXIS 45482 (D. Ariz. 2006) ................................................. 26

*In re ICN Pharm., Inc. Sec. Litig.*,
    299 F. Supp. 2d 1055 (C.D. Cal. 2004) ........................................................... 27

*In re Immune Response Sec. Litig.*,
    375 F. Supp. 2d 983 (S.D. Cal. 2005) ................................................ 19, 46, 47

*In re Impac Mortg. Holdings*,
    554 F. Supp. 2d 1083 (C.D. Cal. 2008) ................................................ 23, 45, 48

*In re Irvine Sensors Corp. Sec. Litig.*,
    2003 U.S. Dist. LEXIS 18397 (C.D. Cal. 2003) ........................................... 23

*Janus Capital Grp., Inc. v. First Derivative Traders*,
    180 L. Ed. 2d 166 (2011) ................................................................................. 46

*In re JDS Uniphase Corp. Sec. Litig.*,
    2007 U.S. Dist. LEXIS 66085 (N.D. Cal. 2007) ...................................... 19, 47

*Lasker v. N.Y. State Electric & Gas Corp.*,
    85 F.3d 55 (2d Cir. 1996) ............................................................................... 23

*In re Lattice Semiconductor Corp. Sec. Litig.*,
    2006 U.S. Dist. LEXIS 262 (D. Or. 2006) ........................................ 34, 35, 41

*In re LDK Solar Sec. Litig.*,
    584 F. Supp. 2d 1230 (N.D. Cal. 2008) ............................................ 13, 39, 44

*In re Levi Strauss & Co. Sec. Litig.*,
    527 F. Supp. 2d 965 (N.D. Cal. 2007) ........................................................... 39

*Lewis v. Straka*,
    2006 U.S. Dist. LEXIS 76716 (E.D. Wis. 2006) ........................................... 43

*Lipton v. Pathogenesis Corp.*,
    284 F.3d 1027 (9th Cir. 2002) ................................................................. 27, 42

*Livid Holdings Ltd. v. Salomon Smith Barney, Inc.*,
    416 F.3d 940 (9th Cir. 2005) ......................................................................... 47

*Lormand v. US Unwired, Inc.*,
    565 F.3d 228 (5th Cir. 2009) ......................................................................... 33

*Makor Issues & Rights, Ltd. v. Tellabs Inc.*,
   513 F.3d 702 (7th Cir. 2008) ................................................................ 30, 36, 43

*Marcus v. Frome*,
   329 F. Supp. 2d 464 (S.D.N.Y. 2004) ............................................................. 43

*Matrixx Initiatives, Inc. v. Siracusano*,
   131 S. Ct. 1309 (2011) ................................................................................. 17

*In re Maxim Integrated Prods., Inc. Sec. Litig.*,
   639 F. Supp. 2d 1038 (N.D. Cal. 2009) ........................................................ 42

*McGann v. Ernst & Young*,
   102 F.3d 390 (9th Cir. 1996) ........................................................................ 45

*In re McKesson HBOC, Inc. Sec. Litig.*,
   126 F. Supp. 2d 1248 (N.D. Cal. 2000) .................................................. 41, 46

*In re Medicis Pharm. Corp. Sec. Litig.*,
   2010 U.S. Dist. LEXIS 81410 (D. Ariz. 2010) .............................................. 44

*Metzler Inv. GMBH v. Corinthian Colls., Inc.*,
   540 F.3d 1049 (9th Cir. 2008) ................................................................. 16, 27

*Middlesex Ret. Sys. v. Quest Software Inc.*,
   527 F. Supp. 2d 1164 (C.D. Cal. 2007) ............................................ 35, 41, 44

*Morgan v. AXT, Inc.*,
   2005 U.S. Dist. LEXIS 42346 (N.D. Cal. 2005) ............................................ 40

*N.M. State Inv. Council v. Ernst & Young LLP*,
   2011 U.S. App. LEXIS 7680 (9th Cir. 2011) ......................................... *passim*

*In re Nature's Sunshine Prods. Sec. Litig.*,
   486 F. Supp. 2d 1301 (D. Utah 2007) ........................................................... 23

*In re Navarre Corp. Sec. Litig.*,
   299 F.3d 735 (8th Cir. 2002) ........................................................................ 19

*In re Netflix, Inc. Sec. Litig.*,
   2005 U.S. Dist. LEXIS 18765 (N.D. Cal. 2005) ........................................... 15

*In re New Century*,
   588 F. Supp. 2d 1206 (C.D. Cal. 2008) ................................................ *passim*

vii

*No. 84 Emp'r-Teamster Joint Council Pension Trust Fund v. Am. W. Holding Corp.*,
320 F.3d 920 (9th Cir. 2003) ............................................................... 45

*Norfolk Cnty. Ret. Sys. v. Ustian*,
2009 U.S. Dist. LEXIS 65731 (N.D. Ill. 2009) ................................... 38

*In re NorthPoint Commc'ns Grp., Inc., Sec. Litig. & Consol. Cases*,
221 F. Supp. 2d 1090 (N.D. Cal. 2002) ....................................... 21, 34

*In re NorthPoint Commc'ns Grp., Inc., Sec. Litig.*,
184 F. Supp. 2d 991 (N.D. Cal. 2001) ................................. 18, 28, 38

*In re Northwest Biotherapeutics Inc. Sec. Litig.*,
2008 U.S. Dist. LEXIS 54028 (W.D. Wash. 2008) ......................... 36

*Novak v. Kasaks*,
216 F.3d 300 (2d Cir. 2000) ................................................................ 29

*Nursing Home Pension Fund, Local 144 v. Oracle Corp.*,
380 F.3d 1226 (9th Cir. 2004) ................................................. 21, 27, 34

*In re Nuvelo, Inc., Sec. Litig.*,
668 F. Supp. 2d 1217 (N.D. Cal. 2009) ...................................... 14, 46

*Official Unsecured Creditors Comm. of Media Vision Tech., Inc. v. Jain*,
215 F.R.D. 587 (N.D. Cal. 2003) ...................................................... 30

*In re Oxford Health Plans, Inc., Sec. Litig.*,
51 F. Supp. 2d 290 (S.D.N.Y. 1999) ............................................... 41

*In re Pac. Gateway Exch., Inc. Sec. Litig.*,
2002 U.S. Dist. LEXIS 8014 (N.D. Cal. 2002) ............................... 42

*Patel v. Parnes*,
253 F.R.D. 531 (C.D. Cal 2008) ....................................................... 14

*Commc'ns Workers of Am. Plan for Emps.' Pensions & Death Benefits v. CSK Auto Corp.*,
525 F. Supp. 2d 1116 (D. Ariz. 2007) .............................................. 41

*In re PETsMART, Inc. Sec. Litig.*,
61 F. Supp. 2d 982 (D. Ariz. 1999) ...................................... 15, 19, 42

*Pozzi v. Smith*,
  1995 U.S. Dist. LEXIS 18163 (E.D. Pa. 1995)..................................................46

*Provenz v. Miller*,
  102 F.3d 1478 (9th Cir. 1996) ..............................................................30, 47

*In re Rackable Sys., Inc. Sec. Litig.*,
  2010 U.S. Dist. LEXIS 88927 (N.D. Cal. 2010)................................................17

*In re Read-Rite Corp. Sec. Litig.*,
  335 F.3d 843 (9th Cir. 2003) ................................................................25, 27

*In re Refco, Inc. Sec. Litig.*,
  503 F. Supp. 2d 611 (S.D.N.Y. 2007) ...........................................................45

*N.Y. City Emps.' Ret. Sys. v. Berry*,
  616 F. Supp. 2d 987 (N.D. Cal. 2009).............................................................27

*Ronconi v. Larkin*,
  253 F.3d 423 (9th Cir. 2001) ................................................................31, 34

*Rosenbaum Capital, LLC v. McNulty*,
  549 F. Supp. 2d 1185 (N.D. Cal. 2008) ...........................................................46

*S. Ferry LP, #2 v. Killinger*,
  542 F.3d 776 (9th Cir. 2008) ................................................................25, 26

*Santa Fe Indus., Inc. v. Green*,
  430 U.S. 462 (1977) .................................................................................43

*SEC v. Mozilo*,
  2009 U.S. Dist. LEXIS 104689 (C.D. Cal. 2009).................................................23

*SEC v. Todd*,
  2011 U.S. App. LEXIS 12692 (9th Cir. 2011)................................23, 30, 39, 49

*In re SemGroup Energy Partners, L.P. Sec. Litig.*,
  729 F. Supp. 2d 1276 (N.D. Okla. 2010) ........................................................28

*In re Silicon Graphics Inc. Sec. Litig.*,
  183 F.3d 970 (9th Cir. 1999)......................................................................42

*Siracusano v. Matrixx Initiatives, Inc.*,
  585 F.3d 1167 (9th Cir. 2009).....................................................................44

*In re Software Toolworks Inc. Sec. Litig.*,
    50 F.3d 615 (9th Cir. 1994) ............................................................ 40

*In re Spear & Jackson Sec. Litig.*,
    399 F. Supp. 2d 1350 (S.D. Fla. 2005) ............................................ 43

*In re Stac Elecs. Sec. Litig.*,
    89 F.3d 1399 (9th Cir. 1996) ............................................................ 15

*Stocke v. Shuffle Master, Inc.*,
    615 F. Supp. 2d 1180 (D. Nev. 2009) ........................................ 37, 38

*In re Surebeam Corp. Sec. Litig.*,
    2004 U.S. Dist. LEXIS 26951 (S.D. Cal. 2005) ......................... 48, 50

*Svezzese v. Duratek, Inc.*,
    2002 U.S. Dist. LEXIS 20967 (D. Md. 2002) .................................. 27

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
    551 U.S. 308 (2007) ..............................................................*passim*

*Tripp v. IndyMac Bancorp, Inc.*,
    2007 U.S. Dist. LEXIS 95445 (C.D. Cal. 2007) ............................. 40

*In re Turbodyne Techs., Inc. Sec. Litig.*,
    2000 U.S. Dist. LEXIS 23020 (C.D. Cal. 2000) ......................... 21, 33

*In re U.S. Aggregates, Inc. Sec. Litig.*,
    235 F. Supp. 2d 1063 (N.D. Cal. 2002) ........................................... 44

*In re UTStarcom, Inc. Sec. Litig.*,
    617 F. Supp. 2d 964 (N.D. Cal. 2009)................................ 17, 27, 47

*In re Vantive Corp. Sec. Litig.*,
    283 F.3d 1079 (9th Cir. 2002)..................................................16, 27

*In re Wash. Mut., Inc. Sec. Derivative & ERISA Litig.*,
    694 F. Supp. 2d 1192 (W.D. Wash. 2009) ...................................... 43

*In re Wet Seal, Inc. Sec. Litig.*,
    518 F. Supp. 2d 1148 (C.D. Cal. 2007)......................................23, 26

*In re Worlds of Wonder Sec. Litig.*,
    35 F.3d 1407 (9th Cir. 1994).............................................................. 26

x

1  *Zucco Partners, LLC v. Digimarc Corp.*,
2      552 F.3d 981 (9th Cir. 2009) ................................................................... 36, 38, 40

3  **STATUTES**

4  8 U.S.C. §1324a(a)(3) ............................................................................................ 29

5  15 U.S.C. §78j(b) ................................................................................................... 14

6  15 U.S.C. §78u-4(b)(1)(B) .................................................................................... 14

7  15 U.S.C. §78u-5(c)(1)(A)(i) ................................................................................ 46

8  17 C.F.R. §240.10b-5 ............................................................................................ 17

9  Fed. R. Civ. P. 12(b)(6) ......................................................................................... 13

10  Fed. R. Civ. P. 15(a) .............................................................................................. 50

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1       Lead Plaintiff Charles Rendelman (hereafter "plaintiff") respectfully submits

2  this memorandum of law in opposition to the three separate motions to dismiss filed

3  by (i) American Apparel, Inc. ("American Apparel" or the "Company"); (ii) American

4  Apparel Chief Executive Officer ("CEO") and Chairman of the Board ("Chairman"),

5  Dov Charney, and former American Apparel Chief Financial Officer ("CFO") Adrian

6  Kowalewski (the "Individual Defendants"); and (iii)  Lion Capital LLP and Lion

7  Capital (Americas) Inc. ("Lion Capital").[1]

## I.    INTRODUCTION

9       The Complaint tells a simple story of a clothing retail Company that had

10  become so deeply dependent on the thousands of **undocumented** manufacturing

11  workers it employed while it was still privately-held, that the Individual Defendants

12  actively concealed their massive illegal operation from shareholders after taking

13  American Apparel public on December 17, 2007.  ¶10.[2]  American Apparel's

14  manufacturing facilities and headquarters are all based under one roof in downtown

15  Los Angeles.  The Individual Defendants' executive offices are also located in the

16  same manufacturing facility where, at the start of the Class Period, the Company

17  employed approximately 5,800 manufacturing employees.

18       Defendants seek dismissal of the Complaint largely by ignoring plaintiff's

19  allegations, the startling conclusions of American Apparel's own independent auditor

20  and Charney's own admissions of wrongdoing.  Defendants also ignore that

21  representatives from two federal agencies accused defendants of "**knowingly**"

---

[1]    "Defendants" refers to American Apparel and the Individual Defendants.  "APP MTD" refers to American Apparel's motion to dismiss (Docket No. 73).  "Indiv. MTD" refers to the Individual Defendants' motion to dismiss (Docket No. 76).  "Lion MTD" refers to Lion Capital's motion to dismiss (Docket No. 77).

[2]    All "¶_" citations are to the Consolidated Class Action Complaint for Violation of Federal Securities Laws ("Complaint") (Docket No. 66).  Unless otherwise noted, all emphasis is added and internal citations are omitted.

1   engaging in a "scheme" to violate U.S. immigration laws.[3]  Indeed, ICE and the

2   Department of Homeland Security ("DHS") fined American Apparel for its unlawful

3   scheme and, on July 3, 2009, Matt Chandler, a DHS spokesman, forcefully stated that

4   the ICE action at American Apparel "underscore[s] our commitment to targeting

5   employers *that cultivate illegal work forces by knowingly hiring and exploiting*

6   *illegal workers*." ¶88.

7        Despite this, defendants nevertheless contend that, as early as November 2007,

8   they disclosed that the Company relied heavily on *documented* immigrant workers.[4]

9   The Complaint, however, alleges that defendants knew but failed to disclose that

10  thousands of those workers were *undocumented*.  ¶¶13, 74, 80-81, 85.  This is

11  distinction with a difference.  Before American Apparel's illegal manufacturing

12  operation was revealed, defendants had falsely and repeatedly told investors that the

13  Company's manufacturing employees were "*documented immigrants, authorized to*

14  *work in the United States*." ¶¶69, 71.  When the truth about the Company's massive

15  illegal operation was first disclosed on June 30 and July 1, 2009, American Apparel's

16  share price dropped *16%* on heavy trading volume.  Defendants' motions to dismiss

17  provide no other explanation for this abrupt, significant decline in the Company's

18  stock price.

19       After American Apparel's large undocumented workforce was identified (and

20  later terminated), defendants sought to assure by-then jittery investors that the

21  terminations would have "no material impact" on the Company.  ¶¶14-15, 19, 81-82,

22  89, 92-93, 96, 100.  This, too, was false, and when defendants finally admitted the

---

[3]      The Company's motion seeks to paint this allegation derisively by stating that
"Plaintiff repeatedly intones that American Apparel...was engaged in some sort of
'immigration scheme.'"  APP MTD at 1.  The "scheme" allegation comes directly
from the U.S. Immigration and Customs Enforcement ("ICE").  ¶¶13, 79-80, 88.

[4]      Defendants also claim that their filings and disclosures were always "timely."
APP MTD at 2, 4-5, 9,18.  Under our facts, this is a horrible argument.  *See* Appendix
A.

"unprecedented" impact the terminations had on the Company's operations on May 19, 2010, the Company's stock plunged ***40.51%***, to close on May 19, 2010 at $1.63. ¶¶20-22, 105-07, 150-51.  Again, defendants provide no other explanation for this significant decline in the Company's stock price.

Defendants' motions also fail to squarely address the allegation that defendants concealed that internal American Apparel e-mails stated that the Company "***almost went bankrupt***" in December 2008.  ¶¶28-29.  Notably, only a few weeks earlier during the Company's November 10, 2008 conference call with investors, Charney trumpeted the Company's strong financial health, stating "[*w*]*e're confident in the numbers we've put out there, that's for sure*."  ¶30.  Ultimately, while defendants may choose to mischaracterize plaintiff's detailed allegations, they do not (and cannot) seriously dispute that:

> (i)     In May 2008, former American Apparel CFO Ken Cieply ***resigned*** after being described by Charney in the *Wall Street Journal* as having "no credibility" and being a "complete loser" (¶¶25, 110);
>
> (ii)    On November 10, 2009, American Apparel disclosed that it was fined by ICE for ***knowingly*** employing thousands of undocumented workers after previously telling investors the "fine had been withdrawn" on September 30, 2009 (¶¶16-17, 88, 99);
>
> (iii)   On June 22, 2010, Deloitte & Touche LLP ("Deloitte") ***resigned*** as American Apparel's independent auditor, stating that it was "***no longer willing to rely on management's representations*** due to Deloitte's belief that management withheld from Deloitte the February 2010 monthly financial statements until after the filing of the 2009 10-K and ***made related misrepresentations***" (¶¶12, 22, 34-36, 124-27);
>
> (iv)    In August 2010, the Department of Justice ("DOJ"), the Federal Bureau of Investigation ("FBI") and the U.S. Securities and Exchange Commission ("SEC") commenced civil and ***criminal*** investigations into the same wrongdoing defendants' motions to dismiss blithely depict as "rhetoric," "innuendo" and "sweeping homilies on corporate ethics" (¶¶12, 35, 130);[5]

---

[5]     Defendants' coy dismissal of the Company's ***own*** "Code of Ethics" is telling. ¶¶51, 169.

1
2

(v)  On April 1, 2011, Lion Capital's two designated Board directors – Lyndon Lea and Neil Richardson – *resigned* from American Apparel's Board, citing "*conflicts of interest*" (¶¶38, 117); and

3
4
5

(vi)  On May 2, 2011, the first Monday following the filing of the above-captioned action, Keith Miller, a member of the Company's Audit Committee and Chairman of the Compensation Committee, *resigned* from the Board lamenting the "erosion" Charney's reckless behavior had caused the Company and its shareholders (¶7).

6
7
8
9
10
11
12
13
14
15
16
17
18
19

Despite this remarkably poor record, throughout the Class Period, Charney showered himself and his closest relatives with millions of dollars in "performance" and other (undeserved) bonuses.  ¶¶155-59, 161-62.  While enjoying the investing public's money (¶¶11, 57-62), by the last day of the Class Period, the Company's share price had been reduced to a mere $1.03 from a Class Period high of $15.60 as the truth regarding defendants' prior misconduct was revealed to the market.  While defendants half-heartedly raise other arguments – such as whether defendants' false statements constitute "puffery" – they merit little more than passing mention.  Predominantly, defendants simply raise questions of fact that cannot be decided here.  And, in those rare instances where such arguments could be decided on a motion to dismiss, defendants utterly fail to carry their burden.   For all these reasons, defendants' motions to dismiss should be denied in their entirety.  *See generally N.M. State Inv. Council v. Ernst & Young LLP*, 2011 U.S. App. LEXIS 7680 (9th Cir. 2011).

20

## II.   STATEMENT OF FACTS

21
22

### A.   Background to the Class Period

23
24
25
26
27
28

In 2005, Richard H. Koppes, a former corporate defense lawyer and highly experienced and respected corporate governance expert, said of American Apparel that "[i]t sounds like there's no adult presence at that company….The workplace is not a playground."  ¶56.  To this day, the "Corporate Governance" section of American Apparel's website touts that "American Apparel founder and Chief Executive Officer Dov Charney is a self-described '*hustler*' and one of fashion's leading innovators."

¶54.   Charney's self-description could not be more apt – *American Heritage Dictionary* defines a "hustler" as someone who "make[s] money by questionable means," while *Merriam-Webster Dictionary* defines a "hustler" as a person who "sell[s] something [by] especially underhanded activity."  Both definitions apply with equal force to Charney.

Realizing Charney's credibility problem, the Individual Defendants' motion informs us that, in 2004, Charney was "an Ernst & Young Entrepreneur of the Year and an Apparel Magazine Man of the Year."  Indiv. MTD at 2.  The Complaint, however, does not challenge Charney's design sensibilities.  Nor does it mention Ernst & Young LLP.  Defendants' motions also advise us that Charney "is committed to knowing his employees by face, greeting them in the factory and retail stores [and] has remained a champion of…workers."  *Id*.  Charney may be committed to knowing his employees by face but, as alleged in the Complaint, not because he is a "champion" of workers' rights.  ¶¶7 n.4, 56.

Instead, and in stark contrast to the Company's purported pro-labor "brand," Charney has repeatedly been accused of sexual harassment by the Company's female employees.  *Id*.  These are not mere tabloid allegations.  On August 9, 2010, the Equal Employment Opportunity Commission ("EEOC") issued a written determination to the Company that a "reasonable cause exists to believe the Company ***discriminated against*** [] ***women***, as a class, on the basis of their female gender, ***by subjecting them to sexual harassment***."  ¶7 n.4.  The Complaint also alleges that the Company has a policy of firing (or not hiring) retail store employees that Charney personally deems "too ugly."  ¶74 n.12.  Charney even ***personally*** hired young women at random to work in his Los Angeles factory.[6]  ¶¶68, 73.  Moreover, and most disturbingly, in sworn testimony from a 2006 sexual harassment lawsuit, Charney admitted to and

---

[6]   Despite this, defendants advised investors that they made "diligent efforts" to comply with labor and employment regulations.  ¶¶5, 69, 73.

1  defended using the patently inappropriate slur – "slut – " to describe the Company's

2  female employees, testifying "[y]ou know, ***there are some of us that love sluts***.  You

3  know, it's not necessarily – it could [] also be ***an endearing term***." ¶56; Ex. 1.[7]  Given

4  the foregoing, defendants' characterization of Charney as a "champion" of workers'

5  rights can best be described as a reflection of defendants' own biases and repugnant

6  stereotypes.

7      Moreover, Charney's dismal defense of his indefensible slur to describe

8  American Apparel's female employees likewise pervades the arguments defendants

9  raise in support of their motions to dismiss the Complaint.

10      **B.    Defendants' Immigration Compliance Fraud**

11      Before the Class Period, "Charney seem[ed] to relish too much the control and

12  the flexibility guaranteed by the ***absence of shareholders*** to go public."  ¶57.  By

13  December 2006, however, Charney "was nearly broke from financing the 150-store

14  company since its inception [in 1989]."  *Id*.  Charney's decision to take American

15  Apparel public surprised the market with the *New York Times* reporting that "[t]he

16  decision to sell the privately held company, expected to be announced today, is a

17  surprise move by the company's eccentric founder, Dov Charney, who is known for

18  exercising strict, and at times controversial, control over the retailer's operations."

19  ¶57.  To quickly gain access to much needed capital, Charney took American Apparel

20  public through an unusual "blank check" reverse-merger.[8]  Charney ensured that the

21  merger terms were as lucrative for himself as possible and enabled him to maintain his

22  role as CEO – something that Endeavor Acquisition Corp. ("Endeavor") did not

23  _____

24  [7]    All "Ex._" citations are to the exhibits attached to the Declaration of Ramzi

25  Abadou in Support of Lead Plaintiff's Opposition to Defendants' Motions to Dismiss.

26  [8]    A "blank check" merger enables companies, like American Apparel, with weak
    controls and bogus financials to avoid the scrutiny associated with a traditional initial

27  public offering.  ¶¶11, 57-58; Ex. 2.  On June 11, 2011, the SEC cautioned investors
    about buying stakes in companies that gain listings on U.S. exchanges through reverse

28  mergers, finding they are prone to "fraud and other abuses."  Ex. 3.

1    initially agree to.  ¶¶58-60.  As a result of the merger, Charney's net worth was $580

2    million. ¶11.

3           American Apparel's purportedly pro-immigrant "brand" identity has long been

4    closely tied to Charney, and American Apparel's domestic manufacturing and labor

5    practices were perceived as "integral" to the Company's "brand."  ¶¶6-7, 15, 70.

6    Analysts conveyed defendants' message to investors, stating that the Company's

7    purported "pro-employee" branding provides American Apparel a "critical marketing

8    advantage" over its competitors; enabling it to "differentiate" itself from other U.S.

9    clothing retailers who manufacture their garments overseas.  ¶¶6, 18, 56, 61, 77, 97.

10   To promote its "made in the U.S.A." brand, the Company repeatedly promoted the

11   fact that all of American Apparel's manufacturing facilities for its worldwide

12   operations and its headquarters are based in Los Angeles, where Charney's and

13   Kowalewski's executive offices are located.   ¶¶5, 63, 71.   Charney spent

14   approximately 50 hours per-week at the factory during the Class Period. ¶¶19, 71.  In

15   an effort to conceal the thousands of undocumented workers from its vendors and

16   other sources of potential scrutiny, American Apparel even utilized ***separate payroll***

17   ***departments*** and systems for its factory and retail/corporate employees.   ¶74.

18   Defendants completely ignore this allegation.

19          In January 2008, only a month after going public, American Apparel was

20   notified by DHS that ICE had commenced an audit of the Company regarding its

21   compliance with immigration laws.  ¶¶85-87.  Despite the importance of the ICE

22   notice (or, perhaps, because of it), defendants concealed the notice from investors for

23   four full months.[9]  On June 30, 2009, the Company filed an 8-K, signed by Charney,

24   which finally disclosed publicly to investors what defendants knew all along –

25

26   _____

27   [9]     Given defendants' publicly-stated heavy reliance on immigrant labor, this was
     an event the Company should have immediately disclosed in a press release on Form
28   8-K.

-7-

1  namely, that "1,600 current employees appear **not to be authorized to work in the**

2  **United States**."   ¶¶80, 145.   This stood in stark contrast to defendants' prior

3  statements that the Company's manufacturing employees were "**documented**

4  **immigrants, authorized to work in the United States**."  ¶¶5, 13, 69, 71.

5       Then, on July 1, 2009, the Company issued an unusual next-day press release

6  on Form 8-K that revealed that many of the targeted undocumented workers had

7  "worked at American Apparel **for as long as a decade**," confirming that the Company

8  had long failed to comply with immigration laws and that Charney knew many of

9  these employees **personally**.  ¶81.  As a result of this disclosure, the Company's stock

10  price fell **16%** between June 30, 2009 and July 2, 2009 on heavy trading volume.

11  ¶¶13, 81, 146.  On July 2, 2009 an ICE spokeswoman commented that, "'[c]learly, if

12  there is widespread use of Social Security numbers that either are not real or belong to

13  someone other than the person named, we have concerns about possibly a **scheme to**

14  **avoid immigration law**….They [American Apparel] are going to be fined no matter

15  what.  What's in question now is the amount of the fine.'"  ¶88.  On July 3, 2009, Matt

16  Chandler, a spokesman for DHS, stated that the ICE action at American Apparel

17  "underscore[s] our commitment to targeting employers that cultivate illegal work

18  forces by **knowingly** hiring and exploiting illegal workers."[10]  ¶88.  On September 30,

19  2009, Congressman Brian P. Bilbray condemned the Company for knowingly hiring

20  thousands of undocumented workers, stating that American Apparel had "'become

21  addicted to illegal labor'" and "'[t]hey seem to think that somehow **the law doesn't**

22  **matter**, that **crossing the line from legal to illegal is not a big deal**.'"  *Id.*, n.14.

23       Cognizant of the profound harm their "scheme" caused shareholders, the July 1,

24

25

_____

26  [10]     While Charney repeatedly sought to blame President Obama for the ICE sanctions and the Company's subsequent financial troubles (¶¶17-18), the Company's

27  motion to dismiss sarcastically states that the Complaint "is long on rhetoric and innuendo – **featuring**, among other things, [] President Obama's immigration

28  policies."  The Company's attempt at sarcasm is misplaced.  *See id.*

1   2009 press release on Form 8-K also misleadingly assured investors that it "is the

2   Company's policy, and has been at all times, to fully comply with its obligations to

3   establish the employment eligibility of prospective employees under immigration

4   laws." ¶¶13, 69, 83.  Defendants also told investors that the terminations would have

5   "***no material impact***" on the Company.  ¶82.  Even as late as November 10, 2009, the

6   Company held a 3Q09 earnings conference call, maintaining that the terminations

7   were not having ***any*** adverse impact on the Company.  ¶¶19, 89, 100.  Specifically,

8   Kowalewski stated, "I think what we said back in July [2009] when we had this issue

9   was we didn't think it was going to have a material impact to our financial results."

10   ¶¶19, 100.  Kowalewski also compared the Company's labor efficiency to the prior

11   year's, stating, "I think on a year over year basis the efficiency in labor is probably

12   pretty comparable."  ¶100.  Charney similarly falsely described the Company's

13   transition to new workers resulting from the loss of one-third of the Company's

14   workforce as "***virtually seamless***."  *Id.*

15        The transition had not been "virtually seamless."  Only a few short months

16   later, on March 25, 2010, defendants were forced to admit that the effects of the

17   terminations had been "substantial" and that the "extended disruption on [the

18   Company's] operations has been ***unprecedented***."  ¶101.  On April 2, 2010, the *Los*

19   *Angeles Times* pointed out the contradiction, reporting that Charney "***initially said***

20   ***that business would barely be affected***. ***He has since changed his tune***, now saying

21   that the personnel cuts were 'a big setback' to the company and its plans to make more

22   sophisticated products." ¶103.

23        Soon thereafter, defendants were forced to admit the profoundly negative

24   impact the terminations had (and are still continuing to have) on the Company's

25   operations.  On May 19, 2010, the Company reported a significant drop in its gross

26   margin due, in part, to "***reduced labor efficiency***."  ¶¶105, 150.  The Company also

27   admitted that the "[t]he reduction in labor efficiency ***was a result*** of the dismissal of

28   over 1,500 experienced manufacturing employees."  ¶150.  The same day, the

Company also stated that it "expects that the reduced manufacturing efficiency at the company's production facilities beginning during the fourth quarter of 2009 could likely continue through the end of 2010, and could impact the company's financial results at least through early 2011." *Id.* In response to the May 19, 2010 announcement, the Company's stock price dropped ***40.51%*** on trading of over 2.8 million shares in a single day. ¶151.

Finally, on August 17, 2010, the Company issued a press release that reported that the Company expected to report a loss of $5 million to $7 million in 2Q10 on net sales of $132 million to $134 million. ¶¶23, 129, 153-54. A significant factor for the losses was "***lower labor efficiency*** at the Company's production facilities….The lower labor efficiency was ***primarily*** a result of the hiring of over 1,600 net new manufacturing workers during the second quarter of 2010." ¶¶129, 153 The August 17, 2010, press release also stated that, as a result of these developments, American Apparel's very existence was now in doubt, stating "the Company may not have sufficient liquidity necessary to sustain operations for the next twelve months [which] raise[s] substantial doubt that the Company will be able to continue as a going concern." ¶¶23, 129, 154. On this news, the Company's share price fell another 25.9%. ¶154.[11]

### C.    The Deloitte Debacle

In addition to misleading investors about its immigration compliance, defendants also misled its own auditor and the broader market about the Company's financial controls and statements. Indeed, throughout the Class Period, Charney had zero ability to control himself, let alone his Company. ¶¶7 n.4, 56. For instance, only a few short months after taking American Apparel public, Charney publicly humiliated his then-current CFO, Ken Cieply, during a March 20, 2008, interview

---

[11]    As of the date of this filing, the Company's share price trades at approximately $0.90.

with the *Wall Street Journal*, saying Mr. Cieply had "**no credibility**" and was a "**complete loser**."  ¶25.  Not surprisingly, Mr. Cieply resigned almost immediately thereafter.   Charney replaced Cieply with Kowalewski, age 31, who had just graduated from business school in 2006 and was a former American Apparel *intern*.  With his new "team" in place, Charney's efforts to mislead the market went unobstructed and, throughout 2008, 2009 and into 2010, analysts celebrated the Company's remarkably positive (but illusory) financial performance.  ¶¶32-33, 113.

In truth, defendants knew that the Company was on the verge of bankruptcy.  On December 24, 2008, then-CFO Kowalewski sent the Company's head of public relations, Ryan Holiday, a series of e-mails.  ¶29.  In the opening e-mail, Holiday seeks Kowalewski's assistance responding to an upcoming (and potentially damaging) news story about Charney. ¶¶28-29.  Several minutes later at 1:33 p.m., Kowalewski responds to Holiday's request saying that he did not have time to help with the story on Christmas Eve because, among other things, "1.  We [American Apparel] *almost went bankrupt last Friday*.  I'm sorry but I was busy with that *for the past several weeks*.  2.  I've been sick and occupied with other company matters since Friday because we're *hardly out of the woods* on #1 [*i.e.*, bankruptcy]." *Id.*

American Apparel never previously disclosed that the Company was on the verge of bankruptcy at that point during the Class Period.  To the contrary, during the Company's November 10, 2008 conference call with investors only a month earlier, Charney falsely trumpeted the Company's strong financial health, claiming "[w]e're confident in the numbers we've put out there, *that's for sure*."  ¶30.  As expected, investors and analysts relied upon Charney's assured and unequivocal statements.  *See* Ex. 4 at 9 ("very impressive results… [k]eep up the good work").   Then, to further calm nervous investors about the Company's troubled controls and the accuracy of its financial reporting, defendants hired Deloitte to replace Marcum as the Company's

1    new independent auditor in the spring of 2009.[12]  ¶¶31, 121.

2           Only a year later, on July 28, 2010, defendants suddenly announced that,

3    effective July 22, 2010, Deloitte had ***resigned*** as the Company's independent auditor.

4    Without elaborating, defendants advised investors that Deloitte had resigned because

5    "certain information had come to Deloitte's attention that if further investigated may

6    materially impact the reliability of either its previously issued audit report or the

7    underlying consolidated financial statements for the year ended December 31, 2009

8    included in the Company's 2009 Form 10-K."  ¶34.  Deloitte later withdrew its audit

9    for all of the Company's 2009 financial statements, warning investors that they should

10   "***no longer be relied upon***."  *Id.*  On this news, the Company's stock price fell 14.36%

11   on unusually heavy volume.  *Id.*

12          Then, on August 17, 2010, the Company was forced to disclose that defendants

13   had received a grand jury subpoena from the DOJ on July 30, 2010 (a week after

14   Deloitte quit) for documents relating to the Deloitte resignation and a related inquiry

15   from the SEC regarding the matter.  ¶35.  In response to this and other same-day

16   negative announcements, the Company stock price fell over 46% between August 16

17   and August 19, 2010.  *Id.*  Then, in November 2010, it was also revealed that (i)

18   American Apparel had also received a subpoena from the U.S. Attorney's Office for

19   the Central District of California for documents relating to an official ***criminal***

20   investigation being conducted by the FBI into Deloitte's resignation and the

21   Company's financial reporting and internal controls; and (ii) a subpoena from the SEC

22   for documents relating to the SEC's, now, ***formal*** investigation surrounding Deloitte's

23   resignation and the Company's financial reporting and internal controls.  *Id.*

24          After the Class Period, on December 21, 2010, the Company belatedly provided

25

---

26   [12]    On April 3, 2009, Marcum was dismissed as the Company's auditor shortly
27   after Marcum disclosed "material weaknesses" in American Apparel's internal
     controls. ¶¶37 n.8, 127. Inexplicably, Marcum was later re-hired after Deloitte would
28   no longer bless the Company's books.

1    additional facts about Deloitte's resignation.  The Company disclosed that its Audit
2    Committee received notice that Deloitte's resignation was motivated by Deloitte's
3    "professional judgment" that it was "***no longer willing to rely on management's***
4    ***representations*** due to Deloitte's belief that management **withheld from Deloitte** the
5    February 2010 monthly financial statements until after the filing of the 2009 10-K and
6    ***made related misrepresentations***." ¶¶12, 36, 124, 134, 169.  In other words, Deloitte
7    resigned as the Company's independent auditor, reported defendants to federal
8    authorities and withdrew its audit for the Company's 2009 financial statements
9    because Deloitte could no longer credibly assure investors that defendants had not
10   committed an accounting fraud.  And, indeed, by being accused of ***withholding***
11   financial statements by Deloitte, it accused defendants of not just reckless conduct, but
12   intentional conduct.  American Apparel's "Audit Committee" has been purportedly
13   "investigating" this issue since last year.  ¶¶126 n.18, 134-35.

14   **III.    ARGUMENT**

15       **A.    Legal Standard**

16         In assessing a Fed. R. Civ. P. 12(b)(6) motion in a PSLRA case, courts must
17   consider the complaint in its entirety, "accept all factual allegations…as true" and
18   construe them in the light most favorable to plaintiff.  *Tellabs, Inc. v. Makor Issues &*
19   *Rights, Ltd.*, 551 U.S. 308, 314 (2007).  The question is not whether a plaintiff will
20   prevail in the action, but whether she is entitled to offer evidence in support of her
21   claim.  *See In re LDK Solar Sec. Litig.*, 584 F. Supp. 2d 1230, 1241 (N.D. Cal. 2008).
22   A complaint should not be dismissed if it contains sufficient factual matter that,
23   accepted as true, states a claim for relief that is plausible on its face.  *See Ashcroft v.*
24   *Iqbal*, 129 S. Ct. 1937, 1949 (2009).

25       **B.    The Complaint Adequately Alleges Violations of Section 10(b)**

26         Section 10(b) of the Securities Exchange Act of 1934 makes it unlawful for a
27   person to employ "any manipulative or deceptive device" in contravention of the rules
28   and regulations of the SEC "in connection with the purchase or sale of any security."

15 U.S.C. §78j(b).  Under §10(b), a plaintiff must allege (1) a false statement or omission (or deceptive acts); (2) of material fact; (3) made with scienter; (4) on which plaintiff justifiably relied; and (5) that proximately caused the alleged loss.  *See Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 341-42 (2005); *Binder v. Gillespie*, 184 F.3d 1059, 1063 (9th Cir. 1999).  Here, defendants' motions do not challenge materiality, reliance or loss causation.  Plaintiff's well-pled allegations of falsity and scienter are more than sufficient.

### C. The Complaint Pleads Actionable False and Misleading Statements and Omissions

Falsity is adequately alleged by "specify[ing] each statement alleged to have been misleading" and "the reason or reasons why the statement is misleading." 15 U.S.C. §78u-4(b)(1)(B).  A complaint sufficiently pleads falsity where, as here, it includes: (i) each statement or omission alleged to have been false and misleading (¶¶5, 13-14, 16, 19, 22, 27, 30-31, 69, 71-73, 75, 81-83, 85, 89, 92-93, 96, 99-100, 108, 110-11, 113-14, 119-20, 122-22, 125); (ii) the reason or reasons why the statement or omission is misleading (¶¶5, 12-14, 17-23, 26-29, 34, 36-37, 71-74, 80-81, 84, 86-88, 90, 94, 96-97, 99, 101, 109-10, 112, 115); and (iii) all facts on which that belief is formed (¶¶5-23, 26-29, 34-38, 67-78, 80-81, 84, 88, 90-91, 96-99, 101-07, 109-10, 115, 119, 121-27, 129, 132-34).  *See Desaigoudar v. Meyercord*, 223 F.3d 1020, 1023 (9th Cir. 2000); *In re Nuvelo, Inc., Sec. Litig.*, 668 F. Supp. 2d 1217, 1225 (N.D. Cal. 2009).   Thus, the "Complaint provides adequate organization and sufficiently clear allegations" and, as evidenced by their "rigorous [] motions," "[d]efendants have adequate notice of the allegations against them."[13] *In re New Century*, 588 F. Supp. 2d 1206, 1219 (C.D. Cal. 2008).

---

[13]    In *Patel v. Parnes*, 253 F.R.D. 531, 552 (C.D. Cal 2008), the "allegations regarding falsity d[id] not tie these reasons to particular statements; instead, the reasons appear to apply generally to the statements quoted in the preceding paragraphs."

-14-

1

### 1. The Complaint Adequately Alleges False and Misleading Statements and Omissions Regarding American Apparel's Immigration Law Compliance

2

3

4

With limited exception, defendants' falsity argument follows a conclusory and rote pattern: (i) cherry-pick and miscategorize certain falsity allegations, while ignoring others; and (ii) then declare the allegations not false. Defendants' efforts fail. Prior to the Company's June 30, 2009 revelation that ICE had uncovered what it later characterized as a "scheme" by the Company to violate U.S. immigration laws, defendants steadfastly maintained that the Company complied with all immigration laws. ¶83. The Company's November 28, 2007 Proxy stated, for instance, that "American Apparel's workers are documented immigrants, authorized to work in the United States." ¶¶5, 13, 69, 71.[14]

5

6

7

8

9

10

11

12

The Company argues that plaintiff misquotes the Company's statement from its November 28, 2007 Proxy which told investors that "[m]*any* of American Apparel's workers are documented immigrants and authorized to work in the United States." AA MTD at 13 (emphasis in original). It appears the Company is now trying to suggest that by stating that "[m]*any* of American Apparel's workers are ***documented*** immigrants," it implicitly disclosed that the other workers (2,500 of them) were ***undocumented*** immigrants. This argument is risible. Had defendants actually wanted

13

14

15

16

17

18

19

20

---

[14]   In *In re Downey Sec. Litig.*, 2009 U.S. Dist. LEXIS 83443, at *17-*18 (C.D. Cal. 2009), it was "undisputed" that defendants had disclosed the exact information plaintiff challenged. Here, there is no dispute that defendants failed to warn investors about the Company's undocumented manufacturing workforce. In *Eshelman v. OrthoClear Holdings, Inc.*, 2008 U.S. Dist. LEXIS 6826, at *12-*13 (N.D. Cal. 2008), defendants made sufficient disclosures and, unlike here, never "told the investors to ignore the risk disclosures." In *In re Netflix, Inc. Sec. Litig.*, 2005 U.S. Dist. LEXIS 18765, at *21 (N.D. Cal. 2005), defendants disclosed the precise "risks that [the company] faced from competitiors" and made no false statements contrary to the disclosures. In *In re PETsMART, Inc. Sec. Litig.*, 61 F. Supp. 2d 982, 996 (D. Ariz. 1999), "[p]laintiffs' own complaint cites to a published report" from the class period that details the exact information plaintiffs alleged defendants failed to disclose. *In re Stac Elecs. Sec. Litig.*, 89 F.3d 1399, 1409 (9th Cir. 1996) held that defendants need not disclose risks, such as customer resistance to purchasing a product in anticipation of a newer product, that all investors are assumed to anticipate.

21

22

23

24

25

26

27

28

-15-

1    to disclose that their manufacturing workforce was undocumented, they would have

2    done so.  The other workers, of course, refer to the Company's non-manufacturing

3    employees.  Nowhere in the Complaint does plaintiff allege that defendants hired

4    undocumented workers for the Company's "racy" retail stores.  ¶88.  Instead, plaintiff

5    alleges that the Company utilized separate payroll departments and systems for its

6    factory versus retail/corporate employees.   ¶74.   Moreover, as alleged in the

7    Complaint, ICE and DHS have confirmed the falsity of the Company's immigration

8    compliance statements.  ¶¶5, 13, 17, 80, 88, 99, 145.  That is precisely why ICE fined

9    the Company – it engaged in a knowing scheme to conceal these facts.

10        Second, the Company argues that the Complaint fails to plead the falsity of the

11   Company's immigration compliance efforts.[15]  AA MTD at 13-14.  Not so.  For

12   example, the Complaint pleads, among other things, that (i) Charney hired employees

13   at random off the street (¶¶68, 74); (ii) the Company had virtually no systems in place

14   to verify and identify undocumented workers (*id.*); and (iii) after thoroughly

15   investigating the Company's practices, ICE depicted American Apparel as an

16   "employer[] that cultivate[s] ***illegal*** work forces by ***knowingly*** hiring and exploiting

17   illegal workers" (¶88).  The Company also argues that, by relying on ICE's findings of

18   "possibly a scheme to avoid immigration law" that would result in a "fine[] no matter

19   what," plaintiff is pleading "fraud by hindsight."  *Id.*; APP MTD at 15.  Plaintiff's

20   allegations, however, are based on the results of the ICE investigation that was

22   [15]    Unlike here (¶¶68, 74, 88), in *In re Vantive Corp. Sec. Litig.*, 283 F.3d 1079,
23   1091 (9th Cir. 2002), the complaint "fail[ed] to allege specific contemporaneous
     conditions known to the defendants that would strongly suggest that the defendants
24   understood" the falsity of their statements.  In *Metzler Inv. GMBH v. Corinthian
     Colls., Inc.*, 540 F.3d 1049, 1070 (9th Cir. 2008), plaintiff alleged that "virtually every
25   statement" defendants made during the class period was false simply because of the
     general allegation that they "create the false impression that defendants ran their
26   business with proper financial reporting…and that quality of education was
     emphasized."  In *Brodsky v. Yahoo! Inc.*, 630 F. Supp. 2d 1104, 1113-14 (N.D. Cal.
27   2009), the statements at issue are "general optimistic statements," as opposed to
     statements regarding compliance with specific laws and the impact of violations of
28   those laws.

ongoing and known to defendants from the beginning of the Class Period. ¶72. This is not pleading fraud by hindsight. *See, e.g.*, *In re UTStarcom, Inc. Sec. Litig.*, 617 F. Supp. 2d 964, 972 (N.D. Cal. 2009) (evaluating contemporaneous facts known to defendants to assess falsity of statements). And while defendants would prefer it to be so, this is not a projections case.[16]

Next, defendants argue that they were under no "duty to disclose" that the Company was even the ***subject*** of an ICE investigation. The Company received the first ICE notice "in late 2007" and deliberately concealed the notice until March 17, 2008, when it filed its late 2007 Annual Report on Form 10-K. AA MTD at 4. Once a company or its officers begin to speak on a topic, they have a duty to speak fully and truthfully on that topic. *See* 17 C.F.R. §240.10b-5 (mandating disclosure of material facts necessary to make disclosed statements not misleading); *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 504 (9th Cir. 1992) ("Rule 10b-5 imposes a duty to disclose material facts that are necessary to make disclosed statements, whether mandatory or volunteered, not misleading."); *Matrixx Initiatives, Inc. v. Siracusano*, 131 S. Ct. 1309, 1321-22 (2011); *In re Apollo Grp. Inc. Sec. Litig.*, 395 F. Supp. 2d 906, 920 (D. Ariz. 2005). Thus, at a minimum, defendants had a duty to disclose the ICE investigation no later than January 18, 2008 in a press release on Form 8-K, when Charney made extensive statements to the *New York Times* regarding American Apparel's "non-American-born" labor force and support for immigration reform. Ex. 5; *Hanon*, 976 F.2d at 504.

Defendants simply ignore the other statements plaintiff alleges to be false. For instance, defendants do not contest the falsity of Peter Schey's April 30, 2008

---

[16]     Defendants' authorities are not to the contrary. APP MTD at 15. In *Vantive* and *Rackable*, defendants failed to meet projections where plaintiffs claimed that, due to the miss, defendants must have know that their projections were false at the time they were made. *In re Rackable Sys., Inc. Sec. Litig.*, 2010 U.S. Dist. LEXIS 88927, at *14-*16 (N.D. Cal. 2010) (shortcomings in the execution of a legitimate business strategy do not equate to fraud).

1  statement that "the company's employees, 4,000 of whom work downtown, **were all**

2  **legal** to the best of his knowledge." ¶75. Nor do defendants address their failure to

3  correct this materially false and misleading statement. *See Hanon*, 976 F.2d at 504.

4  Defendants also similarly ignore Schey's September 30, 2009 statement to the *New*

5  *York Times* that "[a] fine threatened by the agency [*i.e.*, ICE] **was withdrawn**." ¶99.

6  Less than two weeks after this representation, of course, the Company admitted, deep

7  in its 3Q09 10-Q, that "[i]n the fourth quarter of 2009, as a result of the inspection, **the**

8  **Company was fined by ICE**." *Id.*; *Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982,

9  988 n.5 (9th Cir. 2008).

10          **2.**     **The Complaint Adequately Alleges False and Misleading**

11                           **Statements and Omissions About the *Effects* of the ICE Sanctions**

12         Starting with the Company's June 30, 2009 disclosure and continuing until

13  defendants' March 25, 2010 admission of the "substantial" and "unprecedented"

14  effects the terminations had on the Company, defendants falsely maintained that the

15  manufacturing employee terminations "would [not] have a material impact" on the

16  Company. ¶¶14, 19, 81, 82, 87, 89, 92, 96, 100-01. Defendants misleadingly

17  explained that this was so because, among other things: (i) they "had effectively hired

18  significant amounts of people at the end of Q2'08" (¶92); (ii) they had "a significant

19  backlog of active job applications" (¶81); (iii) the Company had surplus levels of

20  inventory and manufacturing capacity sufficient to mitigate the disruption in the slow

21  economy (¶¶82, 96); and (iv) the reduction in labor costs "improved [the] overhead

22  situation" (¶119).[17]

23

24  _____

25  [17]    In *Downey*, 2009 U.S. Dist. LEXIS 83443, at *12-*14, "[p]laintiff [] alleged nothing more than conclusory allegations." For example, unlike here, the complaint

26  did not explain "why the [alleged false statement] was unreasonable in light of" defendants' contemporaneous knowledge. *Id.* In *In re NorthPoint Commc'ns Grp.,*

27  *Inc., Sec. Litig.*, 184 F. Supp. 2d 991, 1004 (N.D. Cal. 2001), the court found that the challenged practices were a legitimate and "*honest* effort" – a far cry from what ICE

28  characterized as defendants' "*scheme* to avoid immigration law" (¶88) alleged herein.

1      At the same time defendants told investors that the ultimate impact of the

2  terminations might be generally difficult to predict, however, defendants

3  simultaneously provided specific, concrete and misleading reasons why the labor

4  disruption would ***not*** materially impact the Company's financial results.  *See In re*

5  *JDS Uniphase Corp. Sec. Litig.*, 2007 U.S. Dist. LEXIS 66085, at \*45 (N.D. Cal.

6  2007) (general warnings are overshadowed by specific misrepresentations to

7  investors).  Defendants' generic, boilerplate cautionary language does not "discredit

8  the alleged misrepresentations to such an extent that 'the risk of real deception [from

9  defendants' statements] drops to nil.'"  *In re Immune Response Sec. Litig.*, 375 F.

10  Supp. 2d 983, 1033 (S.D. Cal. 2005).  For example, in their July 1, 2009 press release

11  on Form 8-K signed by Kowalewski, the Company explained that its surplus

12  inventory and manufacturing capability would mitigate the adverse impact of any

13  labor disruption.  ¶¶81-82.  Kowalewski echoed this (false) reassurance on an August

14  13, 2009 analyst conference call, stating the Company would "mitigate" its loss of

15  workers "by increasing the days per week of our employees on the selling floor."  ¶92.

16      Similarly, on November 10, 2009, over four months after ICE notified the

17  Company of the extent of its immigration violations, Kowalewski told investors that

18  the loss of the manufacturing employees would actually ***help*** the Company's bottom

19  line, stating, "because we had been operating with a higher number of workers than

20  maybe we would have needed under normal circumstances.  So we do think some of

21  the head count has ***improved our overhead situation***."  ¶119.  During the same call,

22  Charney "agree[d] with what [Kowalewski] said" and stated that "I also, [k]now that

23  we have the stability in the workforce at the factory level, in July [2009], we knew we

24

25

---

26  In *In re Navarre Corp. Sec. Litig.*, 299 F.3d 735, 743 (8th Cir. 2002) and *PETsMART*,
27  61 F. Supp. 2d at 992, the complaints provided no basis for why defendants'
    statements were false when made.

28

1    were going to have to lose some people." *Id.*[18]

2         For a time, defendants' efforts to mislead the market succeeded.  On July 1,

3    2009, KeyBanc Capital Markets analyst Edward Yruma noted in a research report that

4    "[m]anagement was ***clear in emphasizing*** that even if a significant number of the

5    1,800 employees are deemed ineligible to work, the Company should ***not see a***

6    ***material financial impact***.  'Made in Los Angeles' is key to the brand, management

7    should be able to replace workers." ¶¶15, 89.  Similarly, on July 2, 2009, the *Los*

8    *Angeles Times* quoted Todd Slater from Lazard Capital Markets who stated that the

9    terminations "[s]hould have no impact on earnings."  ¶89.

10        Notably,   the   Company's   experienced   (but   largely   undocumented)

11   manufacturing workforce was key to its highly-touted "vertical-integration," which

12   enabled the Company to respond quickly to rapidly changing fashion trends.

13   "Vertical integration" means that the Company's manufacturing, design, retail and

14   accounting operations are under the same roof, rather than being outsourced.  Indiv.

15   MTD at 2.  According to the Company's November 28, 2007 Proxy, "American

16   Apparel's vertically integrated business model…provide[s] speed to market, which

17   allows American Apparel to produce product quickly when specific demand is

18   identified." Ex. 6 at 61; *see also id*. at 142. ("The Company's domestic manufacturing

19   operations allow American Apparel to quickly respond to customer demand and react

20   faster to changing fashion trends.").  The Company repeatedly touted this flexibility as

21   one of its core "competitive advantages."  ¶¶6, 98.  After losing 2,500 of its 5,800

22   manufacturing workers, defendants were well aware that the Company's stale excess

---

24   [18]    Notably, defendants earlier acknowledged (before the ICE notification) that
25   such a loss of its workers "would be adverse to American Apparel's manufacturing
     capabilities and harm American Apparel's operations and financial results."  ¶85.
26   This is because, as defendants were well aware, hiring "new workers…does take a bit
     of a toll on the business" because "it takes years training these people," especially
27   because the Company could no longer rely on undocumented workers to produce its
     garments. ¶90.

28

1   inventory would cripple its ability to efficiently respond to the market's demand for

2   new products.  Defendants also knew that, with a new staff of inexperienced workers,

3   producing new product to keep up with those trends would materially impact

4   American Apparel's margins.  *See In re Turbodyne Techs., Inc. Sec. Litig*., 2000 U.S.

5   Dist. LEXIS 23020, at *70-*71 (C.D. Cal. 2000) ("strong inference can be drawn that

6   the president and chief executive officer, the chief operating officer, and the chief

7   financial officer knew the true facts respecting the company's manufacturing

8   capacity" for its main product).

9        Nor were the Company's inventory levels sufficient to offset the diminished

10   efficiency resulting from the terminations.  Indeed, during a May 19, 2010 conference

11   call, Charney blamed the Company's financial woes on a *lack* of inventory, admitting

12   that "[t]here is a hole, in my opinion, of a few hundred thousand pieces not being

13   produced every week."  ¶¶96, 97.  The holes in inventory did not come as an eleventh-

14   hour surprise.  Charney and Kowalewski reviewed *daily* information about inventory

15   levels and inventory needs.  ¶98; *see Nursing Home Pension Fund, Local 144 v.

16   Oracle Corp.*, 380 F.3d 1226, 1234 (9th Cir. 2004) ("reasonable to infer that

17   [defendants'] detail-oriented management style led them to become aware of

18   [discrepancy] of…significant magnitude");  *In re NorthPoint Commc'ns Grp., Inc.,

19   Sec. Litig. & Consol. Cases*, 221 F. Supp. 2d 1090, 1104 (N.D. Cal. 2002) (same).

20        Then, on March 25, 2010, only four months after informing investors that there

21   would be "no material impact" from the terminations, defendants were forced to admit

22   that the effects of the terminations had been "substantial," citing an "unprecedented"

23   and "extended disruption."  ¶101.  That day, Charney also admitted that "[t]he biggest

24   problem has been employee productivity" because "we lost some of our best people"

25   and training new employees was taking time.  ¶102.  On May 19, 2010, the Company

26   reported that the terminations "could impact the company's financial results at least

27   through early *2011*."  ¶105.  By August 17, 2010, the resulting impact had nearly

28   bankrupted the Company, with Charney placing the blame squarely on the loss of

1    efficiency resulting from the terminations.    ¶¶23, 129.  Defendants' "no material

2    impact" mantra was a knowing and egregious fraud.

3          **3.    The Complaint Adequately Alleges False and Misleading Statements and Omissions Regarding the Company's Internal Controls**

4

5          On a May 13, 2008 earnings conference call, Charney acknowledged that

6    American Apparel's financial compliance and internal controls were "very important

7    for [its] investors." ¶111.  On March 17, 2008, Kowalewski similarly falsely assured

8    investors that the Company was "taking this issue very seriously." ¶108.  Defendants

9    also stated that the Company was: (i) "looking to build a world class financial

10   team…[and] pursue a strict corporate orthodoxy as far as financial accounting issues"

11   (¶¶27, 111); (ii) "going to be remediating [] material weaknesses so we can get into

12   compliance with Sarbanes-Oxley" (¶110); and (iii) "commit[ted] to conservatism and

13   maintaining best practices" (¶120).  In reality, however, defendants were engaged in a

14   series of misrepresentations about the Company's fiscal strength and accounting

15   controls that culminated in the July 2010 resignation of its auditor, Deloitte, who later

16   withdrew its audit for all of the Company's 2009 financial statements, warning

17   investors that they should "no longer be relied upon," because it was "***no longer***

18   ***willing to rely on management's representations***." ¶¶12, 34, 36, 112, 124, 126-28.

19         These statements were integral to defendants' broader campaign to reassure the

20   market that it could count on defendants' financial statements.  ¶¶27, 108, 110-11,

21   114, 116.  While defendants hope to characterize their false statements to investors

22   and Deloitte as mere "puffery" (Indiv. MTD at 9-10, AA MTD at 16), where, as here,

23   a defendant affirmatively characterizes management practices as "conservative" or

24   "orthodox," the representation is material and the defendant is required to speak

25   truthfully.  *See New Century*, 588 F. Supp. 2d at 1226-27 ("assurances of [] strict

26   underwriting practices...and adequacy of internal controls" are actionable); *Atlas v.*

27   *Accredited Home Lenders Holding Co.*, 556 F. Supp. 2d 1142, 1149, 1155 (S.D. Cal.

28

2008) (statements that "underwriting procedures were better and more conservative" than competitors are actionable).

Certainly, analysts and investors did not dismiss these statements as material expressions of optimism.  For example, a KeyBanc Capital Markets report dated April 22, 2009 highlighted that the Company was "[c]ommitted to best practices.  The question was asked about what management views as a Street misperception about the Company, to which **management highlighted the flawed view** that the Company is disorganized and unsystematic internally.  **Charney emphasized** the Company's commitment to **conservatism** and maintaining best practices." [19]  In response to this news, that same date the Company's stock jumped 7.66%.  ¶¶31, 120.  This is not "puffery."  *See SEC v. Mozilo*, 2009 U.S. Dist. LEXIS 104689, at *25 (C.D. Cal. 2009) ("[O]nly if…the materiality of the statement is so obvious that reasonable minds could not differ [is this] issue[] appropriately resolved as a matter of law."); *SEC v. Todd*, 2011 U.S. App. LEXIS 12692, at *27 (9th Cir. 2011) ("[g]enerally, 'whether a public statement is misleading, or whether adverse facts were adequately disclosed is a mixed question to be decided by the trier of fact'").  Notably, while characterizing their statements as soft, defendants do not challenge what plaintiff alleges caused the 14% stock drop following the July 28, 2010 disclosure that Deloitte was resigning as the Company's independent public accountant.  *See* ¶126; *In re Irvine Sensors Corp. Sec. Litig.*, 2003 U.S. Dist. LEXIS 18397, at *5 (C.D. Cal. 2003) (market response shortly after adverse announcement is indicia of statement's materiality); *In re Nature's Sunshine Prods. Sec. Litig.*, 486 F. Supp. 2d 1301, 1308

---

[19]  Defendants' authorities address general statements of optimism, not actual business practices.  *See In re Foundry Networks, Inc. Sec. Litig.*, 2003 U.S. Dist. LEXIS 18200, at *47-*48 (N.D. Cal. 2003); *Lasker v. N.Y. State Electric & Gas Corp.*, 85 F.3d 55, 59 (2d Cir. 1996); *In re Impac Mortg. Holdings*, 554 F. Supp. 2d 1083, 1097 (C.D. Cal. 2008); *In re Wet Seal, Inc. Sec. Litig.*, 518 F. Supp. 2d 1148, 1168 (C.D. Cal. 2007); *Emp'rs Teamsters Local Nos. 175 & 505 Pension Trust Fund v. Clorox Co.*, 353 F.3d 1125, 1132 (9th Cir. 2004).

1   (D. Utah 2007) ("'the materiality of disclosed information may be measured *post hoc*

2   by looking to the movement, in the period immediately following disclosure, of the

3   price of the firm's stock'").

4       Finally, defendants' own (former) auditor's refusal to rely on the individual

5   defendants' representations due to Deloitte's belief that Charney and Kowalewski

6   withheld material information from it and "made related misrepresentations" belies

7   the purported truth of defendants' representations regarding their internal controls

8   over financial reporting and accounting.[20]   ¶¶27, 30, 33, 108-11, 113, 116, 120-21,

9   124-25, 127.  Simply put, a public company "pursu[ing] a strict corporate orthodoxy,"

10  and "commit[ted] to conservatism and maintaining best practices" does not

11  "with[o]ld…financial statements" nor "ma[ke] related misrepresentations" to its

12  auditor.[21]  *See* ¶¶111, 114, 120, 124-25. As set forth above, plaintiff alleges specific

13  factual basis to show defendants' statements and omissions regarding the Company's

14  internal controls were false and misleading when made.

15      **D.    The Complaint Raises a Strong Inference of Scienter**

16      To plead scienter, a plaintiff must "'state with particularity facts giving rise to a

17  strong inference' that defendants acted with the intent to deceive or with deliberate

18  recklessness as to the possibility of misleading investors." *Berson*, 527 F.3d at 987.

19  "The inference that the defendant acted with scienter need not be irrefutable, *i.e.*, of

20  the 'smoking gun' genre, or even the 'most plausible of competing inferences.'"

21  *Tellabs*, 551 U.S. at 324.   A complaint survives if, "[w]hen the allegations are

22  _____

23  [20]     Defendants argue  that, during the March 25, 2010 conference call, they had no

24  duty to disclose the same adverse financial information they fraudulently withheld
     from Deloitte.  *See* AA MTD at 11 n.5.  This is contrary to controlling law.  Once a
     company begins to speak on a topic, it has a duty to speak fully and truthfully on that

25  topic.  *See Hanon*, 976 F.2d at 504.

26  [21]     On March 31, 2011, American Apparel filed its 2010 Annual Report, which
     included its ***new*** auditor's "adverse opinion on the effectiveness of the Company's

27  internal control over financial reporting [during the Class Period] because of the
     existence of material weaknesses [at the Company]." ¶37.

28

accepted as true and taken collectively," a reasonable person would "deem the inference of scienter *at least as strong* as any opposing inference." *Id.* at 326. A court should "consider the totality of circumstances, rather than to develop separately rules of thumb for each type of scienter allegation." *S. Ferry LP, #2 v. Killinger*, 542 F.3d 776, 784 (9th Cir. 2008); *Tellabs*, 551 U.S. at 326 ("[T]he court's job is not to scrutinize each allegation in isolation but to assess all the allegations holistically."). Moreover, following *Tellabs*, the Ninth Circuit noted that much of the authority defendants repeatedly cite (Indiv. MTD at 7, 13-14, 18, 20; AA MTD at 8, 9, 13, 16, 18, 21, 22, 24) sets too high a burden for pleading scienter. *See S. Ferry*, 542 F.3d at 784 (*Tellabs* "suggests that perhaps *Silicon Graphics, Vantive* and *Read-Rite* are too demanding and focused too narrowly in dismissing vague, ambiguous, or general allegations outright.").

Defendants' approach of cherry-picking, isolating and decontextualizing each individual fact (while ignoring others) runs afoul of the U.S. Supreme Court's recent teaching in *Matrixx*:

> [In *Matrixx*] the Court provided for us a post-*Tellabs* example of how to consider scienter pleadings 'holistically' in section 10(b) cases. Writing for the Court, Justice Sotomayor expertly addressed the allegations collectively, did so quickly, and, importantly, *did not parse out the allegations for individual analysis*. This is the only appropriate approach following *Tellabs's* mandate to review scienter pleadings based on the collective view of the facts, not the facts individually. Our former method of reviewing each allegation individually before reviewing them holistically *risks losing the forest for the trees*. Furthermore, after *Tellabs*, conducting an individual review of myriad allegations is an *unnecessary inefficiency*.

*Frank v. Dana Corp.*, 2011 U.S. App. LEXIS 10437, at *14-*15 (6th Cir. 2011).

Under *Tellabs* and *Matrixx*, the Complaint easily pleads scienter. Defendants' primary scienter argument seems to be that they *knew and disclosed* the adverse information at issue. *See* Indiv. MTD at 17-18, 24; APP MTD at 2, 4, 7-8, 18, 22. Yet, defendants' disclosures that "*changes in immigration laws*" could affect the Company did not inform investors that the American Apparel employed thousands of undocumented workers in violation of *existing* immigration laws. The Company's

1    earlier statements about possible effects from *changes* in immigration law were also

2    eclipsed by defendants' repeated assurances, after the immigration violations came to

3    light, that they would have "no material impact" on the Company.   Nor did

4    defendants' purported "disclosures" regarding internal controls inform investors that

5    the Company was engaging in a pattern of financial shenanigans, including failing to

6    disclose that it "almost went bankrupt" in 2008, engaging in numerous GAAP

7    violations that required a restatement for 2008, and intentionally withholding

8    information from Deloitte – its own auditor.[22]   Instead of negating scienter,

9    defendants' claim that they disclosed this information demonstrates that they knew, or

10   were deliberately reckless in not knowing, that their statements were false.

11          Because defendants do not (and cannot) deny that they knowingly hired

12   undocumented workers and intentionally withheld this information from investors and

13   American Apparel's own auditor, they resort to arguing that plaintiff's allegations are

14   inadequate because they do not utilize the usual "favorite" pleading tactics.  Indiv.

15   MTD at 13-14; APP MTD at 18-19.  But this is not the usual case and the Supreme

16   Court rejected any "rules of thumb" approach to scienter in *Tellabs*.  *See S. Ferry*, 542

17   F.3d at 784.  Plaintiff need not plead contemporaneous internal reports when an ICE

18

19   ─────────────────────────

20   [22]     Because defendants' "disclosures" did not impart the truth to investors, their
      authority is inapposite. In *In re Worlds of Wonder Sec. Litig.*, 35 F.3d 1407, 1417 (9th
21   Cir. 1994), for example, defendants "included an express disclaimer that 'there can be
      no assurances' that [the company's] existing internal controls would continue to be
22   adequate [and ] *made no predictions to the contrary*."  Moreover, in *Worlds of
      Wonder*, defendants "made full disclosure to [the company's auditor] of all relevant
23   information." *Id.* at 1421; *see also Wet Seal*, 518 F. Supp. 2d at 1171-72.  In *In re
      Hypercom Corp. Sec. Litig.*, 2006 U.S. Dist. LEXIS 45482, at *30-*31 (D. Ariz.
24   2006), plaintiffs did not allege that the defendants misrepresented their financial
      compliance efforts.  Nor did the company's auditor accuse defendants of intentionally
25   withholding and misrepresenting information.  *Id.*  Finally, defendants utterly misstate
      the holding in *Glazer Capital Mgmt., LP v. Magistri*, 549 F.3d 736, 748 (9th Cir.
26   2008) (cited in American Apparel's brief as "*In re InVision Techs. Inc. Sec. Litig.*"),
      which reasoned that the appearance of the misrepresentations at issue (not the
27   underlying truth) in a private merger agreement negated scienter because defendant
      knew that the company to whom he was making the alleged misrepresentations
28   "would be shortly conducting a due diligence inquiry."  *Id.* at 748.

-26-

investigation concluded, contemporaneously, that defendants knowingly hired undocumented workers and engaged in a "scheme" to violate immigration laws. Nor does plaintiff need to include contemporaneous confidential witness reports when the Company's own auditor contemporaneously reported that defendants deliberately withheld and misrepresented material information.[23]   Moreover, as discussed below, these "contemporaneous reports" are buttressed by many additional specific facts corroborating these allegations. *See In re Daou Sys., Inc., Sec. Litig.*, 411 F.3d 1006, 1015 (9th Cir. 2005).

### 1.   Plaintiff Has Adequately Pled Scienter For Defendants' Immigration Compliance Statements

Throughout the Class Period, defendants assured investors that the Company's workers were "authorized to work in the United States." ¶¶71, 75.  This was because, according to defendants, the Company made "diligent efforts to comply with…immigration laws" and had a policy, "at all times," of "fully comply[ing]" with immigration laws. ¶¶73, 83.  Contemporaneously, American Apparel had been employing ***thousands of undocumented*** manufacturing workers in its Los Angeles manufacturing facility for over 10 years. ¶74; *Ernst & Young*, 2011 U.S. App. LEXIS 7680, at *27-*28 (magnitude of the falsity strengthens scienter inference); *N.Y. City Emps.' Ret. Sys. v. Berry*, 616 F. Supp. 2d 987, 1001 (N.D. Cal. 2009) ("duration, magnitude and pervasiveness" of polices supports scienter); *UTStarcom*, 617 F. Supp. 2d at 975 (same); *In re Countrywide Fin. Corp. Sec. Litig.*, 588 F. Supp. 2d 1132, 1194 (C.D. Cal. 2008) ("issues were so fundamental to [the company] and on such a broad scale" that "it would be difficult to conclude [defendants] did not know what

---

[23]   None of defendants' authorities involve similar damning conclusions by federal authorities or independent auditors.  *See Oracle*, 380 F.3d at 1230; *In re Read-Rite Corp. Sec. Litig.*, 335 F.3d 843, 847 (9th Cir. 2003); *Vantive*, 283 F.3d at 1090-91; *In re ICN Pharm., Inc. Sec. Litig.*, 299 F. Supp. 2d 1055, 1065 (C.D. Cal. 2004); *Metzler*, 540 F.3d at 1067-68; *Lipton v. Pathogenesis Corp.*, 284 F.3d 1027, 1036 (9th Cir. 2002); *Svezzese v. Duratek, Inc.*, 2002 U.S. Dist. LEXIS 20967, at *17 (D. Md. 2002);

was going on"); *In re SemGroup Energy Partners, L.P. Sec. Litig.*, 729 F. Supp. 2d 1276, 1300 (N.D. Okla. 2010) ("magnitude of [fraudulent conduct] alleged in the Complaint further evidences scienter").   Ultimately, "the more likely [defendant] would have discovered the truth if a reasonable [investigation] had been conducted, the stronger the scienter inference."  *Ernst & Young*, 2011 U.S. App. LEXIS 7680, at *20.

Plaintiff also alleges that Charney spent "50 hours a week" at the factory, and that defendants' offices were located ***in the same building***.  ¶¶5, 19.  Defendants do not explain how working alongside American Apparel's thousands of undocumented workers on a daily basis, over the course of a decade (¶17, 81), would not have alerted them of Charney's immigration violations.  This is especially true given Charney's well-greased marketing campaign in support of immigration reform.  ¶¶8, 71, 76, 88, 95.  Defendants seek refuge in distinguishable authority.  APP MTD at 20 n.10.  In *Glazer*, the Ninth Circuit held that plaintiffs could not allege that defendants were aware of "a discrete set of illegal payments made by InVision's foreign sales agents operating in ***China***, the ***Philippines***, and ***Thailand***."  549 F.3d at 746.  This sharply contrasts with defendants' day-to-day "intimate[] involve[ment]" with thousands of undocumented workers, whom Charney is "committed to knowing…by face" and describes as "family."   Indiv. MTD at 2-3; ¶¶5, 17, 19, 71, 74, 81.  Defendants' knowledge is further demonstrated by their overt attempts to conceal the thousands of undocumented workers from the Company's vendors and other sources of potential scrutiny by utilizing separate payroll departments and systems for its factory versus retail/corporate employees.  ¶74.  Defendants ignore this allegation entirely.

Moreover, despite Charney's publicly-stated view that "over 50% of the workers in [the] industry are falsely documented," (¶¶8, 71, 76-78), American Apparel

---

*NorthPoint*, 184 F. Supp. 2d at 997.

had virtually no verification systems in place to identify undocumented workers.  ¶74.

Although ICE best practices included "us[ing] E-Verify, the DHS employment

eligibility verification program, to verify the employment eligibility of all new hires,"

American Apparel did not use E-Verify during the Class Period.  ¶¶67-68.  While

defendants seek to discredit E-Verify, the Supreme Court recently determined that,

"the program is 'the best means available to determine the employment eligibility of

new hires.'" *Chamber of Commerce of the U.S. v. Whiting*, 179 L. Ed. 2d 1031, 1057

(2011).  Had defendants actually been making "diligent efforts" to comply with

immigration laws, as they falsely represented, the Company would have had an

affirmative defense to ICE's findings.  *Id.* at 1044 (citing 8 U.S.C. §1324a(a)(3))

("Good-faith compliance with IRCA's I-9 document review requirements provides an

employer with an affirmative defense if charged with a §1324a violation.").  They did

not.  Hence, although defendants attempt to make light of their failure to utilize E-

Verify, arguing that it was not "necessary or required" (APP MTD at 14, 19), their

failure to do so is telling because "any employer that utilizes E-Verify 'and obtains

confirmation of identity and employment eligibility in compliance with the terms and

conditions of the program…has established a rebuttable presumption' that it has not

violated IRCA's unauthorized alien employment prohibition." *Whiting*, 179 L. Ed. 2d

at 1045.

Having failed to make "diligent efforts" to identify undocumented workers at

the Company, defendants apparently did not receive the benefit of this rebuttable

presumption from ICE.  ¶¶16-17, 99.   In fact, during its inspection, ICE discovered

what it would later characterize as a "*scheme*" by the Company to violate U.S.

immigration laws.  ¶¶13, 79-80, 88.  A DHS spokesman said that the ICE action at

American Apparel "underscore[s] our commitment to targeting employers that

cultivate illegal work forces by *knowingly* hiring and exploiting illegal workers." ¶88.

Courts have held that engaging in "deliberately illegal behavior" supports a strong

inference of scienter.  *Novak v. Kasaks*, 216 F.3d 300, 311 (2d Cir. 2000).

In response, defendants argue that Charney's "50%" statement "cannot support an inference that Mr. Charney knew that **his** Company employed undocumented workers." Indiv. MTD at 16; APP MTD at 20 n.11.  Yet, given American Apparel's massive undocumented workforce, and American Apparel's refusal to use industry practices to identify these workers, defendants, at the very least, were reckless in not knowing that the Company was employing undocumented workers.  Any purported "failure to question" or willful disregard constitutes deliberate recklessness.  *See Ernst & Young*, 2011 U.S. App. LEXIS 7680, at *24 (scienter adequately pled against auditor where it "noticed there could be a significant issue…asked for documentation, but when none was received…still signed off"); *Howard v. Everex Sys., Inc.*, 228 F.3d 1057, 1064-65 (9th Cir. 2000) (inferring scienter and stating "[defendant] cannot simply argue that he **looked the other way**"); *Makor Issues & Rights, Ltd. v. Tellabs Inc.*, 513 F.3d 702, 704 (7th Cir. 2008) ("When the facts known to a person place him on notice of a risk, he cannot ignore the facts and plead ignorance of the risk.").

Finally, defendants' immigration violations and financial improprieties violated the Company's own Code of Ethics.  ¶¶51, 158, 169.  The Ninth Circuit has previously inferred scienter where "defendants appear to have violated [the company's] own policies."  *Provenz v. Miller*, 102 F.3d 1478, 1490 (9th Cir. 1996); *Todd*, 2011 U.S. App. LEXIS 12692, at *17 (upholding finding of liability where the company's "internal policies, which had been disclosed to investors, were violated"); *Official Unsecured Creditors Comm. of Media Vision Tech., Inc. v. Jain*, 215 F.R.D. 587, 588 (N.D. Cal. 2003).  These allegations are sufficient to raise a strong inference of scienter.

### 2. Plaintiff has Adequately Pled Scienter for Defendants' Statements Regarding the Effects of Their Immigration Violations

Unable to further conceal their immigration law violations after the ICE audit, defendants assured nervous investors that the loss of employees would have "no

1   material impact" on the Company.  ¶¶14, 81-82.  Although defendants now argue that

2   they were simply "attempt[ing] to estimate" the impact, (APP MTD at 5) the market

3   had a different impression, with analysts reporting that "[*m*]*anagement was clear in*

4   *emphasizing* that…the Company should not see a material financial impact" and that

5   the terminations "[*s*]*hould have no impact on earnings*."   ¶89.   Charney and

6   Kowalewski told the market that the terminations would have no impact on July 1,

7   2009, August 13, 2009, September 3, 2009 and again on November 10, 2009.  ¶¶19,

8   89, 92, 96, 100.  Critically, defendants did not lose only a handful of workers, but

9   2,500 employees that Charney repeatedly characterized earlier in the Class Period as

10  vitally important to the Company's survival.

11          For instance, on May 16, 2008, in a letter he personally signed for his "*Legalize*

12  *LA*" campaign, Charney, in answer to his own question "Why does American Apparel

13  care about immigration reform?" answered:

14          Self interested answer: *because we do everything in Los Angeles*…and
        this city's economy as a whole is deeply dependant on immigrant
15      labor.…If these industries were forced to move offshore…because of
        stepped-up enforcements, *the damage to the economy would be*
16      *irreparable*.

17  ¶76.[24]   Hence, upon learning that almost *half* of the Company's manufacturing

18  workforce had been lost, Charney also knew that the damage to the Company would

19  be irreparable because, as the Company earlier admitted in November 2007, losing

20  *any* such workers "would be adverse to American Apparel's manufacturing

21  capabilities and harm American Apparel's operations and financial results." ¶85.[25]  In

---

23  [24]    Defendants try to find fault with plaintiff's allegation that defendants knew the
24  Company was hiring undocumented workers because otherwise it would be forced to
    move its production offshore, going so far as to accuse plaintiff of having "biases."
    APP MTD at 9 n.9.  Yet, it was Charney himself who wrote that "stepped up
25  enforcements" could "*force*[] [*the industry*] *to move offshore*."  ¶76.

26  [25]    In *Ronconi v. Larkin*, 253 F.3d 423, 433 (9th Cir. 2001) defendants simply
27  "underestimated the value of" employees.  Here, defendants knew that the Company's
    manufacturing facility was its core competitive advantage.  ¶98.  In fact, realizing the
28  end was near, Charney purportedly "cried" about the terminations.  ¶95.

-31-

1  addition, throughout the Class Period, Charney knew that hiring "new workers…does

2  take a bit of a toll on the business" because "*it takes years training these people*."

3  ¶90.[26]  As the Ninth Circuit recently explained, "the more facts alleged that should

4  cause a reasonable [defendant] to investigate further before making a representation,

5  the more cogent and compelling a scienter inference becomes." *Ernst & Young*, 2011

6  U.S. App. LEXIS 7680, at *19.

7        Defendants argue that the lengthy training cycle for new employees does not

8  support scienter because those effects would be mitigated by "surplus inventory."

9  APP MTD at 21-22.  Yet, the Company's vertically-integrated operations and ability

10  to respond to rapidly changing fashion trends quickly was touted as the Company's

11  core competitive advantage.   ¶98.  Defendants' admissions confirm that the

12  Company's inability to efficiently respond to market demand is what "broke"

13  American Apparel.  ¶101.  For instance, during a May 19, 2010 conference call,

14  Charney admitted that the Company was not getting the full benefit of its vertical

15  integration because "we don't have enough people." ¶106.  On the same conference

16  call, Charney admitted that "[t]here is a hole, in my opinion, of a few hundred

17  thousand pieces not being produced every week. Now we could lose orders at

18  wholesale or they go backorder or they might migrate to the competition….At the

19  store level people come into the store, *if you don't have it in stock, if it's not a store*

20  *floor, they walk away and they may end up buying somewhere else*. They may end

21  up at Zara, who knows." ¶97.  On August 18, 2010, Charney stated that "having the

22  *right product at the right time at the right place* is more important than ever.  *But we*

23  *could not respond quickly enough because of our issues with the factory*." ¶132.

24  Further, on October 29, 2010 Charney admitted that the immigration violations "*broke*

25

26  _____

27  [26]    Although defendants argue that this prior admission does not support scienter, it
   clearly shows that defendants knew that new workers would not operate efficiently for
28  years. Indiv. MTD at 17 n.4; APP MTD at 22.

1  *our efficiencies* and generated a situation where we were late delivering garments.  It

2  *lost us an enormous amount of money*."  ¶101.

3       Defendants were well aware, therefore, that the Company's stale excess

4  inventory combined with the turmoil in its manufacturing workforce would

5  immediately cripple the Company's ability to efficiently respond to market demand

6  for trendy new products.  ¶98.  Defendants also knew that, with a new team of

7  inexperienced workers, producing new product to keep up with those trends would be

8  less efficient and more expensive, materially impacting American Apparel's margins.

9  *Id.*  Thus, defendants were at least reckless in not knowing that the loss of the

10  Company's core competitive advantage and increased costs would materially impact

11  its results.  *See Turbodyne*, 2000 U.S. Dist. LEXIS 23020, at *70-*71 ("strong

12  inference can be drawn that [the CEO and CFO] knew the true facts respecting the

13  company's manufacturing capacity" for its main product); *Epstein v. Itron, Inc.*, 993

14  F. Supp. 1314, 1326 (E.D. Wash. 1998) ("If it is true, as Plaintiff alleges, that [the

15  company's] core product is technologically incapable of meeting requirements that are

16  central to [its] continued survival as a business entity, it can be strongly inferred that

17  key officers…had knowledge of this fact."); *Lormand v. US Unwired, Inc.*, 565 F.3d

18  228, 252 (5th Cir. 2009) (strong inference of scienter where defendants knew of "loss

19  of…function[] which had been key to [the company's] prior business and financial

20  success").

21       In fact, on May 19, 2010, Charney blamed the Company's nosedive on a lack of

22  inventory, admitting that "[t]here is a hole, in my opinion, of a few hundred thousand

23  pieces not being produced every week."  ¶¶96-97.  Notably, Charney, who personally

24  reviewed daily information about inventory levels and needs, was aware of these

25  adverse developments.  In 2006, for instance, Charney bragged, "I have visuality [sic]

26  to what's going on in my stores *every night, every day of the week.  Right here and*

27  *now*."  ¶98.  In March 2009, defendants boasted, "we get daily inventories at this

28  point….The amount of information we are getting is incredible….I believe we can

-33-

continue to improve inventory trends…***by knowing what we have and knowing what is selling and what's trending***." *Id.*  According to Kowalewski, this visibility allowed defendants to "better… track the ***cost of inventory***." *Id.*[27]

"[T]hese allegations show that the defendants had access to information about the company's business success and to information about the company's financial data, which, in combination with the [Sarbanes-Oxley Act ("SOX")] certification[s] and other allegations…provide 'adequate corroborating details,' sufficient to create an inference of ***scienter*.**" *In re Lattice Semiconductor Corp. Sec. Litig.*, 2006 U.S. Dist. LEXIS 262, at *41 (D. Or. 2006) (emphasis in original).  This inference is even stronger where, as here, the monitored metric evidenced a significant discrepancy. *See Oracle*, 380 F.3d at 1234 ("reasonable to infer that [defendants'] detail-oriented management style led them to become aware of [discrepancy] of…significant magnitude");  *NorthPoint*, 221 F. Supp. 2d at 1104 (same).

Moreover, just four months after assuring investors during the November 10, 2009 conference call for 3Q09, that there would be "no material impact" from the terminations, and that the transition to new workers had been "virtually seamless," defendants were forced to reveal staggering losses resulting directly from the loss of its manufacturing employees. In a March 25, 2010 press release, the Company disclosed that "[t]he reduction in manufacturing efficiency was ***principally*** a result of the ***forced*** termination of over 1,500 experienced manufacturing employees."  ¶102. "[T]he 'temporal proximity' of the misleading statement and the subsequent disclosure 'bolster[s] the inference that defendants knew [the undisclosed information] when they made the statement." *Berson*, 527 F.3d at 988 n.5 (quoting *Ronconi*, 253

---

[27]    Plaintiff does not merely provide boilerplate allegations of negative "internal reports." APP MTD at 21 n.12; Indiv. MTD at 13-14.  Instead, plaintiff alleges that defendants themselves touted their constant review of the contested metrics, including "daily" review of inventories.  ¶98.  In addition, defendants were reviewing such information at the same time the Company was experiencing, in Charney's own words, an "extended disruption."  ¶¶101-04.

F.3d at 437).[28]   Defendants admitted that the effects of the terminations had been "substantial," citing an "unprecedented" and "extended disruption." ¶¶101-04.[29] That day, Charney also admitted what he had known all along – that "[t]he biggest problem has been employee productivity" because "we lost some of our best people" and training new employees was taking time.  ¶102.  By May 2010, the Company was reporting that the terminations "could impact the company's financial results at least through early 2011."  ¶105.  By August 2010, the resulting impact had nearly bankrupted the Company, with Charney finally placing the blame squarely on the loss of efficiency resulting from the terminations.  ¶¶23, 129.  In fact, according to an August 17, 2010 press release, a significant factor in the Company's losses was "lower labor efficiency at the Company's production facilities" that "was primarily a result of [the terminations]."  ¶153.

Defendants claim that these admissions constitute "fraud by hindsight."  Indiv. MTD at 17.  But "[u]nder Ninth Circuit precedent, a 'later statement may suggest that a defendants had a contemporaneous knowledge of the falsity of his statement, if the later statement directly contradicts or is inconsistent with the earlier statement.'" *Middlesex Ret. Sys. v. Quest Software Inc.*, 527 F. Supp. 2d 1164, 1189 (C.D. Cal. 2007) (quoting *Read-Rite*); *Lattice*, 2006 U.S. Dist. LEXIS 262, at *43.  Given that, by March 2010, the disruption was already "extended" and "substantial," it is reasonable to infer that defendants had knowledge of that effect just months earlier. In addition, the Individual Defendants are American Apparel's senior executives.

---

[28]    *See also Fecht v. Price Co.*, 70 F.3d 1078, 1083 (9th Cir. 1995); *Dana*, 2011 U.S. App. LEXIS 10437, at *12 (inference of scienter where "statements were quickly followed by contrary company announcements").

[29]    Defendants also argue that because layoffs occurred in 3Q and 4Q09, their effects could not have been known until those quarters ended.  APP MTD at 6.  Yet, defendants reiterated on November 10, 2010, after the close of the third quarter, that the terminations would have no material effect.  ¶¶19, 100.  Moreover, as discussed herein, defendants knew in June 2009 that the loss of *thousands* of experienced manufacturing workers would negatively impact the Company.

¶¶45-47.  And Charney, who "is intimately involved in the daily direction of the Company" (Indiv. MTD at 3), "is known for exercising **strict, and at times controversial, control** over the retailer's operations."  ¶57; *see Countrywide*, 588 F. Supp. 2d at 1191 ("a defendant's position within the company is a relevant circumstance to consider in the *Tellabs* analysis," especially where the false statements relate to the company's core operations); *In re Northwest Biotherapeutics Inc. Sec. Litig.*, 2008 U.S. Dist. LEXIS 54028, at *3 (W.D. Wash. 2008) (defendants' positions strongly suggest they knew statements were false or misleading);[30] *Berson*, 527 F.3d at 987-88.

Finally, American Apparel's immigration violations, and the effects of those violations on its vertical integration, all played out in real time in American Apparel's sole factory, in the same building where defendants worked.  *See Tellabs*, 513 F.3d at 711 ("exceedingly unlikely" that the "[CEO] was unaware of the problems of his company's two major products").

### 3.    Plaintiff Adequately Pleads Scienter For Defendants' False Financial Reporting Statements

Prior to going public, American Apparel had a history of shoddy financials. ¶108. Hence, by the start of the Class Period, defendants repeatedly assured investors that American Apparel "had to be in [SOX] compliance from the beginning," was "taking th[e] issue very seriously" and was "pursu[ing] a strict corporate orthodoxy as far as financial accounting issues."  ¶¶27, 108, 110-11, 114.  In response, analysts

---

[30]    *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 1000 (9th Cir. 2009) recognized that allegations regarding "management's role in a corporate structure," when "buttressed with detailed and specific allegations about management's exposure to factual information within the company," are sufficient to plead scienter.  Here, plaintiff alleges that Charney, who defendants concede was "intimately involved in the daily direction of the Company," had, in his own words, "visuality [sic] to what's going on in my stores **every night, every day of the week.  Right here and now.**" Indiv. MTD at 3; ¶98.  *Yahoo! Inc.*, 630 F. Supp. 2d at 1118, which merely held that allegations regarding defendants' positions, **without more**, were insufficient, is similarly inapposite.

noted that the Company was "committ[ed] to conservatism." ¶31.  The Company even hired accounting giant Deloitte "to provide comfort to investors" and partnered with Lion to "inject[] financial discipline" and "boost investor confidence about corporate governance." ¶¶116, 127.  Defendants also assured investors that the Company would make significant progress remediating deficiencies by the end of 2008.  ¶¶111-13.

Meanwhile, defendants were engaged in a pattern of financial improprieties and misrepresentations about the Company's fiscal health.  ¶¶25-38, 108-40, 167-70.  For example, on December 24, 2008, Kowalewski sent an internal Company e-mail explaining that American Apparel "almost ***went bankrupt*** last Friday" and that "we're hardly out of the woods [on going bankrupt]." ¶¶28-29.[31]  Yet, just ***a month earlier***, on November 10, 2008, Charney had touted the Company's financial health, claiming "[w]e're confident in the numbers we've put out there, that's for sure." ¶30.[32]  On the same analyst conference call, Kowalewski told investors that "we're very pleased with our financial results for the third quarter." Ex. 4 at 2.  Defendants' misrepresentations continued, with Charney gloating that the Company would "weather the economic storm," and analysts concluding that it was "in a pretty elite group," "[b]ucking the trend," "[o]ne of the few bright real spots in this environment" and the "[b]est-positioned" apparel retailer in the world.  ¶¶32-33, 113.

Then, in May 2009, American Apparel was forced to restate its FY2008 financials.  ¶¶33, 121; *see Stocke v. Shuffle Master, Inc.*, 615 F. Supp. 2d 1180, 1191 (D. Nev. 2009) (accounting error one year before restatement and false remediation

---

[31]     Defendants submit that the failure to disclose American Apparel's precarious financial situation was justified because the Company disclosed its debt levels.  Indiv. MTD at 18-19.  But disclosing that the Company's indebtedness "could result in 'default'" is a far cry from informing investors that the Company is on the brink of bankruptcy on a daily basis.

[32]     Thus, contrary to Defendant's argument, plaintiff does connect the "almost bankrupt" e-mails to false financial health and compliance statements.  *Compare* Indiv. MTD at 18, *with* ¶¶28-30.

assurances probative of scienter.); *Norfolk Cnty. Ret. Sys. v. Ustian*, 2009 U.S. Dist. LEXIS 65731, at *26-*27 (N.D. Ill. 2009) (earlier restatement raised red flags regarding inadequate accounting and material internal control weaknesses); *Gelfer v. Pegasystems, Inc.*, 96 F. Supp. 2d 10, 16 (D. Mass. 2000) (repeated accounting violations can create inference of recklessness).[33]  Nor had defendants shored up American Apparel's financial controls by the end of 2008.[34]  Despite defendants' argument that American Apparel's controls improved (Indiv. MTD at 9; APP MTD at 7-8), even by 2011, the Company still had not remediated up its internal control deficiencies.  ¶¶37, 110; *see In re Faro Techs. Sec. Litig.*, 534 F. Supp. 2d 1248, 1263 (M.D. Fla. 2007) ("Individual Defendants are not alleged to be simply poor managers – they are alleged to be dishonest ones.")  Indeed, American Apparel's 2010 Form 10-K, which was filed March 31, 2011 (15 days late), contained its ***new*** auditor's "***adverse opinion*** on the effectiveness of the Company's internal control over financial reporting [during the Class Period] because of the existence of material weaknesses [at the Company]."  ¶37.[35]

Moreover, while assuring investors that the Company was diligently pursuing a

---

[33]    Defendants' authority stands for the unremarkable proposition that a restatement, standing alone, is insufficient to establish scienter.  Indiv. MTD at 20; APP MTD at 23-24 (citing *NorthPoint*, 184 F. Supp. 2d at 1003 (distinguishing *Gelfer*, 96 F. Supp. 2d at 16, where "improper accounting methods were brought to light by the resignation of [the firm's accountants]")); *DSAM Global Value Fund v. Altris Software, Inc.*, 288 F.3d 385, 390-91 (9th Cir. 2002) (refusing to hold the ***auditor*** liable, based solely on restatement of revenue because there was no evidence that the auditor "knew or had to have known" of the accounting improprieties); *Zucco*, 552 F.3d at 1001 (restatement insufficient to support scienter where misrepresentations did "not concern especially prominent facts" and were "largely definitional" such that "the falsity of the original representations would not be immediately be obvious to corporate management").

[34]    Defendants' failure to maintain effective controls is itself indicative of scienter. *Shuffle Master*, 615 F. Supp. 2d at 1191; *Batwin v. Ocean Networks, Inc.*, 2008 U.S. Dist. LEXIS 52365, at *40-*41 (C.D. Cal. 2008).

[35]    The Company's serially late filings contradict defendant's representations that American Apparel made "prompt" and "timely" public disclosures during the Class Period.  *See* Indiv. MTD at 17; APP MTD at 2, 4, 18; Appendix A.

"conservative" approach to maintaining its internal controls and financial statements, defendants were *intentionally* withholding adverse material information from the Company's auditor.   On July 22, 2010, as a result of defendants' malfeasance, Deloitte resigned and later withdrew its audit for all of the Company's 2009 financial statements, warning investors that they should "no longer be relied upon," because Deloitte was "no longer willing to rely on management's representations due to Deloitte's belief that management *withheld* from Deloitte the February 2010 monthly financial statements until after the filing of the 2009 10-K and made related *misrepresentations*."   ¶¶12, 34, 36, 109, 112, 124, 126-28.[36]   The withheld information, according to Deloitte, evidenced significant "declines in operations and gross margin" and a "significant decrease in…projections" that, had they been disclosed, would have required a revision to the 2009 Form 10-K.  ¶124.[37]  The Ninth Circuit recently upheld a scienter verdict, because "[a] jury could reasonably find that [defendants'] actions delayed [the company's independent auditor's] discovery [of problems] until after the release of the third-quarter numbers" and this "was a significant departure from the standards of ordinary care and presented a danger of misleading buyers and sellers as to [the company's] actual financial status." *Todd*, 2011 U.S. App. LEXIS 12692, at *20.  As a result, the Ninth Circuit held that "there was substantial evidence for the jury to find at least recklessness."  *Id.*

Further, just six days before that misleading 2009 10-K was issued, on March 25, 2010, Charney misrepresented that "I think the outlook for American Apparel is strong, and I am *very confident about the business*…I am looking forward to a *great*

---

[36]   The argument that "the CAC reveals no indication that the Individual Defendants had any advance knowledge of the reasons for Deloitte's resignation" is nonsensical.  Indiv. MTD at 18.  Deloitte resigned because defendants *intentionally* withheld information and *misrepresented* the Company's financial health.¶¶126-28.

[37]   The absence of more than one restatement here does not negate scienter any more than it negates falsity. *See LDK*, 584 F. Supp. 2d at 1245-46; *In re Levi Strauss & Co. Sec. Litig.*, 527 F. Supp. 2d 965, 987 (N.D. Cal. 2007).

1    *year*."   ¶125.   These facts reinforce a strong inference of scienter.   Indeed, as one

2    market observer presciently stated upon Deloitte's sudden departure, "'[a]nytime

3    auditors step back, you've really got to take a hard look at whether there was fraud.'"

4    ¶¶35, 132.  Defendants' consistent financial improprieties also violated GAAP.  ¶¶34,

5    37, 87, 136-40, 168.[38] "Violation of [GAAP] can also provide evidence of scienter."

6    *Tripp v. IndyMac Bancorp, Inc.*, 2007 U.S. Dist. LEXIS 95445, at *14 (C.D. Cal.

7    2007); *In re CornerStone Propane Partners, L.P. Sec. Litig.*, 355 F. Supp. 2d 1069,

8    1091 (N.D. Cal. 2005) (same).[39]  Defendants' certification of American Apparel's

9    misleading financial statements is further indicia of scienter.  ¶¶45-46, 167-68.  The

10   Ninth Circuit holds that SOX certifications are "'probative of scienter if the person

11   signing the certification was severely reckless in certifying the accuracy of the

12   financial statements.'"  *Glazer*, 549 F.3d at 747[40] (quoting *Garfield v. NDCHealth*

---

14   [38]    Plaintiffs do not merely cite "[c]onclusory GAAP allegations."  APP MTD at
15   23; Indiv. MTD at 20.  Rather, defendants' own auditor specifically determined that
     defendants made intentional misrepresentations and purposefully withheld
16   information.  *Compare Morgan v. AXT, Inc.*, 2005 U.S. Dist. LEXIS 42346, at *41
     (N.D. Cal. 2005) ("Plaintiff only alleges that defendants ***must have been*** aware that its
17   products were flawed and were being shipped to customers anyway") (emphasis in
     original), *with* ¶124.

18   [39]    Defendants' authority involves the scienter of independent auditors, not
19   corporate insiders. APP MTD at 23; Indiv. MTD at 20.  As the Ninth Circuit recently
     held, "pleading sufficient facts to support a strong inference of scienter by an outside
20   auditor is difficult because outside auditors have more limited information than, for
     example, ***the company executives*** who oversee the audit."  *Ernst & Young*, 2011 U.S.
21   App. LEXIS 7680, at *18.   Moreover, because, here, defendants intentionally
     misrepresented and withheld information in violation of GAAP, defendants' authority
22   is inapplicable. *See DSAM*, 288 F.3d at 390-91 (plaintiffs failed to alleged that ***auditor***
     "knew or must have been aware of the improper revenue recognition" or
23   "intentionally or knowingly falsified the financial statements"); *In re Software
     Toolworks Inc. Sec. Litig.*, 50 F.3d 615, 627-28 (9th Cir. 1994) ("At most, the
     evidence establishes that [the ***auditor***] was negligent in auditing [the company], not
24   that [the ***auditor***] recklessly or knowingly falsified the financial statements.").

25   [40]    Defendants' reliance on *Zucco*, for the proposition that SOX certifications are
26   "ignor[ed]" and "add nothing" to the scienter calculus is erroneous. Indiv. MTD at
     20.  *Zucco* only stated that "Sarbanes-Oxley certifications are not sufficient, ***without***
27   ***more***, to raise a strong inference of scienter."  *Zucco*, 552 F.3d at 1004.  Here,
     plaintiff asserts far more, including that the Company's own auditor found that
28   defendants were intentionally making misstatements. *See Backe v. Novatel Wireless,*

1   *Corp.*, 466 F.3d 1255, 1266 (11th Cir. 2006) (strong inference of scienter if certifier

2   "had reason to know, or should have suspected, due to the presence of glaring

3   accounting irregularities or other 'red flags,' that the financial statements contained"

4   false statements)); *Quest*, 527 F. Supp. 2d at 1189-90 ("For these certifications to have

5   any substance, signatories…must be held accountable….It would be wholly

6   inappropriate to permit a signatory to evade liability…on the ground that the signatory

7   was unaware of the misstatements made therein….To hold otherwise would

8   effectively eviscerate the entire substance [of the certifications], the purpose of which

9   is to ensure…the signatories are attesting to their accuracy and reliability."); *Lattice*,

10   2006 U.S. Dist. LEXIS 262, at *50-*51; *Commc'ns Workers of Am. Plan for Emps.'*

11   *Pensions & Death Benefits v. CSK Auto Corp.*, 525 F. Supp. 2d 1116, 1124 (D. Ariz.

12   2007).

13         Moreover, during the Class Period, American Apparel had at least three CFOs.

14   Cieply resigned and Kowalewski, who replaced Cieply, was ousted and was replaced

15   by John J. Luttrell.   ¶¶25-27.   With the resignation of ***three*** members of the

16   Company's Board, the facts also provide additional indicia of scienter.   *See, e.g.*, *In re*

17   *Adaptive Broadband Sec. Litig.*, 2002 U.S. Dist. LEXIS 5887, at *42-*43 (N.D. Cal.

18   2002) (resignation and replacement of CFO provides additional support for scienter);

19   *Dana*, 2011 U.S. App. LEXIS 10437, at *13 (executive's retirement supports

20   scienter); *In re McKesson HBOC, Inc. Sec. Litig.*, 126 F. Supp. 2d 1248, 1275 n.16

21   (N.D. Cal. 2000).

22   Finally, after the Class Period, the FBI, DOJ and SEC all commenced simultaneous

23   civil and criminal investigations into Deloitte's resignation ***and the Company's Class***

24   ***Period financial reporting and internal controls***.   ¶¶12, 35, 130.   These

25

26   ───────────────────────

27   *Inc.*, 607 F. Supp. 2d 1145, 1163 (S.D. Cal. 2009) (under holistic approach, false SOX certifications, along with other allegations including violations of GAAP and position

28   of defendants, support an inference of scienter at the pleading stage).

investigations also contribute to an inference of scienter.  *See In re Oxford Health Plans, Inc., Sec. Litig.*, 51 F. Supp. 2d 290, 295 (S.D.N.Y. 1999); *Dana*, 2011 U.S. App. LEXIS 10437, at *13 (inference of scienter from "investigation into [the company's] accounting practices by the [SEC]"); *In re Bristol Myers Squibb Co. Sec. Litig.*, 586 F. Supp. 2d 148, 168 (S.D.N.Y. 2008) (inference of scienter where DOJ launched investigation).[41]

### 4.   Defendants had Motive to Commit Fraud

Plaintiff does not simply make "generalized assertions of motive" or "aver intent in general terms."  Indiv. MTD at 19-20; APP MTD at 2-3, 24-25 (citing *Lipton*, 284 F. 3d at 1038; *In re Silicon Graphics Inc. Sec. Litig.*, 183 F.3d 970, 979 (9th Cir. 1999)).  Rather, the Complaint details specific motives for defendants' misrepresentations and omissions.[42]  By the start of the Class Period, defendants had to either disclose the Company's large undocumented workforce, damage the brand and risk federal sanctions, or mislead investors in the hopes that a new administration, which had promised to provide a path to citizenship for undocumented workers, would eradicate the dilemma.  Defendants recklessly chose the latter course.  ¶¶9-10, 17.

> [Defendants] may have thought that there was a chance that the situation regarding the [undocumented workers] would right itself.  If so, the benefits of concealment might exceed the costs.  Investors do not like to

---

[41]   Defendants' authority is not remotely helpful.  Indiv. MTD at 19; APP MTD at 22 n.13.  Both *In re Hansen Natural Corp. Sec. Litig.*, 527 F. Supp. 2d 1142, 1162 (C.D. Cal. 2007) and *In re Maxim Integrated Prods., Inc. Sec. Litig.*, 639 F. Supp. 2d 1038, 1047 (N.D. Cal. 2009) merely held that the announcement of a government investigation was not an adequate corrective disclosure under a ***loss causation*** analysis.  Neither case contains any analysis of whether government investigations support scienter.  Moreover, defendants here do not challenge plaintiff's loss causation allegations.

[42]   In *In re Acterna Corp. Sec. Litig.*, 378 F. Supp. 2d 561, 576 (D. Md. 2005) where plaintiffs did "not allege [] any concrete benefits that could be realized by the alleged false statements."  *See also In re Pac. Gateway Exch., Inc. Sec. Litig.*, 2002 U.S. Dist. LEXIS 8014, at *53-*56 (N.D. Cal. 2002) (same); *PETsMART*, 61 F. Supp. 2d at 999 (rejecting "generic motive" allegations); *Brashears v. 1717 Capital Mgmt.*, 2004 U.S. Dist. LEXIS 28400, at *25-*26 (D. Del. 2004) (same).

> think they're riding a roller coaster….The fact that a gamble –
> concealing bad news in the hope that it will be overtaken by good news –
> fails is not inconsistent with its having been a considered, though
> because of the risk a reckless, gamble.  It is like embezzling in the hope
> that winning at the track will enable the embezzled funds to be replaced
> before they are discovered to be missing.

*Tellabs*, 513 F.3d at 710.

Charney also reaped massive financial benefits from his fraud.  Charney earned over $16 million in 2007 alone, and American Apparel's blank-check reverse merger with Endeavor gave him an instant reported net worth of over $580 million. ¶11. Indeed, even after the Company's undocumented workforce came to light, and the Company was fined by ICE, Charney was awarded a performance bonus of between $1.6 and $2.4 million.  ¶159.  These incentives, although not alone sufficient, "squarely" contribute to an inference of scienter. *CornerStone*, 355 F. Supp. 2d at 1092.[43]  Charney also used American Apparel as a vehicle to enrich his family. ¶¶155-59; *Lewis v. Straka*, 2006 U.S. Dist. LEXIS 76716, at *20-*21 (E.D. Wis. 2006) (strong inference of scienter where CEO of closely-held corporation "and members of his family engaged in considerable self dealing, obtaining loans on terms more favorable than those available to the public"); *Marcus v. Frome*, 329 F. Supp. 2d 464, 473 (S.D.N.Y. 2004) (same).[44]

In addition, "[a]s chairman, CEO, and ***majority shareholder***," Charney "clearly had a large stake in keeping [American Apparel's] stock price inflated." *In re Spear & Jackson Sec. Litig.*, 399 F. Supp. 2d 1350, 1359 (S.D. Fla. 2005).[45]  Courts infer

---

[43]    *See also Tellabs*, 551 U.S. at 325 ("personal financial gain may weigh heavily in favor of a scienter inference"); *In re Wash. Mut., Inc. Sec. Derivative & ERISA Litig.*, 694 F. Supp. 2d 1192, 1216 (W.D. Wash. 2009).

[44]    Defendants' reliance on *Santa Fe Indus., Inc. v. Green*, 430 U.S. 462, 479 (1977) is misplaced.  Indiv. MTD at 20.  Plaintiff does not allege that Charney's enrichment of his family is actionable, but rather, that largesse for kin is additional indicia of scienter.

[45]    Charney has also consistently voted his controlling interests and taken actions that dilute shareholder value without negatively affecting his own stake in the

-43-

1  scienter "when a defendant's violation of accounting principles allows a company to

2  obtain a financial benefit or a competitive advantage." *In re Medicis Pharm. Corp.*

3  *Sec. Litig.*, 2010 U.S. Dist. LEXIS 81410, at *28 (D. Ariz. 2010).  The Complaint also

4  specifically alleges that the individual defendants withheld material information from

5  Deloitte because they knew that much needed financing and covenant waivers would

6  be difficult (and prohibitively expensive) to obtain if the Company issued a "going

7  concern" qualification in its 2009 Annual Report on Form 10-K.  ¶¶122-23.[46]  In fact,

8  some of the Company's debt immediately came due upon the issuance of such a

9  qualification.  *Id.*[47]  Defendants argue that such financial motivation is insufficient to

10  support scienter.  Indiv. MTD at 19-20; APP MTD at 24-25.  The Ninth Circuit takes

11  a different view.  *See Howard*, 228 F.3d at 1064 n.8 (finding strong inference of

12  scienter where the company "had a motivation to overstate its net value so as not to

13  violate loan covenants with its principal lender"); *In re U.S. Aggregates, Inc. Sec.*

14  *Litig.*, 235 F. Supp. 2d 1063, 1071 (N.D. Cal. 2002); *Dana*, 2011 U.S. App. LEXIS

15  10437, at *13 (finding scienter where company "was able to use positive earnings

16  projections to obtain loans imperative for its survival").

17       Nor does Charney's lack of stock sales negate scienter.[48]  The Ninth Circuit has

18  expressly rejected such a notion, stating, "a party that introduces fraudulent

_____

Company.  ¶¶119 n.17, 159, 166.

[46]     An auditor is responsible for including "going concern" language in their audit
report if they believe it is "reasonably possible" that the auditee will go bankrupt
within 12 months.  ¶123.

[47]     "As of December 31, 2009, American Apparel ha[d] substantial indebtedness,
including $6.2 million of borrowings [from Bank of America] and $65.6 million of
borrowings [from Lion Capital]." *See* Ex. 7 at 10, 49.  Both lenders required American
Apparel to submit audited year-end financial statements without a "going concern"
qualification."  *See, e.g.*, Abadou Decl., Ex. 8 at 51; Ex. 9 at 74.

[48]     *Siracusano v. Matrixx Initiatives, Inc.*, 585 F.3d 1167, 1182 (9th Cir. 2009);
*Hanon*, 976 F.2d at 507; *LDK*, 584 F. Supp. 2d at 1247 (same); *Quest*, 527 F. Supp.
2d at 1191 (same); *Batwin*, 2008 U.S. Dist. LEXIS 52365, at *43-*45 (same).

1    information into the securities market does no less damage to the public because the
2    party did not trade stocks." *McGann v. Ernst & Young*, 102 F.3d 390, 396 (9th Cir.
3    1996). "In other words, the lack of stock sales by a defendant is not dispositive as to
4    scienter." *No. 84 Emp'r-Teamster Joint Council Pension Trust Fund v. Am. W.*
5    *Holding Corp.*, 320 F.3d 920, 944 (9th Cir. 2003). Moreover, here, Charney was
6    prohibited, under lock-up agreements, from selling ***any*** American Apparel stock
7    during the Class Period. ¶159 n.22. "[I]t is undisputed that [defendants] were subject
8    to a lock-up agreement [until] well after [the company's] stock had
9    plummeted….Therefore, individual defendants' failure to sell [] stock [is] not
10   sufficient evidence for the Court to find that defendants did not have scienter." *In re*
11   *Entropin, Inc., Sec. Litig.*, 487 F. Supp. 2d 1141, 1153-54 (C.D. Cal. 2007);[49] *see*
12   *Tellabs*, 551 U.S. at 325 ("the absence of a motive allegation is not fatal").

13           Defendants also argue that Charney's share purchases are inconsistent with
14   scienter. Indiv. MTD at 15 n.3; APP MTD at 25. However, "[t]he [Officer
15   Defendants] might have believed that the [true financial condition] could be hidden
16   indefinitely." *In re Refco, Inc. Sec. Litig.*, 503 F. Supp. 2d 611, 647 (S.D.N.Y. 2007)
17   (finding scienter where defendants purchased stock during class period). In addition,
18   as analyst Ben Silverman told the *Wall Street Journal*, do not "discount the possibility
19   that Mr. Charney may be trying to send a signal to investors, rather than buying the
20   stock on its own merits. '***Charney is a master when it comes to PR and marketing***.'"
21   *See* Ex. 10. Considered collectively, plaintiff's allegations are "at least as compelling
22   as any opposing inference one could draw." *Tellabs*, 551 U.S. at 324. "[A]s scienter
23   is appropriately alleged for the [Individual Defendants]… it is appropriately alleged
24

25
26   [49]      Defendants' authorities do not involve lock-up agreements. Indiv. MTD at 15;
     APP MTD at 25; *Higginbotham v. Baxter Int'l Inc.*, 495 F.3d 753, 759 (7th Cir.
27   2007); *Impac*, 554 F. Supp. 2d at 1100 n.11; *In re FVC.com Sec. Litig.*, 136 F. Supp.
     2d 1031, 1039-40 (N.D. Cal. 2000); *In re Allergan Inc. Sec. Litig.*, 1993 WL 623321,
28   at *37 (C.D. Cal. 1993).

for [American Apparel]." *In re Cylink Sec. Litig.*, 178 F.Supp. 2d 1077, 1088 (N.D. Cal. 2001); *In re Cadence Design Sys., Inc. Sec. Litig.*, 692 F. Supp. 2d 1181, 1192-93 (N.D. Cal. 2010) (same); *McKesson*, 126 F. Supp. 2d at 1277 (citing *Hollinger v. Titan Capital Corp.*, 914 F.2d 1564, 1576-78 (9th Cir. 1990)).[50]

### E.   Defendants' False and Misleading Statements Are Not Protected by the PSLRA's Safe Harbor

Defendants claim that their false statements regarding their remediation of the Company's control deficiencies, the Company's financial health and the negative impact of terminated workers are forward-looking statements protected by the safe harbor.  Indiv. MTD at 21-22; APP MTD at 11-13.  Misstatements of present and/or historical facts, as here, are not subject to the safe harbor.  *Compare* ¶¶14-15, 32, 81-84, 89, 92-94, 111, 113, 119, 125, *with Rosenbaum Capital, LLC v. McNulty*, 549 F. Supp. 2d 1185, 1190 (N.D. Cal. 2008); *Nuvelo*, 668 F. Supp. 2d at 1231; *Berson*, 527 F.3d at 990.  The effect of defendants' statements was to convey a misleading picture of the Company's then-present business conditions.[51]

In addition, the PSLRA only protects "forward-looking statement[s]…accompanied by meaningful cautionary statements." 15 U.S.C. §78u-5(c)(1)(A)(i).  To be "meaningful," cautionary statements must "'discredit the [alleged misrepresentations] so obviously that the risk of real deception drops to nil.'"  *Pozzi v.*

---

[50]   Likewise, the Company is liable for the acts of its agents – including its attorney and spokesperson, Schey.  *Hollinger*, 914 F.2d at 1578 (holding, in a 10(b) case, that a principal is liable for acts of its agent).  And Charney, as founder, Chairman, President, CEO and majority shareholder of American Apparel, who exercised "strict control" over and was "intimately involved the daily direction," had "ultimate authority" over the content and communication of statements made on the Company's behalf, and is thus liable for those statements. Indiv. MTD at 3; ¶¶45, 57; *Janus Capital Grp., Inc. v. First Derivative Traders*, 180 L. Ed. 2d 166 (2011).

[51]   "Where a statement is 'mixed,'…and where a plaintiff alleges the entire statement is misleading because it omitted material information, the court should determine whether the statement as a whole, not a particular part, is misleading." *Immune Response*, 375 F. Supp. 2d at 1033.

*Smith*, 1995 U.S. Dist. LEXIS 18163, at *5 (E.D. Pa. 1995).   "[B]oilerplate, generalized warnings [will] not suffice to balance [defendants'] specific predictions." *In re Clorox Co. Sec. Litig.*, 238 F. Supp. 2d 1139, 1142 (N.D. Cal. 2002); *Immune Response*, 375 F. Supp. 2d at 1033; *In re Amylin Pharm., Inc. Sec. Litig.*, 2003 U.S. Dist. LEXIS 7667, at *20 (S.D. Cal. 2003).   Moreover, the question of whether any cautionary language is sufficiently "meaningful" raises fact issues that are not properly resolved on a motion to dismiss. *Livid Holdings Ltd. v. Salomon Smith Barney, Inc.*, 416 F.3d 940, 947 (9th Cir. 2005); *UTStarcom*, 617 F. Supp. 2d at 972.

Defendants argue that their statements regarding the Company's controls were accompanied by meaningful cautionary language. *Compare* Indiv. MTD. at 23, *with* ¶111.   Defendants' "cautionary language," however, which merely stated that defendants "seek[] to remedy" deficiencies, additional testing "may reveal additional deficiencies" and "should internal control [] be inadequate" it could affect results, is not meaningful in light of defendants' failure to disclose intentional financial manipulations.[52]  Indiv. MTD at 31-33, 35.  Defendants further argue that cautionary language regarding the effect of immigration violations insulate those statements. APP MTD at 11-12.[53]  But defendants' general warnings were overshadowed by their specific misrepresentations to investors.  *See JDS*, 2007 U.S. Dist. LEXIS 66085, at *45.

The statements are also not protected because plaintiff pleads actual knowledge. Plaintiff may plead actual knowledge by alleging that: (1) the statement is not actually believed, (2) there is no reasonable basis for the belief, *or* (3) the speaker is aware of

---

[52]      Defendants further suggest that Charney's statement that "I think the outlook for American Apparel [in 2010] is strong, and I am very confident about the business" is a forward-looking statement. Indiv. MTD at 5. Yet, Charney made this statement while intentionally withholding adverse trends in American Apparel's business.

[53]      Defendants assert that "all such cautionary language is omitted from the CAC." APP MTD at 6.  Defendants are mistaken.  *See, e.g.*, ¶92 (setting forth, in full, the language that defendants claim is omitted).

1    undisclosed facts tending seriously to undermine the statement's accuracy." *Provenz*,

2    102 F.3d at 1487 (emphasis in original).   As detailed above, plaintiff adequately

3    pleads that defendants did not believe they were complying with immigration law, that

4    the termination of thousands of employees was having no material impact on the

5    Company nor that the Company was diligently instituting conservative financials.

6    Finally, defendants certainly had no reasonable basis for the statements and were

7    aware of undisclosed facts tending to seriously undermine them.[54]

8           **F.    The Complaint Adequately Pleads Control Liability Under §20(a)**

9           Because plaintiff adequately alleges a primary securities violation, the only

10   remaining issue is whether Lion Capital is a "control" person.[55]   Lion Capital

11   misconstrues the standard for pleading "control" in the Ninth Circuit, arguing that

12   plaintiff does not allege that Lion Capital was "responsible for American Apparel's

13   alleged securities violations."   Lion MTD at 2.   This is not the law.   "The Ninth

14   Circuit has [] adopted the SEC's definition of control: 'The possession, direct or

15   indirect, of the power to direct or cause the direction of the management and policies

16   of a person, whether through ownership of voting securities, by contract, or

17   otherwise.'"   *In re Surebeam Corp. Sec. Litig.*, 2004 U.S. Dist. LEXIS 26951, at *72

18   (S.D. Cal. 2005).   Plaintiff pleads that Lion Capital possessed direct and indirect

19   power over American Apparel and the Individual Defendants during the Class Period.

20   ¶¶53, 116-118, 121, 159, 163-165; *see Batwin*, 2008 U.S. Dist. LEXIS 52365, at *74.

21          From the moment Lion Capital entered into its first finance agreement with

22   American Apparel until the end of the Class Period, Lion Capital "exercised actual

---

24   [54]   *Compare* Indiv. MTD at 24; APP MTD at 12-13 (citing *Impac*, 554 F. Supp. 2d
25   at 1099 (plaintiffs did not plead actual knowledge)).   Nor, as the above discussion
     make clear, does plaintiff merely cite "boilerplate" allegations of actual knowledge.
26   *In re Cutera Sec. Litig.*, 610 F.3d 1103, 1112 (9th Cir. 2010).

27   [55]   Charney and Kowalewski do not dispute that they are "control" persons.
     Because, as discussed above, plaintiff has adequately pled a primary violation, the
28   20(a) claims against Charney and Kowalewski should be sustained.

1  power" and "control" over American Apparel and the Individual Defendants. *Batwin*,

2  2008 U.S. Dist. LEXIS 52365, at *74.  Lion Capital came in at a key moment and

3  literally saved American Apparel from sure bankruptcy.  As part of its arrangement

4  with the Company, Lion was empowered to name two members to the Company's

5  Board in addition to a Board Observer.  ¶117.  Lion's Board members were also

6  simultaneously Lion partners.   ¶¶118, 120.   Further, Lion and Charney had a

7  reciprocal voting agreement whereby each agreed to vote their shares in favor of

8  reelection of each other's Board seats.  ¶165.  Lion Capital highlights its role as a

9  lender in an attempt to show that lenders are not control persons.  Lion MTD at 7.

10 Plaintiff alleges, however, that Lion Capital's relationship with the Company was

11 more than that of "lender."  "'The traditional indicia of control are: having a prior

12 lending relationship, owning stock in the target company, or having a seat on the

13 board.'"  *Batwin*, 2008 U.S. Dist. LEXIS 52365, at * 77.  Plaintiff alleges all three

14 "indicia" in the Complaint.  ¶¶116-17, 164.

15      Moreover, Lion Capital had the ability to exercise the warrants it obtained as

16 part of the financing agreement with the Company, regardless of whether it actually

17 exercised the warrants. ¶¶116,164, 188; *Howard*, 228 F.3d at 1065.  Lion Capital also

18 contends that "[t]here are no allegations in the Complaint that Lion Capital had any

19 role…over, American Apparel's alleged decision to withhold material information

20 from the market." Lion MTD at 9.  Again, Lion Capital mistakes the standard for

21 pleading "control."  "When determining 'control person' status…the plaintiff 'need

22 not show that the defendant was a culpable participant in the violation.'" *Todd*, 2011

23 U.S. App. LEXIS 12692, at *35; *Howard*, 228 F.3d at 1065.

24      Finally, Lion Capital points to plaintiff's purported "boilerplate allegation,"

25 citing *Hansen*, where "this Court dismissed without leave to amend a 'control person'

26 claim based on virtually identical allegations to those asserted by Plaintiff here," and

27 provides a chart to support this assertion. Lion MTD at 9; *Hansen*, 527 F. Supp. 2d at

28 1163.  The chart, along with Lion Capital's assertion, is misleading.  The allegation in

1   Lion Capital's chart under "ALLEGATIONS IN *HANSEN* CASE" was the **only** 20(a)

2   allegation mentioned in *Hansen* and, there, there was no primary violation.  *Hansen*,

3   527 F. Supp. 2d at 1163.  By contrast, here, plaintiff makes no fewer than **10**

4   **additional allegations** showing that Lion Capital's control.  *See Surebeam*, 2004 U.S.

5   Dist. LEXIS 26951, at *72; Appendix B.

6   **IV.    CONCLUSION**

7           For the foregoing reasons, defendants' motions should be denied.  In the event

8   the Court grants, in whole or in part, the motions to dismiss, plaintiff requests leave to

9   amend.  *See* Fed. R. Civ. P. 15(a) ("leave [to amend] shall be freely given when

10   justice so requires").

11   DATED: June 30, 2011                     **KESSLER TOPAZ**
                                              **MELTZER & CHECK, LLP**
12

13                                            */s/ Ramzi Abadou*
                                              Ramzi Abadou
14                                            Eli R. Greenstein
                                              Stacey M. Kaplan
15                                            Erik D. Peterson
                                              580 California Street, Suite 1750
16                                            San Francisco, CA 94104
                                              Telephone: (415) 400-3000
17                                            Facsimile: (415) 400-3001

18                                            *Lead Counsel for Lead Plaintiff and the*
                                              *Class*
19

20

21

22

23

24

25

26

27

28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## CERTIFICATE OF SERVICE

I hereby certify that on June 30, 2011, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail addresses denoted on the attached Electronic Mail Notice List.

I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed on June 30, 2011.

*/s/ Ramzi Abadou*
Ramzi Abadou

## Mailing Information for a Case 2:10-cv-06352-MMM -JCG

### Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case

- **Ramzi Abadou**
  rabadou@ktmc com,shebard@ktmc com

- **Seth A Aronson**
  saronson@omm com,LitigationCalendar@omm com

- **David E Bower**
  dblaw@mindspring com,dbower@zlk com

- **Arthur J Chen**
  Achen@aftlaw com

- **Jack G Fruchter**
  jfruchter@aftlaw com

- **Lionel Zevi Glancy**
  lglancy@glancylaw com

- **Michael Marc Goldberg**
  mmgoldberg@glancylaw com,dmacdiarmid@glancylaw com,asohrn@glancylaw com,info@glancylaw com,rprongay@glancylaw com,lglancy@glancylaw com

- **Eli R Greenstein**
  egreenstein@ktmc com

- **Stacey M. Kaplan**
  skaplan@ktmc com

- **Chet A Kronenberg**
  ckronenberg@stblaw com

- **Amy J Longo**
  alongo@omm com

- **Danielle Suzanne Myers**
  dmyers@rgrdlaw com,e_file_sd@rgrdlaw com

- **Brian Oliver O'Mara**
  bomara@rgrdlaw com,e_file_sd@rgrdlaw com

- **Erik David Peterson**
  epeterson@ktmc com,knguyen@ktmc com

- **Harriet S Posner**
  hposner@skadden com,gijones@skadden com,nberglun@skadden com

- **Robert Vincent Prongay**
  rprongay@glancylaw com

- **Darren J Robbins**
  e_file_sd@rgrdlaw com

- **Laurence M Rosen**
  lrosen@rosenlegal com

- **Mitchell M Z Twersky**
  mtwersky@aftlaw com

- **David C Walton**
  davew@rgrdlaw com,e_file_sd@rgrdlaw com

- **Christopher M Wood**
  cwood@rgrdlaw com,e_file_sd@rgrdlaw com,e_file_sf@rgrdlaw com

### Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing)  You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients

```
Phillip Kim
The Rosen Law Firm PA
350 Fifth Ave Ste 5508
New York, NY 10118
```