SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
HARRIET S. POSNER (Bar No. 116097)
harriet.posner@skadden.com
PETER B. MORRISON (Bar No. 230148)
peter.morrison@skadden.com
GILA D. JONES (Bar No. 248213)
gila.jones@skadden.com
300 South Grand Avenue
Los Angeles, California 90071-3144
Telephone:   (213) 687-5000
Facsimile:   (213) 687-5600

Attorneys for Defendant
American Apparel, Inc.

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE AMERICAN APPAREL, INC. SHAREHOLDER LITIGATION | Case No. CV-10-6352 MMM (RCx) |
| This Document Relates To: | (1)  DEFENDANT AMERICAN APPAREL, INC.'S REPLY TO PLAINTIFF'S OPPOSITION TO MOTION TO DISMISS CONSOLIDATED CLASS ACTION COMPLAINT; |
| ALL ACTIONS | (2)  SUPPLEMENTAL REQUEST FOR JUDICIAL NOTICE (separate cover); |
| | (3)  SUPPLEMENTAL DECLARATION OF GILA D. JONES (separate cover); |
| | (4)  [PROPOSED] ORDER GRANTING SUPPLEMENTAL REQUEST FOR JUDICIAL NOTICE (separate cover); |
| | (5)  REPLY TO PLAINTIFF'S OPPOSITION TO REQUEST FOR JUDICIAL NOTICE (separate cover); and |
| | (6)  OPPOSITION TO PLAINTIFF'S REQUEST FOR JUDICIAL NOTICE (separate cover). |
| | Date:  September 12, 2011 Time:  10:00 a.m. Courtroom:  780 |
| | Hon. Margaret M. Morrow Complaint Filed:  April 29, 2011 Trial Date:  TBD |

REPLY TO OPP'N TO MOTION TO DISMISS CAC

# TABLE OF CONTENTS

**Page(s)**

I.    PRELIMINARY STATEMENT ........................................................................ 1

II.    ARGUMENT ...................................................................................................... 1

    A.    The CAC Fails To Satisfy The PSLRA's Standards For Pleading Falsity .......... 1

        1.    Plaintiff Fails To Plead That Disclosures Regarding Immigration Compliance Were False .............................................. 3

        2.    The Company's Forward-Looking Statements About The Estimated Effect Of ICE-Related Terminations Are Inactionable ................................................................................... 6

        3.    Statements Of Optimism Regarding Company's Desire To Improve Controls Were Not False And Misleading As A Matter Of Law ................................................................................ 10

    B.    Plaintiff Fails To Plead Facts Creating A Strong Inference Of Scienter .......... 12

        1.    Plaintiff's Suggestive And Hindsight Allegations Are Insufficient To Show That Company Knowingly Or Recklessly Misled Investors About Immigration Compliance ..................... 14

        2.    Allegations Regarding Effect Of Terminations Are Not Supported By Requisite Factual Detail And Thus Do Not Establish Scienter ........................................................................ 17

        3.    Groundless Allegations Of "Financial Improprieties" Do Not Establish Scienter With Respect To Control Issues .................... 20

        4.    The Opposition Continues To Fail To Describe A Motive Sufficient To Support Scienter Allegations ................................. 24

III.    CONCLUSION .............................................................................................. 25

REPLY TO OPP'N TO MOTION TO DISMISS CAC

# TABLE OF AUTHORITIES

**CASES**

**PAGE(S)**

In re Adaptive Broadband Securities Litigation,
No. C 01-1092 SC,
2002 U.S. Dist. LEXIS 5887 (N.D. Cal. Apr. 2, 2002)...................................... 23

Altas v. Accredited Home Lenders Holding Co.,
556 F. Supp. 2d 1142 (S. D. Cal. 2008) ...................................................... 11, 12

In re Amylin Pharmaceuticals, Inc. Securities Litigation,
No. 01-cv-1455 BTM (NLS),
2003 U.S. Dist. LEXIS 7667 (S.D. Cal. May 1, 2003) .................................. 8

In re Autodesk, Inc. Securities Litigation,
132 F. Supp. 2d 833 (N.D. Cal. 2000)........................................................... 19

Batwin v. Occam Networks, Inc.,
No. CV 07-2750 CAS (SHx),
2008 U.S. Dist. LEXIS 52365 (C.D. Cal. 2008) .................................... 20

Brodsky v. Yahoo! Inc.,
630 F. Supp. 2d 1104 (N.D. Cal. 2009)........................................... 4, 5, 16

Chamber of Commerce of the United States v. Whiting,
131 S. Ct. 1968 (2011).................................................................... 14

In re Cornerstone Propane Partners, L.P. Securities Litigation,
355 F. Supp. 2d 1069 (N.D. Cal. 2005)........................................... 24, 25

In re Countrywide Finance Corp. Securities Litigation,
588 F. Supp. 2d 1132 (C.D. Cal. 2008)........................................... 15

In re Dauo System, Inc. Securities Litigation,
411 F.3d 1006 (9th Cir. 2005) ........................................................ 19

Desaigaoudar v. Meyercord,
223 F.3d 1020 (9th Cir. 2000) .......................................................... 7

In re Downey Securities Litigation,
No. CV 08-3261-JFW (RZx),
2009 U.S. Dist. LEXIS 83443 (C.D. Cal. Aug. 21, 2009) ................................ 17

In re Duane Reade Inc. Securities Litigation,
No. 02 Civ. 6478(NRB),
2003 U.S. Dist. LEXIS 21319 (S.D.N.Y. Nov. 24, 2003) ................................ 12

ECA & Local 134 IBEW Joint Pension Trust of Chicago v. J.P. Morgan Chase
Co.,
553 F.3d 187 (2d Cir. 2009) .................................................................. 11

Employers Teamsters Local Nos. 175 & 505 Pension Trust Fund v. Clorox Co.,
353 F.3d 1125 (9th Cir. 2004) ............................................................. 11

REPLY TO OPP'N TO MOTION TO DISMISS CAC

Epstein v. Itron, Inc.,
993 F. Supp. 1314 (E.D. Wash. 1998)...............................................19

In re Exodus Communications, Inc. Securities Litigation,
No. C 01-2661 MMC,
2005 U.S. Dist. LEXIS 20222 (N.D. Cal. Aug. 5, 2005)...................24

In re Faro Technologies Securities Litigation,
534 F. Supp. 2d 1248 (M.D. Fla. 2007) ...........................................20

In re Foundry Networks, Inc. Securities Litigation,
No. C-00-4823-MMC,
2003 U.S. Dist. LEXIS 18200 (N.D. Cal. Aug. 29, 2003)................18

Frank v. Dana Corp.,
No. 09-4233,
2011 U.S. App. LEXIS 10437 (6th Cir. May 25, 2011) ...............13, 23

Gaylinn v. 3 Com Corp.,
185 F. Supp. 2d 1054 (N.D. Cal. 2000).............................................16

Gelfer v. Pegasystems, Inc.,
96 F. Supp. 2d 10 (D. Mass. 2000)....................................................22

In re Hiengergy Technologies, Inc. Securities Litigation,
No. SACV04-1226-DOC (JTLX),
2005 WL 3071250 (C.D. Cal. Oct. 25, 2005) ...................................16

In re ICN Pharmaceuticals, Inc. Securities Litigation,
299 F. Supp. 2d 1055 (C.D. Cal. 2004)..............................................13

In re Immune Response Securities Litigation,
375 F. Supp. 2d 983 (S.D. Cal. 2005) .............................................7, 9

In re Impac Mortgage Holdings, Inc. Securities Litigation,
554 F. Supp. 2d 1083 (C.D. Cal. 2008)................................................8

In re Impax Laboratories, Inc. Securities Litigation,
No. C 04-04802 JW,
2007 U.S. Dist. LEXIS 52356 (N.D. Cal. July 18, 2007) ................23

In re InVision Technologies Inc. Securities Litigation,
549 F.3d 736 (9th Cir. 2008) .............................................................16

In re JDS Uniphase Corp. Securities Litigation,
No. C 02-1486-CW,
2007 U.S. Dist. LEXIS 66085 (N.D. Cal. 2007)..................................7

In re Juniper Networks, Inc. Securities Litigation,
542 F. Supp. 2d 1037 (N.D. Cal. 2008)..............................................16

In re Lattice Semiconductor Corp. Securities Litigation,
No. CV04-1255-AA,
2006 U.S. Dist. LEXIS 262 (D. Or. Jan. 3, 2006)..............................19

iii

Lewis v. Straka,
  No. 05-C-1008,
  2006 U.S. Dist. LEXIS 76716 (E.D. Wis. Oct. 12, 2006) .................................. 25

Lipton v. Pathogenesis Corp.,
  284 F.3d 1027 (9th Cir. 2002) ........................................................................ 13

Lormand v. US Unwired, Inc.,
  565 F.3d 228 (5th Cir. 2009) .......................................................................... 19

Matrixx Initiatives, Inc. v. Siracusano,
  131 S. Ct. 1309 (2011) .................................................................................... 13

In re McKesson HBOC, Inc. Securities Litigation,
  126 F. Supp. 2d 1248 (N.D. Cal. 2000) .......................................................... 23

Meram v. Citizens Title & Trust, Inc.,
  No. 10cv1388 L(POR),
  2011 U.S. Dist. LEXIS 1657 (S.D. Cal. Jan. 3, 2011) ......................................... 2

Metzler Investment GMBH v. Corinthian Colleges, Inc.,
  540 F.3d 1049 (9th Cir. 2008) ..................................................................... 4, 13

Middlesex Retirement System v. Quest Software, Inc.,
  527 F. Supp. 2d 1164 (C.D. Cal. 2007) ........................................................... 18

New York City Employees' Retirement System v. Berry,
  616 F. Supp. 2d 987 (N.D. Cal. 2009) ............................................................. 15

In re New Century,
  588 F. Supp. 2d 1206 (C.D. Cal. 2008) ...................................................... 11, 12

New Mexico State Investment Council v. Ernst & Young LLP,
  No. 09-55632,
  2011 U.S. App. LEXIS 7680 (9th Cir. Apr. 14, 2011) ...................................... 15

Norfolk County Retirement System v. Ustian,
  No. 07-C-7014,
  2009 U.S. Dist. LEXIS 65731 (N.D. Ill. July 28, 2009) .................................... 22

In re NorthPoint Communications Group, Inc. Securities Litigation,
  221 F. Supp. 2d 1090 (N.D. Cal. 2002) ............................................................. 9

Nursing Home Pension Fund, Local 144 v. Oracle Corp.,
  380 F.3d 1226 (9th Cir. 2004) ........................................................................... 9

Official Unsecured Creditors Committee of Media Vision Technology, Inc. v.
  Jain,
  215 F.R.D. 587 (N.D. Cal. 2003) ..................................................................... 14

Patel v. Parnes,
  253 F.R.D. 531 (C.D. Cal. 2008) ..................................................................... 18

In re PetSmart, Inc. Securities Litigation,
  61 F. Supp. 2d 982 (D. Ariz. 1999) ................................................................. 18

iv

Provenz v. Miller,
    102 F.3d 1478 (9th Cir. 1996) ................................................................... 14

In re Read-Rite Corp. Securities Litigation,
    335 F.3d 843 (9th Cir. 2003) ..................................................... 13, 18, 24

Rombach v. Chang,
    355 F.3d 164 (2d Cir. 2004) ...................................................................... 12

Ronconi v. Larkin,
    253 F.3d 423 (9th Cir. 2001) ..................................................................... 18

SEC v. Todd,
    No. 07-56098,
    2011 U.S. App. LEXIS 12692 (9th Cir. Jun. 23, 2011) ...................................... 21

In re SemGroup Energy Partners, L.P. Securities Litigation,
    729 F. Supp. 2d 1276 (N.D. Okla. 2010) ......................................................... 15

Siegel v. Lyons,
    No. C-95-3588,
    1996 U.S. Dist. LEXIS 22982 (N.D. Cal. Sept. 16, 1996) ................................ 12

In re Silicon Graphics Inc. Securities Litigation,
    183 F.3d 970 (9th Cir. 1999) ..................................................................... 19

Siracusano v. Matrixx Initiatives, Inc.,
    585 F.3d 1167 (9th Cir. 2009) .................................................................... 13

In re Splash Technology Holdings Inc. Securities Litigation,
    160 F. Supp. 2d 1059 (N.D. Cal. 2001) ................................................. 8, 11, 23

In re Stac Electronics Securities Litigation,
    89 F.3d 1399 (9th Cir. 1996) ....................................................................... 6

Stocke v. Shuffle Master, Inc.,
    615 F. Supp. 2d 1180 (D. Nev. 2009) ...................................................... 20, 22

In re Syntex Corp. Securities Litigation,
    95 F.3d 922 (9th Cir. 1996) .................................................................... 6, 18

Tellabs, Inc. v. Makor Issues & Rights, Ltd.,
    551 U.S. 308 (2007) .................................................................................. 12

In re Turboydyne Technologies, Inc. Securities Litigation,
    No. CV-99-00697,
    2000 U.S. Dist. LEXIS 23020 (C.D. Cal. Mar. 15, 2000) ...................... 9, 10, 19

In re U.S. Aggregates, Inc. Securities Litigation,
    235 F. Supp. 2d 1063 (N.D. Cal. 2002) ........................................................ 25

In re UTStarcom Inc. Securities Litigation,
    617 F. Supp. 2d 964 (N.D. Cal. 2009) ..................................................... 4, 22

In re Vantive Corp. Securities Litigation,
    283 F.3d 1079 (9th Cir. 2002) .......................................................... *passim*

In re Watchguard Securities Litigation,
    No. C05-678J,
    2006 WL 2038656 (W.D. Wash. Apr. 21, 2006) ................................ 22

Weiss v. Amkor Technology, Inc.,
    527 F. Supp. 2d 938 (D. Ariz. 2007) ................................................ 23

In re Wet Seal, Inc. Securities Litigation,
    518 F. Supp. 2d 1148 (C.D. Cal. 2007) ............................... 7, 11, 17, 24

Wozniak v. Align Technologies, Inc.,
    No. C-09-3671-MMC,
    2011 WL 2269418 (N.D. Cal. June 8, 2011) ...................................... 11

Zucco Partners, LLC v. Digimarc Corp.,
    552 F.3d 981 (9th Cir. 2009) ...................................................... 12, 13

**STATUTES**

8 U.S.C. § 1324a ............................................................................ 3, 5, 17

15 U.S.C. § 78u-4 ................................................................................ 2, 6

REPLY TO OPP'N TO MOTION TO DISMISS CAC

## I.    PRELIMINARY STATEMENT

In the mistaken belief that he can distract the Court from the insufficiency of the CAC, Plaintiff's opposition to American Apparel's Motion to Dismiss (the "Opposition") consists largely of rhetoric more fitting for "Page Six" of the New York Post than a securities complaint.  Starting with page 1 and Exhibit 1,[1] and continuing for 50 pages,[2] the Opposition continues the tradition started in the CAC of resorting to exaggeration, innuendo, and misstatements of what Defendants actually said to the market.  Under the PSLRA and applicable Ninth Circuit authority, however, rhetoric unsupported by specific facts raising a strong inference that American Apparel's public statements were knowingly and materially false when made does not give rise to a securities claim.  Because the CAC falls woefully short of meeting this standard, it should be dismissed.

## II.    ARGUMENT

### A.    The CAC Fails To Satisfy The PSLRA's Standards For Pleading Falsity

The Opposition does nothing to cure Plaintiff's failure to plead the falsity of statements regarding American Apparel's efforts to comply with immigration laws (CAC ¶ 73), the impact that terminations precipitated by the ICE inquiry would have on the Company (CAC ¶ 82), and its desire to remediate reported deficiencies in its internal controls.  (CAC ¶¶ 108-

---

[1]    Exhibit 1 to the Declaration of Ramzi Abadou is a clip of a Today Show interview of Irene Morales, a plaintiff in a sexual harassment case pending against Charney and the Company.  That interview and the topics covered therein have absolutely nothing to do with the matters pending before this Court.  Plaintiff appears to attempt to make a link with the following nonsensical sentence:

Moreover, Charney's dismal defense of his indefensible slur to describe American Apparel's female employees likewise pervades the arguments defendants raise in support of their motions to dismiss the Complaint.

(Opp'n 6.)  There is no connection, though, and the Court should disregard Plaintiff's diversionary tactics.

[2]    On June 3, 2011, the Court entered an order based on the parties' stipulation regarding excess pages for the Opposition (the "Order").  The Order provided that while Plaintiff would have 50 pages for the Opposition, "[s]uch Omnibus Brief shall not contain more than 25 pages in opposition to any one particular motion to dismiss." (Order at 1.)  In violation of the Order, nearly all of the 48 pages of the Opposition that pertain to the non-Lion Capital defendants are devoted to addressing American Apparel's Motion.

114.)   The PSLRA requires Plaintiff to "specify each statement alleged to have been misleading [and] <u>the reason or reasons why the statement is misleading . . . .</u>" 15 U.S.C. § 78u-4(b)(1)(B) (emphasis added); <u>In re Vantive Corp. Sec. Litig.</u>, 283 F.3d 1079, 1086-87 (9th Cir. 2002) (falsity must be pled with particularity); <u>Meram v. Citizens Title & Trust, Inc.</u>, Civil No. 10cv1388L(POR), 2011 U.S. Dist. LEXIS 1657, at *6 (S.D. Cal.  Jan. 3, 2011) (same).  Plaintiff refers the Court to a litany of paragraphs in the CAC wherein he claims the "reasons" why the statements were false or misleading and the basis for his beliefs are found. (Opp'n 14 (citing CAC ¶¶ 5-23, 26-29, 34-38, 67-78, 80-81, 84, 86-88, 90-91, 94, 96-99, 101-07, 109-10, 112, 115, 119, 121-27, 129, 132-34).)  However, each and every one of these allegations – several of which misrepresent the content of the Company's public disclosures[3] and statements made by Defendants and third parties to the press – contains only conclusory assertions of falsity and is void of <u>specific facts</u> explaining why the statements at issue were false.[4]

---

[3]   For example, Plaintiff alleges that the "Company later revealed that, in fact, 2,500 of the Company's garment manufacturing employees had been dismissed.  This revelation directly contradicted Defendants' unequivocal prior statements that <u>all</u> of the Company's manufacturing employees were 'documented immigrants and authorized to work in the United States.'" (CAC ¶ 13.)  In the Motion, the Company noted that Plaintiff appears to misquote a November 28, 2007 proxy statement, which states that "[m]any of American Apparel's workers are documented immigrants." In providing an accurate citation of the proxy, the Company does not suggest that it "implicitly disclosed that the other workers" were not documented. (Opp'n 15.)  Rather, it seeks to dispel the notion that the Company "contradicted" itself because the allegedly "unequivocal statement" regarding "all" employees is simply not contained in the Company's public filings.

[4]   The Reply addresses the concrete "reasons" and bases for belief.  The remaining allegations are vague, argumentative, and conclusory, and, thus, do not warrant discussion. (<u>See</u> CAC ¶¶ 6, 7-10, 18, 70, 71, 75-78, 84, 94 (alleging that immigration reform and unauthorized workforce integral to Company's brand advantage and financial success); ¶¶ 67, 68, 73 (alleging that Company did not follow Department of Homeland Security ("DHS") "best practices"); ¶¶ 74, 81 (alleging that Charney "hired people at random" and considered his employees to be "family"); ¶¶ 14, 15, 20-23, 69, 97, 101-07 (alleging that termination of employees impacted Company's operations); ¶ 11 (alleging Company went public through blank check company); ¶¶ 12, 26, 27-29, 34, 36, 37, 68 109-11, 115, 124-26, 134 (alleging that Company misrepresented its intention to improve internal control over financial reporting because Defendants did not have adequate controls in place, withheld February monthly financials from its auditor, hired "inexperienced" CFO, and, despite reporting positive Q3 2008 quarterly numbers, almost went bankrupt in December 2008); ¶ 35 (alleging that SEC and DOJ issued subpoenas regarding auditor resignation and internal controls in July and November 2010); ¶ 38 (alleging resignation of two board members in April 2011); ¶¶ 121, 123 (alleging that Company renegotiated debt terms and restated financials to reclassify debt).

1.   **Plaintiff Fails To Plead That Disclosures Regarding Immigration Compliance Were False**

Plaintiff relies heavily on the <u>ultimate outcome</u> of the ICE inquiry[5] in an attempt to allege a false statement regarding the Company's earlier disclosures regarding its efforts to comply with immigration laws.  (<u>See</u> CAC ¶ 5 (Representations that Company made <u>diligent</u> efforts to comply with all employment and labor regulations" were "utterly false . . . [An ICE] I-9 audit found that Defendants had unlawfully employed <u>thousands</u> of undocumented workers[6] . . . ."); <u>see also</u> CAC ¶¶ 5, 13, 17, 72, 74, 80, 84, 91.)  But the CAC fails to explain how ICE's <u>June 2009 conclusion</u> that certain workers[7] did not appear to have proper documentation is dispositive of the truthfulness of the Company's prior disclosures regarding

---

[5]    Defendants do <u>not</u> "argue that they were under 'no duty to disclose' that the Company was even the <u>subject</u> of an ICE investigation."  (Opp'n 17.)  The Company asserts that the inquiry was timely disclosed in its March 2008 Form 10-K – the <u>first</u> required periodic filing following receipt of the notice.  Plaintiff newly argues that a duty to disclose arose prior to March 2008, at one point in the Opposition suggesting – without authority – that a Form 8-K should have been filed "immediately" (Opp'n 7, n.9) or at a minimum, after publication of a January 18, 2008 <u>New York Times</u> article, reporting that Mr. Charney said the Company requires necessary documentation of its employees, since Rule 10-b5 mandates "disclosure of material facts necessary to make disclosed statements not misleading."  (Opp'n 17.)  No duty to disclose arose, however, because Plaintiff does not allege adequately that Charney's statements were untrue.

[6]    Plaintiff, no doubt intentionally, confuses "unauthorized" workers (<u>see</u> 8 U.S.C. § 1324a(a)) with "undocumented" workers.  It should not be assumed, and Plaintiff does not allege, that American Apparel employed people who failed to provide any documentation whatsoever upon their hiring.  Rather, in the disclosure of ICE's findings, the Company reported:  "ICE notified the Company that it was unable to verify the employment eligibility of approximately 200 current employees because of <u>discrepancies in these employees'</u> <u>records</u>.  Additionally, ICE notified the Company that another approximately 1,600 current employees appear . . . to have obtained employment by providing, on Form I-9, documentation which ICE believes, based on its proprietary databases, to be suspect and not valid."  (<u>See</u> Jones Decl. Ex. 13 at 57.)

[7]    Plaintiff attempts to sensationalize his claims by taking liberty with the number of employees terminated in connection with the ICE inquiry.  (<u>See</u> Opp'n 15, 20 (2,500 workers were terminated); 27 ("American Apparel had been employing <u>thousands of undocumented</u> manufacturing workers . . . ."); 31 ("<u>half</u> of the Company's [5,800 person] manufacturing workforce had been lost . . . ."); CAC ¶ 13).)  Where Plaintiff cites to the Company's actual disclosures, the number is closer to 1,500.  (CAC ¶ 20 ("'reduction in labor efficiency <u>was a</u> <u>result</u> of the dismissal of over 1,500 experienced manufacturing employees in the third and fourth quarters of 2009'") (quoting May 19, 2010 press release); ¶ 70 ("In fact, the Company itself later admitted in October 2009 that '[c]ompliance with immigration laws has resulted in the dismissal of about 1,500 of our permanent employees due to alleged discrepancies in their immigration documentation.'").)

REPLY TO OPP'N TO MOTION TO DISMISS CAC

its efforts to verify employment eligibility.  There are no allegations, for example, that the Company did not require employees to complete "Employment Eligibility Verification Forms ('I-9')," "review and record a prospective employee's identity document(s)," "determine whether the document(s) reasonably appear to be genuine and related to the individual," or maintain "each I-9 on file for at least three years, or one year after employment ends, whichever is longer."  (CAC  ¶ 65 (describing requirements of the Immigration Nationality Act).)  And of the eight hiring practices recommended by DHS (CAC  ¶ 67), the CAC alleges only that Defendants did not adopt one (E-Verify).  (CAC ¶ 68.)

Recognizing this, Plaintiff improperly attempts to allege in his Opposition that the Company's statements concerning its immigration compliance efforts were false because the ICE investigation was pending for 18 months.  (See Opp'n 16-17 ("The Company also argues that, by relying on ICE's findings . . . , plaintiff is pleading 'fraud by hindsight.'  Plaintiff's allegations, however, are based on the results of the ICE investigation that was ongoing and known to defendants from the beginning of the Class Period.")  However, Plaintiff fails to explain how mere knowledge of an investigation or its pendency renders the Company's statements false.  Nor does Plaintiff's cited authority support this notion.  In In re UTStarcom Inc. Securities Litigation, 617 F. Supp. 2d 964 (N.D. Cal. 2009), plaintiff adequately pled that certain statements were false where the complaint alleged that "Defendants were aware of . . . adverse circumstances [e.g., "declining demand, declining margins, operational difficulties, increased costs, and internal control problems"] at the time they made the statements."  Id. at 972 (emphasis added).  Here, Plaintiff fails to allege specific, adverse facts regarding the Company's compliance efforts, which were contemporaneously known when the disclosures were made.  See Brodsky v. Yahoo! Inc., 630 F. Supp. 2d 1104, 1117 (N.D. Cal. 2009) (allegations of falsity must be grounded in a "foundation [of] particular facts").[8]

---

[8]      Plaintiff's attempt to distinguish Brodsky v. Yahoo! Inc., 630 F. Supp. 2d 1104 (N.D. Cal. 2009), In re Vantive, 283 F.3d at 1091, and Metzler Investment GMBH v. Corinthian Colleges, Inc., 540 F.3d 1049, 1070 (9th Cir. 2008) is unavailing.  In Brodsky, the alleged misrepresentations were not "general optimistic statements" about Yahoo!'s business (Opp'n 16, n.15), but rather specific statements pertaining to Yahoo!'s reported revenues and
*(cont'd)*

1    Plaintiff also manipulates statements purportedly made by DHS and ICE employees to

2    suggest that the Company "knowingly" hired unauthorized workers, and, thus, issued false

3    statements.  (<u>See</u> Opp'n 26 ("[D]efendants do not (and cannot) deny that they knowingly

4    hired undocumented workers . . . ."); <u>see also</u> CAC ¶ 13 (ICE discovered what it "later

5    characterized as a 'scheme' by the Company to violate U.S. immigration laws . . . ."); ¶¶ 86,

6    88.)[9]  The full quotations, however, do <u>not</u> reflect a finding of a "knowing" violation or

7    "scheme" by the Company.  Rather, one official "stated that the ICE action at American

8    Apparel 'underscore[s] our commitment to targeting <u>employers</u> that <u>cultivate illegal work</u>

9    <u>forces by knowingly hiring and exploiting illegal workers</u>.'" (CAC ¶ 88 (emphasis added and

10   in original).)  The second official stated that "'if there is widespread [mis]use of Social

11   Security numbers . . . , <u>we have concerns about possibly a scheme to avoid immigration</u>

12   <u>law</u> . . . .'"  (<u>Id.</u>)  But the officials' "commitment" to enforcement and description of

13   situations where they would have "concerns" do not amount to an actual finding that the

14   Company "knowingly" hired unauthorized workers or engaged in a "scheme."  Indeed,

15   Plaintiff cannot deny that he overstates ICE's findings – at the start of his Opposition, he

16   claims without factual support, that "two federal agencies <u>accused</u> defendants" of violating

17

_____

18   *(cont'd from previous page)*
     projected revenues from a new product. <u>Brodsky</u>, 630 F. Supp. 2d at 1113-14, 1116-17. <u>In re</u>
19   <u>Vantive</u>, 283 F.3d at 1091-92, held that, "Under the PSLRA, the plaintiffs bear the burden of
     specifying [the reasons] 'why the statement is misleading.'" 283 F. 3d at 1091-92 (citation
20   omitted).  Here, Plaintiff fails to allege any details about the Company's actual hiring
     practices that would support the conclusion that the Company did not make diligent efforts to
21   comply with immigration laws. <u>Metzler</u> held that "the PSLRA's falsity requirement is not
     satisfied by conclusory allegations that a company's class period statements . . . are <u>per se</u>
22   false based on the plaintiff's allegations of [the] fraud . . . ." <u>Metzler</u>, 540 F.3d at 1070.
     Plaintiff attempts to do just the same, alleging that Class Period statements regarding
23   immigration compliance were false because "Defendants knew [and failed to disclose] . . .
     [that] American Apparel employed 2,500 undocumented workers." (CAC ¶¶ 74, 77, 78.)
24   [9]   Plaintiff also asserts that "ICE and DHS have confirmed the falsity of the Company's
     immigration compliance statements.  That is precisely why ICE fined the Company – it
25   engaged in a knowing scheme to conceal these facts." (Opp'n 16.)  Plaintiff fails to allege,
     because he cannot, that employers are <u>only</u> fined for "knowing" violations; that is because
26   employers may be fined for unknowing violations.  <u>See, e.g.</u>, 8 U.S.C. § 1324a(g)(5)
     (providing civil fines for violation of 8 U.S.C. § 1324a(a)(1)(B), which penalizes non-
27   compliance – whether knowing or unknowing – with statute's employment verification
     requirements).
28

the law.  (Opp'n 1-2 (emphasis added).)  Nowhere does he point to a determination by DHS, or any other government agency, that American Apparel knowingly violated immigration laws or engaged in any type of "scheme."[10]

## 2. The Company's Forward-Looking Statements About The Estimated Effect Of ICE-Related Terminations Are Inactionable

Plaintiff alleges that Defendants falsely assured investors that the loss of employees as a result of the ICE inquiry "would not materially impact the Company's financial results." (Opp'n 19; see also CAC ¶¶ 14, 19, 32, 87, 96.)  To the contrary, as detailed in the Motion, Defendants disclosed in June, July and August 2009 that no assurances could be given as to the ultimate impact of any ICE-related terminations.  (See Mot. at 5-6; Jones Decl. Ex. 13 at 57 ("At the present time, because of the uncertainty regarding how many of these employees will have their work authorization ultimately verified by ICE, the Company is not able to accurately assess what the resultant impact of the loss of employees would have on its operations."); Ex. 14 at 64  ("As the ultimate impact is difficult to predict at this time, no assurances can be given as to how, if at all, the loss of a significant number of manufacturing employees will affect the Company's business and operations."); Ex. 15 at 68 ("[I]f we were forced to reduce our work force, the way we would mitigate that would be by increasing the days per week of our employees . . . . [But] at this point it's difficult to estimate [the financial impact] . . . .").)  These disclosures wholly undermine a finding of falsity.  See In re Syntex Corp. Sec. Litig., 95 F.3d 922, 929 (9th Cir. 1996) (no false statement where "Defendants expressly acknowledged that the precise effect of the consent decree could not be known and that the company was merely stating its opinion that the consent decree would not have any 'material adverse effect.'"); In re Stac Elecs. Sec. Litig., 89 F.3d 1399, 1407 (9th Cir. 1996)

_____

[10]   Plaintiff's remaining arguments are equally deficient.  Peter Schey reported to the New York Times that "to the best of his knowledge," the Company's employees were authorized to work in the United States.  (Opp'n 18 (emphasis added).)  The statement is not false, absent allegations that Schey did not believe the statement when made.  See 15 U.S.C. § 78u-4(b)(1)(B).  Schey also stated that ICE would be withdrawing its fine, when, in fact, the Company disclosed two weeks later that it had paid an immaterial amount to the government. (Opp'n 18; see also CAC ¶¶ 16, 99.)  Plaintiff fails to allege how Schey's error demonstrates the falsity of the Company's statements regarding its efforts to comply with immigration laws.

6

1  (statement that "[a]lthough the Company believes that it provides adequate allowances for

2  returns, <u>there can be no assurance that actual returns in excess of recorded allowances will not</u>

3  <u>result in a material adverse effect on business</u>, operating results and financial condition" not

4  misleading) (emphasis added).

5      Plaintiff now concedes that Defendants warned investors that it could not accurately

6  estimate the effects of any layoffs on operations.  (<u>See</u> Opp'n 19 ("defendants told investors

7  that the ultimate impact of the terminations might be generally difficult to predict.").)  But he

8  argues that Defendants' cautionary language was "generic, boilerplate," insufficient to

9  overcome the allegedly false statements.[11]  (Opp'n 19.)  Plaintiff's assertion should be

10 summarily rejected.  Defendants' disclosures were couched in a specific cautionary warning:

11 because the Company had not yet determined how many employees might be terminated, it

12 could not predict how the loss of any workers would affect the business.[12]  Furthermore, the

13 warnings were directly linked to the forward-looking statements, rather than contained in

14 separate public filings or boilerplate risk factor disclosures.  (<u>See</u> Jones Decl. Exs. 13 at 57;

15 14 at 64; 15 at 68.)  For this reason, Plaintiff's authority is plainly distinguishable.  In <u>In re</u>

16 <u>JDS Uniphase Corp. Sec. Litig.</u>, No. C 02-1486-CW, 2007 U.S. Dist LEXIS 66085, at *43-

17 49 (N.D. Cal. 2007), defendants provided "general warnings about forward-looking

18 statements" before conference calls and directed investors to safe harbor statements and risk

19 factors in separate public filings.  In <u>In re Immune Response Sec. Litig.</u>, 375 F. Supp. 2d 983,

20 1034-35 (S.D. Cal. 2003), defendant drug company included generic language at the end of a

21

22 ―――――――――――――――
   [11]    Plaintiff's authority holds that the Court may resolve on a motion to dismiss the
23 question of whether cautionary language is adequate to shield statements from liability.  <u>See</u>
   <u>In re Immune Response</u>, 375 F. Supp. 2d 983 at 1033-34 (dismissal may be granted if
24 "defendant's challenged statements include enough cautionary language or risk disclosure,
   'that reasonable minds could not disagree that the challenged statements were not
25 misleading.'") (citation omitted); <u>see also</u> <u>In re Wet Seal, Inc. Sec. Litig.</u>, 518 F. Supp. 2d
   1148, 1169 (C.D. Cal. 2007) ("Whether a statement qualifies for safe harbor protection is a
26 proper inquiry on a motion to dismiss.") (citation omitted).
   [12]    As stated aptly in a case cited by Plaintiff, "[f]ailure to disclose information that does
27 not yet exist cannot be the predicate" for liability under the securities laws.  <u>Desaigoudar v.</u>
   <u>Meyercord</u>, 223 F.3d 1020, 1023 (9th Cir. 2000).

28

1    press release, stating "[a]ctual results" could vary because "future studies may never be

2    completed" or "prolonged delays may occur."[13]

3            Plaintiff also contends that, notwithstanding the cautionary statements, the disclosures

4    were misleading because "defendants simultaneously provided specific, concrete and

5    misleading reasons why the labor disruption would <u>not</u> materially impact the Company's

6    financial results." (Opp'n 19; CAC ¶ 82 (alleging that Defendants falsely represented that the

7    Company believed "<u>surplus levels of inventory and manufacturing capability</u>" would mitigate

8    effects of employee terminations).) Under the PSLRA, forward-looking statements regarding

9    future events are immunized from liability absent allegations "that the statements were made

10   with actual knowledge of their falsity."[14] <u>See</u> <u>In re Impac Mortg. Holdings, Inc. Sec. Litig.</u>,

11   554 F. Supp. 2d 1083, at 1099 (C.D. Cal. 2008); <u>In re Vantive</u>, 283 F.3d at 1089. Here,

12   Plaintiff fails to allege with any particularity how Defendants' statements about excess

13   inventory and manufacturing capacity were false.

14           Specifically, the Opposition conclusorily claims that Defendants "were well aware that

15   the Company's stale excess inventory would cripple its ability to efficiently respond to the

16   market's demand for new products" and that "inventory levels [were] [in]sufficient to offset

17   the diminished efficiency resulting from the terminations." (Opp'n 20-21.) However, the

18   CAC contains <u>no</u> allegations about the nature or quantity of the inventory on hand, or how the

19   Company projected "trends" and "market demand for new products" when the statements

20   were made. <u>See</u> <u>In re Splash Tech. Holdings Inc. Sec. Litig.</u>, 160 F. Supp. 2d 1059, 1072

21   (N.D. Cal. 2001) ("[T]he complaint must allege that the 'true facts' arose <u>prior</u> to the

22   ─────────────────
[13]      <u>See also</u> <u>In re Amylin Pharm., Inc. Sec. Litig.</u>, No. 01cv1455BTM(NLS), 2003 U.S.
23   Dist LEXIS 7667, *21-22 (S.D. Cal. May 1, 2003) (general "cautionary statements were
     included in approximately <u>ten</u> pages of 'risk factors'" in SEC filings, were not tailored to
24   statements about a particular product, and thus not sufficient).
[14]      Incredibly, Plaintiff argues that the PSLRA's safe harbor provision does not apply to
25   these statements because they "convey[ed] a misleading picture of the Company's then-
     present business conditions." (Opp'n 46.) The argument barely merits discussion. The
26   statements regarding the possible effects of ICE-related terminations (<u>see</u> CAC ¶¶ 14, 15, 81-
     83, 89 (describing and quoting June 30, 3009 and July 1, 2009 press releases) and ¶¶ 92, 93
27   (quoting August 13, 2009 conference call)), <u>preceded</u> the terminations. (Jones Decl. Ex. 18
     at 92.) Thus, the disclosures portend conditions that might result <u>in the future</u>.

28
─────────────────
                                                    8

1  allegedly misleading statement.  This requirement helps guard against pleading fraud by

2  hindsight and helps prevent providing a complaint passageway through the pleading stage

3  merely because it alleges that the allegedly fraudulent statements conflict with the <u>current</u>

4  state of facts.") (citations omitted); <u>compare</u> <u>In re Immune Response</u>, 375 F. Supp. 2d at 1019

5  (falsity pled where complaint "include[d] corroborating details of the internal reports, cite[d]

6  to specific reports, mention[ed] the dates or contents of reports and allege[d] their sources of

7  information about reports.").

8      Plaintiff further concludes that the Company's <u>subsequent</u> finding that inventory was

9  inadequate "did not come as an eleventh-hour surprise [because Defendants] reviewed <u>daily</u>

10  information about inventory levels and inventory needs."  (Opp'n 21; <u>see also</u> CAC ¶ 98.)

11  The suggestion is that because Defendants had access to reports between November 10, 2009

12  (when the Company announced that it had terminated 1,500 employees) and March 25, 2010

13  (when the adverse effects of the terminations were publicly reported), they should have

14  known on June 30, July 1, and August 13, 2009 that inventory would be inadequate in the

15  future.  This assertion, in addition to being metaphysically implausible, is no substitute for

16  specific details about the identity and content of the inventory reports generated around the

17  time of the disclosures at issue, which would demonstrate the falsity of those disclosures.

18      Accordingly, Plaintiff's reliance on <u>Nursing Home Pension Fund¸Local 144 v. Oracle</u>

19  <u>Corp.</u>, 380 F.3d 1226, 1234 (9th Cir. 2004), <u>In re NorthPoint Commc'ns Grp., Inc. Sec. Litig.</u>,

20  221 F. Supp. 2d 1090, 1104 (N.D. Cal. 2002), and <u>In re Turbodyne Techs., Inc. Sec. Litig.</u>,

21  No. CV-99-00697, 2000 U.S. Dist. LEXIS 23020, at *70-71 (C.D. Cal. Mar. 15, 2000) is

22  misplaced.  (Opp'n 21.)  In each of those cases, plaintiffs did not simply plead that because

23  executives generally had access to information about the business, they must have known of

24  the alleged fraud.   The complaints went further, alleging that executives had access to

25  <u>information that contradicted defendants' public statements</u>.  <u>See</u> <u>Nursing Home</u>, 380 F.3d at

26  1234 (CEO monitored database, which reflected improper revenue recognition); <u>In re</u>

27  <u>NorthPoint</u>, 221 F. Supp. 2d at 1104 (testimony of 18 confidential witnesses laid "proper

28

9

REPLY TO OPP'N TO MOTION TO DISMISS CAC

factual foundation" that certain transactions were accounted for improperly and that transactions fell "neatly within [defendants'] presumptive bailiwicks"); Turbodyne, 2000 U.S. Dist. LEXIS 23020, at *70-71 (alleging employee testimony that production facility not running as of the time defendants disclosed that facility was operational).[15]  Thus, Plaintiff's failure to plead the details of the Company's internal reports, memoranda, or the like, and that those details were inconsistent with the public disclosures, is fatal to the CAC.

3.  **Statements Of Optimism Regarding Company's Desire To Improve Controls Were Not False And Misleading As A Matter Of Law**

Plaintiff alleges that Defendants falsely stated that the Company was taking financial compliance and internal controls "'very seriously,'" "'pursu[ing] a strict corporate orthodoxy,'" "'looking to build a world class financial team,'" "'going to be remediating [] material weaknesses'" and was "'commit[ted] to conservatism and maintaining best practices.'" (Opp'n 22 (emphasis added).)   Although Plaintiff attempts to amend the CAC in his Opposition, contending that "[D]efendants affirmatively characterize[d] management practices as 'conservative' or 'orthodox'" (id. (emphasis added)), he can point to no representation by Defendants that the Company's controls were "conservative" or "orthodox."  Rather, Defendants used words like "pursuing," "looking to build," and "going to be" to describe the Company's approach to improving controls in the future, all the while simultaneously disclosing existing control deficiencies.[16]  (See, e.g., Jones Decl. Exs. 4 at 20-22; 10 at 39-44; 18 at 93-95; 20 at 108-13; 23 at 132-37.)   His linguistic gymnastics

---

[15]    Plaintiff also argues that Defendants knew that "a new staff of inexperienced workers, producing new product . . . would materially impact . . . margins" (Opp'n 21) and that Charney admitted in May 2008 that training new workers was "laborious and time-consuming."  (CAC ¶ 90.)  These allegations miss the mark because Defendants stated that hiring a substantial number of new employees would not be necessary.  (See CAC ¶¶ 19, 81.)  Plaintiff does not plead any facts – internal reports or corroborating witness statements – to suggest that statements about the Company's manufacturing capacity or lack of need for additional workers were false.

[16]    Plaintiff tries to give short shrift to these disclosures (Opp'n 47) and acknowledges only the Company's March 31, 2011 disclosure regarding internal controls, as if to suggest that the deficiencies were previously concealed.  (CAC ¶ 37; see also Opp'n 38.)  But the disclosures were numerous and comprehensive, and described in great detail the nature of the deficiencies and the associated risks.

REPLY TO OPP'N TO MOTION TO DISMISS CAC

1  notwithstanding, Plaintiff cannot transmute optimistic statements about future endeavors into

2  concrete statements about current events.  Wozniak v. Align Tech., Inc., No. C-09-3671-

3  MMC, 2011 WL 2269418, at *6 (N.D. Cal. June 8, 2011) (statements that "we are going to

4  continue to drive the expansion," "[o]ur key goals . . . are to generate strong, topline growth,"

5  "[we] will continue to execute our plan" were forward-looking).

6        However, even if the Court were to consider Plaintiff's newly minted argument,

7  Defendants' statements are inactionable puffery.  See In re Wet Seal, 518 F. Supp. 2d at 1168

8  (vague statements, such as "measurable progress" and "continuing improvements," not

9  actionable) (citation omitted); In re Splash, 160 F. Supp. 2d at 1077 (statements that results

10 were "strong," "robust," "improved," and "solid" constituted "vague assessments [], on which

11 no reasonable investor would rely"); ECA & Local 134 IBEW Joint Pension Trust of

12 Chicago v. J.P. Morgan Chase Co., 553 F.3d 187, 205-06 (2d Cir. 2009) (statements that

13 defendant had "'risk management processes [that] are highly disciplined and designed to

14 preserve the integrity of the risk management process,'" "'set the standard' for 'integrity,'"

15 and would "'continue to reposition and strengthen [its] franchises with a focus on financial

16 discipline,'" inactionable).  Moreover, contrary to Plaintiff's assertion, cases immunizing

17 corporate puffing from liability do involve "actual business practices."  (Opp'n 23, n.19.)  See

18 In re Impac 554 F. Supp. 2d at 1097, n.10 (defendant's statements that business

19 "fundamentals, loan acquisitions, and originations" were "solid" is "too vague to be

20 actionable"); In re Wet Seal, 518 F. Supp. 2d at 1168 (statements conveying confidence in

21 new products and aggressiveness in promotional activity not actionable); Emp'rs Teamsters

22 Local Nos. 175 & 505 Pension Trust Fund v. Clorox Co., 353 F.3d 1125, 1132 (9th Cir. 2004)

23 (approximation that inventory problems would be corrected by year end inactionable).

24        Likewise, In re New Century, 588 F. Supp. 2d 1206 (C.D. Cal. 2008) and Altas v.

25 Accredited Home Lenders Holding Co., 556 F. Supp. 2d 1142 (S.D. Cal. 2008) do not hold,

26 as Plaintiff suggests, that statements containing words like "conservative" and "orthodox" are

27

28

1  categorically "material," and thus cannot be puffery.[17]  (Opp'n 22.)    In those cases,

2  statements about "conservative" practices were misleading because they conflicted with

3  defendants' actual, existing business practices.  See In re New Century, 588 F. Supp. 2d at

4  1226 ("Plaintiffs offer New Century's statements that it observed standards of high-quality

5  credit and underwriting, and set those statements against detailed allegations of practices that

6  utterly failed to meet those standards."); Altas, 556 F. Supp. 2d at 1155 ("As a result of the

7  alleged accounting improprieties, statements during the class period regarding [defendant's]

8  projections were rendered false and misleading.").  Here, investors were repeatedly apprised

9  that, notwithstanding the Company's objective of improving its internal control over financial

10  reporting, American Apparel's control environment was materially deficient.  (See, e.g.,

11  Jones Decl. Exs. 4 at 20-22; 10 at 39-44; 18 at 93-95; 20 at 108-13; 23 at 132-37.)

12  **B.  Plaintiff Fails To Plead Facts Creating A Strong Inference Of Scienter**

13  To plead scienter under the PSLRA, Plaintiff must allege with particularity "that the

14  defendant made false or misleading statements either intentionally or with deliberate

15  recklessness or, if the challenged representation is a forward looking statement, with 'actual

16  knowledge . . . that the statement was false or misleading'" when made.  In re Vantive, 283

17  F.3d at 1089 (citation omitted).  Evidence of scienter must be more than "reasonable" or

18  "permissible" – it must be "cogent" and "at least as compelling as any opposing inference one

19  could draw from the facts alleged."  Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S.

20  308, 324 (2007).  While Tellabs introduced a "holistic" review of scienter allegations, it

21  remains the law of the Ninth Circuit that the adequacy of each scienter allegation must be

---

22  [17]     The fact that Defendants' statements were parroted back in analyst reports does not
make them material, as Plaintiff suggests.  (Opp'n 23 ("Certainly, analysts . . . did not
23  dismiss these statements as material [sic] expressions of optimism.").)  See Siegel v.
Lyons, No. C-95-3588, 1996 U.S. Dist. LEXIS 22982, at *19-20 (N.D. Cal. Sept. 16.
24  1996) (statements attributed to defendants and published in analyst reports constituted
inactionable puffery); Rombach v. Chang, 355 F.3d 164, 175 (2d Cir. 2004) ("Like the
25  press releases, the analysts' reports contain . . . statements of guarded optimism . . . .
[P]uffery or 'misguided optimism' is not actionable as fraud."); see also In re Duane
26  Reade Inc. Sec. Litig., No. 02 Civ. 6478, 2003 U.S. Dist. LEXIS 21319, at *26 (S.D.N.Y.
Nov. 25, 2003) ("Plaintiff's assertion that defendants' alleged misstatements and
27  omissions 'swayed stock market analysts' hardly reaches the level of the required
particularized allegations.").

28

1  tested.  Zucco Partners, LLC v. Digimarc Corp., 552 F.3d 981, 987 (9th Cir. 2009) (Tellabs

2  "does not materially alter the particularity requirements for scienter claims established in our

3  previous decisions, but instead only adds an additional 'holistic' component to those

4  requirements.").[18]

5       The infirmity of the CAC is Plaintiff's total failure to provide any concrete factual

6  allegations supporting an inference of scienter.  Specifically, Plaintiff has failed to plead

7  particularized facts that the Company had "contemporaneous knowledge" of the falsity of its

8  statements.  In re Read-Rite Corp. Sec. Litig., 335 F.3d 843, 847 (9th Cir. 2003) (citation

9  omitted); In re Vantive, 283 F.3d at 1090-91 (complaint must contain allegations of "specific

10 contemporaneous conditions known to the defendants that would strongly suggest that the

11 defendants understood" what the impact of their actions would be); In re ICN Pharm. Inc. Sec.

12 Litig., 299 F. Supp. 2d 1055, 1065 (C.D. Cal. 2004) (same).  "Contemporaneous knowledge"

13 is evidenced by access to specific information, such as internal reports, communications, or

14 financial data, that reveal the fraud.  See Metzler, 540 F.3d at 1067-68 (scienter not

15 established "absent some additional allegation of specific information conveyed to

16 management and related to the fraud."); Lipton v. Pathogenesis Corp., 284 F.3d 1027, 1036

17 (9th Cir. 2002) (no scienter where plaintiffs failed to identify internal reports or specific

18

19  [18]   The Supreme Court did not "teach" in Matrixx Initiatives, Inc. v. Siracusano, 131 S. Ct.
20  1309 (2011) that "the only appropriate approach following Tellabs's mandate [is] to review
     scienter pleadings based on the collective view of the facts, not the facts individually."
     (Opp'n 25, quoting Frank v. Dana Corp., No. 09-4223, 2011 U.S. App. LEXIS 10437, at
21  *14-15  (6th Cir. May 25, 2011).)  Rather the Sixth Circuit, observing that the Court in
     Matrixx "addressed the allegations collectively, did so quickly, and [] did not parse out the
22  allegations for individual analysis," concluded that "conducting an individual review of
     myriad allegations is an unnecessary inefficiency."  (Id.)  Under Ninth Circuit authority,
23  however, the Court must determine whether "any of the plaintiff's allegations, standing alone,
     are sufficient to create a strong inference of scienter."  Zucco, 552 F. 3d at 992.  If not, the
24  Court must consider whether the allegations "combine to create a strong inference."  Id.
     Significantly, Matrixx was appealed to the Supreme Court from the Ninth Circuit, which
25  applied the two-step approach to plaintiff's scienter allegations.  See Siracusano v. Matrixx
     Initiatives, Inc., 585 F.3d 1167, 1180 (9th Cir. 2009).  The Supreme Court did not pass on the
26  Ninth Circuit's two-step approach, and addressed the scienter allegations "quickly" because
     the case involved a narrow question of law.  Matrixx, 131 S. Ct. at 1324 (deciding whether
27  scienter is adequately alleged based on internal scientific reports that conflict with public
     statements, where there is no allegation that reports were statistically significant).

28
                                          13

1  content of reports allegedly revealing fraud).  No such information is alleged to have been in

2  Defendants' possession when the purportedly misleading disclosures were made.[19]

3      1.  **Plaintiff's Suggestive And Hindsight Allegations Are Insufficient To Show That Company Knowingly Or Recklessly Misled Investors About Immigration Compliance**

4

5      The CAC fails to plead facts indicating that Defendants knew they were not making

6  "diligent efforts" to comply with immigration laws.  (CAC ¶ 73.)  Absent are specific

7  allegations about what practices American Apparel followed to determine employees' work

8  eligibility.  While Plaintiff contends that "American Apparel[] refus[ed] to use industry

9  practices to identify these workers" (Opp'n 30), he does not allege what industry he speaks of,

10  and if the garment business, what standard practices therein American Apparel did not

11  adopt.[20]  And although Plaintiff alleges that the Company did not participate in the voluntary

12  E-Verify program, he fails to allege – because he cannot – that E-Verify is the only means to

13  verify employment eligibility documents.[21]  Instead, Plaintiff boldly argues that he "need not"

14  plead details, such as "contemporaneous internal reports" reflecting the Company's

15  compliance efforts, because the "ICE investigation concluded, contemporaneously, that

16  _____

17  [19]    Plaintiff suggests that he can plead scienter by alleging that Defendants "violated the Company's own Code of Ethics" (Opp'n 30), but his authority does not support this assertion.

18  See Provenz v. Miller, 102 F.3d 1478, 1490 (9th Cir. 1996) (revenue recognition violated internal policy and GAAP); Official Unsecured Creditors Comm. of Media Vision Tech., Inc. v. Jain, 215 F.R.D. 587, 588 (N.D. Cal. 2003) (in discovery dispute, granting motion to

19  compel production of audit manual because deviation from policies may be probative of scienter).

20  [20]    Notably, and despite Plaintiff's rhetoric to the contrary, ICE's audit of American

21  Apparel was not an outlier event in the history of the agency's enforcement efforts.  The Wall Street Journal reported that between October 2010 and June 2011, ICE had launched over 2,300 audits, and, in the previous year, approximately 2,200.  (Jones Decl. Ex. 26 at 2.)

22  [21]    Plaintiff's characterization of Chamber of Commerce of the United States v. Whiting,

23  131 S. Ct. 1968 (2011) is dishonest.  The Supreme Court did not "determine" that E-Verify is the "best means available to determine employment eligibility of new hires."  (Opp'n 29,

24  citing Whiting, 131 S. Ct. at 1986.)  The Court, in observing that the federal government has touted the track record of E-Verify, quoted a DHS manual stating that the program is the

25  "best means available to determine the employment eligibility of new hires."  (Id.)    The Court also observed that others, including petitioner Chamber of Commerce and Justice

26  Breyer, have expressed concerns about the accuracy of E-Verify.  (Id.)    In fact, only five months before the Class Period ended, ICE announced "initiatives to strengthen the efficiency

27  and accuracy of the E-Verify system."    (See Jones Decl. Ex. 27 at 5 (Press Release, DHS, DHS Unveils Initiatives to Enhance E-Verify (Mar. 17, 2010).)

28

14
REPLY TO OPP'N TO MOTION TO DISMISS CAC

1  defendants knowingly hired undocumented workers." (Opp'n 26-27.) This is both factually

2  wrong and temporally illogical. First, as explained above, Plaintiff fails to cite to any finding

3  by ICE that American Apparel knowingly violated immigration laws. (See supra II.A.1.)

4  Second, it cannot be that the conclusion of the investigation was "contemporaneous[]" with

5  the Class Period. ICE's second notice to the Company was received 18 months after the

6  investigation commenced. (See Jones Decl. Ex. 13 at 57.) The CAC does not allege that ICE

7  apprised the Defendants of the status of the investigation, or that the Company was not

8  complying with immigration laws, at any time during the Class Period. Thus, the fact that the

9  investigation was ongoing is not illuminating.

10      Plaintiff also suggests that scienter should be inferred from the magnitude of the

11  terminations. (Opp'n 27, 30 ("[G]iven American Apparel's massive undocumented

12  workforce, . . . defendants, at the very least, were reckless in not knowing that the Company

13  was employing undocumented workers.").) Plaintiff's authority does not support this circular

14  and conclusory result. Rather, in each case, plaintiffs alleged specific acts of malfeasance that

15  placed defendants on notice of the alleged fraud. New Mexico State Inv. Council v. Ernst &

16  Young LLP, No. 09-55632, 2011 U.S. App. LEXIS 7680, at *26 (9th Cir. Apr. 14, 2011) (in

17  stock option backdating case, auditor allegedly accepted unsigned minutes and

18  "documentation that could not possibly have been valid"); N.Y. City Emps.' Ret. Sys. v.

19  Berry, 616 F. Supp. 2d 987, 1001 (N.D. Cal. 2009) (in stock option backdating case,

20  defendant "oversaw the granting of backdated options"); In re Countrywide Fin. Corp. Sec.

21  Litig., 588 F. Supp. 2d 1132, 1194, n.77 (C.D. Cal. 2008) (confidential witnesses reported

22  that defendant "led the charge to abandon sound underwriting" practices); In re SemGroup

23  Energy Partners, L.P. Sec. Litig., 729 F. Supp. 2d 1276, 1300 (N.D. Okla. 2010) (defendants

24  likely had knowledge of billion dollar fraud where they allegedly directed or participated in

25  questionable accounting activity, including the payment of undisclosed bonuses to

26  themselves). By contrast, there are no allegations in this case regarding the Company's hiring

27

28

1    procedures and efforts to confirm employee eligibility, and, thus, there is no support for the

2    conclusion that Defendants knew they were not complying with the law.

3           Next, Plaintiff argues that because defendants had "day-to-day 'intimate[]

4    involve[ment]'" with their manufacturing employees and their "offices were located in the

5    same building [as the factory]" they must have known that the Company employed

6    unauthorized workers.[22]  (Opp'n 28 ("Defendants do not explain how working alongside

7    American Apparel's thousands of undocumented workers on a daily basis, over the course of

8    a decade, would not have alerted them of Charney's immigration violations.").)  This "must

9    have known" pleading tactic fails to satisfy the PSLRA.  See In re InVision Techs. Inc. Sec.

10   Litig., 549 F.3d 736, 748 (9th Cir. 2008) (allegation defendant should have known fails to

11   meet requirements of the PSLRA; Brodsky v. Yahoo! Inc., 630 F. Supp. 2d 1104, 1118 (N.D.

12   Cal. 2009) (conclusory allegations that executives "must have known" statements were false

13   due to high level positions at the company do not provide a strong inference of scienter);

14   Gaylinn v. 3Com Corp., 185 F. Supp. 2d 1054, 1065 (N.D. Cal. 2000) (same).  Furthermore,

15   Plaintiff does not allege that Charney collected documents from manufacturing workers, and

16   his position as CEO does not support the inference that he would have done so.  See In re

17   Juniper Networks, Inc. Sec. Litig., 542 F. Supp. 2d 1037, 1047 (N.D. Cal. 2008) (Chief

18   Technology Officer would not have knowledge of accounting and thus no scienter); In re

19   Hiengergy Techs., Inc. Sec. Litig., No. SACV04-1226-DOC(JTLx), 2005 WL 3071250, *6

20   (C.D. Cal. Oct. 25, 2005) (defendant signed financial statements but primary position as

21   Chief of Science undercut assertion that he acted with scienter).  Nor does Plaintiff allege that

22   workers presented their documents or any other indicia of employment eligibility to the

23

---

24   [22]      Plaintiff also alleges that the Company's payroll system, which purportedly separates
     retail employees from manufacturing employees (CAC ¶ 74), was an "overt attempt to
25   conceal the thousands of undocumented workers from the Company's vendors."  (Opp'n 28.)
     The Company did not "ignore this allegation" because it is damning.  (Id.)  Rather, it simply
26   fails to see how organization of the payroll system is informative.  Plaintiff does not allege,
     for example, that the payroll contains any information about work authorization or that
27   "vendors and other sources of potential scrutiny" (id.) could look at the system and confirm
     whether employment bona fides were authentic.

28

Company, let alone to its CEO, on a "day-to-day" basis. Plaintiff appears to be of the mind that one can look at a person and tell whether they are an "illegal immigrant."[23] Such profiling, of course, is offensive and unlawful.[24]

 2. **Allegations Regarding Effect Of Terminations Are Not Supported By Requisite Factual Detail And Thus Do Not Establish Scienter**

 Plaintiff fails to allege any facts supporting the conclusion that "[d]efendants knew but failed to disclose that losing one-third of the Company's manufacturing employees had an immediate and severely negative impact on the Company's financial performance." (CAC ¶ 85.) As detailed above, the Company's disclosures regarding the potential impact of any terminations repeatedly stated that no assurances could be given as to the ultimate effects of any ICE-related terminations. (See Jones Decl. Exs. 13 at 57; 14 at 64; 15 at 68.) In re Wet Seal, 518 F. Supp. 2d at 1172 (finding no inference of scienter where "information was disclosed to the market and therefore [it is] not any more likely that Defendants' statements" were designed to defraud; see also In re Downey Sec. Litig., No. CV 08-3261-JFW(RZx), 2009 U.S. Dist. LEXIS 83443, at *17-18 (C.D. Cal. Aug. 21, 2009). Moreover, the timely and fulsome disclosures issued after the effects of the terminations were known do not establish that Defendants misled the market with respect to their beliefs before the

---

[23] This argument is akin to Plaintiff's allegation that one can infer whether a person is an unauthorized alien under the immigration laws because she does not "speak English and was scantily clothed." (CAC ¶ 68.) The Opposition does not even attempt to address the deficiencies of this allegation, i.e., that the hearsay statement of one witness regarding a single alleged employee is insufficient to show scienter. (See Mot. at 19-20.)

[24] Plaintiff argues that if the Company had made "diligent efforts," it "would have had an affirmative defense [under 8 U.S.C. § 1324a(a)(3)] to ICE's findings." (Opp'n 29.) It is no surprise that the Company did not invoke the defense because 8 U.S.C. § 1324a(a)(3) is triggered when an employer has been charged with a knowing violation of the immigration laws under 8 U.S.C. § 1324a(1)(A) (making it unlawful to hire "an alien knowing the alien is an unauthorized alien"). See 8 U.S.C. § 1324a(a)(3) (An "entity that establishes that it has complied in good faith with [the hiring requirements of] subsection (b) [regarding employment verification] . . . has established an affirmative defense that the . . . entity has not violated paragraph (1)(A) with respect to such hiring . . . .). Here, Plaintiff does not allege that ICE charged the Company with a violation of 8 U.S.C. § 1324a(1)(A). Indeed, as the Company disclosed, and Plaintiff cannot refute, "ICE's notification provided no indication that the Company knowingly or intentionally hired unauthorized aliens and no criminal charges have been filed against the Company or any current employees." (See Jones Decl. Ex. 18 at 92.)

1  terminations were completed.  Defendants are not liable under the securities laws for making

2  predictions that later turn out to be incorrect.  See In re Syntex Corp., 95 F.3d at 929 ("the fact

3  that a prediction proves to be wrong in hindsight does not render the statement untrue when

4  made"); Patel v. Parnes, 253 F.R.D. 531, 560 (C.D. Cal. 2008) ("In effect, by arguing that

5  defendants' predictions and forecasts were not low enough, plaintiffs improperly attempt to

6  allege 'fraud by hindsight.'"); In re PetSmart, Inc. Sec. Litig., 61 F. Supp. 2d 982,  992 (D.

7  Ariz. 1999) ("defendants' lack of clairvoyance simply does not constitute securities fraud.")

8  (citation omitted).[25]

9      Rather, the CAC must plead contemporaneous facts demonstrating the falsity of

10  Defendants' statements.  See In re Read-Rite, 335 F.3d at 847.  Here, Plaintiff alleges that

11  Defendants knew that terminations would adversely affect the business because "surplus

12  inventory" would not mitigate potential inefficiencies arising from losing or hiring new

13  workers.  (Opp'n 32.)  However, the CAC contains no allegations that when the forward-

14  looking statements were made, Defendants had contemporaneous facts that would or should

15  have led them to believe that inventory would be inadequate to meet demand.  While

16  Defendants may have had access to inventory reports,[26] the CAC neither alleges what the

17  [25]    Plaintiff also argues that scienter may be inferred because disclosures regarding the
18  adverse effect of the terminations came "just four months" after the November 10, 2009
   disclosure.  (Opp'n 34.)  However, proximity between disclosures "in and of itself, is
19  insufficient" to evidence scienter.  See Ronconi v. Larkin, 253 F.3d 423, 437 (9th Cir. 2001)
   (Since "none of the plaintiff's other allegations are sufficiently specific, we now conclude that
20  the five week period between the optimistic statements and the below-expectation earnings
   report is not enough to sustain the complaint."); In re Foundry Networks, Inc. Sec. Litig., No.
21  C-00-4823-MMC, 2003 U.S. Dist. LEXIS 18200, at *42 (N.D. Cal. Aug. 29, 2003) (two
   month interval between disclosures "alone is not sufficient to satisfy the requirements of the
22  PSLRA).  Plaintiff further contends, citing Middlesex Ret. Sys. v. Quest Software, Inc., 527 F.
   Supp. 2d 1164, 1189 (C.D. Cal. 2007), that scienter can be inferred when a later statement
23  "directly contradicts or is inconsistent with the earlier statement."  (Opp'n 35.)  But there is
   no inconsistency here since the earlier statements did not assure investors that layoffs would
24  have no impact on the business.  Moreover, In re Read-Rite Corp. Securities Litigation, 335
   F.3d 843 (9th Cir. 2003) completes the rule stated in Middlesex: "'[i]t is clearly insufficient
25  for plaintiffs to say that a later, sobering revelation makes an earlier, cheerier statement a
   falsehood.'"  Read-Rite, 335 F.3d at 848 (citation omitted).  Given the vacuum of adequately
26  supported allegations, that is precisely what Plaintiff attempts here.
   [26]    The Opposition states that "'these contemporaneous reports' are buttressed by many
27  additional specific facts corroborating these allegations."  (Opp'n 27.)  Curiously, Plaintiff
28  does not direct the Court to where these "many additional" facts are found, but rather cites a

*(cont'd)*

1   reports stated nor that the reports were inconsistent with the Company's disclosures.[27]   As

2   stated in In re Silicon Graphics, Inc. Securities Litigation, 183 F.3d 970, 985 (9th Cir. 1999)

3   without such information, the Court cannot "ascertain whether there [was] any basis for the

4   allegation that the officers had actual or constructive knowledge of [the company's] problems

5   [and] that . . . their optimistic representations to the contrary [were] consciously misleading."

6   Id. (where plaintiff alleged internal reports reflected production and sales issues, scienter not

7   pled without allegations regarding content of reports or indicia of reports' reliability); In re

8   Autodesk, Inc. Sec. Litig., 132 F. Supp. 2d 833, 844 (N.D. Cal. 2000) (plaintiff failed to make

9   "specific allegations . . . about the contents of the reports," "how the contents contradict

10   defendants' public statements," or "how they know what was in the reports"); see also In re

11   Foundry Networks, 2003 U.S. Dist. LEXIS 18200, at *31 (although described with

12   specificity, reports not contemporaneous with disclosures, thus no scienter; information about

13   shipments in first few weeks of October "insufficient to show that either revenue or profit

14   forecasts [issued at end of October] were false or misleading.").[28]

15

16   _____

_(cont'd from previous page)_

17   discussion in In re Dauo Sys., Inc. Sec. Litig., 411 F.3d 1006, 1015 (9th Cir. 2005), regarding reliance on confidential witness statements.  (Opp'n 27.)  He does allege elsewhere that

18   because the Company reported on March 25, 2010 that the labor "disruption was already 'extended' and 'substantial,' it is reasonable to infer that defendants had knowledge of that effect just months earlier." (Opp'n 35.)  Such an inference is untenable since just months

19   earlier, the workers were still in the Company's employ.

20   [27]   Plaintiff claims that the "monitored metric [i.e., inventory reports] evidenced a significant discrepancy." (Opp'n 34.)  However, he does not describe or attach to the CAC

21   any inventory reports, or plead other bases for asserting that the reports or some other "metric" indicated an issue, let alone a "significant discrepancy," with inventory.

22   [28]   The insufficiency of Plaintiff's allegations sharply contrasts with the cases cited in the Opposition. (Opp'n 33.) See Turbodyne, 2000 U.S. Dist. LEXIS 23020, at *70-71 (alleging

23   testimony of employees that assembly line not operational until months after public statements that facility was functional); Epstein v. Itron, Inc., 993 F. Supp. 1314, 1326 (E.D.

24   Wash. 1998) (inferring defendants knew statements about integration of existing and new technologies were false where defendants acknowledged that existing products were

25   incompatible with new technology); Lormand v. US Unwired, Inc., 565 F.3d 228, 252 (5th Cir. 2009) (alleging private statements and internal memorandum indicating that transition to

26   different network would be detrimental to company, despite contrary public statements); In re Lattice Semiconductor Corp. Sec. Litig., No. CV04-1255-AA, 2006 U.S. Dist. LEXIS 262, at

27   *38-39 (D. Or. Jan. 3, 2006) ("For allegations based on the defendants' regular receipt of . . . business reports . . . , plaintiff must provide such 'adequate corroborating details,' as who

28

_(cont'd)_

19

REPLY TO OPP'N TO MOTION TO DISMISS CAC

3. **Groundless Allegations Of "Financial Improprieties" Do Not Establish Scienter With Respect To Control Issues**

The CAC alleges that Defendants knowingly misled investors that they were "taking [SOX compliance] very seriously'" and "'pursu[ing] a strict corporate orthodoxy as far as financial accounting issues.'" (Opp'n 36.)  Notwithstanding that the Company disclosed its control deficiencies throughout the Class Period (see supra II.A.3)[29] and that Defendants' optimistic statements about financial compliance are inactionable corporate puffing (see id.), Plaintiff insists that Defendants knew, or were reckless in not knowing, that the statements were false because the Company was "engaged in a pattern of financial improprieties and misrepresentations about the Company's fiscal health." (Opp'n 37.)  Plaintiff's potpourri of conclusory allegations, however, fails to support the assertion that the Company was engaged in any such "financial shenanigans." (Opp'n 26.)

First, Plaintiff alleges that Defendants violated GAAP by "intentionally withholding adverse material information from the Company's auditor." (Opp'n 39, 40, n.38.)  Plaintiff's description of the Deloitte resignation grossly mischaracterizes events and is unsupported by the allegations of the CAC.  For example, in the few instances where Plaintiff offers specific details about the resignation, he cites the Company's July 28, 2010 and December 21, 2010

---

*(cont'd from previous page)*

drafted the reports, who received them, an 'adequate description of their contents,' and from whom the plaintiffs obtained information about them.") (citation omitted).

[29]    Contrary to Plaintiff's suggestion, Stocke v. Shuffle Master, Inc., 615 F. Supp. 2d 1180 (D. Nev. 2009), Batwin v. Occam Networks, Inc., No. CV-7-2750CAS(SHx), 2008 U.S. Dist. LEXIS 52365 (C.D. Cal. Jul. 1, 2008), and In re Faro Technologies Securities Litigation, 534 F. Supp. 2d 1248 (M.D. Fla. 2007) do not hold that "failure to maintain effective controls is itself indicative of scienter." (Opp'n 38, n.33.)  In Stocke, defendants' failure to implement a plan to remedy control weaknesses, developed after an earlier restatement, led to the recurrence of the improper accounting practices and a second restatement.  See Stocke, 615 F. Supp. 2d at 1191.  In Batwin, defendants' auditor "identified certain internal control deficiencies relating to revenue recognition, . . . defendants falsely represented that they had implemented measures to correct these deficiencies and continued to recognize revenue prematurely."  Batwin, 2008 U.S. Dist. LEXIS 52365, at *40-41.  Accordingly, the initial disclosure of control weaknesses did not negate an inference of scienter because defendants misled investors about the company's remediation efforts.  Id.  In In re Faro, "Defendants . . . knowingly or recklessly attested to the adequacy of the internal controls system, when they knew that the system was, in fact, seriously inadequate."  In re Faro, 534 F. Supp. 2d at 1264 (emphasis added).

20

1  Form 8-Ks. (CAC ¶¶ 34, 36, 124.)   These disclosures do <u>not</u> state the Company

2  "intentionally" withheld information, nor do they characterize the February financials as

3  "material."[30]  (Opp'n 33.)  The words "intentionally" and "material," as well as "fraudulently

4  withheld" (Opp'n 24, n.20), "deliberately withheld" (Opp'n 27), and "misrepresented the

5  Company's financial health" (Opp'n 39, n.36), have been inserted liberally by Plaintiff and

6  his counsel after the fact.[31]  Plaintiff also claims that the December 21, 2010 disclosure

7  "<u>belatedly</u> provided additional facts about Deloitte's resignation."[32]  (Opp'n 12-13 (emphasis

8  added).)   But Plaintiff omits what facts the Company should have disclosed about the

9  resignation at any earlier time.  Plaintiff also asserts that Deloitte "reported defendants to

10  federal authorities" (Opp'n 13), but points to no documents, witness statements, or other facts

11  to support that claim.   Finally, and perhaps most importantly, the Company's new

12  independent auditor, Marcum, re-audited the Company's 2009 financial statements.  (Jones

13  Decl. Ex. 24 at 140.)  Marcum's new audit report was contained in a Form 10-K/A for fiscal

14  year ended 2009 and removed the notation that the 2009 financials were unaudited  (<u>Id.</u>)

15  Tellingly, Plaintiff does not allege that Marcum's re-audit resulted in a restatement of any

16  kind.

17  <u>Second</u>, Plaintiff asserts that a restatement in 2009 of the Company's FYE 2008

18  financials to reclassify one of its debt obligations (CAC ¶ 121) serves as an indicia of scienter

19  because a Company that seeks to improve its internal controls does not restate its financials.

---

20  [30]     <u>See</u> Jones Decl. Ex. 28 at 7 ("Deloitte further indicated that . . . [based on] their
   professional judgment . . . they are no longer willing to rely on management's representations

21  due to Deloitte's belief that management withheld from Deloitte the February 2010 monthly
   financial statements until after the filing of the 2009 10-K and made related

22  misrepresentations."); <u>id.</u> at 11 ("Specifically, we believe that we requested the February
   2010 financial information prior to issuing our reports and that management informed us that

23  such information was not available.").

   [31]     <u>SEC v. Todd</u>, No. 07-56098, 2011 U.S. App. LEXIS 12692, at *7, 20 (9th Cir. Jun. 23,

24  2011) is factually distinguishable.  In that case, defendants failed to disclose to its auditors
   that it accounted for a $47 million transaction as revenue (without which the company would

25  not have met analysts' expectations) until after the release of quarterly financials.  The
   transaction was later restated. <u>Id.</u> at *7, 19.

26  [32]     Plaintiff incorrectly alleges that the Company waited until March 31, 2011 to disclose

27  these "additional facts." (CAC ¶¶ 124, 134).  The same language found in CAC ¶¶ 124, 134
   is included in the December disclosure.  (<u>See</u> Jones Decl. Ex. 28 at 7.)

28

1    (Opp'n 37-38.)   Plaintiff provides no authority for this proposition.[33]   Each of the cases cited

2    in the Opposition involved multiple restatements and a failure to correct control deficiencies

3    that were identified after an earlier restatement.   See Stocke, 615 F. Supp. 2d at 1191

4    (alleging two restatements and failure to correct control deficiencies that caused first

5    restatement); Norfolk Cnty. Ret. Sys. v. Ustian, No. 07-C-7014, 2009 U.S. Dist. LEXIS

6    65731, at *26-27 (N.D. Ill. Jul. 28, 2009) (same); Gelfer v. Pegasystems, Inc., 96 F. Supp. 2d

7    10, 16 (D. Mass. 2000) (multiple restatements arising from same improper accounting).

8    Additionally, each of the foregoing cases – as in most cases holding that a restatement may

9    support an inference of scienter – involved a restatement of revenue or income.   See Stocke,

10   615 F. Supp. 2d  at 1185 (earnings overstated by 30%); Norfolk, 2009 U.S. Dist. LEXIS

11   65731, at *4 (defendant overstated income by $677 million); Gelfer, 96 F. Supp. 2d at 16 (net

12   income overstated by 110%); accord In re UTStarcom, 617 F. Supp. 2d at 975 ("The Ninth

13   Circuit has held that 'if properly pled, overstating of revenues may state a claim for securities

14   fraud, as under GAAP, revenue must be earned before it can be recognized.'") (citation

15   omitted).  Plaintiff does not allege what effect the 2009 restatement – which had nothing to do

16   with the substance of Plaintiff's claims in this case – had on the Company's financial

17   statements.  That is no doubt because, as the Company disclosed contemporaneously with the

18   restatement, the restatement "did not have any impact on the Company's previously reported

19   net cash flows, cash position, revenues, net income or comparable store sales."  (See Jones

20   Decl. Ex. 16 at 76.)

21        Third, changes in the Company's CFOs over the last three years do not support an

22   inference of scienter.  In contrast with the cases he cites in the Opposition, Plaintiff does not

23   allege that the changes were made in connection with the revelation of accounting

---

[33]    This is because, as stated in In re Watchguard Securities Litigation, No. C05-678J, 2006 WL 2038656, at *12 (W.D. Wash. Apr. 21, 2006), "corporate restatements of earnings are commonplace.  There can be little doubt that the investing public would prefer that corporations correct their errors rather than suppress[] them."

improprieties.[34]   See In re Adaptive Broadband Sec. Litig., No. C01-1092SC, 2002 U.S. Dist. LEXIS 5887, at *42-43 (N.D. Cal. Apr. 2, 2002) (resignations and reassignment of executives supported inference of scienter where "changes occurred as Adaptive's financials were being restated"); Frank, 2011 U.S. App. LEXIS 10437, at *13 (CFO retired within months of discovery of "accounting errors and at the same time as [company's] bankruptcy filing"); In re McKesson HBOC, Inc. Sec. Litig., 126 F. Supp. 2d 1248, 1273-74 (N.D. Cal. 2000) (terminations followed restatement); see also In re Impax Labs, Inc. Sec. Litig., No. C04-04802JW, 2007 U.S. Dist. LEXIS 52356 at *26-27 (N.D. Cal. Jul. 18, 2007) ("when corporate reshuffling occurs in tandem with financial restatements, these changes 'add one more piece to the scienter puzzle.'") (citation omitted).

Fourth, Plaintiff alleges that "just six days before the misleading 2009 10-K was issued,[35] on March 25, 2010, Charney misrepresented that [he thought] 'the outlook for American Apparel is strong,' [was] 'very confident about the business' . . . [and] 'looking forward to a great year.'" (Opp'n 39-40.)   Again, these statements are inactionable puffery. See In re Splash, 160 F. Supp. 2d at 1076 (use of words "strong," "well positioned," "solid," and "improved" are "vague and nonactionable."); Weiss v. Amkor Tech., Inc., 527 F. Supp. 2d 938, 956 (D. Ariz. 2007) (statement that "'[w]e believe that 2004 will present exceptional growth opportunities'" constituted puffery) (citation omitted).   Additionally, the allegations of the CAC contradict the assertion that Charney made these statements "while intentionally withholding adverse trends in American Apparel's business."  (Opp'n 47, n.52.)  On March 25, 2010, the Company made several disclosures of adverse financial information.[36]

---

[34]   Plaintiff states that the Company "had at least three CFOs" during the Class Period (Opp'n 41), which ended on August 17, 2010.  This is wrong.  As Plaintiff acknowledges in the CAC, Mr. Luttrell succeeded Mr. Kowalewski in February 2011.  (CAC ¶ 26.)

[35]   Plaintiff fails to identify how the 2009 10-K was misleading, and there are no allegations that the Company restated its 2009 financials.

[36]   See CAC ¶ 101 ("[O]n March 25, 2010, Defendants were forced to admit that the effects of the [ICE-related] terminations had been "substantial" and that the "extended disruption on [the Company's] operations has been unprecedented."); ¶¶ 102, 147 (same); ¶ 148 (March 25, 2010 press release reported that given "certain restrictive financial covenants under the company's credit facilities, the company has determined to defer providing annual financial guidance for 2010").

23

<u>Finally</u>, Plaintiff intimates that Defendants misrepresented the state of the Company's condition on a November 2008 investor call by concealing that it was on the verge of bankruptcy.  (Opp'n 37 ("[O]n December 24, 2008, Kowalewski sent an internal Company e-mail explaining that American Apparel 'almost <u>went bankrupt</u> last Friday' . . . . Yet, just <u>a month earlier</u>, on November 10, 2008, Charney had touted the Company's financial health . . . .").)   However, Defendants' statements during the call could not be misleading under the securities laws unless the Company was on the verge of bankruptcy <u>in November</u>. <u>See</u> <u>In re Exodus Commc'ns, Inc. Sec. Litig.</u>, No. C 01-2661 MMC, 2005 U.S. Dist. LEXIS 20222, at *123 (N.D. Cal. Aug. 5, 2005) (where company filed for bankruptcy on September 26, but CEO stated that company was in good health as late as September 3, scienter not alleged because "[no] facts suggesting [CEO's] statements about Exodus's finances were false at the time they were made."); <u>In re Read-Rite</u>, 335 F.3d at 847.  Significantly, Plaintiff does not allege that the Company ultimately filed for bankruptcy, or that it restated its revenues or net income for fiscal year 2008.  Moreover, Defendants' statements did not constitute an actionable misrepresentation, since comments that "[w]e're confident in the numbers we've put out there," the Company would "weather the economic storm," and "we're pleased with our financial results" (Opp'n 37) – are puffery.  <u>See</u> <u>In re CornerStone Propane Partners, L.P. Sec. Litig.</u>, 355 F. Supp. 2d 1069, 1087 (N.D. Cal. 2005) (statements about "accomplishments we have achieved" and "resilience in the face of mounting debt" not "actionable material misstatements of fact"); <u>In re Wet Seal</u>, 518 F. Supp. 2d at 1167-68 (statements that "[w]e remain confident," "[w]e are pleased with the continuation of the month-over-month improvement in our sales trends," and "we will deliver a better operating performance in the second half of the year" inactionable).

### 4.   <u>The Opposition Continues To Fail To Describe A Motive Sufficient To Support Scienter Allegations</u>

Plaintiff has failed to plead any logical or compelling motive for the alleged fraud.  He alleges that Defendants had a choice to "disclose the Company's large undocumented work force" and damage the brand, or mislead investors in the hope that a new administration

would grant amnesty.   (Opp'n 42.)   The CAC alleges, however, that the brand value is derived from the fact that the Company's products are "Made in U.S.A." (CAC ¶ 70) – not "Made by Undocumented Immigrants."  Given, as Plaintiff concedes, that the Company paid all of its workers above minimum wage and offered generous benefits (CAC ¶¶ 6, 64), there was no need for the Company to employ persons ineligible to work in the United States.

Additionally, Plaintiff's own cases demonstrate that pecuniary motive allegations alone are insufficient to raise an inference of scienter.  See In re Cornerstone, 355 F. Supp. 2d at 1092 (granting defendant's motion to dismiss when plaintiff alleged bonus programs that "incentivized the specific form of accounting malfeasance alleged by the complaint" because, although allegations contributed to inference of scienter, they were "legally and factually insufficient to carry that burden alone.") (emphasis added); In re U.S. Aggregates, Inc. Sec. Litig., 235 F. Supp. 2d 1063, 1071-1072 (N.D. Cal. 2002) (granting defendant's motion to dismiss when plaintiff alleged "concrete, particular and corroborated" allegations concerning defendant's motive to defraud to remain compliant with loan agreements because "motive is not sufficient to raise a strong inference of scienter"); Lewis v. Straka, No. 05-C-1008, 2006 U.S. Dist. LEXIS 76716, at *19-23 (E.D. Wis. Oct. 12, 2006) (granting motion to dismiss as to some defendants for failure to adequately plead scienter despite allegations that defendants were "motivated by their wish to continue to collect fees, salaries and bonuses and in some cases loans on favorable terms").   In light of the deficiencies of Plaintiff's other scienter allegations, Charney's compensation and stock purchases are inconsequential to the scienter analysis.

## III.   CONCLUSION

For the foregoing reasons, the Court should dismiss the CAC.

DATED: July 14, 2011       SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP


By: _____
                    /s/Harriet S. Posner
                    Harriet S. Posner
                    Attorneys for Defendant
                    American Apparel, Inc.