1
2
3
4
5
6

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
HARRIET S. POSNER (Bar No. 116097)
harriet.posner@skadden.com
PETER B. MORRISON (Bar No. 230148)
peter.morrison@skadden.com
GILA D. JONES (Bar No. 248213)
gila.jones@skadden.com
300 South Grand Avenue
Los Angeles, California 90071-3144
Telephone:   (213) 687-5000
Facsimile:   (213) 687-5600

7   Attorneys for Defendant
    American Apparel, Inc.

8

9                        UNITED STATES DISTRICT COURT

                         CENTRAL DISTRICT OF CALIFORNIA

10

11

12  | IN RE AMERICAN APPAREL, INC. | ) | Case No. CV-10-6352 MMM (JCGx) |
    | SHAREHOLDER LITIGATION | ) | |

13  | | ) | (1)  DEFENDANT AMERICAN |
    | | ) | APPAREL, INC.'S REPLY TO |
14  | This Document Relates To: | ) | PLAINTIFF'S OPPOSITION TO MOTION |
    | | ) | TO DISMISS FIRST AMENDED CLASS |
15  | ALL ACTIONS | ) | ACTION COMPLAINT; and |
    | | ) | |
16  | | ) | (2)  REPLY TO PLAINTIFF'S |
    | | ) | OPPOSITION TO REQUEST FOR |
17  | | ) | JUDICIAL NOTICE (separate cover). |
    | | ) | |
18  | | ) | Date:  May 21, 2012 |
    | | ) | Time:  10:00 a.m. |
19  | | ) | Courtroom:  780 |
    | | ) | |
20  | | ) | Hon. Margaret M. Morrow |
    | | ) | Am. Complaint Filed:  February 27, 2012 |
21  | | ) | Trial Date:  TBD |
    | | ) | |
22  | | ) | |

23
24
25
26
27
28

REPLY TO OPP'N TO MOTION TO DISMISS FAC

# TABLE OF CONTENTS

PAGE

I.      PRELIMINARY STATEMENT ................................................................1

II.     ARGUMENT ..........................................................................................3

   A.   Plaintiff Misstates The Standard For Determining Whether Confidential Witnesses Possess The Requisite Personal Knowledge And Indicia Of Reliability ...........3

   B.   Statements Regarding Immigration Compliance Do Not Give Rise To Liability Under The Securities Laws .......................................................8

        1.   The FAC Fails To Allege That Defendants Knowingly Misled Investors Regarding Their Efforts To Comply With Immigration Laws.................................................................8

        2.   Plaintiff Fails To Plead Falsity With Respect To The November 2007 Proxy .........................................................13

   C.   The FAC Fails To Plead Falsity Or Scienter With Respect To Statements Regarding The Impact Of ICE-related Terminations .......................................14

        1.   Internal Reports Do Not Establish That Defendants Misled Investors About The Impact Of Lay-Offs.................................17

        2.   CW Allegations Regarding Costs And Worker Productivity Do Not Support Plaintiff's Claims Of Falsity Or Scienter.......18

   D.   Deloitte's July 2010 Resignation Does Not Render Defendants' Statements Regarding Internal Controls Actionable.......................................22

III.    CONCLUSION ....................................................................................24

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# TABLE OF AUTHORITIES

**PAGE(S)**

**CASES**

In re Autodesk, Inc. Securities Litigation,
132 F. Supp. 2d 833 (N.D. Cal. 2000)........................................................18

In re Business Objects S.A. Securities Litigation,
No. C 04-2401 MJJ,
2005 U.S. Dist. LEXIS 20215 (N.D. Cal. July 27, 2005) .........................1, 7

Berson v. Applied Signal Technology, Inc.
527 F.3d 982 (9th Cir. 2008)..............................................................16-17

In re Cabletron System, Inc.,
311 F.3d 11 (1st Cir. 2002) ........................................................................5

In re Cadence Design System, Inc. Securities Litigation,
692 F. Supp. 2d 1181 (N.D. Cal. 2010)........................................................5

In re Cell Therapeutics, Inc. Class Action Litigation,
Case No. 2:10-cv-00414-MJP,
2011 U.S. Dist. LEXIS 11157 (W.D. Wa. Feb. 4, 2011) ...............................5

In re Countrywide Finance Corp. Derivative Litigation,
554 F. Supp. 2d 1044 (C.D. Cal. 2008) ........................................................5

In re Countrywide Finance Corp. Securities Litigation,
588 F. Supp. 2d 1132 (C.D. Cal. 2008) ......................................................12

In re Daou Systems, Inc.,
411 F.2d 1006 (9th Cir. 2004).................................................................4, 5

In re Dot Hill Systems Corp. Securities Litigation,
594 F. Supp. 2d 1150 (S.D. Cal. 2008) ..............................................1, 9, 20

In re Foundry Networks, Inc. Securities Litigation,
Master File No. C-00-4823-MMC,
2003 U.S. Dist. LEXIS 18200 (N.D. Cal. Aug. 29, 2003) ...........................16

Gomez v. Wells Fargo Home Mortgage,
No. C 11-01725 LB,
2012 U.S. Dist. LEXIS 49746 (N.D. Cal. Apr. 9, 2012)..............................22

In re Hansen Natural Corp. Securities Litigation,
527 F. Supp. 2d 1142 (C.D. Cal. 2007)......................................................12

In re Impac Mortgage Holdings, Inc. Securities Litigation,
554 F. Supp. 2d 1083 (C.D. Cal. 2008) ......................................................15

In re Juniper Networks, Inc. Securities Litigation,
No. C 02-0749 SI,

REPLY TO OPP'N TO MOTION TO DISMISS FAC

2004 U.S. Dist. LEXIS 4025 (N.D. Cal. Mar. 10, 2004), aff'd,
158 F. App'x 899 (9th Cir. 2005) ................................................................. 9

Karpov v. Insight Enterprises, Inc.,
No. CV 09-856-PHX-SRB,
2010 U.S. Dist. LEXIS 128621 (D. Ariz. Nov. 16, 2010),
aff'd, No. 10-17841, 2012 U.S. App. LEXIS 4632 (9th Cir. Mar. 6, 2012) ............... 7, 9

In re Lattice Semiconductor Corp. Securities Litigation,
No. CV04-1255-AA,
2006 U.S. Dist. LEXIS 262 (D. Or. Jan. 3, 2006) ..................................... 18

Lipton v. Pathogenesis Corp.,
284 F.3d 1027 (9th Cir. 2002) .................................................................. 18

Matrixx Initiatives, Inc. v. Siracusano,
131 S. Ct. 1309 (2011) ............................................................................. 13

In re Maxim Integrated Products, Inc. Securities Litigation,
639 F. Supp. 2d 1038 (N.D. Cal. 2009) ................................................ 12

In re Metawave Communications Corp. Securities Litigation,
298 F. Supp. 2d. 1056 (W.D. Wa. 2003) ......................................... 1, 4, 10

Metzler Investments GMBH v. Corinthian Colleges, Inc.,
540 F.3d 1049 (9th Cir. 2008) ............................................. 13, 14, 15, 17

New York City Employees' Retirement System v. Berry,
616 F. Supp. 2d 987 (N.D. Cal. 2009) .................................................... 12

New Mexico State Investment Council v. Ernst & Young LLP,
641 F.3d 1089 (9th Cir. 2011) ................................................................. 12

In re NorthPoint Communications Group, Inc. Securities Litigation,
221 F. Supp. 2d 1090 (N.D. Cal. 2002) .................................................. 18

Novak v. Kasaks,
216 F.3d 300 (2d Cir. 2000) .......................................................................4

Nursing Home Pension Fund Local 144 v. Oracle Corp.,
380 F.3d 1226 (9th Cir. 2004) ........................................................... 18, 20

In re PMI Group, Inc. Securities Litigation,
No. C 08-1405 SI,
2009 U.S. Dist. LEXIS 101582 (N.D. Cal. Nov. 2, 2009) ............................5

Patel v. Parnes,
253 F.R.D. 531 (C.D. Cal. 2008) ............................................................ 16

In re Rackable Systems, Inc. Securities Litigation,
No. C 09-0222 CW,
2010 U.S. Dist. LEXIS 88927 (N.D. Cal. Aug. 27, 2010) ................... 19, 21

Ronconi v. Larkin,
253 F.3d 423 (9th Cir. 2001) ................................................................... 16

In re Siebel Systems, Inc. Securities Litigation,
  No. C 04-0983 CRB,
  2005 U.S. Dist. LEXIS 36347 (N.D. Cal. Dec. 28, 2005),
  aff'd sub nom. Wollrab v. Siebel Systems, Inc.,
261 F. App'x 60 (9th Cir. 2007) .................................................................. 7, 21

In re Silicon Graphics Inc. Securities Litigation,
  183 F.3d 970 (9th Cir. 1999) ....................................................................... 18

In re SunPower Securities Litigation,
  No. C 09-5473 RS,
  2011 U.S. Dist. LEXIS 152920 (N.D. Cal. Dec. 19, 2011) .......................... 5

In re Syncor International Corp. Securities Litigation,
  327 F. Supp. 2d 1149 (C.D. Cal. July 6, 2004), aff'd in part, rev'd in part,
  239 F. App'x 318 (9th Cir. 2007) ................................................................ 10

In re Tibco Software Inc. Securities Litigation,
  Master File No. C 05-2146 SBA,
  2006 U.S. Dist. LEXIS 36666 (N.D. Cal. May 25, 2006) ................... passim

In re UTStarcom Inc. Securities Litigation,
  617 F. Supp. 2d 964 (N.D. Cal. 2009) ........................................................ 12

In re Vantive Corp. Sec. Litig.,
  283 F.3d 1079 (9th Cir. 2002) ...................................................................... 2

In re Verifone Holdings, Inc. Securities Litigation,
  No. C 07-6140 MHP,
  2011 U.S. Dist. LEXIS 24964 (N.D. Cal. Mar. 7, 2011) ............................ 21

Wozniak v. Align Technology, Inc.,
  No. C 09-3671 MMC,
  2012 U.S. Dist. LEXIS 13425 (N.D. Cal. Feb. 3, 2012) .................... passim

Zucco Partners, LLC v. Digimarc Corp.,
  552 F.3d 981 (9th Cir. 2009) ..................................................................... passim

**STATUTES**

15 U.S.C. § 78u-4(b)(1)(B) ............................................................................ 15

## I.     PRELIMINARY STATEMENT

Plaintiff's addition of twelve confidential witness (or "CW") accounts to the FAC fails utterly to address the Court's prior ruling that the CAC was not "supported by sufficient facts," and, thus,  "[did] not give rise to a 'strong inference' of scienter. . . ." (Order at 65, ECF No. 105.)  When confidential witness "statements are introduced to establish scienter[,] [they] must be described with sufficient particularity to establish their reliability and personal knowledge. . . ."  Zucco Partners, LLC v. Digimarc Corp., 552 F.3d 981, 995 (9th Cir. 2009). Here, Plaintiff avers that "because the CW accounts are internally consistent and are corroborated by the other facts alleged in the FAC," he has adequately pled the witness' reliability and basis of knowledge.  (Opp'n at 10.)   However, a "shared opinion among confidential witnesses does not necessarily indicate either falsity or a strong inference of scienter if the allegations themselves are not specific enough."  In re Metawave Commc'ns Corp. Sec. Litig., 298 F. Supp. 2d 1056, 1070 (W.D. Wa. 2003) (citation omitted); In re Dot Hill Corp. Sys. Sec. Litig., 594 F. Supp. 2d 1150, 1163 (S.D. Cal. 2008) ("Instead of providing the specificity and particularity demanded by the PSLRA and Ninth Circuit precedents, plaintiffs resort to numerosity and verbosity in their confidential witness allegations.  If one confidential witness is impermissibly vague in making an allegation, the attribution of the same vague allegation to other confidential witnesses does not cure the pleading defect.").   Accordingly, Plaintiff's attempt to pass off vague and duplicative incantations of the Company's hiring practices and the effects of the ICE-related terminations, many of which amount to nothing more than gossip and innuendo, must be rejected.

Plaintiff also wrongly asserts that "[t]he CW statements are reliable because the 'job title, employer and period of employment' of the FAC's CWs is [sic] described with sufficient specificity."  (Opp'n at 8, ECF No. 116 (citation omitted).)  Such bare allegations are wholly insufficient to satisfy the PSLRA's heightened pleading requirements.  Instead, Plaintiff must allege the witnesses' responsibilities with the requisite specificity necessary to lay a foundation for their purported knowledge.  See, e.g., In re Bus. Objects S.A. Sec. Litig.,

No. C 04-2401 MJJ, 2005 U.S. Dist. LEXIS 20215, at *17 (N.D. Cal. July 27, 2005) (rejecting witness allegations where complaint pled "no more than the job title of the confidential witnesses . . . [and] fail[ed] to provide any other detail regarding his or her job description and responsibilities."). In this case, Plaintiff either omits entirely any detail regarding the witnesses' job responsibilities, or describes them in such cursory fashion, that it is impossible to deduce how the witnesses have personal knowledge of the facts alleged.

Lastly, and significantly, Plaintiff's confidential witnesses do not demonstrate that Defendants acted with scienter. See Zucco, 552 F.3d at 995 ("statements which are reported by confidential witnesses with sufficient reliability and personal knowledge must themselves be indicative of scienter"); In re Tibco Software Inc. Sec. Litig., Master File No. C 05-2146 SBA, 2006 U.S. Dist. LEXIS 36666, at *51 (N.D. Cal. May 25, 2006) (confidential witnesses must provide "information that would suggest that Defendants either knew that the false statements being made were false when made or that they were acting in a deliberately reckless manner."). Although the CWs purport to describe, for example, the process for reviewing and completing Forms I-9 (FAC ¶¶ 97-98, ECF No. 106), and conditions in the factory after the ICE audit concluded (id. ¶¶ 83, 86, 101), not one of the twelve witnesses can speak to what Defendants knew with respect to the information contained in the disclosures at issue. As such, the CW allegations ignore the Court's admonition that "[t]he key to pleading intentional or reckless conduct is pleading facts that show that when defendants made the allegedly false statements, they knew they were false, or knew facts 'so obvious that they must have been aware' that they were misleading the public." (Order at 52, ECF No. 105 (emphasis added) (citation omitted).)

At bottom, Plaintiff has failed to satisfy his burden of pleading particularized facts demonstrating "that the defendant made false or misleading statements either intentionally or with deliberate recklessness. . . ." In re Vantive Corp. Sec. Litig., 283 F.3d 1079, 1085 (9th Cir. 2002) (quoting 15 U.S.C. § 78u-5(c)(1)(B)(i)). Plaintiff's vague, speculative and unreliable confidential witness allegations simply do not overcome the more compelling

1  inference that Defendants, without an intent to defraud, believed the Company's workforce

2  was properly documented, failed to accurately predict the precise effects of the ICE-related

3  terminations, and, worked to fulfill the Company's aspirations of rectifying publicly disclosed

4  deficiencies in its internal controls environment.  The FAC, therefore, should be dismissed.

5  II.  **ARGUMENT**

6       A.  **Plaintiff Misstates The Standard For Determining Whether Confidential
   Witnesses Possess The Requisite Personal Knowledge And Indicia Of
7  Reliability**

8       The FAC introduces and heavily relies upon allegations from 12 confidential witnesses

9  in an attempt to cure the infirmities of the CAC.  Under Ninth Circuit law:

10  > [A] complaint relying on statements from confidential witnesses must pass two
   > hurdles to satisfy the PSLRA pleading requirements. First, the confidential witnesses
11  > whose statements are introduced to establish scienter must be described with
   > sufficient particularity to establish their reliability and personal knowledge. . . .
12  > Second, those statements which are reported by confidential witnesses with sufficient
   > reliability and personal knowledge must themselves be indicative of scienter.

13  Zucco, 552 F.3d at 995 (citations omitted).  "The first prong of this two-part confidential

14  witness test analyzes whether a complaint has provided sufficient detail about a confidential

15  witness' position within the defendant company to provide a basis for attributing the facts

16  reported by that witness to the witness' personal knowledge." Id. (emphasis added).  Zucco

17  further instructs that a plaintiff may rely on confidential witness allegations under two

18  circumstances:  (i) Plaintiff "'"need not name [his] sources"'" if the complaint "relies on both

19  confidential witnesses and other factual information, such as documentary evidence" and

20  "'"the latter facts provide an adequate basis for believing that the defendants' statements were

21  false"'" or (ii) where "such additional evidence is absent, confidential witness statements may

22  only be relied upon where the confidential witnesses are described 'with sufficient

23  particularity to support the probability that a person in the position occupied by the source

24  would possess the information alleged.'" Id. (citations omitted).

25       Drawing on the foregoing language from Zucco, Plaintiff suggests that confidential

26  witness statements may be credited when they are merely corroborated by other facts and are

27  consistent with each other.  (Opp'n at 9-10 ("By disregarding the corroborative facts alleged,

28   

1  however, Defendants hope to avoid the Ninth Circuit rule that, '[w]here a complaint relies on

2  both confidential witnesses and other factual information, such as documentary evidence, the

3  plaintiffs need not name their sources' . . . .") (emphasis added) (citation omitted); id. at 8

4  ("The 'corroborative nature of the other facts alleged (including from other sources)' and 'the

5  coherence and plausibility of the allegations' is [sic] also indicative of scienter.") (citation

6  omitted); id. at 10-11 ("Additionally, because the CW accounts are internally consistent and

7  are corroborated by the other facts alleged in the FAC − including the facts set forth in the

8  ICE documents − the CW statements are also reliable under the standard American Apparel

9  seeks to avoid.").)   But the notion that "consistent" and "corroborated" statements are

10  adequate, alone, to satisfy the exacting pleading requirements of the PSLRA has no support in

11  the law.  As stated in In re Daou Systems, Inc., 411 F.3d 1006 (9th Cir. 2004), a case relied

12  on by Plaintiff:

> [T]o meet th[e] particularity requirement for personal sources of information, this circuit has applied the Second Circuit's standard [set forth in Novak v. Kasaks, 216 F.3d 300 (2d Cir. 2000)] that "personal sources of information relied upon in a complaint should be 'described in the complaint with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged.'"
>
> . . . . The First Circuit has also adopted Novak's approach of "look[ing] at all of the facts alleged to see if they 'provide an adequate basis for believing that the defendants' statements were false.'". . . The First Circuit added that this approach "involves an evaluation, inter alia, of the level of detail provided by the confidential sources, the corroborative nature of the other facts alleged (including from other sources), the coherence and plausibility of the allegations, the number of sources, the reliability of the sources, and similar indicia.". . . It is by this circuit's adoption of the Second Circuit's standard for evaluating personal sources of information, augmented by the First Circuit's suggested criteria for assessing reliability of confidential witnesses, that plaintiffs' complaint here should be evaluated. . . . Naming sources is unnecessary so long as the sources are described "with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged" and the complaint contains "adequate corroborating details."

24  Daou, 411 F.3d at 1015 (emphasis added) (citations omitted).  In other words, a finding that

25  confidential witness statements are "consistent" or "corroborated" may add to, but does not

26  supplant, an analysis of whether the witnesses were in a position to have knowledge of the

27  information alleged.  See In re Metawave, 298 F. Supp. 2d at 1070 ("[A] shared opinion

28

4

among confidential witnesses does not necessarily indicate either falsity or a strong inference of scienter if the allegations themselves are not specific enough.") (citation omitted).  Thus, in Daou – and in each case cited by Plaintiff – the court determined that confidential witnesses at issue were employed in roles wherein they would have personal knowledge of the complaint's allegations.    See Daou, 411 F.3d at 1016 (in action alleging premature recognition of revenue without regard to labor costs, witnesses described with requisite specificity; for example, "[CW] worked in the Finance Department[,] . . . dealt with audit issues, [SEC] reporting and budget matters[,] [and] [a]s such . . . was familiar with Daou's process of collecting project cost information."); In re Countrywide Fin. Corp. Derivative Litig., 554 F. Supp. 2d 1044, 1058-59 (C.D. Cal. 2008) (alleging, for example, "CW9, an auditor[,] . . . examined loans being returned to the Company that had been labeled as 'prime' but were clearly not"; "underwriters at various levels and offices attested to egregious instances of underwriting"); In re Cadence Design Sys., Inc. Sec. Litig., 692 F. Supp. 2d 1181, 1187-89 (N.D. Cal. 2010) ("As a sales director, it is plausible that [CW] had personal knowledge" regarding subject contracts; "As an Account Executive, [CW] would presumably be familiar with [defendant's] general role in negotiating deals with large clients."); In re Cell Therapeutics, Inc. Class Action Litig., Case No. 2:10-cv-00414-MJP, 2011 U.S. Dist. LEXIS 11157, at *11 (W.D. Wa. Feb. 4, 2011) (CW, Vice President of Clinical Development and Regulatory Affairs, stated that she informed defendant executives that their actions invalidated an agreement between defendant company and Food and Drug Administration); see also In re Cabletron Sys., Inc., 311 F.3d 11, 30 (1st Cir. 2002) ("[T]hese are not conclusory allegations of fraud, but specific descriptions of the precise means through which it occurred, provided by persons said to have personal knowledge of them.").[1]

---

[1]      Neither In re SunPower Securities Litigation, No. C 09-5473 RS, 2011 U.S. Dist. LEXIS 152920 (N.D. Cal. Dec. 19, 2011), nor In re the PMI Group, Inc. Securities Litigation, No. C 08-1405 SI, U.S. Dist. LEXIS 101582 (N.D. Cal. Nov. 2, 2009), cited by Plaintiff, specifies which allegations were supplied by confidential witnesses or discusses why the allegations were sufficient under the PSLRA.

REPLY TO OPP'N TO MOTION TO DISMISS FAC

Here, many of Plaintiff's confidential witness allegations fall far short of satisfying _Daou_'s requirement that a complaint plead personal knowledge.[2]   Appendix A shows that with respect to eight of the 12 CWs, either (i) Plaintiff fails altogether to describe the CWs' job responsibilities, and, thus, it is impossible to determine how the witnesses would have knowledge of the matters alleged – particularly where those matters pertain to aspects of the Company that plainly fall within another department's bailiwick or (ii) the witnesses' job responsibilities are wholly unrelated to the subjects of their testimony.  By way of example:

- CW1 (a former Customer Service Representative and Supervisor), CW3 (a former Distribution/Returns Supervisor), CW5 (a former Resource Assignor), and CW6 (a former Bundling employee) all claim that American Apparel hired undocumented workers and/or that, after the ICE audit, replacement workers were difficult to hire and were less skilled and efficient as their predecessors.  (_See_ FAC ¶¶ 78, 83, 85-87.)  The FAC is bereft of details specifying what these employees did in their respective positions or how they would have knowledge of the Company's hiring practices and/or manufacturing operations.

- CW4, a former Production Scheduler, was purportedly responsible for "extract[ing] information from American Apparel's AX system, and incorporat[ing] the information into Microsoft Excel spreadsheets in order to determine which products/styles were needed." (_Id._ ¶ 84.)  CW4 alleges that "employees who were dismissed after failing to produce ICE documentation were later rehired by American Apparel under different names." (_Id._)  Plaintiff makes no attempt to describe CW4's basis of personal knowledge.

- CW8, a former logistics manager who was "involved in the movement of inventory from the warehouse to retail stores" (_id._ ¶ 89), "managed the sale of merchandise to the Company's international subsidiaries" (_id._ ¶ 90), and created reports "that broke down sales by subsidiary" (_id._), purports to testify about the creation and distribution of reports created by persons in two _other_ departments – retail operations and accounting. (_Id._ ¶ 91.)  Notably, CW8 does not claim to have received these reports, so as to know their contents or to whom they were, in fact, distributed.

Plaintiff counters that "[t]he CW statements are reliable because the 'job title, employer and period of employment' of the FAC's CWs is [sic] described with sufficient

---

[2]    As detailed below, the remaining CW allegations do not contradict Defendants' public statements and/or do not attest to Defendants' knowledge, and, as such, fail to support Plaintiff's claims of falsity and scienter.  _See_ Wozniak v. Align Tech., Inc., No. C 09-3671 MMC, 2012 U.S. Dist. LEXIS 13425, at *35 (N.D. Cal. Feb. 3, 2012) (applying no weight to confidential witness allegations that did not contradict defendants' statements); In re Tibco, 2006 U.S. Dist. LEXIS 36666, at *51 (confidential witnesses must provide "information that would suggest that Defendants either knew that the false statements being made were false when made or that they were acting in a deliberately reckless manner.").

1  specificity." (Opp'n at 8 (citations omitted); see also id. at 10 (the "FAC provides the title

2  for all of the CWs and lists their dates of employment at the Company"); id. at 8 ("because

3  all of the CWs were employed by American Apparel at the Company's Los Angeles factory

4  during the Class Period, the CWs knew first hand the facts alleged by his or her statements.").)

5  If such scant allegations were enough, however, a court would be required to credit testimony

6  from confidential witnesses by dint of the fact that the witnesses worked for a defendant.

7  Instead, the cases teach that confidential witness allegations provided, like here, by persons

8  who are not in a position to know the subjects about which they speak fail to satisfy the

9  PSLRA.  See, e.g., In re Bus. Objects S.A., 2005 U.S. Dist. LEXIS 20215, at *17 (rejecting

10  witness allegations where complaint pled "no more than the job title of the confidential

11  witnesses . . . [and] fail[ed] to provide any other detail regarding his or her job description and

12  responsibilities."); In re Tibco, 2006 U.S. Dist. LEXIS 36666, at *65 ("[D]escriptions of the

13  duties performed by most of the witnesses do not satisfactorily demonstrate that the witnesses

14  would know the information that is ascribed to them."); In re Siebel Sys., Inc. Sec. Litig., No.

15  C 04-0983 CRB, 2005 U.S. Dist. LEXIS 36347, at *27 (N.D. Cal. Dec. 28, 2005) ("Source

16  10, a former credit department employee, claims that on the last day of the fourth quarter

17  2001, Siebel executives held a conference call to decide which deals to close and which to

18  hold. . . . [T]here is not a single allegation as to how Source 10 'recalls' such information. The

19  inference drawn from the SAC is that Source 10 was not a participant in the meeting (as

20  Source 10 was a credit department employee, not an executive)."), aff'd sub nom., Wollrab v.

21  Siebel Sys., Inc., 261 F. App'x 60 (9th Cir. 2007); Karpov v. Insight Enters., Inc., No. CV 09-

22  856-PHX-SRB, 2010 U.S. Dist. LEXIS 128621, at *18-20 (D. Ariz. Nov. 16, 2010)

23  (allegations from confidential witnesses who worked in sales, collections, customer service

24  and IT were not reliable on the subject of defendant's accounting for aged trade credits), aff'd,

25  No. 10-17841, 2012 U.S. App. LEXIS 4632 (9th Cir. Mar. 2, 2012).

26

27

28

### B.     Statements Regarding Immigration Compliance Do Not Give Rise To Liability Under The Securities Laws

#### 1.     The FAC Fails To Allege That Defendants Knowingly Misled Investors Regarding Their Efforts To Comply With Immigration Laws

In dismissing the CAC for failure to plead scienter with respect to statements on the Company's immigration compliance efforts, the Court made the following findings:

- "Plaintiffs do not allege facts that demonstrate defendants had actual, contemporaneous knowledge that <u>American Apparel itself</u> – not the garment industry in general, or other companies in the industry – had employed undocumented or illegal workers." (Order at 53.)

- "The [CAC] alleges that Charney spent '50 hours a week' at the factory, and that defendants' offices were located in the same building as the manufacturing plant. Charney described the 1,500 terminated employees as 'part of our family for nearly 10 years.' These allegations are thin reeds upon which to construct an inference of scienter. Missing from the complaint are facts indicating that Charney was in possession of concrete knowledge that would have led him to conclude that a substantial portion of American Apparel's workers were undocumented." (Order at 54.)

Plaintiff purports to address these deficiencies by "includ[ing] well-pled allegations from numerous former American Apparel employees that 'American Apparel hired undocumented workers regularly and did not require employees to provide proper employment documentation.'" (Opp'n at 13 (citation omitted).) The new FAC allegations are unavailing. <u>First</u>, as detailed above and in Appendix A, Plaintiff fails to plead the basis of knowledge for several of the witnesses upon which he relies, namely CW1 (former Customer Service Supervisor), CW5 (former Resource Assignor in Production and Planning), and CW6 (former Bundling employee). The FAC contains no description of the witnesses' job responsibilities, or how persons who occupy their positions could purport to know about the Company's hiring practices. Rather, the CWs simply claim that it was "'common knowledge' internally at the Company that American Apparel employed undocumented workers." (Opp'n at 2.) Confidential witness accounts of supposed "common knowledge," however, are roundly rejected by courts. <u>See, e.g.</u>, <u>In re Tibco</u>, 2006 U.S. Dist. LEXIS 36666, at *52 (insufficiency of allegations that problems leading to earnings shortfall were "known internally" are "readily apparent; Plaintiffs utterly fail to provide information showing who specifically knew the

8

information, how they knew it, what information was known, and when it was known."); In re Dot Hill, 594 F. Supp. 2d at 1163 ("Some of the confidential witness allegations seem to come from sources of questionable reliability, e.g., 'hallway conversations' and vague claims of common knowledge. In these instances, plaintiffs do not give the Court the necessary information to 'be able to tell whether a confidential witness is speaking from personal knowledge or merely regurgitating gossip and innuendo.'") (citations omitted); In re Juniper Networks, Inc. Sec. Litig., No. C 02-0749 SI, 2004 U.S. Dist. LEXIS 4025, at *8 (N.D. Cal. Mar. 10, 2004) (assertions of "common knowledge" do not raise a strong inference of scienter), aff'd, 158 F. App'x 899 (9th Cir. 2005).

Second, with respect to the two employees who arguably had some involvement in reviewing employment eligibility documentation in connection with the hiring process and the ICE audit – CW9 (no title given) and CW10 (an Executive Assistant) (FAC ¶¶ 92-100) – neither professes to know anything about Defendants' awareness of immigration compliance issues. See Zucco, 552 F.3d at 995 (statements "which are reported by confidential witnesses with sufficient reliability and personal knowledge must themselves be indicative of scienter.") (emphasis added); In re Tibco, 2006 U.S. Dist. LEXIS 36666, at *51 (confidential witnesses must provide "information that would suggest that Defendants either knew that the false statements being made were false when made or that they were acting in a deliberately reckless manner."); Karpov, 2010 U.S. Dist. LEXIS 128621, at *23 (no scienter where "even those CW allegations that indicated that some of the individuals had personal knowledge of the ways in which [defendant company] handled trade credits . . . do not demonstrate that the CWs had personal knowledge of the individual Defendants' mental state.") (emphasis added).

Instead, Plaintiff encourages the Court to infer that Defendants must have known what CW9 and CW10 allegedly discovered in reviewing applications and in preparing for the ICE audit, i.e., that Forms I-9 were incorrectly completed or not supported by proper documentation. (FAC ¶¶ 94, 97, 99, 100.) Plaintiff attempts to accomplish this sleight-of-hand by alleging that CW9 and CW10 reported to individuals who, in turn, reported to

9

1   Defendants.  (See FAC ¶ 93 ("While Moreno instructed CW9 in the preparation for the I-9
2   audit, CW9 believed Moreno received directions from or conferred with . . . Charney
3   regarding the audit.") (emphasis added); id. ¶ 108 ("Moreno and Bailey – both direct reports
4   to the Individual Defendants – were updated on the progress of the review and the reviewers'
5   findings.").)  Tellingly, however, the Opposition makes no effort to distinguish authority that
6   "[t]he mere fact that someone reported to another who reported to [the defendant] does not
7   raise a strong inference that [the defendant] knew of or participated in the fraudulent
8   practice. . . ."  In re Syncor Int'l Corp. Sec. Litig., 327 F. Supp. 2d 1149, 1160 (C.D. Cal. July
9   6, 2004); see also Wozniak, 2012 U.S. Dist. LEXIS 13425, at *35 (CW9's speculation about
10  what was conveyed at meetings he did not attend, and about [CEO's] receipt of unspecified
11  "updates" CW9 did not see, does not establish a strong inference of scienter.); In re
12  Metawave, 298 F. Supp. 2d at 1083 (rejecting suggestion that CFO must have known about
13  discussions between company controller, who reported directly to CFO, and confidential
14  witness).[3]

15        Additionally, Plaintiff claims that "[t]hat the Company rehired terminated workers
16  known to be undocumented is a strong indicia of scienter."  (Opp'n at 13.)  But, here again,
17  allegations regarding rehired employees are supplied by "confidential witnesses [who] were
18  simply not positioned to know the information alleged [or] allege conclusory assertions of
19  scienter."  Zucco, 552 F.3d at 996.   For example, the FAC alleges that "[a]ccording to CW4,
20  manufacturing employees who were dismissed after failing to produce ICE documentation
21  were later rehired by American Apparel under different names."  (FAC ¶ 84.)  Plaintiff
22  provides no explanation for how CW4, a Production Scheduler who "extracted information

23

24  [3]    Incredibly, the Opposition, citing paragraph 94 of the FAC, claims that "Charney was
25  updated regularly through the Company's I-9 review process."  (Opp'n at 13.)  Paragraph 94,
    however, says no such thing.  Rather, Plaintiff alleges that "[a]ccording to CW9, Moreno and
26  Bailey would have been updating Charney regularly through the Company's I-9 review
    process." (FAC ¶ 94 (emphasis added).)   The Court should not countenance Plaintiff's
27  attempt to transform CW9's rank speculation into an affirmative fact that Charney was
    involved in the ICE audit.

28

from American Apparel's AX system, and incorporated the information into Microsoft Excel spreadsheets in order to determine which products/styles were needed" (id.), would know that manufacturing employees were rehired after the inspection and under what circumstances. CW11's statement is even more deficient.  CW11, a quality assurance employee, "believed that employees who were laid off as a result of the inspection may have been rehired." (Id. ¶ 102 (emphasis added).)  Not only does the witness fail to assert positively that workers were rehired, CW11 rests his/her belief on the vague  observation "there were instances when CW11 noticed employees, whom he/she had not seen for a period of time, suddenly reappear at the Company." (Id.)   Finally, CW5 alleges that a "cutting floor employee . . . returned to the Company following the investigation with a different last name" (id. ¶ 85), and CW6 alleges that his/her manager was terminated as a result of the ICE inspection but, one month after he was terminated, the manager was rehired." (Id. ¶ 87.)  The glaring flaw in both accounts is that neither witness claims that the two employees were later rehired without proper documentation.  Further, and most crucially, all four witnesses say nothing about Defendants' knowledge of the purported rehirings.[4]

Lastly, Plaintiff suggests that scienter should be inferred from the "magnitude and duration of Defendants' immigration violations." (Opp'n at 15.)  While the Court previously found that "[g]iven the extent of the company's non-compliance, . . . it is a plausible inference that there were significant compliance problems at the times the statements were made" (Order at 39), the Court also held that "[d]emonstrating that defendants made the statements intentionally or were deliberately reckless in making them is another [matter]." (Id. at 52.)  Plaintiff's new confidential witness allegations, which fail to illuminate Defendants'

---

[4]    Plaintiff attempts to impute such knowledge by claiming that "ICE [found] that the Company had illegally rehired some of the terminated workers." (Opp'n at 8-9.)  Specifically, the FAC alleges that "[a]fter the terminations, ICE determined that the Company had actually **rehired** some of the terminated workers.  On July 2, 2010, an ICE special agent conducted another review of the Company to determine if there were any employees who had been listed on the 'Notice of Suspect Documents' who were still working at the Company." (FAC ¶ 32.)  Plaintiff curiously fails to mention the conclusions of this purported inspection, or when and to whom they were reported.

REPLY TO OPP'N TO MOTION TO DISMISS FAC

1  knowledge of the Company's hiring practices, do not change the equation.  Plaintiff's cited

2  authority does not counsel a different result.  Unlike here, in each case, plaintiffs alleged

3  specific acts of malfeasance that were known to or perpetrated by defendants.  See N.Y. City

4  Emps.' Ret. Sys. v. Berry, 616 F. Supp. 2d 987, 1001 (N.D. Cal. 2009) (in stock option

5  backdating case, defendant "oversaw the granting of backdated options"); In re UTStarcom

6  Inc. Sec. Litig., 617 F. Supp. 2d 964, 972 (N.D. Cal. 2009) (plaintiff adequately pled that

7  "Defendants were aware of . . . adverse circumstances [e.g., "declining demand, declining

8  margins, operational difficulties, increased costs, and internal control problems"] at the time

9  they made the statements."); In re Countrywide Fin. Corp. Sec. Litig., 588 F. Supp. 2d 1132,

10  1194 n.77 (C.D. Cal. 2008) (confidential witnesses reported that defendant "led the charge to

11  abandon sound underwriting" practices); N.M. State Inv. Council v. Ernst & Young LLP, 641

12  F.3d 1089, 1100 (9th Cir. 2011) (in stock option backdating case, defendant auditor allegedly

13  accepted unsigned minutes and "documentation that could not possibly have been valid").

14  Here, Plaintiff fails to plead any specific, adverse facts regarding the Company's compliance

15  efforts, which were contemporaneously known by Defendants when the disclosures were

16  made.[5]

17

---

18  [5]      In yet another attempt to substitute vague allusions for particularized facts, the Opposition asserts that "the Company virtually ignores the FAC's key allegation that

19  Defendants knew about the impeding I-9 audit at least two months **before** American Apparel was formally served with the Inspection Notice. . . . These allegations raise an inference of

20  scienter because they demonstrate what Defendants knew and when."  (Opp'n at 11 (citations omitted).)  But the FAC does not allege who had advance knowledge of the inquiry; Plaintiff

21  only conclusorily alleges that 'the Company' had notice.  (See FAC ¶ 93 ("According to CW9, the Company learned of the upcoming ICE I-9 audit well in advance of the formal

22  November 29, 2007 Inspection Notice."); id. ¶ 98 ("According to CW10, the Company spent approximately three months preparing employee Forms I-9 for the audit.").)  Moreover,

23  Plaintiff fails to articulate why, if true, advanced notice of the audit demonstrates that Defendants knowingly misled investors about immigration compliance.  Nor can he, since

24  mere notice of an audit or investigation does not constitute a finding of wrongdoing.  See In re Hansen Natural Corp. Sec. Litig., 527 F. Supp. 2d 1142, 1162 (C.D. Cal. 2007) ("'[T]he

25  mere existence of [an] investigation cannot support any inferences of wrongdoing or fraudulent scienter on the part of [a] company or its senior management.'") (citation omitted);

26  In re Maxim Integrated Prods., Inc. Sec. Litig., 639 F. Supp. 2d 1038, 1047 (N.D. Cal. 2009) (An SEC investigation and subpoenas from the U.S. Attorneys Office of the Northern District

27  of California did not reveal the alleged fraud because the disclosures "do not themselves

*(cont'd)*

28

2.    **Plaintiff Fails To Plead Falsity With Respect To The November 2007 Proxy**

Plaintiff renews his claim that the FAC "alleges the falsity of a statement the Order found was not adequately pled – <u>i.e.</u>, '[m]any of American Apparel's workers are documented immigrants authorized to work in the United States.'" (Opp'n at 13 (citations omitted).)   Specifically, Plaintiff asserts that once "Defendants chose to speak on the issue of immigration compliance . . . , they had a duty to do so fully and truthfully, which meant simultaneously disclosing the Inspection Notice to investors." (<u>Id.</u> at 14 (citations omitted).) Plaintiff further asserts that the Company "concede[s]" that the November 2007 proxy was misleading "by disputing the materiality of the Inspection Notice and the I-9 violations the Company had already found by the start of the Class Period." (<u>Id.</u> at 14.)

The Motion, however, contains <u>no</u> discussion of the materiality of the Inspection Notice; rather, the issue is when did a duty to disclose arise.  As Plaintiff concedes, "'10b-5 imposes a duty to disclose material facts that are necessary to make disclosed statements, whether mandatory <u>or volunteered</u>, not misleading.'" (Opp'n at 14 (citation omitted); <u>see also</u> <u>Matrixx Initiatives, Inc. v. Siracusano</u>, 131 S. Ct. 1309, 1321-22 (2011) ("§ 10(b) and Rule 10b-5(b) do not create an affirmative duty to disclose any and all material information. . . . <u>Even with respect to information that a reasonable investor might consider material, companies can control what they have to disclose under these provisions by controlling what they say to the market</u>.") (emphasis added).)  Here, the Company had no duty to disclose the audit at an earlier time because the fact of the audit was not inconsistent with any prior public statements.  <u>See</u> <u>Metzler Inv. GMBH v. Corinthian Colleges, Inc.</u>, 540 F.3d 1049, 1071 (9th Cir. 2008) (no misrepresentation where complaint "does not connect [undisclosed] [Department of Education] or California Attorney General investigations to any false or

---

*(cont'd from previous page)*
indicate anything more than a 'risk' or 'potential' that Defendants engaged in widespread fraudulent conduct.").

REPLY TO OPP'N TO MOTION TO DISMISS FAC

1  misleading statement").[6]   That is, the mere commencement of an audit by ICE did not

2  contradict the Company's statement that "many" of its workers were documented

3  immigrants.[7]   Regarding the "I-9 violations the Company had already found by the start of

4  the Class Period" (Opp'n at 14), the FAC alleges that, during the ICE inspection on January 3,

5  2008, the Company did not furnish Forms I-9 for eight of 3,562 employees.  (See FAC ¶ 23

6  ("According to ICE, the Company represented that, as of January 2, 2008, there were 3,562

7  manufacturing employees at the Company.  However, on January 3, 2008, American Apparel

8  presented only 3,554 Forms I-9 to the ICE agents.").)   Plaintiff does not, and cannot, explain

9  how the allegation that eight forms were missing is at odds with the Company's statement

10 that "many workers" were documented.[8]

11 ## C.   The FAC Fails To Plead Falsity Or Scienter With Respect To Statements Regarding The Impact Of ICE-related Terminations

12     The Opposition contends that "[a]fter disclosing that nearly 2,000 of the Company's

13

14 [6]     Plaintiff's attempt to distinguish Metzler – by observing that "plaintiffs did not connect
the undisclosed government investigations to a false or misleading statement or omission"
15 (Opp'n at 14 n.13) – misses the mark.   The Court found that the failure to disclose the
inquiries was not an actionable omission because defendants had made no prior
16 representations that would lead an investor to believe that defendant company was not under
investigation.  See Metzler, 540 F.3d at 1071 (non-disclosure of inquiries inactionable absent
17 "some affirmative statement or omission by [defendant] that suggested it was not under any
regulatory scrutiny."); see also Wozniak, 2012 U.S. Dist. LEXIS 13425, at *27 ("'To be
18 actionable under the securities laws, an omission must be misleading. . . . [I]n other words it
must affirmatively create an impression of a state of affairs that differs in a material way from
19 the one that actually exists.'") (citation omitted).  The same is true in this case.

20 [7]     Plaintiff further posits that, "[a]t a minimum, Defendants had a duty to disclose the
ICE investigation on January 18, 2008, when Charney made extensive statements to the New
21 York Times regarding American Apparel's 'non-American-born' labor force and support for
immigration reform." (Opp'n at 14.)  The Opposition newly alleges that "at the time he made
22 those statements, Charney knew about the ICE inspection and that numerous fake I-9
documents had been discovered in the Company's files." (Id. at 14.)   However, nowhere in
23 the FAC does Plaintiff allege that Charney was ever made aware of "fake" I-9 documents, or
that he was even informed of the audit.

24 [8]     To be clear, the Company does not suggest that by stating "many workers" were
immigrants authorized to work in the United States, the Company implicitly disclosed that
25 some workers were immigrants lacking proper documentation.  Rather, as the Court has
observed, "[s]tating that 'many' of a company's workers are documented immigrants does
26 not necessarily constitute an admission that the rest of the workers are undocumented; it
could just as easily have been meant to suggest that the remainder of the employees were
27 non-immigrants or U.S. citizens." (Order at 37-38.)

28

1 manufacturing workers would be lost, Defendants misleadingly told investors that the effects

2 of the terminations, if any, would be negligible."[9]  (Opp'n at 17.)  Plaintiff points to no

3 statement by Defendants that any ICE-related lay-offs would have a "negligible" impact on

4 the Company's operations.  To the contrary, the Company's disclosures repeatedly stated that

5 no assurances could be given as to the ultimate effects of the terminations.  (See Jones Decl.

6 Exs. 13 at 57; 14 at 64; 15 at 68.)  As the Court previously found, "the company properly

7 stated in SEC filings that the ultimate effect of the staffing reduction was uncertain, and that

8 the situation was still developing.  The complaint does not allege facts, such as defendants'

9 'contemporaneous receipt of a report with information directly at odds with [the] alleged

10 misrepresentation,' or 'statements by witnesses that they told the actor the true facts before

11 the false statement was made.'"  (Order at 58  (citation omitted); see also In re Impac Mortg.

12 Holdings, Inc. Sec. Litig., 554 F. Supp. 2d 1083, 1099 (C.D. Cal. 2008) (forward-looking

13 statements regarding future events are immunized from liability absent allegations "that the

14 statements were made with actual knowledge of their falsity."); In re Tibco, 2006 U.S. Dist.

15 _____

16 [9]      The number of terminated employees is an ever-moving target.  (Opp'n at 17 ("The FAC alleges that between 1,800 and 2,500 workers were dismissed, abandoned their jobs or

17 quit.").)  Although each of the public statements made by Defendants during the Class Period place the number around 1,800 (see, e.g., FAC ¶¶ 29, 34), the FAC newly alleges that the Company "failed to **also** disclose that over 700 or so other employees simply stopped coming

18 to work as a result of the ongoing I-9 audit."  (FAC ¶ 29; see also id. ¶ 27 ("[W]hen the audit started on January 3, 2008, many of the Company's undocumented workers, fearful of being

19 deported stopped showing up for work and whole sections of the factory went dark.").) Notably, Plaintiff fails to proffer any facts, such as an ICE finding, confidential witness

20 testimony, or documentary evidence, to corroborate the allegation that, in addition to the terminated workers, hundreds of employees simply stopped reporting to work.  See 15 U.S.C.

21 § 78u-4(b)(1)(B) ("[I]f an allegation regarding [a] statement or omission is made on information and belief, [plaintiff must] state with particularity all facts on which that belief is

22 formed."); Metzler, 540 F.3d at 1070 ("A litany of alleged false statements, unaccompanied by the pleading of specific facts indicating why those statements were false, does not meet

23 [the PSLRA].").  Plaintiff attempts to bridge the gap between 1,800 and 2,500 employees by alleging in the Opposition that "[a] Company e-mail to ICE in November 2009 confirms that

24 while 1,800 workers were terminated, others quit or just stopped showing up."  (Opp'n at 17.) However, Plaintiff, no doubt purposefully, mischaracterizes the email, which is described in

25 the FAC as follows: "On November 25, 2009, American Apparel e-mailed ICE, confirming that 'all employees identified in the agency's suspect and discrepancy documents lists have

26 left American Apparel's employment by failing to show up for work, resigning, **or** being terminated, an[d] of course are no longer employed by the company.'").  (FAC ¶ 142

27 (emphasis added) (citation omitted).)

28

1  LEXIS 36666, at *51 ("Plaintiffs must allege facts that overcome Defendants' preferred

2  reasons for the discrepancy in the actual . . . results and the previous statements made by the

3  Company."); Ronconi v. Larkin, 253 F.3d 423, 433 (9th Cir. 2001) (affirming dismissal

4  because "[a]lleging in substance that [defendant] underestimated the difficulties it would face

5  if it fired 300 salespeople does not make out a fraud case."); Patel v. Parnes, 253 F.R.D. 531,

6  560 (C.D. Cal. 2008) (J. Morrow) ("In effect, by arguing that defendants' predictions and

7  forecasts were not low enough, plaintiffs improperly attempt to allege 'fraud by hindsight.'")

8  (citation omitted).)

9      The FAC fares no better.  Plaintiff alleges that between June 2009 and September,

10  Defendants and its spokesperson Peter Schey stated that the impact of any lay-offs would be

11  absorbed by (i) "'current surplus levels of inventory and manufacturing capacity'" (FAC ¶

12  132); (ii) "hir[ing] for a fraction of those employees that would be terminated" (id. ¶ 34

13  (emphasis omitted)); (iii) that "increasing the days per week of our employees on the selling

14  floor" (id. ¶ 140); and (iv) "'the slow economy and high preexisting inventory levels.'"[10] (Id.

15  ¶ 142 (citation omitted).)  The FAC, like the CAC, is void of facts demonstrating that these

16  statements were either false or made with knowledge of falsity.[11]

---

17  [10]     The Opposition also contends that Defendant Kowalewski's comments during a
    November 2009 earnings call contained "then-existing facts" that Defendants knew to be
18  false.  (Opp'n at 19.)  Plaintiff cherry-picks Kowalewski's comments to falsify an impression
    that he represented that the terminations had not had an impact on operations.  (Id. at 18
19  ("[A]s late as November 2009, Defendants continued to maintain that 'on a year over year
    basis the efficiency in labor is probably pretty comparable.'")  However, as detailed in the
20  Motion at page 24, n.14, Kowalewski was comparing two periods exhibiting increased labor
    costs.
21
    [11]     Plaintiff also argues that scienter may be inferred from the "'temporal proximity' of the
22  misleading statement and the subsequent disclosure. . . .  (Opp'n at 19 n.20.)  However,
    proximity between disclosures "in and of itself, is insufficient" to evidence scienter.  See
23  Ronconi, 253 F.3d at 437 (Since "none of the plaintiff's other allegations are sufficiently
    specific, we now conclude that the five week period between the optimistic statements and
24  the below-expectation earnings report is not enough to sustain the complaint."); In re Foundry
    Networks, Inc. Sec. Litig., Master File No. C-00-4823-MMC, 2003 U.S. Dist. LEXIS 18200,
25  at *42 (N.D. Cal. Aug. 29, 2003) (two month interval between disclosures "alone is not
    sufficient to satisfy the requirements of the PSLRA").  Berson v. Applied Signal Technology,
26  Inc., 527 F.3d 982 (9th Cir. 2008), is distinguishable.  There, defendant disclosed that work
    on a project was halted just two weeks after reporting that the project was part of its
27  "backlog," i.e., work the company was contracted to do but had not yet performed.  Berson,

                                                                                    *(cont'd)*

28                                              16

1.   **Internal Reports Do Not Establish That Defendants Misled Investors About The Impact Of Lay-Offs**

Plaintiff alleges that after the terminations were completed, Defendants "blamed the Company's financial woes on a <u>lack</u> of inventory." (Opp'n at 20.)  Plaintiff further suggests that Defendants had contemporaneous knowledge of deficiencies in inventory because they had access to inventory reports.  (<u>See id.</u> (lack of inventory "did not come as an eleventh-hour surprise because Defendants used AX to carefully monitor inventory at the Company.").)  As an initial matter, the FAC alleges that inventory were generally <u>available</u>.   (<u>See, e.g.</u>, FAC ¶ 58 ("[I]n March 2009, Defendants boasted about the Company's systems saying 'we get <u>daily</u> inventories at this point.  The whole creative team has access to inventory turns by color, by fabric style.'") (citation omitted); <u>id.</u> ¶ 79 ("According to CW2, the Company tracked purchasing, production, cost of goods sold, inventory, sales and accounts payable through its ERP system, Microsoft Dynamics AX ('AX')."); <u>id.</u> ¶ 90 ("CW8 believed the Company's inventory tracking system modules communicated well together, thus enabling American Apparel to monitor exactly what type of inventory it had on hand."); <u>id.</u> ¶ 91 ("The accounting department also generated and distributed a daily report that listed the Company's inventory, raw materials, sales and expenses for the previous day.  The daily accounting report was circulated to the same distribution list as the daily sales report, which included both Charney and Kowalewski.").)  Notably, Plaintiff fails to plead that Defendants actually "used AX" or <u>reviewed</u> inventory reports.  <u>See</u> <u>Meztler</u>, 540 F.3d at 1067-68 (rejecting allegation that "because [company] had in place a 'management information system' that monitored enrollment and other data company-wide, its principals must have had knowledge of the alleged fraudulent practices.") (citation omitted).

_____

*(cont'd from previous page)*
527 F.3d at 984, 988 n.5.  The court found that the proximity of disclosures bolstered an inference of scienter where it was implausible that defendants would not have known about the stop-work order given that it pertained to the "company's largest contract with one of its most important customers."  <u>Id.</u> at 988 n.5.

Moreover, had they been included in the FAC, allegations that Defendants reviewed inventory reports would still not be dispositive. Plaintiff must allege what the reports stated in order to establish that the data was inconsistent with Defendants' public statements. See In re Autodesk, Inc. Sec. Litig., 132 F. Supp. 2d 833, 844 (N.D. Cal. 2000) (allegations that defendants had knowledge due to their "hands on" positions at the company and the existence of internal reports – without specific allegations of the contents of the reports or how the contents contradicted defendants' public statements – were insufficient to raise a strong inference of scienter); Lipton v. Pathogenesis Corp., 284 F.3d 1027, 1036 (9th Cir. 2002) (conclusory allegations that "defendants had access to internal data demonstrating a decline in sales" insufficient to demonstrate scienter); In re Silicon Graphics, 183 F.3d at 984-85 n.14 (allegations that corporate officers reviewed daily reports containing manufacturing, sales and financial data insufficient to show scienter). Plaintiff seeks to amend the FAC with the Opposition, claiming that the FAC "details . . . the specific contents of the reports that demonstrated that . . . inventory w[as] decreasing. (Opp'n at 20 n.21.) But the Court will search the FAC in vain for a single allegation indicating that AX or the daily accounting report reflected that "inventory [was] decreasing."[12]

## 2. CW Allegations Regarding Costs And Worker Productivity Do Not Support Plaintiff's Claims Of Falsity Or Scienter

The Opposition claims that "Defendants knew . . . that even before the forced terminations started in 3Q09, the ICE audit itself had severely disrupted the Company's

---

[12] The cases cited in the Opposition highlight the insufficiency of Plaintiff's allegations. (Opp'n at 20 n.22.) See Nursing Home Pension Fund Local 144 v. Oracle Corp., 380 F.3d 1226, 1234 (9th Cir. 2004) (CEO monitored database, which reflected improper revenue recognition); In re NorthPoint Commc'ns Grp., Inc. Sec. Litig., 221 F. Supp. 2d 1090, 1104 (N.D. Cal. 2002) (testimony of 18 confidential witnesses laid "proper factual foundation" that certain transactions were accounted for improperly and that transactions fell "neatly within [defendants'] presumptive bailiwicks"); In re Lattice Semiconductor Corp. Sec. Litig., Case No. CV04-1255-AA, 2006 U.S. Dist. LEXIS 262, at *38-39 (D. Or. Jan. 3, 2006) ("For allegations based on the defendants' regular receipt of . . . business reports . . . , plaintiff must provide such 'adequate corroborating details,' as who drafted the reports, who received them, an 'adequate description of their contents,' and from whom the plaintiffs obtained information about them.") (citation omitted).

operations and financial performance." (Opp'n at 3.) This assertion is rooted in confidential witness testimony fraught with problems – namely the witnesses either (i) lack personal knowledge; (ii) do not contradict Defendants' public statements; and/or (iii) do not allege that Defendants were aware of the conditions the witnesses purportedly observed.

For example, CW2, a manufacturing division controller who monitored headcount to determine the impact payroll had on costs (FAC ¶ 80), claims that "[t]he Company's financial records in July or August 2009 reflected that, while payroll was increasing, productivity was low, and sales were not keeping up with the Company's bloated expenses."[13] (Id. (emphasis added).)   But CW2's conclusory allegations of "increased labor costs and . . . slower production" (id.) are not in tension with Defendants' statements – i.e., Defendants did not assure the market that the Company would not hire replacement workers or that new employees would be as productive as their predecessors in the early stages of training.  See In re Tibco, 2006 U.S. Dist. LEXIS 36666, at *70-71 (rejecting confidential witness allegations that failed to contradict executive's public statements).

Furthermore, CW2's allegations of "increased payroll" and "low productivity" in either "July or August" are too vague to support an inference of scienter.  See Wozniak, 2012 U.S. Dist. LEXIS 13425, at *32 (no scienter because "'[a]lthough plaintiff refer[red] to the existence of sales and shipment data and ma[de] a general assertion about what the data showed, plaintiff allege[d] no hard numbers or other specific information.'") (citation omitted); In re Rackable Sys., Inc. Sec. Litig., No. C 09-0222 CW, 2010 U.S. Dist. LEXIS 88927, at *24-25 (N.D. Cal. Aug. 27, 2010) ("The CWs allege general knowledge about inventory shortages and excesses, minimum purchase requirements, ERP implementation problems and sales tax issues.  However, the CWs do not provide the level of particularity from which to infer that Rackable knew that it would miss its gross margin and EPS

---

[13]     Later in the FAC, Plaintiff alleges that "CW2 confirms that between June 2009 and September 2009, American Apparel's financial reports showed increased payroll and decreased revenues."  (FAC ¶ 136 (emphasis added).)  Plaintiff's mischaracterization of his own witnesses' statement reveals his propensity for exaggeration.

1   projections or that any statement by Defendants was made with fraudulent intent."); <u>compare</u>

2   <u>Nursing Home</u>, 380 F.3d at 1231 (allegations of internal reports supported strong inference of

3   scienter where plaintiffs "<u>have hard numbers and make specific allegations regarding large</u>

4   <u>portions of Oracle's sales data</u>.") (emphasis added).  Nor does Plaintiff allege that the July or

5   August monthly financials were filtered up the chain of command.  To be sure, <u>the</u>

6   <u>Opposition</u> claims that "Adrian Taylor [CW2's boss] informed Kowalewski of significant

7   variances in the cost increases, decreases in production efficiency and the faltering quality

8   and quantity of the Company's output." (Opp'n at 20.)  However, <u>the FAC</u> states something

9   much different:  "CW2 <u>believes</u> that it was Taylor's <u>responsibility</u> to inform Kowalewski of

10  any significant variances in the divisions' financials."  (FAC ¶ 79 (emphasis added).)  CW2

11  apparently cannot confirm that Kowalewski was made specifically aware of the July or

12  August data.  Accordingly, CW2's vague accounts regarding the July or August financials do

13  not support Plaintiff's assertions of falsity or scienter.

14      Next, CW2, CW3, CW5, and CW11 all claim that the Company was allegedly in a

15  "mad rush to hire replacement workers" who were less efficient than the terminated

16  employees.   (<u>See</u> FAC ¶¶ 134-136.)    <u>First</u>, the job responsibilities of CW3,

17  "Distribution/Returns Supervisor" (<u>id.</u> ¶ 83), and CW5, a "Resource Assignor" (<u>id.</u> ¶ 85), are

18  unknown.  Thus, CW3 and CW5 are not described with sufficient particularity to establish

19  their basis of knowledge regarding hiring and productivity on the factory floor.  <u>See</u> <u>In re Dot</u>

20  <u>Hill</u>, 594 F. Supp. 2d at 1162-63  ("As presently pled, the job descriptions (e.g., 'salesperson,'

21  'marketing employee,' 'buyer') are too vague for the Court to discern whether the

22  confidential witness likely knows what he/she is talking about.").  <u>Second</u>, the witnesses'

23  alleged accounts do not contradict Defendants' statements.  The disclosures make no

24  representations on the rate of hiring or how the addition and training of new workers might

25  affect efficiencies or costs. And while the Company stated on July 1, 2009, that it anticipated

26  that it would only need to hire a "fraction" of the terminated workers (Opp'n at 17), the FAC

27

28

REPLY TO OPP'N TO MOTION TO DISMISS FAC

1   does not allege how many workers were ultimately rehired, or that the figure was not, in fact,

2   some "fraction" of the laid-off employee pool.[14]

3       Third, the Opposition fails to address the fact that the sources do not purport to have

4   "first hand knowledge of what the individual defendants allegedly knew.  None of the sources

5   were in a meeting with defendants or personally overheard a conversation of any of the

6   defendants…." In re Siebel Sys., 2005 U.S. Dist. LEXIS 36347, at *36 (emphasis added)

7   (finding witness statements insufficient to support finding of scienter); see also In re Rackable

8   Sys., 2010 U.S. Dist. LEXIS 88927, at *24 (rejecting confidential witness testimony where

9   witnesses were not alleged "'to have had any interaction or communication with any of the

10   defendants, or to have provided any defendant with information, or to have heard or read any

11   statement by any defendant, that contradicted or even cast doubt on a public statement made

12   during the class period.'") (citation omitted); In re Verifone Holdings, Inc. Sec. Litig., No. C

13   07-6140 MHP, 2011 U.S. Dist. LEXIS 24964, at *46-47 (N.D. Cal. Mar. 7, 2011) (same).

14   Here, the confidential witnesses do not profess to have discussed with or reported their

15   observations to the Individual Defendants.  The Opposition duplicitously claims that

16   "[a]ccording to CW3, Charney was personally aware" that "the replacement workers needed

17   substantial training and were far more inexperienced and inefficient than the terminated

18   _____

19   [14]    CW2 claims that "[t]here was a  mad rush to hire replacement employees starting in

20   June 2009, which resulted in almost double the number of employees in manufacturing positions." (FAC ¶ 80.)  This allegation is woefully vague.  Does CW2 maintain that, after

21   the ICE audit, manufacturing employee head count went from approximately 3,500 employees (id. ¶ 23) to 7,000?  Or does "double the number of employees" refer to twice the

22   number of employees remaining after the terminations, which were not completed until Q4 2009?  Indeed, when did this supposed "doubling" occur?  What is certain is that by

23   Plaintiff's own account, the alleged hiring surge could not have been accomplished in June, so as to render the Company's July 1, 2009 statement false.  That is because Plaintiff

24   simultaneously alleges that the Company experienced great difficulty in finding replacement workers.  (See  FAC ¶ 81 ("According to CW2, American Apparel experienced great

25   difficulty replacing the workers it lost and, by the time CW2 left the Company in June 2010, American Apparel still had not replaced all of the employees that were terminated due to the

26   ICE investigation."; id. ¶ 83 ("According to CW3, American Apparel had difficulty hiring, and never fully replaced, the terminated workers in the returns department.").)  See Zucco,

27   552 F.3d at 999 (discrediting confidential witness statements that conflict with other allegations in complaint).

28

REPLY TO OPP'N TO MOTION TO DISMISS FAC

workers" (Opp'n at 18), but <u>the FAC</u> contains <u>no</u> such allegation.  Rather, Plaintiff alleges that CW3 thought "it was ridiculous for [Charney] to suggest that he did not immediately know about the loss of productivity. . . . " (FAC ¶ 83.)   Allegations that a corporate officer "'had to have known what was going on' . . . are not sufficient to create a strong inference of scienter." <u>Zucco</u>, 552 F.3d at 998.[15]   Accordingly, Plaintiff's attempt to attribute the witnesses' purported knowledge to Defendants must be rejected.

### D.   Deloitte's July 2010 Resignation Does Not Render Defendants' Statements Regarding Internal Controls Actionable

In a strained effort to "connect Deloitte's allegations with the Company's false statements" (Opp'n at 22) regarding aspirations to improve internal control over financial reporting, Plaintiff recasts Deloitte's post-Class Period statements and makes unsupported assertions about the circumstances surrounding the auditor's resignation.  The Court should reject these machinations.

<u>First</u>, Plaintiff baldly states that "Deloitte itself accused the Company's management of fraud." (Opp'n at 22.)  However, Plaintiff points to no statement by Deloitte accusing the Company of knowingly intending to deceive the auditor.  <u>See</u> <u>Gomez v. Wells Fargo Home Mortg.</u>, No. C 11-01725 LB, 2012 U.S. Dist. LEXIS 49746, at *19 n.9 (N.D. Cal. Apr. 9, 2012) ("'[A]ctual fraud is limited to acts committed with the intent to deceive. . . .'") (citations omitted).  Rather, Deloitte stated that "we believe that we requested the February 2010 financial information prior to issuing our reports and that <u>management informed us that such information was not available</u>." (FAC ¶ 54.) As the Court previously observed, these

---

[15]   CW3's assertion that Charney must have known about the alleged productivity issues is akin to the argument that scienter can be inferred from his position as CEO of the Company. (Opp'n 20 at n.22 (inference of scienter "even stronger where . . . Defendants were personally involved in every facet of the Company's operations.").)  The Court previously held that this "core operations" theory supports an inference of scienter "where allegations concerning core operations are accompanied by 'detailed and specific allegations about management's exposure to factual information within the company.'"  (Order at 56-57 n.203 (citation omitted); <u>Wozniak</u>, 2012 U.S. Dist. LEXIS 13425, at *37 (core operations inference rejected where plaintiff "fail[ed] to allege [CEO's] actual exposure to information inconsistent with his statements. . . .").)  Here, Plaintiff fails to offer any particularized allegations of factual information shown to Charney regarding the impact of the terminations.

REPLY TO OPP'N TO MOTION TO DISMISS FAC

1  allegations support an equally plausible inference that management "act[ed] incompetently, in

2  ignorance of applicable financial standards, or in the mistaken belief that the auditor had not

3  asked for specific pieces of information." (Opp'n at 62.)

4      <u>Second</u>, Plaintiff claims that "[w]hile assuring investors that the Company was

5  diligently pursuing a 'conservative' approach to maintaining its internal controls and financial

6  statements, . . . . Defendants were intentionally withholding adverse material information

7  from the Company's auditor." (Opp'n at 22-23.)   It bears noting, however, that investors

8  have always been apprised that there are material weaknesses in the Company's internal

9  controls, which the Company has endeavored to correct. (<u>See, e.g.</u>, Jones Decl. Exs. 4 at 20-

10  22; 10 at 39-44; 18 at 93-95; 20 at 108-13; 23 at 132-37.)  Furthermore, the Opposition does

11  not contest that the adverse information supposedly withheld from Deloitte – "<u>declines in</u>

12  <u>operations and gross margin</u>" (FAC ¶ 169) – was publicly reported as of the time Deloitte

13  signed its audit opinion. (<u>See id.</u> ¶ 145 (on March 25, 2010, "Defendants were forced to

14  admit that the effects of the terminations had been '<u>substantial</u>' and that the 'extended

15  disruption on [the Company's] operations had been <u>unprecedented</u>.'") (emphasis added)

16  (citation omitted); <u>id.</u> ¶ 165 (Deloitte signed off on its audit opinion six days later, on March

17  31, 2010).)  Instead, the Opposition describes a new piece of information allegedly withheld

18  from Deloitte:  citing FAC paragraph 169, Plaintiff claims that Defendants failed to furnish

19  Deloitte with information regarding "a 'significant decrease in . . . projections.'" (Opp'n at

20  23.)   But the disclosure quoted in FAC paragraph 169 states that Deloitte's decision to

21  withdraw its FYE 2009 audit opinion was based upon, <u>inter alia</u>, "the Company's issuance of

22  revised projections in early May 2010 which reflected a significant decrease in the

23  Company's 2010 projections. . . ." (FAC ¶ 169.)  Deloitte did not accuse the Company of

24  withholding its projections. (<u>See</u> Posner Decl. Exs. 3 and 4.)

25      <u>Third</u>, Plaintiff claims that if the February financials were disclosed, Defendant "would

26  have required a revision to the 2009 Form 10-K." (Opp'n at 23.)   Plaintiff fails to

27  substantiate this allegation with any statement by Deloitte, confidential witness account, or

28

REPLY TO OPP'N TO MOTION TO DISMISS FAC

documentary evidence.  The Opposition cites FAC paragraph 169, which states that Deloitte and the Company disagreed over the "Company's conclusion that the results shown in the February 2010 monthly financial statements would not have <u>required a revision to the Company's projections</u> as of the date of the 10-K filing and in the issuance of Deloitte's reports."  (FAC  ¶ 169 (emphasis added).)   There is no suggestion in the disclosures by Deloitte and the Company that the auditor claimed it would have required a revision to the financials.  (<u>See</u> Posner Decl. Exs. 3 and 4.)   Plaintiff's disingenuous characterization of the record is only further illustrated by the fact that American Apparel has never restated its FYE 2009 financials, even after the Company's new accounting firm re-audited those financial statements.  (<u>See</u> Jones Decl. Ex. 24.)

## III.   **CONCLUSION**

For the foregoing reasons, the Court should dismiss the FAC.


DATED:  May 7, 2012            SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP


By: _____/s/Harriet S. Posner_____
Harriet S. Posner
Attorneys for Defendant
American Apparel, Inc.

REPLY TO OPP'N TO MOTION TO DISMISS FAC

**Appendix A**

| CW /Title | Responsibilities | Allegations |
|---|---|---|
| 1 – Customer Service Representative; Customer Service Supervisor (FAC ¶ 78.) | Not described. | "American Apparel hired undocumented workers regularly and did not require employees to provide proper employment documentation." (FAC ¶ 78.) "[L]earned in late 2008 that the Company was close to filing for bankruptcy." (FAC ¶ 157.) |
| 3 – Distribution/Returns Supervisor (FAC ¶ 83.) | Not described. | "The workers hired to replace the skilled undocumented employees, in addition to requiring training, were generally slower than the undocumented workers."  (FAC ¶ 83.) |
| 4 – Production Scheduler (FAC ¶ 84.) | Extracted information from AA's AX system to determine what styles were needed.  (FAC ¶ 84.) | "Manufacturing employees who were dismissed after failing to produce ICE documentation were later rehired by American Apparel under different names." (FAC ¶ 84.) |
| 5 – Resource Assignor (FAC ¶ 85.) | Not described. | "[I]t was common knowledge within the Company that American Apparel employed undocumented workers. American Apparel's Human Resources Department coached job applicants who did not have proper work documentation on what they needed to produce to get hired by the Company." (FAC ¶ 85.) "A cutting floor employee who stopped working for American Apparel during the ICE investigation in 2009 returned to the Company following the investigation with a different last name."  (FAC ¶ 85.) "The workforce reduction . . . negatively affected production because the employees hired to replace the undocumented workers were inexperienced and could not perform their jobs as efficiently."  (FAC ¶ 86.) |
| 6 – Bundling employee | Not described. | "[T]he majority of |

1
REPLY TO OPP'N TO MOTION TO DISMISS FAC

| (FAC ¶ 87.) | | manufacturing personnel employed at American Apparel lacked the necessary papers to legally work at the Company. CW6 knew this because he/she spoke to employees in CW6's department who did not have proper documentation." (FAC ¶ 87.) |
|---|---|---|
| 8 – Logistics Manager | Involved in movement of inventory from warehouse to retail stores.  Managed sale or merchandise to international subsidiaries and retrieved sales information for report that broke down sales by subsidiary.  (FAC ¶¶ 89-90.) | "[T]he retail operations compiled and circulated a daily sales report every morning, which provided the previous day's sales broken down by retail store . . . . [T]he daily sales report was e-mailed to a large distribution list, which included Charney [and] Kowalewski. . . . The accounting department also generated and distributed a daily report that listed the Company's inventory, raw materials, sales and expenses, for the previous day.  The daily accounting report was circulated to the same distribution list as the daily sales report. . . ."  (FAC ¶ 91.) |
| 11 – Quality Assurance employee (FAC ¶ 101.) | Responsible for conducting quality control inspections of the cutting floor and quality assurance lab.  (FAC ¶ 101.) | "[B]elieved that employees who were laid off as a result of the inspection may have been rehired."  (FAC ¶ 102.) |
| 12 – Contract Cost Accountant (FAC ¶ 103.) | Not described. | "American Apparel was not properly tracking its manufacturing costs for 20 to 30 per cent of its items and, as a result, was underreporting costs."  (FAC ¶ 103.) |

2

REPLY TO OPP'N TO MOTION TO DISMISS FAC