1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
HARRIET S. POSNER (Bar No. 116097)
harriet.posner@skadden.com
PETER B. MORRISON (Bar No. 230148)
peter.morrison@skadden.com
ALLISON B. HOLCOMBE (Bar No. 268198)
allison.holcombe@skadden.com
300 South Grand Avenue
Los Angeles, California 90071-3144
Telephone:   (213) 687-5000
Facsimile:    (213) 687-5600

Attorneys for Defendant
American Apparel, Inc.

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE AMERICAN APPAREL, INC. SHAREHOLDER LITIGATION<br><br>This Document Relates To:<br><br>ALL ACTIONS | Case No. CV-10-6352 MMM (JCGx)<br><br>(1)  DEFENDANT AMERICAN APPAREL, INC.'S NOTICE OF MOTION AND MOTION TO DISMISS SECOND AMENDED CLASS ACTION COMPLAINT;<br><br>(2)  MEMORANDUM OF POINTS AND AUTHORITIES;<br><br>(3)  [PROPOSED] ORDER GRANTING MOTION TO DISMISS (separate cover);<br><br>(4)  REQUEST FOR JUDICIAL NOTICE (separate cover);<br><br>(5)  DECLARATION OF ALLISON B. HOLCOMBE (separate cover); and<br><br>(6)  [PROPOSED] ORDER GRANTING REQUEST FOR JUDICIAL NOTICE (separate cover).<br><br>Date:  June 3, 2013<br>Time:  10:00 a.m.<br>Courtroom:  780<br><br>Hon. Margaret M. Morrow<br>Complaint Filed:  April 29, 2011<br>Trial Date:  TBD |

**TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:**

**PLEASE TAKE NOTICE** that on June 3, 2013, at 10:00 a.m., or as soon thereafter as the matter may be heard, in Courtroom 780 of the above-referenced court, before the Honorable Margaret M. Morrow, Defendant American Apparel, Inc. will, and hereby does move this Court, pursuant to Federal Rule of Civil Procedure 12(b)(6), for an order dismissing the Second Amended Class Action Complaint filed in the above-captioned action.  This Motion is made following the conference of counsel pursuant to C.D. Cal. R. 7-3, which took place on March 11, 2013.

The Motion will be based on this Notice, the Memorandum of Points and Authorities attached hereto, Request for Judicial Notice, Declaration of Allison B. Holcombe, all of the pleadings, records and files in this action, all matters of which this Court may take judicial notice, and such other documents and argument as may be presented on or prior to the date set for decision.

DATED:  March 15, 2013        SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP


By: _____/s/ Harriet S. Posner_____
                        Harriet S. Posner
                     Attorneys for Defendant
                     American Apparel, Inc.

1

## **<u>TABLE OF CONTENTS</u>**

2

3    PRELIMINARY STATEMENT ......................................................................... 1

4    FACTUAL BACKGROUND ............................................................................ 3

5        I. Defendants' Disclosures Regarding Immigration And Customs Enforcement
            Investigation ............................................................................................ 3
6
        II.    Defendants' Disclosures Regarding Internal Control Over Financial
7              Reporting ........................................................................................... 4

8    ARGUMENT ................................................................................................. 5

9        I. The SAC Fails To Satisfy The PSLRA's Stringent Requirements For Pleading
            Scienter ................................................................................................. 5
10
            A.    Plaintiff Fails To Allege That Disclosures Regarding Effects Of
11                Terminations Were Knowingly False ................................................ 6

12               1.    Allegations Of Disruption Of Vertically-Integrated
                        Operations ............................................................................. 8
13
                 2.    Allegations About Knowledge Of Lack Of "Proper
14                      Inventory" ........................................................................ 10

15               3.    Allegations About Knowledge Of Effects Of Turnover ....... 11

16               4.    Access To Reports And Financial Information ................... 12

17               5.    Allegations Regarding Change to Quarterly Disclosure
                        of Comparable Store Sales ................................................ 15
18
            B.    Plaintiff Fails To Plead That Defendants Intentionally Misled
19                Investors Regarding Internal Controls ............................................ 16

20               1.    Allegations Regarding Alleged Breach Of Debt
                        Covenants ......................................................................... 17
21
                 2.    Allegations That The Company Withheld Negative
22                      Financial Results And Projections From Deloitte In
                        1Q10 .................................................................................. 19
23
                 3.    Additional Allegations Related To Internal Controls ........... 21
24
        II.    The SAC Fails To Correct The Deficiencies Of The Falsity Allegations In
25             Plaintiff's Two Prior Complaints ................................................................. 23

26          A.    American Apparel's Disclosures Regarding The Potential Effects Of
                  The ICE Investigation Were Not Misleading ................................... 23
27
            B.    The SAC Fails To Plead That Statements About Internal Controls
28                Were False ..................................................................................... 25

MOTION TO DISMISS SAC

CONCLUSION ........................................................................................... 25

MOTION TO DISMISS SAC

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

In re Adaptive Broadband Securities Litigation,
  No. C 01-1092 SC,
  2002 U.S. Dist. LEXIS 5887 (N.D. Cal. Apr. 2, 2002)................................21

Applestein v. Medivation, Inc.,
  861 F. Supp. 2d 1030 (N.D. Cal. 2012).....................................................9, 22

In re Autodesk, Inc. Securities Litigation,
  132 F. Supp. 2d 833 (N.D. Cal. 2000)...........................................................13

Brodsky v. Yahoo! Inc.,
  630 F. Supp. 2d 1104 (N.D. Cal. 2009)..........................................................22

In re Cornerstone Propane Partners, L.P. Securities Litigation,
  355 F. Supp. 2d 1069 (N.D. Cal. 2005).........................................................21

Destfino v. Reiswig,
  630 F.3d 952 (9th Cir. 2011) ..........................................................................2

In re Downey Securities Litigation,
  No. CV 08-3261-JFW (RZx),
  2009 WL 2767670 (C.D. Cal. Aug. 21, 2009) ........................................24, 25

Greenberg v. Cooper Cos., Inc.,
  No. 11-CV-05697YGR,
  2013 WL 100206 (N.D. Cal. Jan. 7, 2013)....................................................10

In re Immersion Corp. Securities Litigation,
  No. C 09-4073 MMC,
  2011 U.S. Dist. LEXIS 145160 (N.D. Cal. Dec. 16, 2011) ....................21, 22

In re Impac Mortgage Holdings, Inc. Securities Litigation,
  554 F. Supp. 2d 1083 (C.D. Cal. 2008).........................................................25

In re Juniper Networks, Inc.,
  158 Fed. App'x 899 (9th Cir. 2005)...............................................................12

Lipton v. Pathogenesis Corp.,
  284 F.3d 1027 (9th Cir. 2002) .................................................................13, 14

In re McKesson HBOC, Inc. Securities Litigation,
  126 F. Supp. 2d 1248 (N.D. Cal. 2000).........................................................21

Metzler Investment GMBH v. Corinthian Colleges, Inc.,
  540 F.3d 1049 (9th Cir. 2008) ..................................................................7, 18

In re Netflix, Inc. Securities Litigation,
  No. C 04-2978 FMS,
  2005 U.S. Dist. LEXIS 18765 (N.D. Cal. Jun. 28, 2005) .............................25

In re Northpoint Commcunications Group, Inc., Securities Litigation,
      184 F. Supp. 2d 991 (N.D. Cal 2001)...........................................................8

In re Oracle Corp. Securities Litigation,
      627 F.3d 376 (9th Cir. 2010) ........................................................................18

In re PETsMART, Inc. Securities Litigation,
      61 F. Supp. 2d 982 (D. Ariz. 1999) .............................................................24

Plichta v. Sunpower Corp.,
      790 F. Supp. 2d 1012 (N.D. Cal. 2011)..........................................................7

In re Rackable System, Inc. Securities Litigation,
      No. C 09-02222 CW,
      2010 U.S. Dist. LEXIS 88927 (N.D. Cal. Aug. 27, 2010) .........................614

In re Silicon Graphics Securities Litigation,
      183 F.3d 970 (9th Cir. 1999) .......................................................................14

In re Skechers U.S.A., Inc. Securities Litig.,
      273 Fed. App'x 626 (9th Cir. 2008)..............................................................10

In re Splash Tech. Holdings Inc. Securities Litigation,
      160 F. Supp. 2d 1059 (N.D. Cal. 2001)....................................................2, 11

In re Tibco Software Inc. Securities Litigation,
      Master File No. C 05-2146 SBA,
      2006 U.S. Dist. LEXIS 36666 (N.D. Cal. May 25, 2006).......................9, 24

Tripp v. Indymac Finance Inc.,
      No. CV07-1635-GW(VBKx),
      2007 WL 4591930 (C.D. Cal. Nov. 29, 2007) .............................................13

In re Wet Seal, Inc. Securities Litigation,
      518 F. Supp. 2d 1148 (C.D. Cal. 2007) ........................................................25

Wozniak v. Align Technogies, Inc.,
      850 F. Supp. 2d 1029 (N.D. Cal. 2012)........................................................14

Zucco Partners, LLC v. Digimarc Corp.,
      552 F.3d 981 (9th Cir. 2009) ..................................................................passim

## **PRELIMINARY STATEMENT**

The current complaint is Plaintiff's third attempt to plead a violation of securities laws based on alleged misrepresentations by Defendants which, from the beginning, the Court has found were not "supported by sufficient facts" and failed to "give rise to a 'strong inference' of scienter . . . ." (1/13/2012 Order dismissing Class Action Complaint (ECF No. 105) ("CAC Order" at 64-65).) Plaintiff continues to allege that Defendants made knowingly false statements in their attempt to predict how operations and profits would be affected by the lay-off of 1,500 manufacturing employees as the result of an Immigration and Customs Enforcement ("ICE") investigation. (Second Amended Class Action Complaint (ECF No. 144) ("SAC") ¶¶ 20-24.) Plaintiff also repeats allegations that Defendants' statements that the Company was "looking to build a world class financial team" and "to pursue a strict corporate orthodoxy as far as financial accounting issues" were intentionally misleading. (SAC ¶¶ 184, 188.)

The Court has informed the Plaintiff that this third attempt "would be [his] last opportunity to cure any defects in the pleading." (1/16/2013 Order dismissing First Amended Complaint (ECF No. 142) ("FAC Order") at 70.) The Court's last order also contained a road map towards an adequate complaint by pointing out specific ways in which the pleadings could be corrected. For example, the Court stated that the previous complaint was "devoid of any factual allegations suggesting that when [Defendants made the alleged misrepresentations] . . . they knew or deliberately or recklessly disregarded the fact that the statements were false." (Id. at 58-9.) The Court also noted that in both of Plaintiff's prior complaints, the claims related to financial controls lacked "detail[s of] the inaccuracies in the financial statements, the types of information defendants purportedly withheld, and the knowledge or participation of individual defendants in the decision to withhold the information . . . ." (Id. at 65.) However, Plaintiff has declined to follow the Court's direction and has not added any of the specificity required. Instead, Plaintiff has chosen to add length but not substance to his previous allegations.

1   <u>First</u>, Plaintiff has identified three additional confidential witnesses.  Like the

2   twelve previously identified, these witnesses are not "described with sufficient

3   particularity to establish their reliability and personal knowledge," nor are the facts

4   described by the witnesses "indicative of scienter."  <u>Zucco Partners, LLC v. Digimarc

5   Corp.</u>, 552 F.3d 981, 995 (9th Cir. 2009).  None of these witnesses offer any proof that

6   any of the Defendants knew that the statements at issue were false when made—the

7   same defect in the testimony of the first twelve confidential witnesses.  (FAC Order at

8   54-5.)

9   <u>Second</u>, Plaintiff reorganizes and expands on his previously stated theory of

10   scienter as to the claims regarding the effects of the employee terminations.  Plaintiff's

11   essential theory has not changed, however.  Plaintiff continues to assert that operational

12   and financial issues, which developed <u>after</u> Defendants made their predictions, should

13   mean that the statements were false when made.  This attempt to "plead fraud by

14   hindsight" still does not establish scienter.  <u>In re Splash Tech. Holdings Inc. Sec. Litig.</u>,

15   160 F. Supp. 2d 1059, 1072 (N.D. Cal. 2001) ("[T]he complaint must allege that the

16   'true facts' arose <u>prior</u> to the allegedly misleading statement.  (emphasis added).

17   <u>Third</u>, Plaintiff has added the allegation that American Apparel had an

18   undisclosed breach of a debt covenant with Lion Capital.  Plaintiff makes this claim

19   despite the fact the Lion Capital (or anyone else) has never claimed such a breach

20   occurred.  The only evidence of any breach is Plaintiff's own calculations that use

21   financial measures different than what is defined in the debt covenant with Lion Capital.

22   None of these additions change Plaintiff's twice-denied pleadings into an

23   adequate complaint.  Therefore, American Apparel respectfully requests that Plaintiff's

24   claims regarding the effects of employee terminations and internal financial controls be

25   dismissed with prejudice.  <u>Destfino v. Reiswig</u>, 630 F.3d 952, 958-59 (9th Cir. 2011)

26   ("Plaintiffs had three bites at the apple, and the court acted well within its discretion in

27   disallowing a fourth.");  <u>Zucco Partners LLC</u>, 552 F.3d at 1007 ("[W]here the plaintiff

28   has previously been granted leave to amend and has subsequently failed to add the

requisite particularity to its claims, [t]he district court's discretion to deny leave to amend is particularly broad." (internal quotation marks omitted)).

## **FACTUAL BACKGROUND**

### I.    **Defendants' Disclosures Regarding Immigration And Customs Enforcement Investigation**

Plaintiff's SAC presents the same essential allegations as the First Amended Class Action Complaint ("FAC") (ECF No. 106) and Consolidated Class Action Complaint ("CAC") (ECF No. 66) before it.    Shortly after going public, American Apparel received a notice from ICE requesting an inspection of employee Forms I-9.  (Declaration of Gila D. Jones in Support of American Apparel's Motion to Dismiss FAC ("Jones Decl."), Ex. 4 at 13 (ECF No. 74)[1].)  That notice and the resulting investigation culminated 18 months later (in June 2009) in a second notification that ICE had identified discrepancies in the documentation of about 1,800 employees.  (SAC ¶ 18.)  The June 2009 notice ultimately resulted in approximately 1,500 Company employees being dismissed in the third and fourth quarters of 2009.  (Id.)[2]

In statements issued in June, July, August and September 2009, the Company attempted to estimate how the termination of a significant number of workers, if required in the future, would impact American Apparel's financial results.  (Jones Decl. Ex. 13 at 57; id. Ex. 14 at 63-64; id. Ex. 15 at 68.)  Defendants qualified these disclosures by specifically warning investors that the ultimate outcome of any terminations was not known.   For example, in a July 1, 2009 press release, American Apparel stated "the Company is not able to accurately assess what the resultant impact of the loss of employees would have on its

---

[1] The Court previously took judicial notice of all exhibits to the Jones Decl. referenced in this Motion.  (See CAC Order at 26-31 (ECF No. 105).)

[2] The Court denied American Apparel's motion to dismiss in relation to Plaintiff's claims of alleged misrepresentation of the Company's compliance with immigration laws.  (FAC Order at 46.)  While American Apparel respectfully disagrees that Plaintiff has stated a claim on this issue, it is also cognizant of the Court's instruction in its Order and, therefore, is not re-arguing those points.  Facts related to the immigration compliance allegations are only included for context.

1   operations" and "the ultimate impact on the Company is difficult to predict at this time."

2   (Holcombe Decl., Ex. 9 (7/1/2009 8-K).)   Plaintiff nonetheless insists that Defendants

3   falsely told investors, unequivocally, that the loss of workers "would have little, if any,

4   material impact on the Company . . . ." (SAC ¶ 128.)  The Company said no such thing.

5   On March 25, 2010, when the Company reported preliminary results for the

6   fourth quarter of 2009, it properly disclosed that gross margin had been negatively

7   affected by a "substantial reduction in manufacturing efficiency experienced in the

8   fourth quarter of 2009 at the company's production facilities."  (Id. ¶ 223.)   The

9   Company attributed the decline in efficiency to the "forced termination of over 1,500

10  experienced manufacturing employees in the third and fourth quarters of 2009"

11  following the ICE investigation.  (Id. ¶ 161.)  Notably, the SAC fails to allege 1) that

12  Defendants knew prior to the announcement of lay-offs how the terminations would

13  affect the business; or 2) when after the announcement of the layoffs and prior to March

14  25, 2010, the Company had determined the effects of the lay-offs requiring disclosure.

15  **II.   Defendants' Disclosures Regarding Internal Control Over Financial Reporting**

16

17  For the third time, Plaintiff alleges that statements made in 2008 that American

18  Apparel was "'looking to build a world class financial team,'" "'want[ed] to pursue a strict

19  corporate orthodoxy as far as financial accounting issues,'" and "'expected to demonstrate

20  significant progress in our [remediation] of [deficiencies] by year end [2008]'" were

21  knowingly false.  (SAC ¶ 184, FAC ¶¶ 152, 154 (emphasis omitted).)   In truth, since its

22  inception as a public company, American Apparel identified and publicly disclosed material

23  weaknesses in its internal control over financial reporting in each of the Company's Form

24  10-Ks for fiscal years ended 2007, 2008, 2009 and 2010, as well as in interim quarterly

25  reports.  (See, e.g., Jones Decl. Exs. 4 at 20-22; 10 at 39-44; 18 at 93-95; 20 at 108-13; 23 at

26  132-37.)  The Company has worked diligently to remediate its reported control weaknesses,

27  such that by the end of 2009, all but two had been remediated.  (Id. Ex. 20 at 108-09.)

28  Nevertheless, Plaintiff attempts to prove the Company's aspirational statements false

by repeating inadequate allegations of financial wrongdoing.  For example, on March 16, 2009, American Apparel announced that it had entered in to a Credit Agreement with Lion Capital ("Lion Agreement").  (Holcombe Decl., Ex. 2 at 81 (3/16/2009 8-K).)  Among other things, the Lion Agreement included loan terms for up to $80 million to the Company at the rate of 15% per year.  (Id.)  As a condition of the Lion Agreement, American Apparel was required to keep its ratio of Total Debt to Consolidated EBITDA under a certain limit.  (Id.)  Plaintiff alleges that American Apparel had an undisclosed breach of that limit in March 2010.  (SAC ¶ 198.)  However, the only evidence of this alleged breach is Plaintiff's own calculation that uses a Consolidated Adjusted EBITDA different from the Consolidated EBITDA defined in the agreement with Lion Capital. Moreover, Plaintiff conveniently ignores the Company's multiple prompt and complete disclosures of all covenant renegotiations, waivers, and anticipated breaches of the Lion Capital agreement.

Relying largely on the testimony of a former employee in customer service, Plaintiff also repeats allegations that American Apparel concealed that it was on the verge of bankruptcy in late 2008—allegations that this Court has twice found inadequate under PSLRA pleading requirements.  (SAC ¶¶ 78, 157.)  Plaintiff also renews its claim that the Company did not properly "track[]" its manufacturing costs based on statements made by a contract accountant employed at the Company for four months.  (Id. ¶¶ 92-93.)   As detailed below, Plaintiff fails to sufficiently allege that these witnesses have a foundation to speak to the Company's financial condition and accounting methods.  Their statements, therefore, do not support Plaintiff's theory, and should be disregarded.

## ARGUMENT

## I.    The SAC Fails To Satisfy The PSLRA's Stringent Requirements For Pleading Scienter

Defendants have extensively briefed both the heightened standard for pleading scienter under the PSLRA and the Ninth Circuit's requirements for the use of confidential witness testimony.  (American Apparel's Motion to Dismiss Class Action Complaint (ECF

No. 73) at 8-9; American Apparel's Motion to Dismiss First Amended Complaint (ECF No. 114) at 4-6.)   American Apparel also agrees with the Court's view of these standards as expressed in its prior rulings.   (CAC Order at 24-25, 33-35; FAC Order 20-21, 26-31.) Defendants do not repeat those standards here as not to burden the court with repetitive argument.

### A.   Plaintiff Fails To Allege That Disclosures Regarding Effects Of Terminations Were Knowingly False

Plaintiff seeks to hold American Apparel liable for statements attempting to predict the effects of employee terminations resulting from the ICE investigation on the Company's operations.  (SAC ¶¶ 20-24.)  Plaintiff alleges that the Company misled investors by stating that "the Company does not currently believe that the loss of employees would have a materially adverse impact on its financial results . . . The Company believes that its current surplus levels of inventory and production capacity will mitigate the adverse impact of any disruption . . . ."  (SAC ¶ 20 quoting 6/30/2009 8-K and 7/1/2009 8-K.)  Plaintiff also alleges that similar statements made in August, September and November of 2009 were also misleading.  (SAC ¶¶ 129-32.)

These are the same statements the Court has previously noted "are not suggestive of falsity or scienter."  (FAC Order at 56; CAC Order at 25-26.)  First, each of the statements at issue were couched in cautionary language.  When first announcing the terminations, the Company made clear that it was "not able to accurately assess what the resultant impact of the loss of employees would have on its operations."  (Holcombe Decl., Ex. 8 at 137 (6/30/2009 8-K) and Ex. 9 at 143 (7/1/2009 8-K).)  Again, when asked about the impact of the employee terminations on August 13, 2009, Kowalewski stated "at this point [it is] difficult to estimate."  (SAC ¶ 129.)  Second, the Company's statements were predictions which, as the Court has twice ruled, are not knowingly false simply because they turned out to be incorrect.  "[D]efendants framed their optimistic statements as predictions about the future, while acknowledging that the ultimate effect of the workforce reduction had yet to be felt."  (FAC Order at 56; see CAC Order at 42.)  "'[E]ven reasonable predictions turn out to

be wrong.  Instead, plaintiffs must allege with particularity facts that show the initial prediction was a falsehood.'"  In re Downey Sec. Litig., 2009 WL 2767670, at *13-14 (C.D. Cal. Aug. 21, 2009).

Plaintiff has attempted to prove that the statements of Charney and others were knowingly false by using the testimony of confidential witnesses to describe the operations and financial conditions of the Company that developed after the statements were made and after the terminations had taken place.  (See SAC ¶ 135.)  However, this effort also fails to meet the burden of pleading scienter because "[t]he facts are susceptible" to other, non-fraudulent interpretations.  (FAC Order at 58; Zucco, 552 F.3d at 991 ("A court must compare the malicious and innocent inferences cognizable from the facts pled in the complaint, and only allow the complaint to survive a motion to dismiss if the malicious inference is at least as compelling as any opposing innocent inference.").)

The Court noted that the testimony of Plaintiff's confidential witnesses was unable to establish two key facts still missing in the new complaint:

- "The complaint is devoid of any factual allegations suggesting that when [Defendants] predicted the work force reduction would not impact operations or profits, they knew or deliberately disregarded the fact that the statements were false."  (FAC Order at 58-59.)

- "[T]he complaint does not clearly allege when the full effects of the reduction were evident, how they were made known to the management , or the contents of reports that management reviewed."  (Id. at 58.)

Instead of presenting new, contemporaneous evidence of scienter, Plaintiff has doubled down on his strategy of using inadequate confidential witness testimony to recite a litany of operational and financial conditions that they claim existed after the terminations, but that have no bearing on the speakers' knowledge at the time they made their predictions about financial effects.  Plichta v. Sunpower Corp., 790 F. Supp. 2d 1012, 1021 (N.D. Cal. 2011) (even the requirement to look at a complaint holistically "'cannot transform a series of inadequate allegations into a viable inference of scienter.'") (citation omitted); Metzler Inv. GMBH v. Corinthian Colleges, Inc., 540 F.3d 1049, 1072 (9th Cir.

2008) (granting motion to dismiss where "the sheer volume of alleged false statements and claims supporting scienter do not overcome the lack of specificity that the PSLRA requires").

### 1. Allegations Of Disruption Of Vertically-Integrated Operations

Plaintiff attempts to prove scienter through confidential witness testimony and baseless statements regarding the Company's operations after the employee terminations. (SAC ¶¶ 136-39 (alleging "the Company's apparel defect rate rose from 2-3% to around 8%," "the Company was no longer quickly responding to changing trends and customer demands, " and "replacement workers . . . were only producing half as much as the terminated employees.").) These allegations fail for at least two reasons.

First, none of the confidential witnesses even purport to have knowledge of whether any of the statements regarding the effects of termination were false when made. (See SAC ¶¶ 136-39.) There is little detail as to when the conditions described by the confidential witnesses occurred. What little detail there is indicates that the events all occurred after the terminations. (See id. ¶ 138 ("[B]y 3Q09, the Company was no longer quickly responding to changing trends and customer demand….").) Nothing alleged by the confidential witnesses suggests that the statements were anything other than predictions that turned out to be incorrect or that the Company had determined the effects of the lay-offs before its March 25, 2010 disclosure. In re Northpoint Commc'ns Grp., Inc., Sec. Litig., 184 F. Supp. 2d 991, 997-98 (N.D. Cal. 2001) (noting that examples of evidence sufficient for scienter include "contemporaneous receipt of a report with information directly at odds with an alleged misrepresentation, . . . and statements by witnesses that they told the actor the true facts before the false statements was made. . . .'") (citation omitted).

Second, even if the SAC did plead that the confidential witnesses had requisite knowledge, they fail to plead an adequate basis for their knowledge. Plaintiff tries to rely on the testimony of CW2, CW11, and CW13 to establish scienter on behalf of Defendants, despite the fact that none of these witnesses reported to any of the

Defendants.  See Applestein v. Medivation, Inc., 861 F. Supp. 2d 1030, 1036-37 (N.D. Cal. 2012) ("[C]onfidential witnesses must be described with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged.") (citation and quotations omitted); In re Tibco Software Inc. Sec. Litig., 2006 U.S. Dist. LEXIS 36666, at *65 (N.D. Cal. May 25, 2006) (same).

The Court has already determined that "neither CW2 or CW11 asserts that Charney or Kowalewski had access to the conditions the confidential witnesses observed."  (FAC Order at 54-55.)  Plaintiff has not corrected this defect in his new complaint.   Plaintiff's relevant additions include the fact that CW2 "worked just a few doors down from the corporate finance department, which included Taylor and Defendant Kowalewski," (SAC ¶ 62), as well as additional detail on CW2's previous allegations of increasing costs after the terminations.  (Id. ¶¶ 62-69.)   However, CW2 does not allege to have spoken with even his/her supervisor (a non-Defendant) about these allegations.  (SAC ¶ 138.)  He/she only asserts that his/her supervisor "would have been aware" of the inefficiency because of production quotas.  (Id. (emphasis added))  He/she offers no explanation as to how the quotas would have communicated the inefficiencies to his/her supervisor, let alone to any of the actual Defendants.  (Id.)

Similarly, Plaintiff makes no attempt to connect CW11 to any of the Defendants beyond what was plead in the previous complaint.  The additional facts in the SAC only add conclusory comments about the effects of the layoffs on operations.  (Id. ¶ 89 ("The decrease in production and increase in defects were a result of a substantial number of employees . . . being laid off.").)  CW11 continues to allege only that his/her supervisor received defect rate reports, but not that these reports were ever discussed with Defendants.  Further, CW11 would have no basis to assert that Charney or Kowalewski ever saw any such reports since he/she does not assert ever having interacted with either of them.  (SAC ¶¶ 89, 91, 136.)

Nor does the addition of CW 13 to this complaint help Plaintiff's effort.  CW13

only worked "part of the time in Los Angeles" and was "responsible for store windows and displays."  (Id. ¶ 94.)  Similarly, CW13 only alleges that he/she discussed efficiency and defect issues with his/her supervisor and never that they were reported to Charney himself.  (SAC ¶ 137.)  CW13's knowledge of alleged efficiency problems does not establish scienter on the part of any of the Defendants.

2.    Allegations About Knowledge Of Lack Of "Proper Inventory"

Around the time of the employee terminations, the Company issued statements that it believed that "surplus" or "high preexisting inventory levels" would "mitigate the adverse impact  . . . from the loss of [terminated] employees."  (SAC ¶¶ 128, 131.) Plaintiff first tries to prove that these statements must have been false when made because of prior, general statements about the importance of inventory management to the Company's business.  For example, in 2008, Charney stated "'[w]e're having very good momentum, in [the wholesale] arena, and that requires inventory, not just general inventory, but the right color and the right size in the right place at the right time.'" (SAC ¶ 140.)  Also in 2008, Charney said its "'about having the right inventory, and the right composition of inventory."" (Id.)

Plaintiff fails to explain how these general statements made in 2008 demonstrate that the comments specifically related to the effects of employee terminations made in 2009 were knowingly false.  In re Skechers U.S.A., Inc. Sec. Litig., 273 Fed. App'x 626, 627 (9th Cir. 2008) ("Allegations that the officers knew that sales were down in February do not strongly support an inference that the officers' statements were fraudulent when made two months later in April.").  At best, Plaintiff has alleged that the Company manages inventory.  Greenberg v. Cooper Cos., 2013 WL 100206, at *6 (N.D. Cal. Jan. 7, 2013) (allegations that senior management was "appraised" of quality control issues does not support "the necessary inference of scienter").  But alleging that American Apparel manages inventory is not the same as alleging that Defendants knew that inventory levels at the time of their statements were inadequate to mitigate any effects of any terminations.

10
MOTION TO DISMISS SAC

Plaintiff then tries to suggest scienter through statements made by the Company almost a year <u>after</u> the terminations were announced that inventory issues were affecting the Company's results.  (SAC ¶ 142 ("[W]e have a lot of inventory issues relating to basics in our stores.")  Plaintiff also relies on the inadequate testimony of confidential witnesses that "retail stores were not receiving enough of the top-selling styles."  (SAC ¶ 141.)[3]  Again, Plaintiff is attempting to take improper advantage of hindsight to establish scienter.  The fact that inventory issues allegedly developed after the terminations, does not establish that Charney knew at the time of his earlier statements that inventory would not help mitigate the effects of the employee terminations.  <u>In re Splash Tech. Holdings Inc. Sec. Litig.</u>, 160 F. Supp. 2d at 1072 ("[T]he complaint must allege that the 'true facts' arose prior to the allegedly misleading statement.  This requirement helps guard against pleading fraud by hindsight.").

3.  <u>Allegations About Knowledge Of Effects Of Turnover</u>

As with inventory, Plaintiff alleges that facts unconnected to the employee terminations establish the Company's intent to deceive investors in its estimates of the effects of the layoffs.  Specifically, in early 2008, American Apparel hired 600 new manufacturing workers in anticipation of increasing production through the first half of 2008.  (SAC ¶ 143; Holcombe Decl., Ex. 1 at 27 (10-Q for 1Q08).)  After experiencing a decline in some financial indicators in the first quarter of 2008, the Company explained that adding workers had taken "a little bit of a toll on our business."  (<u>Id.</u>)  The company made similar statements in the 10-Q for the first quarter and related

---

[3] Plaintiff relies on the testimony of CW13 and CW5 to establish the existence of inventory issues.  (<u>See</u> <u>supra</u>, Sec. I.A.1 (description of allegations regarding CW13).)  In its prior order, the Court stated in regards to CW5 that it "cannot credit the statement of confidential witnesses who offer little information concerning the bases of their beliefs and opinions."  (FAC Order at 52-53, n.167.)  Plaintiff makes no further effort to explain the basis for CW5's beliefs in this complaint and only offers two new facts related to CW5.  (SAC ¶ 72 ("CW5 was responsible for reviewing American Apparel's sales trends and analyzing its inventory stock levels in order to allocate raw materials (<u>e.g.</u> fabric) for the production of clothing."); <u>id.</u> ¶ 73 ("For example, American Apparel was still putting out swimwear and summer attire in September 2009.").)

1    conference calls.  (SAC ¶¶ 144-45  ("Typically, gross margin is negatively impacted

2    during  periods  wherein  the  Company  undergoes  an  increased  level  of  hiring;"

3    "'[a]bsorbing all the new workers is an issue'").)

4         The Court has already determined that Charney's 2008 statements do not establish

5    scienter:

6              [T]he earlier 2008 statements regarding the challenges
              inherent in training new employees do not necessarily
7              contradict the post-ICE investigation statements about the
              ability to compensate for staffing reductions with surplus
8              inventory.  Charney made the statements eight months to a
              year before he was faced with having to replace 1,500 workers.
9              The statements do not speak to the strategies defendants
              developed to deal with that circumstance, nor to whether they
10             believed those strategies would avoid a downturn in company
              profitability.  (CAC Order at 58.)
11

12        What  the  Court  recognized  and  Plaintiff  continues  to  ignore  is  that  American

13   Apparel's  statements  at  the  time  of  the  terminations  did  acknowledge  that  the

14   terminations could have an "adverse impact" on operations.  (Holcombe Decl., Ex. 8 at

15   137 (6/30/2009 8-K).)   In this particular instance, however, the Company believed

16   inventory levels and the backlog of applications were adequate to "mitigate" the effects

17   of the termination.  (Id.)  Nothing in American Apparel's public statements ignores or is

18   contrary to the Company's prior experience.  In re Juniper Networks, Inc., 158 Fed.

19   App'x 899, 900 (9th Cir. 2005) (even where allegation is that "forecast was

20   unrealistically optimistic" and "defendants knew there was no way [the company] would

21   be able to achieve its predictions" complaint fails for lack of "specific facts establishing

22   that the forecast was false when made")).

23            4.    Access To Reports And Financial Information

24        Next, Plaintiff claims that Defendants were aware of financial data and reports,

25   which purportedly showed an adverse financial impact of the terminations.  Plaintiff

26   alleges that Defendants had the ability to monitor inventory, sales, and other financial

27   and operations metrics. (See SAC ¶ 148 ("Defendants touted the benefits that the

28   Company had gained by tracking 'daily inventories,' 'cost of inventory,' and 'quality

control.'"); <u>id.</u> ¶ 150 ("CW14 created a report for Charney to enable him to view the styles and colors available at the Company's retail stores.").)

Still missing, however, are particular facts as to what these reports stated, details about why the content of these reports should have changed Defendant's predictions of the effects of the terminations, or actual knowledge that defendants received those reports.  <u>See</u> <u>In re Autodesk, Inc. Sec. Litig.</u>, 132 F. Supp. 2d 833, 844 (N.D. Cal. 2000) (allegations that defendants had knowledge due to their "hands on" positions at the company and the existence of internal reports – without specific allegations of "the <u>contents of the reports or about how the contents contradicted defendants' public statements</u>" – were insufficient to raise a strong inference of scienter) (emphasis added); <u>Lipton v. Pathogenesis Corp.</u>, 284 F.3d 1027, 1036 (9th Cir. 2002) (same).  As the Court has already noted, "[g]eneral references to reports defendants may or may not have received do not aid plaintiffs, as the complaint contains no information concerning the content of these reports, and no allegations that Charney and Kowalewski reviewed reports containing damning information."  (FAC Order at 55.)

Plaintiff again attempts—unsuccessfully—to rely on confidential witness statements, specifically CW2, CW8, and CW14. [4]  CW8 claims that Charney and Kowalewski were on an email distribution list that received daily reports, which provided the "previous day's sales by retail store, the previous seven day's sales and a

---

[4] <u>See</u> <u>supra</u>, Sec. I.A.2 (describing allegations regarding CW2).  CW8 was a logistics manager with the Company during the Class Period and describes the way the Company internally tracked and reported inventory, sales, costs, etc.  (SAC ¶ 76.)  He/she asserts only that he/she "worked closely with Charney" but offers no further details such as the kinds of tasks, the nature of their interactions, specific topics discussed, or personal knowledge that any of the Defendants ever availed themselves of any of the information in the reports he/she describes.  (<u>Id.</u> ¶¶ 76-78.)  CW14 only worked for the Company until May/June 2009.  (<u>Id.</u> ¶ 96.)  Since the terminations were not announced until June 30, 2009, he/she cannot have  personal knowledge of their effects, much less the Defendants' state of mind regarding the effects.  (<u>Id.</u> ¶ 18.)  <u>Tripp v. Indymac Fin. Inc.</u>, 2007 WL 4591930, at *3 (C.D. Cal. Nov. 29, 2007) ("Plaintiffs have cited the beliefs and opinions of certain confidential witnesses with respect to the allegedly problematic areas of [defendant's] operations.  However, Plaintiffs have failed to allege that the individual Defendants shared these beliefs and opinions or even that they were aware of them and found them to be reliable and justified.").

year-over-year comparison."  (SAC ¶ 152.)   CW14 alleges that Charney had access to reports of inventory by color and style as well as an automated method for running these reports.  (Id. ¶ 150.)   While CW2's and CW8's allegations might provide additional detail about the types of information included in Company reports, Plaintiff continues to fail to allege what information in the reports contradicted Defendants' statements.  See Lipton, 284 F.3d at 1035-36 (plaintiffs' claim failed where plaintiffs alleged defendant "'could regularly track its sales data,'" which indicated "that patient demand was flat," but failed to "plead, in any detail, the contents of such report or the purported data"); Zucco, 552 F.3d at 1000-01 ("Allegations . . . that the management analyzed the inventory numbers closely, do not support the inference that management was in a position to know that such data was being manipulated.").

CW2 claims that "in July or August 2009, payroll was increasing, productivity was low, and sales were not keeping up with the Company's bloated expenses."  (SAC ¶ 66.)   But these generalized allegations of "increased payroll" and "low productivity" over a two month period are insufficient to support an inference of scienter.  See Wozniak v. Align Tech., Inc., 850 F. Supp. 2d 1029, 1042 (N.D. Cal. 2012) (no scienter because "'[a]lthough plaintiff refer[red] to the existence of sales and shipment data and ma[de] a general assertion about what the data showed, plaintiff allege[d] no hard numbers or other specific information'") (citation omitted); In re Silicon Graphics, 183 F.3d at 988 (allowing a plaintiff "'to go forward with a case based on general allegations of "negative internal reports" would expose all those companies to securities litigation whenever their stock prices dropped'") (citations omitted); In re Rackable Sys. Inc. Sec. Litig., 2010 U.S. Dist. LEXIS 88927, at *24-25 (N.D. Cal. Aug. 27, 2010) ("The CWs allege general knowledge about inventory shortages and excesses, minimum purchase requirements, ERP implementation problems and sales tax issues. However, the CWs do not provide the level of particularity from which to infer that Rackable knew that it would miss its gross margin and EPS projections or that any statement by Defendants was made with fraudulent intent.").  Without concrete details, Plaintiff's allegations do

not withstand the stringent requirements of the PSLRA.

5.   Allegations Regarding Change to Quarterly Disclosure of Comparable Store Sales

In Plaintiff's final attempt to establish scienter, Plaintiff argues that the Company's fully-disclosed decision to change how it reported comparable store sales was indicative of intent to deceive.  (SAC ¶¶ 156-60.)  Not so.  First, Plaintiff makes no attempt to explain how it is a violation of a securities law to disclose a change in reporting method and then report in accordance with that disclosure.  This assertion is even more absurd since the Company is under no obligation to report comparable store sales in the first place.  As Plaintiffs' own complaint describes, in 4Q09, the Company announced in advance that beginning in 2010, it would report comparable store sales on a quarterly basis rather than in a monthly 8-K as it had in the past.  (Id. ¶ 158.)  The Company reported monthly sales through the end of 2009 (including December 2009 monthly sales in a January 7, 2010 8-K).  (Id.)  Beginning with its first 10-Q in 2010, the Company reported comparable store sales on a quarterly basis as described in its previous disclosure.  (Id.)  The January and February 2010 sales that Plaintiff accuses the Company of trying to conceal were publicly reported on a quarterly basis in that same 10-Q.  (Holcombe Decl., Ex. 20 (1Q10 10-Q).)

Moreover, Plaintiff's assertion that the Company hid negative comparable store sales numbers in January and February is unconnected to the employee terminations. The Company reported negative same store sale numbers every month from at least March 2009 to December 2009 before the terminations and before the change to quarterly reporting.  (Holcombe Decl., Exs. 3, 5, 6, 10, 11, 13, 15, 17-19 (8-Ks announcing comparable store sales for March 2009 through December 2009).).  As the Company explained, American Apparel opened new stores during this time, many in markets where stores already existed.  (Jones Decl., Ex. 28 (8/13/2009 earnings call transcript).)  This growth "cannibalized" the same store sales in these markets.  (Id. ("Comparable store sales were weakest in the US retail segment where we experienced

the highest degree of cannibalization to existing stores who were also impacted by a weak consumer environment.")  Notably, net sales generally increased during this time, included during 4Q09, the same period Plaintiff claims was "disrupted" by the terminations.  (Holcombe Decl., Ex. 21 at 280 (3/25/2010 8-K (noting 8.6% increase in net sales and 0.5% increase in gross margin).)  The conflicting inferences that can be drawn from focusing on only one financial metric demonstrates the difficulty in determining how one event—such as the employee terminations—will or has affected operations.  (See Holcombe Decl. Ex. 9 (7/1/2009 8-K ("[T]he ultimate impact on the Company is difficult to predict at this time, no assurances can be given as to how, if at all, the loss of a significant number of manufacturing employees will affect the Company's business and operations."))).)  The fact that Plaintiff has failed to identify when before March 25, 2010 Defendants would have been able to disclose the effects of the terminations is evidence of this difficulty.  (FAC Order at 58.)

### B.   Plaintiff Fails To Plead That Defendants Intentionally Misled Investors Regarding Internal Controls

At issue are American Apparel's statements that it "'[was] looking to build a world class financial team,'" "'want[ed] to pursue a strict corporate orthodoxy as far as financial accounting issues,'" was committed to "conservatism and maintaining best practices," and the "company expects to have made significant progress in improving its internal controls by end-2008.'"  (SAC ¶¶ 184, 185.)  The Court has twice found these statements to be inactionable.  (CAC Order at 45 ("The allegedly false statements are couched in aspirational terms."); FAC Order at 59 (statements "were simply too vague to be actionable").)  Moreover, the Company disclosed throughout the Class Period that its controls were materially deficient.  (See, e.g., Jones Decl. Exs. 4 at 20-22; 10 at 39-44; 18 at 93-95; 20 at 108-13; 23 at 132-37.)  Ignoring both the Court's prior orders and the Company's public disclosures, Plaintiff continues to insist that later events prove that American Apparel intended to deceive investors when making these statements.

1.   <u>Allegations Regarding Alleged Breach Of Debt Covenants</u>

Plaintiff alleges that as of, March 31, 2010, American Apparel breached its debt covenant with Lion Capital requiring that the Company's Total Debt to Consolidated EBITDA ratio not exceed 2.00:1.00.   (SAC ¶ 196.)   Amazingly, Plaintiff accuses the Company of concealing this "breach" through statements in <u>the same two SEC filings in which the Company actually disclosed anticipated breaches of its covenants by the end of the quarter</u>.   (<u>Id.</u> ¶¶ 198, 199 alleging misrepresentations in a 5/19/2010 8-K and 8/17/2010 10-Q.)   In fact, the company made at least <u>ten</u> disclosures related to the Lion Agreement including two renegotiations of debt limits, one waiver of debt limits, and <u>two disclosures of potential non-compliance with those limits</u>.[5]

Despite the Company's multiple disclosures, Plaintiff asserts American Apparel mislead investors with statements on March 31, 2010, May 19, 2010 and August 17, 2010 that it was in compliance with all covenants in its credit facilities.   (SAC ¶¶ 196, 197, 199.) However, it is Plaintiff who is attempting to mislead with an apples-to-oranges comparison in an effort to prove a breach that did not occur.

Plaintiff claims that on March 31, 2010, American Apparel's Total Debt to Consolidated EBITDA ratio was 2:04:1.00, a violation of its agreement with Lion Capital. (<u>Id.</u> ¶ 198.)   However, to calculate this ratio, Plaintiff uses a Consolidated Adjusted EBITDA published <u>almost a year after</u> the alleged misstatements.   (<u>Id.</u> (noting use of Consolidated Adjusted EBITDA based on May 11, 2011 filing).)   The Consolidated

---

[5] American Apparel issued ten 8-Ks related to the Lion Agreement on 3/16/ 2009 (announcing the agreement), 4/16/2009 (announcing amendment to Agreement), 6/19/2009 (announcing amendment to Agreement), 8/20/2009 (announcing amendment to Agreement),10/6/2009 (announcing credit waiver through November 14, 2009), 11/3/2009 (announcing agreement regarding Charney's right to transfer shares), 4/1/2010 (announcing amendment to Agreement that increases Total Debt to Consolidated EBITDA ratio to 2.0:1.0); 5/19/2010 (announcing "the Company anticipates that it will not be in compliance with the Total Debt to Adjusted EBITDA covenant . . . at June 30, 2010."), 6/24/2010 (announcing amendment to debt covenant which is now based on a minimum Consolidated EBITDA), 8/17/2010 (announcing that "the Company believes it is probable that as of September 30, 2010, the Company will not be in compliance with the minimum Consolidated EBITDA covenant.").   (Holcombe Decl., Exs. 4, 7, 14, 16, 22-24; Jones Decl. Ex. 21.)

EBITDA definition required under the Lion Credit Agreement is different than that reported by American Apparel.  (Holcombe Decl. Ex. 2 at 90-91 (definition of Consolidated EBITDA in Lion Agreement); Ex. 25 at 365, (explanation of Consolidated Adjusted EBITDA in 5/11/2011 Form 8-K).)  When American Apparel reports EBITDA numbers, it includes the caveat that EBITDA is a non-GAAP metric and should not be confused with "similarly titled metrics of other companies." (Id.)  Using the appropriate measure of EBITDA, the Company was in compliance with its covenants as described in multiple disclosures.

Further evidence that American Apparel was not in breach is Plaintiff's failure to allege any action taken by Lion Capital, the other party to the covenant allegedly breached.  Plaintiff's own complaint alleges that "Lion Capital . . . had consultants on-site at American Apparel" who "paid particularly close attention to the Company's financial information" because of the debt covenants.  (SAC ¶ 153.)  It is telling that there is no indication that Lion Capital considered American Apparel to be in breach.[6]

Plaintiff also claims that American Apparel mislead investors after the negotiation of its credit agreements by stating that the cash from the new agreements "'provides us with an enormous amount of room to work with—not that we are going to use it all.  We are going to make strategic investments.'"  (SAC ¶ 194.)  Plaintiff claims that the Company knew "that the covenant amendment could not credibly provide the Company with any breathing room or surplus for capital expenditures."  However, Plaintiff fails to identify any particular fact that establishes how much additional money was available under the new credit arrangement and why it was not enough for Charney to believe cash was available for

---

[6] To the extent that Plaintiff is arguing that the alleged misrepresentations regarding debt covenants contributed to the damages in this case, he fails to adequately plead loss causation.  Since the alleged breach of the debt covenant was never revealed to the market (nor could it have been since it did not occur), the information's disclosure could not have been responsible for any losses to shareholders.  "[I]n order to establish loss causation, the market must learn of and react to [the allegedly fraudulent] practices . . .."  In re Oracle Corp. Sec. Litig., 627 F.3d 376, 392 (9th Cir. 2010); Metzler Inv. GMBH, 540 F.3d at 1062 (9th Cir. 2008) ("[T]he complaint must allege that the defendant's ''share price fell significantly after the truth became known.'').

strategic investment.

2.    <u>Allegations That The Company Withheld Negative Financial Results
And Projections From Deloitte In 1Q10</u>

For the third time, Plaintiff attempts to demonstrate scienter using Deloitte's decision
to withdraw as American Apparel's auditor in July 2010.  <u>Twice</u> the Court has found that
Plaintiff has "failed to describe how Deloitte's concerns raised a strong inference that the
defendant's aspirational statements were false or made with intent to deceive."  (FAC Order
at 65; <u>see also</u> CAC Order at 64.)  <u>Twice</u> the Court found that while scienter was one
possible inference from Plaintiff's allegations, other, non-fraudulent inferences "remain[]
equally plausible."  (<u>Id.</u>)  Nothing in Plaintiff's third pleading changes the Court's analysis.

As American Apparel immediately disclosed, on July 28, 2010, "'Deloitte advised the
Company that certain information has come to Deloitte's attention, that if further
investigated may materially impact the reliability of either its previously issued audit report
or the underlying consolidated financial statements for the year ended December 31, 2009
included in the Company's 2009 Form 10- K.'"  (FAC ¶ 166; Posner Decl. (ECF No. 115),
Ex. 3 at 10 .)  American Apparel also disclosed a later-occurring disagreement between
management and Deloitte as to whether the February 2010 financial statement was available
at the time or withheld by the Company.  (Jones Decl. (ECF No. 91), Ex. 28, 12/21/2010 8-
K.)  "Without allegations detailing the inaccuracies in the financial statements, the types of
information defendants purportedly withheld, and the knowledge or participation of
individual defendants in the decision to withhold the information, Plaintiff fails to plead
scienter."  (FAC Order at 65.)

Plaintiff asserts that the February information must have been deliberately withheld
because the information Deloitte requested was available in monthly updates to Lion Capital
and in reports regularly generated by employees.  (SAC ¶ 215.)  However, Plaintiff makes
no specific allegations as to what financial metrics were requested by Deloitte, or that the
same information was available from Lion Capital.  Plaintiff's own complaint shows that
monthly sales information was not due to Lion Capital until "30 days after the end of each

fiscal month." (SAC ¶ 176.)  Since Deloitte signed its audit opinion on March 31, 2010, the Lion Agreement is not definitive proof that the February 2010 information was actually available when Deloitte requested it.

Nor is the testimony of CW2, CW8, and CW15 who claim to have been involved with producing daily and/or monthly reports on the Company's operations.  (See, e.g., SAC ¶ 215 (stating CW2 "downloaded . . . sales, inventory and costs . . . and forwarded this information to corporate or Taylor . . .[and] consolidated [it] with sales information provided by [other] divisions into a report for the entire Company.")  The confidential witnesses make no specific allegations about what the reports specifically contained much less that they contained the January and February 2010 information requested by Deloitte.[7] Zucco, 552 F.3d at 997 ("The lack of detail in [confidential witness's] allegations . . . further support the conclusion that [his/her] allegations are not reliable enough to support the SAC's allegations of scienter."); see also supra, Sec. I.A.2. (discussing CW2's allegations).

Lastly, Plaintiff continues to fail in pleading "with sufficient particularity what aspects of American Apparel's financial statements were false, and how those misstatements were linked to management's alleged misrepresentation or concealment of information from Deloitte."  (CAC Order at 62; see FAC Order at 65.)  Indeed, Plaintiff does not and cannot dispute that the financial statements for FYE December 31, 2009 were never restated. Instead, Plaintiff hypothesizes that had Deloitte timely been given access to the Company's negative financial statements, "Deloitte may have needed to impose a 'going concern' qualification for the Company's 2009 Annual Report."  (SAC ¶ 35 (emphasis added).)

---

[7] CW8 makes the bare allegation that "these [daily and monthly] reports would have contained the financial information that Deloitte said it had requested from management." (SAC ¶ 78.)  However, he/she fails to describe 1) what Deloitte requested, 2) how as Logistics Manager he/she would have been familiar with Deloitte's request, or 3) that he/she had specific knowledge about what financial information for January and February 2010 was available and when.  CW15's allegations are even more attenuated stating that "meetings were attended by Taylor [and] Kowalewski [where they] were told whether gross margins were off due to efficiency, product mix or overhead." (Id. ¶ 97.)  The timing or specific reason for margins being "off" are not mentioned.

But these assertions cannot be squared with the facts alleged. On March 25, 2010, Defendants disclosed that the "effects of the terminations had been 'substantial' and that the 'extended disruption on [the Company's] operations had been unprecedented.'" (SAC ¶ 161 (emphasis added); id. ("The Company's March 25, 2010 press release . . . also revealed that '[t]he reduction in manufacturing efficiency was principally a result of the forced termination of over 1,500 experienced manufacturing employees in the third and fourth quarters of 2009. . . .'").) Deloitte was aware of this disclosure when it signed off on its audit opinion six days later, in other words, after it was made aware of disruptions caused by the terminations. (See SAC ¶ 214.) The Form 10-K, meanwhile, disclosed that "gross margin was also negatively impacted by lower capacity utilization of the company's manufacturing facilities in the first half of 2009, and the substantial reduction in manufacturing efficiency experienced in the fourth quarter of 2009 . . . .'" (Id. ¶ 223.) Deloitte was aware of the very information Plaintiff alleges was concealed. Moreover, Plaintiff points to no statement by Deloitte indicating that it would have included "going concern" language in the March 31, 2010 10-K, had it received the February financials.[8]   That is pure speculation.

### 3.   Additional Allegations Related To Internal Controls

Plaintiff's current complaint alleges that "Charney was aggressively pushing the Company's auditor, Marcum, to write off costs in violation of GAAP. "[A]ccording to CW12, at the time, the Company was not properly tracking manufacturing costs for 20 to 30 percent of its items, thereby underreporting costs." (SAC ¶ 185; see FAC ¶ 103.) As the

---

[8] Plaintiff's tired attempt to allege scienter by listing the resignations of certain Company employees and directors likewise fails. (See SAC ¶ 139.) Allegations regarding executive departures are insufficient to establish scienter where, as here, a plaintiff "'allege[s] . . . defendants "resigned", not that they were terminated for wrongdoing.'" In re Immersion Corp. Sec. Litig., 2011 U.S. Dist. LEXIS 145160, at *26-27 (N.D. Cal. Dec. 16, 2011) (citations omitted); see also In re Cornerstone Propane Partners, L.P. Sec. Litig., 355 F. Supp. 2d 1069, 1093 (N.D. Cal. 2005) (holding departures, absent termination on basis of fraud, did not give rise to inference of scienter). Where relevant, changes in management have followed financial restatements. See In re Adaptive Broadband Sec. Litig., 2002 U.S. Dist. LEXIS 5887, at *42-43 (N.D. Cal. Apr. 2, 2002) (resignations and reassignment of executives supported inference of scienter where "changes occurred as Adaptive's financials were being restated"); In re McKesson HBOC, Inc. Sec. Litig., 126 F. Supp. 2d 1248, 1273-74 (N.D. Cal. 2000) (terminations followed restatement).

1    Court as previously held, the suggestion that Charney's purported disagreement with the
2    auditor renders Defendants' statements knowingly false cannot be sustained, where the SAC
3    fails to allege that the accounting treatment was ultimately incorrect.  (FAC Order at 61.)
4    "CW12 . . . does not state what transpired after the calls.  Did Charney succeed in
5    persuading Marcum to write off expenses in violation of  GAAP?  Did Marcum's position
6    win out?  The complaint is silent on these matters."  (Id.)  The current complaint remains
7    silent on these points.   CW12's statements, thus, lend nothing to an assessment of
8    Defendants' state of mind.  See In re Immersion Corp. Sec. Litig., 2011 U.S. Dist. LEXIS
9    145160, at *22 (confidential witness allegations of improper accounting insufficient where
10   witness failed to "identify a single transaction where revenue was improperly recognized").

11          In addition, Plaintiff again fails to plead sufficient facts regarding the basis of
12   CW12's belief.   CW12 "was a contract Cost Accountant for American Apparel from
13   December 2007 to March 2008" – a period of four months.  (SAC ¶ 92.)  The SAC does not
14   further describe CW12's responsibilities, other than the bare allegation that he/she "assisted
15   in American Apparel's year-end close, as well as with the Company's 2007 Annual Report"
16   and "prepared schedules . . . [and] year-end numbers and forecasts."  (Id.)  This lack of
17   detail, coupled with CW12's limited engagement with the Company, undercuts Plaintiff's
18   attempt to plead scienter.  Applestein, 861 F. Supp. 2d at 1036-37 ("[C]onfidential witnesses
19   must be 'described "with sufficient particularity to support the probability that a person in
20   the position occupied by the source would possess the information alleged."') (citation
21   omitted); Brodsky v. Yahoo! Inc., 630 F. Supp. 2d 1104, 1115 (N.D. Cal. 2009) ("[B]ecause
22   [confidential witnesses] were not . . . employees for most of the Class Period, the Court
23   cannot rely on their statements to support claims . . . for the entire Class Period.").  Further,
24   Plaintiff admits that CW12 did not raise his/her alleged concern with Defendants, anyone in
25   accounting or finance, or any one responsible for preparing the Company's financial
26   statements.   (SAC  ¶ 185 (only alleging that CW12 brought concerns to "senior
27   management").)

28          Plaintiff also makes a third attempt at alleging that, in 2008, American Apparel

concealed that it was on the verge of bankruptcy.  (SAC ¶¶ 186-87; see FAC ¶ 155 (Kowalewski sent an email stating "[American Apparel] almost went bankrupt last Friday."); id. ¶ 156 ("American Apparel, however, had never previously publicly disclosed that the Company was on the verge of bankruptcy . . . during the Class Period.").)  Plaintiff attempts to corroborate these allegations with the same deficient confidential witness testimony used in previous complaints.  (SAC ¶ 187 ("CW1 claims that he/she "learned in late 2008 that the Company was close to filing for bankruptcy."); see also FAC ¶ 157.) These are the same allegations that the Court found "shed no additional light on the truth of Kowalewski's statement."  (FAC Order at 62.)

## II.  The SAC Fails To Correct The Deficiencies Of The Falsity Allegations In Plaintiff's Two Prior Complaints

### A.  American Apparel's Disclosures Regarding The Potential Effects Of The ICE Investigation Were Not Misleading

Allegations that the Company misled investors regarding the effects of the ICE-related terminations are unsupported.  (SAC ¶ 128.)  Plaintiff alleges that from June through September of 2009, Defendants and Peter Schey made the following statements:

- "The Company believes that its current surplus levels of inventory and manufacturing capacity will mitigate the adverse impact of any disruption to its manufacturing activities . . . ."  (Id. ¶¶ 20, 128 (quoting 6/30/2009 8-K).)

- "[T]he Company believes that its current surplus levels of inventory and production capacity will mitigate the adverse impact of any disruption . . . . To the extent that the Company may need to hire replacement workers, the Company presently believes it would only need to hire for a fraction of those employees that would be terminated."  (Id. (quoting 7/1/2009 8-K).)

- "So by – if we were forced to reduce our workforce, the way we would mitigate that would be by increasing the days per week of our employees on the selling floor; so that would virtually pick up all of the reduction in labor that we might see if we had a loss in workers."  (Id. ¶ 129 (quoting 8/13/2009 earnings call).)

- In September 2009, Schey allegedly reported to the Los Angeles Times, "'[w]e do not anticipate [the immigration violations] will have a significant impact on American Apparel's productivity because of the confluence of several factors including the slow economy and high preexisting inventory levels.'"  (Id. ¶ 131.)

Like both the CAC and the FAC, the current complaint is bereft of facts indicating that these statements were false when made.  (See CAC Order at 42 ("Plaintiff's allegations of falsity are insufficient to the extent they suggest that plaintiffs should have been aware of the

ultimate impact of the ICE investigation, since 'even reasonable predications [can] turn out to be wrong.'"); FAC Order at 56; In re Downey, 2009 WL 2767670, at *13-14 (falsity not shown by "'[m]erely alleging that . . . reasonable predictions turn out to be wrong.  Instead, plaintiffs must allege with particularity facts that show the initial prediction was a falsehood.'") (citation omitted).)  First, as previously discussed the Court has found these statements "not suggestive of scienter" because they were couched in cautionary language. (See supra, Sec. II.A.)   In addition, Plaintiff does not allege that, notwithstanding Defendants' public statements, inventory levels were in fact inadequate to absorb the loss of workers, the Company did not have the capacity to add more workers, management expected to replace a substantial amount of the terminated workers, or there were no applicants seeking employment.

In lieu of specific allegations, Plaintiff continues to rely on confidential witness testimony regarding operations months after the terminations to turn the predictions of the Company into knowingly false statements.  (See, e.g., SAC ¶¶ 136-39.)  However, even accepting the witnesses' statements as adequate, they fail to contradict any of the Company's disclosures.[9]  The witnesses' testimony relates to defect rates, inventory management issues, and increased costs of goods sold, none of which were addressed in any of the statements at issue.  See In re Tibco, 2006 U.S. Dist. LEXIS 36666, at *70-71 (rejecting confidential witness allegations that failed to contradict executive's public statements).  Again, simply because the Company was unable to accurately predict the results of the employee terminations, does not make its attempts to do so misleading.  In re PETsMART, Inc. Sec. Litig., 61 F. Supp. 2d 982, 992 (D. Ariz. 1999) ("[D]efendants' lack of clairvoyance simply does not constitute securities fraud.")

---

[9] Plaintiff relies on the testimony of CW2, CW11, and CW13.  See supra, Sec. I.A.1, for discussion of the inadequacy of these witnesses' allegations.

1

2

### B.  The SAC Fails To Plead That Statements About Internal Controls Were False

3

Plaintiff also alleges that American Apparel made false representations regarding the status of its internal controls and efforts to achieve compliance with reporting requirements. (See SAC ¶ 184.)  Once again, these allegations fail because since its inception as a public company, American Apparel identified and publicly disclosed material weaknesses in its internal control over financial reporting in each of the Company's Form 10-Ks for fiscal years ended 2007, 2008, 2009 and 2010, as well in interim quarterly reports.  See In re Downey, 2009 WL 2767670, at *17-18; In re Netflix, Inc. Sec. Litig., 2005 U.S. Dist. LEXIS 18765, at * 20-21 (N.D. Cal. Jun. 28, 2005); see also supra Sec. II.B..

The Court already twice recognized that Defendants' statements are inactionable corporate optimism.  (See CAC Order at 45 ("The repeated use of words like 'pursuing,' 'looking to build,' 'going to be,' and 'committed to,' indicates that the company was articulating goals it was trying to meet, not making factual statements about the current status of its financial compliance and accounting records."); FAC Order at 61 ("these vague, forward-looking aspirational statements do not constitute actionable misrepresentations."); see also In re Impac Mortg. Holdings, Inc. Sec. Litig., 554 F. Supp. 2d 1083, 1097 n.10 (C.D. Cal. 2008); In re Wet Seal v. Sec. Litig., 518 F. Supp. 2d 1148, 1168 (C.D. Cal. 2007).

### CONCLUSION

For the foregoing reasons, the Court should dismiss the SAC.

DATED:  March 15, 2013          SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP


By: _____/s/ Harriet S. Posner_____
            Harriet S. Posner
            Attorneys for Defendant
            American Apparel, Inc.

714187-LACSR02A - MSW