

1
2
3
4
5
6
7
8                              UNITED STATES DISTRICT COURT

9                             CENTRAL DISTRICT OF CALIFORNIA

10
11                                                    )   CASE NO. CV 10-06352 MMM (RCx)
                                                      )
12                                                    )   CLASS ACTION
       IN RE AMERICAN APPAREL, INC.                   )
13     SHAREHOLDER LITIGATION.                         )
                                                      )   ORDER GRANTING IN PART AND
14                                                    )   DENYING IN PART DEFENDANTS'
                                                      )   MOTIONS TO DISMISS
15                                                    )
                                                      )
16                                                    )
                                                      )
17     _____        )

18

19         This is a consolidated putative securities class action against defendants American Apparel,

20   Inc., Dov Charney, Adrian Kowalewski, and Lion Capital, Inc.  Plaintiffs allege that during the

21   class period, defendants misled the public concerning the immigration status of workers American

22   Apparel employed in its Los Angeles factory.   They assert that defendants hired numerous

23   undocumented workers in violation of the Immigration and Nationality Act ("INA"); that they

24   failed to comply with the INA's reporting requirements; and that they tried to conceal from

25   investors the results of ongoing federal investigations concerning the company's hiring practices.

26   Plaintiffs contend that when American Apparel's misconduct came to light, it was forced to

27   terminate a large number of factory workers, and that it subsequently misled the public about the

28   effect the staffing reduction would have on its bottom line.

Plaintiffs contend that defendants' misrepresentations and omissions violated section 10(b) of the Securities Exchange Act of 1934 (the "1934 Act") and Securities and Exchange Commission ("SEC") Rule 10b-5 during a class period that extended from November 28, 2007 to August 17, 2010.  They also assert that defendants Charney, Kowalewski, and Lion Capital violated § 20(a) of the 1934 Act because they were controlling persons of American Apparel.[1]

The court has previously ruled on motions to dismiss two earlier complaints.  On January 13, 2012, the court granted a motion to dismiss plaintiffs' consolidated class action complaint.[2]  On February 27, 2012, plaintiffs filed a first amended complaint;[3] the court granted in part and denied in part a motion to dismiss that pleading.[4]  Specifically, the court found that plaintiffs had successfully alleged that American Apparel's representations regarding its immigration compliance were knowingly false when made such that they were sufficient to support a securities fraud claim.[5]  The court dismissed plaintiffs' claims to the extent based on other representations or omissions with leave to amend.[6]

---

[1]Consolidated Class Action Complaint ("Complaint"), Docket No. 66 (Apr. 29, 2011), ¶¶ 157-72.

[2]Order Granting Defendants' Motion to Dismiss ("MTD Order"), Docket No. 105 (Jan. 13, 2012).  Subsequent citations to this order will be to the published decision: *In re American Apparel, Inc. Shareholder Litig.* ("*In re American Apparel I*"), 855 F.Supp.2d 1043 (C.D. Cal. 2012).

[3]First Amended Class Action Complaint for Violation of Federal Securities Laws ("FAC"), Docket No. 106 (Feb. 27, 2012).

[4]Order Granting in Part and Denying in Part Defendants' Motions to Dismiss ("2nd MTD Order"), Docket No. 142 (Jan. 16, 2013).  Subsequent citations to this order will be to the Westlaw version of the decision: *In re American Apparel, Inc. Shareholder Litig.* ("*In re American Apparel II*"), No. CV 10–06352 MMM (JCGx), 2013 WL 174119 (C.D. Cal. Jan. 16, 2013).

[5]*Id*. at 70.

[6]*Id*.

On February 15, 2013, plaintiffs filed a second amended complaint.[7]  Defendants filed various motions to dismiss on March 15, 2013.[8]  Plaintiffs separately opposed each of the motions.[9]

## I.  BACKGROUND AND FACTUAL ALLEGATIONS

### A.    Background Concerning American Apparel, Inc.

Dov Charney founded American Apparel in 1998 as a California limited liability company.[10]  In September 2002, PR Week ran a profile piece on American Apparel observing that "[e]verything about American Apparel, including its internal and external PR practices, has been an organic extension of Charney's beliefs, visions, and personality."[11]  The company's SEC filings confirmed that Charney was "considered intimately connected to American Apparel's brand identity."[12]  American Apparel opened its first retail store in Los Angeles in October 2003.[13]

Market observed noted that because he desired to retain full control of the company's affairs, Charney initially did not want to take American Apparel public.[14]  In January 2006, the

---

[7]Second Amended Complaint ("SAC"), Docket No. 144 (Feb. 15, 2013).

[8]Defendant Lion Capital Inc.'s Motion to Dismiss ("Lion MTD"), Docket No. 148 (Mar. 15, 2013); Defendant American Apparel's Motion to Dismiss ("American Apparel MTD"), Docket No. 149 (Mar. 15, 2013); Defendants Dov Charney's and Adrian Kowalewski's Motion to Dismiss ("Charney MTD"), Docket No. 152 (Mar. 15, 2013).

[9]Opposition to Lion Capital Inc.'s Motion to Dismiss ("Lion Opp."), Docket No. 154 (May 13, 2013); Opposition to American Apparel's Motion to Dismiss ("American Apparel Opp."), Docket No. 155 (May 13, 2013); Opposition to Dov Charney's and Adrian Kowalewski's Motion to Dismiss ("Charney Opp."), Docket No. 156 (May 13, 2013).

[10]SAC, ¶ 98.

[11]*Id.*

[12]*Id.*

[13]*Id.*, ¶ 99.

[14]*Id.*, ¶ 100.

*Guardian* reported that "Charney seems to relish too much the control and the flexibility guaranteed by the absence of shareholders to go public."[15] By December 2006, however, Charney was nearly broke from financing the 150-store company from its inception and took the company public to gain much needed capital.  On December 19, 2006, the *New York Times* reported that "[t]he decision to sell the privately held company, . . . [was] a surprise move by the company's eccentric founder, Dov Charney, who is known for exercising strict, and at times controversial, control over the retailer's operations."[16]  Plaintiffs allege that, in line with his desire for control, Charney structured the transaction in a manner that maximized the benefit to him.[17]  Charney has served as chairman, CEO, president, and director of American Apparel since the company went public; his net worth has been valued at $580 million.[18]

The complaint alleges that American Apparel's 'vertically integrated" operations and its public positions on immigration reform are "integral to the [c]ompany brand," which it has described in SEC filings as one of its "core business strengths."[19]  The company consistently draws attention to the fact that its products are "Made in the USA," by legal immigrant workers.[20]  This pro-immigrant brand is purportedly tied closely to Charney himself, who has long espoused immigration reform, allegedly in order to "market the [c]ompany's 'edgy' brand."[21]

---

[15]*Id.*

[16]*Id.*

[17]*Id.*, ¶¶ 101-02

[18]*Id.*, ¶ 102.

[19]*Id.*, ¶ 8.

[20]*Id.*

[21]*Id.*

**B.**     **Defendants' Allegedly False and Misleading Statements During the Class Period**

Plaintiffs' allegations regarding defendants' false statements and their scienter during the class period are of three primary types.  First, plaintiffs assert that although American Apparel touted its progressive labor policies and represented that it was in full compliance with U.S. immigration laws, an audit by the Department of Homeland Security's ("DHS") Immigration and Customs Enforcement division ("ICE") revealed that a substantial portion of American Apparel's manufacturing employees were not authorized to work in the United States.  Plaintiffs assert that Charney and other defendants knew this fact during the class period, and materially misrepresented the company's compliance with the immigration laws.

Second, they contend that defendants misrepresented the consequences of the reduction in workforce that was necessary to bring the company's into immigration compliance.  Plaintiffs allege that given the company's structure and the individual defendants' intimate knowledge of its operations, defendants knew that terminating so many employees would have a significant adverse impact on American Apparel's ability to maintain inventory levels, which in turn would affect its profitability.  They assert that defendants nonetheless minimized the effect of the work force reduction.

Third, plaintiffs contend that American Apparel and the individual defendants repeatedly misrepresented the company's financial health not only to investors via conference calls, press releases, and SEC filings, but also to its independent auditors.  Plaintiffs assert that defendants repeatedly affirmed the strength of American Apparel's internal controls and its commitment to conservative financial practices and in this way misled the public and the company's auditors about the myriad financial problems the company experienced during the class period.

**1.     American Apparel's Employment of Unauthorized Workers**

As noted, plaintiffs allege a class period that began on November 28, 2007, the date American Apparel filed a Proxy Statement with the SEC in preparation for an initial public

offering.[22]  The proxy statement included a representation that "many of [the company's then-existing employees were] documented immigrants, authorized to work in the United States."[23]

The next day – November 29, 2007 – ICE served a Notice of Inspection ("the inspection notice") on American Apparel.[24]  The inspection notice advised the company that ICE wished to review immigration documents for all current manufacturing employees at its downtown Los Angeles factory, where Charney's and Kowalewski's executive offices were also located.[25]  It stated that ICE special agents would inspect the company's records on December 12, 2007 – the day American Apparel was slated to go public.[26]  A former American Apparel employee, who worked in the company's Human Resources Department from mid-2006 to January 2010, stated that the company actually learned of the ICE I-9 audit prior to receiving the November 29 inspection notice.[27]  This is corroborated by the testimony of a confidential witness ("CW10"), who states that the company began to collect Forms I-9 in preparation for the audit prior to November 2007.[28]

The complaint alleges that Kristina Moreno, then American Apparel's human resources director – who reported directly to Charney – instructed a team to gather Forms I-9 between August and December 2007.[29]  Human resources employees were purportedly instructed to fix any Forms I-9 that were missing information; this included forging I-9's so that it appeared they had

---

[22]*Id.*, ¶ 117.

[23]*Id.*

[24]*Id.*, ¶ 11.

[25]*Id.*

[26]*Id.*

[27]*Id.*, ¶¶ 79, 81.

[28]*Id.*, ¶ 86.

[29]*Id.*, ¶ 11.

been signed within three days of the employee's hire date as the INA requires.[30]

On December 10, 2007, defendants allegedly sought and obtained an extension of the inspection date; it was rescheduled for January 3, 2008.[31]  That day, ICE agents arrived at the company's headquarters and hand-counted the Forms I-9 in the presence of the company's COO, Martin Bailey; in-house counsel Joyce Crucillo; and outside counsel.[32]  Both Bailey and Crucillo reported directly to Charney and Kowalewski.[33]  Although they were asked to certify ICE's count, the individuals present refused to do so; rather, Crucillo wrote on an ICE document that the "[i]nitial hand count was made by U.S. Immigration Customs Enforcement, [and was] not verified by [a] company representative."[34]

Although American Apparel represented that, as of January 2, 2008, there were 3,562 manufacturing employees working in Los Angeles, it purportedly presented only 3,554 Forms I-9 to ICE agents on January 3, 2008.[35]  Plaintiffs contend this was an "existing violation" of immigration law, which required that every employee have a Form I-9.[36]  Later, on August 25, 2009, ICE agents rechecked two boxes of original Forms I-9 and determined that American Apparel had failed to prepare and present original Forms I-9 for 85 employees.  As a result, the agency determined that the company should be "charged with failure to prepare and present Forms I-9 for 85 employees."[37]

---

[30]*Id.*

[31]*Id.*

[32]*Id.*, ¶ 12.

[33]*Id.*

[34]*Id.*

[35]*Id.*, ¶ 110.

[36]*Id.*

[37]*Id.*, ¶ 116 n. 26.

Defendants purportedly failed to disclose the ICE inspection until March 2008.[38]  In the interim, they made numerous statements concerning the company's immigrant workforce.  On January 18, 2008, for example, Charney personally made statements to the *New York Times* concerning American Apparel's "non-American-born" labor force and his support of immigration reform.  Among other things, he stated that amnesty "is at the core of my company, at the core of my soul."[39]

On March 17, 2008, the Company's 2007 Annual Report on Form 10-K disclosed that the company had received an inspection notice from ICE.[40]  It stated that "[i]n late 2007, American Apparel received a notice from the Immigration and Customs Enforcement division of the U.S. Department of Homeland Security . . . requesting to inspect the I-9 forms of the employees of American Apparel, Inc.  In January 2008, American Apparel provided ICE with access to the requested forms."[41]  The report asserted that "even if no violations [were] found," American Apparel might experience employee turnover.[42]  Plaintiffs contend this statement was misleading when made, as defendants knew that violations had been found, that the company had not given ICE all of the Forms I-9 required, and that the company was going to experience massive disruptions as a result of the audit.[43]  They also assert that when the audit began in earnest on January 3, 2008, many of the company's undocumented workers, who were afraid of ICE, stopped showing up for work and that whole sections of the factory went "dark."[44]  Given that Charney reported he spent perhaps "50 hours per week" at the factory site, plaintiffs contend he

---

[38]*Id.*, ¶ 13.

[39]*Id.*, ¶ 14.

[40]*Id.*, ¶ 15.

[41]*Id.*

[42]*Id.*

[43]*Id.*, ¶ 16.

[44]*Id.*

8

1    was present to see the disruption himself.[45]

2    On March 16, 2009, the company's 2008 Annual Report on Form 10-K represented that

3    "American Apparel ha[d] not had any further communications with ICE since th[e] [January 3,

4    2008] request [for Forms I-9] was fulfilled."[46]  Plaintiffs maintain this statement was misleading

5    because defendants had been in constant communication with ICE about the inspection, and were

6    receiving regular updates regarding ICE's negative findings.[47]  They contend that in a July 3, 2009

7    *New York Times* article, the company's outside counsel, Peter Schey, admitted that there were

8    "discussions over 18 months between federal officials and American Apparel, after immigration

9    agents first inspected the company's files in January 2008."[48]  ICE documents purportedly

10   corroborate that, starting January 3, 2008, the agency routinely updated the company regarding

11   its negative findings.[49]  Plaintiffs allege that, because the company began forging or altering I-9

12   documents prior to receiving the inspection notice, defendants knew as early as the fall of 2007

13   that American Apparel was not in compliance with U.S. immigration laws because they found that

14   hundreds of the documents they tried to verify were fake.[50]

15   On June 30, 2009, American Apparel revealed that one-third of its Los Angeles-based

16   manufacturing employees (approximately 1,800 people) were not authorized to work in the United

17   States and were being terminated.[51]  In the press release that made this announcement, the

18   company failed to disclose that approximately 700 other employees had simply stopped coming

---

[45]*Id.*

[46]*Id.*, ¶ 17.

[47]*Id.*

[48]*Id.*

[49]*Id.*

[50]*Id.*

[51]*Id.*, ¶ 18.

to work as a result of the I-9 audit.[52]  An article in *Fast Company* dated August 24, 2010, which reported a leaked statement Charney purportedly made during an internal company conference call, confirmed that, in fact, 2,500 of American Apparel's approximately 3,500 garment manufacturing employees were gone as a result of the investigation.[53]  Similarly, an April 2, 1010 *Los Angeles Times* article reported that "[a]s a result [of the ICE enforcement activity], Charney said[ that] the company lost more than 2,000 workers overall."[54]  In response to these disclosures, the company's stock price tumbled approximately 16% on unusually heavy trading volume between June 30 and July 2, 2009.[55]

ICE ultimately concluded that immigration compliance "was not a priority for the [ ] company," and that "American Apparel [ran] the risk of hiring unauthorized aliens by not preparing Forms I-9 for all of [its] employees."[56]  The agency stated that this was evident given "the large amount of unauthorized aliens employed at the[ ] company."[57]  Specifically, ICE found that 84.5% of 2,297 American Apparel employees with alien numbers were undocumented.[58]  Former American Apparel employees corroborated ICE's conclusion ;[59] for example, one former customer service supervisor ("CW1"), who worked at the company's downtown facility during the class period, stated that the company routinely hired undocumented workers, and that he/she knew of at least three people in his/her department who lacked documentation.[60]  Another former

---

[52]*Id.*

[53]*Id.*

[54]*Id.*

[55]*Id.*, ¶ 19.

[56]*Id.*

[57]*Id.*

[58]*Id.*

[59]*Id.*

[60]*Id.*, ¶ 61.

employee ("CW6") testified that "the majority of manufacturing personnel employed at American Apparel lacked the necessary papers to legally work at the [c]ompany."[61]  Moreover, a former payroll administrator for American Apparel ("CW7") believed that "American Apparel had separate payroll systems because there were many manufacturing employees at the [c]ompany's Los Angeles factory who lacked proper documentation."[62]

Plaintiffs allege that following the large-scale terminations, ICE found that American Apparel had rehired some of the discharged workers.[63]  On July 2, 2010, an ICE special agent conducted another review of company records to determine if there were any employees still working at American Apparel who had been listed on an earlier "Notice of Suspect Documents" served on the company in June 2009.[64]  The agent found that more than forty individuals identified in the notice had presented new Social Security numbers and were working at the company.[65]  Former American Apparel employees purportedly corroborate this allegation.[66]

### 2.   American Apparel's Representations Regarding the Effect of the Workforce Reduction on Operations

Plaintiffs also allege that American Apparel misleadingly assured investors in a June 30, 2009 press release, that, "even if [it] were to lose substantially all of the 1,800 identified employees, (which represent approximately one-third of the 5,600 employees [it] currently employs in its manufacturing operations in the Los Angeles area), [it] does not presently believe

---

[61]*Id.*, ¶ 74.

[62]*Id.*, ¶ 75.

[63]*Id.*, ¶ 125.

[64]*Id.*

[65]*Id.*

[66]*Id.,* ¶ 126.  For example, a former Production Scheduler at the Los Angeles facility ("CW4") testified that "many manufacturing employees who were dismissed after failing to produce ICE documentation were later rehired by American Apparel under different names. (*Id.*, ¶ 71).

that the loss of employees would have a materially adverse impact on its financial results."[67]  In another press release filed with a Form 8-K dated July 1, 2009, the company purportedly misrepresented that it "believe[d] that its current surplus levels of inventory and production capacity [would] mitigate the adverse impact of any disruption to its manufacturing activities that [might] potentially result from the loss of these employees."[68]  American Apparel further represented that, to the extent it needed to hire replacement workers, it "believe[d] [that] it would only need to hire . . . a fraction of th[e] employees [who had] be[en] terminated" because it "currently ha[d] a significant backlog of active job applications."[69]

Plaintiffs allege that, after a meeting with Charney on July 1, 2009, KeyBanc analyst Edward Yruma noted in a research report that American Apparel's "[m]anagement was clear in emphasizing that even if a significant number of the 1,800 employees are deemed ineligible to work, the Company should not see a material financial impact.  'Made in Los Angeles' is key to the brand, [and] management should be able to replace workers."[70]  Plaintiffs allege that although they made these statements, defendants knew that many workers had been found ineligible to work, and that the company was having difficulty replacing them.[71]

They also contend that, during a November 10, 2009, earnings conference call with analysts concerning the third quarter of 2009, then-CFO Kowalewski answered a question concerning the effect of the terminations, stating: "I think what we said back in July [2009] when we had this issue was we didn't think [the ICE enforcement action] was going to have a material impact [on] our financial results."[72]  Kowalewski also characterized the loss of manufacturing

---

[67]*Id.*, ¶ 128.

[68]*Id.*, ¶ 20.

[69]*Id.*

[70]*Id.*, ¶ 21.

[71]*Id.*

[72]*Id.*, ¶ 22.

employees as a competitive advantage that would result in lower costs, explaining that "because we had been operating with a higher number of workers than maybe we would have needed under normal circumstances[,]"[73] "we do think some of the head count has improved our overhead situation." Charney, also on the call, voiced agreement with Kowalewski's statements.[74]

Plaintiffs assert these statements were misleading because, at the time they were made, defendants had actual knowledge of the effect of the terminations. A former manufacturing division controller, who worked at American Apparel from 2008 to mid-June 2010 ("CW2"), confirms that the impact of terminations during the third quarter of 2009 was evident no later than the fourth quarter of that year, and that Charney was personally aware of the significant adverse impact that the workforce reduction had had.[75] He further states that American Apparel experienced great difficulty replacing the workers it had lost.[76] A former distribution supervisor who worked at the company from August 2009 to early 2010 ("CW3"), found it "ridiculous" for Charney to suggest that he did not know the impact of the terminations, since they had immediate negative effects on the company's productivity.[77] Plaintiffs allege that the replacement workers were generally slower than the more skilled and efficient terminated workers who had been at the company for as much as a decade; specifically, they cite the testimony of a former Resource Assignor for American Apparel ("CW5"), who reports that the replacement workers were producing only half as much output as the workers who were terminated.[78] Plaintiffs assert that the company was engaged in a "mad rush" to hire replacement employees in the third and fourth quarters of 2009, the result of which was that the company had almost double the number of

---

[73]*Id.*

[74]*Id.*

[75]*Id.*, ¶ 66.

[76]*Id.*

[77]*Id.*, ¶ 70.

[78]*Id.*, ¶ 73.

employees it previously had performing the same manufacturing tasks.[79]   Although payroll increased from June to September 2009, productivity was down, and sales did not keep pace with expenses.[80]   Plaintiffs contend that Charney knew in real time about the significant negative impact the termination of manufacturing workers had had because he was heavily involved in every aspect of American Apparel's operations.   Former American Apparel employees purportedly confirm this fact.[81]

On March 25, 2010, American Apparel acknowledged that it had suffered "lower capacity utilization of [its] manufacturing facilities in the first half of 2009, and [a] substantial reduction in manufacturing efficiency . . . in the fourth quarter of 2009."[82]   This disclosure allegedly caused American Apparel's stock price to drop 17% in one day on unusually heavy trading.[83]   Subsequently, on May 19, 2010, the company stated that its gross margins had been negatively impacted by reduced labor efficiency at its production facility; it tied that "reduction in labor efficiency" to "the dismissal of over 1,500 experienced manufacturing employees in the third and fourth quarters of 2009 following the completion of an I-9 inspection by U.S. Immigration and Customs Enforcement."[84]   The company also disclosed that its lower manufacturing efficiency might impact its financial results into 2011.[85]   On a conference call that day, Charney stated that:

> "We didn't move quickly enough after we had the immigration intervention. We were still in the mode it was a culture. . . .   We should have been hiring more people. . . .   We are off our game but we are going to get back on our game as far

---

[79]*Id.*, ¶ 65.

[80]*Id.*

[81]See e.g. *id.*, ¶¶ 66, 78.

[82]*Id.*, ¶ 25.

[83]*Id.*

[84]*Id.*, ¶¶ 25-26.

[85]*Id.*, ¶ 25.

as – in a way the fact that we had this Made in USA factory we were not getting the full benefit of it because actually we don't have enough people."[86]

Following this disclosure, shares of American Apparel's stock declined 40.51% on unusually heavy trading volume, closing on May 19, 2010 at $1.63 per share.[87]

On August 17, 2010, the company issued a press release associated with its Form 8-K, which stated that it would report a operational loss of $5 million to $7 million for the third quarter.[88]   The primary reason cited for the loss was "lower labor efficiency at the Company's production facilities," which was linked to the mass workforce reduction and the hiring of more than 1,600 new manufacturing workers during the second quarter of 2010.[89]   The same day, defendants for the first time disclosed that the company might not have sufficient liquidity to sustain operations for the next twelve months, and that there was "substantial doubt that the Company [would] be able to continue as a going concern."[90]   Shares of the company's stock tumbled an additional 25.9% on heavy trading volume, closing on August 17, 2010 at $1.03 per share.[91]   As the market continued to digest the news, the company's stock fell an additional 27.2%, closing on August 19, 2010 at approximately $0.75 per share.[92]

### 3. American Apparel's Representations Regarding its Financial Condition

#### a. Financial Reporting Practices

Plaintiffs also allege that defendants misrepresented American Apparel's financial

---

[86]*Id.*, ¶ 166.  Charney later told the *Globe and Mail* that American Apparel's immigration violations "broke [its] efficiencies and generated a situation where [it was] late delivering garments.  It lost us an enormous amount of money."  (*Id.*, ¶ 167).

[87]*Id.*

[88]*Id.*, ¶ 27.

[89]*Id.*

[90]*Id.*

[91]*Id.*

[92]*Id.*

condition.  In a March 20, 2008, interview with the *Wall Street Journal*, Charney stated that his then-current CFO, Ken Cieply, had "no credibility" and was a "complete loser."[93]  The next day, Charney reversed course, calling his words "juvenile."[94]  Cieply resigned a short time later, and was replaced with an interim CFO, William T. Gochnauer, whom Kowalewski replaced in late 2008.[95]  Kowalewski was promoted to CFO at the age of 31, two years after he earned an M.B.A. in 2006.[96]

During a May 13, 2008 earnings conference call for the first quarter of 2008, Charney reassured investors that the company was "looking to build a world class financial team.  We want to – we have a very creative company and a creative brand, but we want to pursue a strict corporate orthodoxy as far as financial accounting issues and putting together a team.  And we're studying that and working on that very closely."[97]  Plaintiffs assert this was false, as American Apparel's accounting practices "were anything but 'strict,' and the [c]ompany's internal controls were virtually non-existent."[98]  Allegedly, American Apparel's financial practices only worsened once Kowalewski assumed the position of CFO.[99]

In April 2009, American Apparel retained Deloitte & Touche LLP ("Deloitte") as its independent auditor, purportedly to assure investors that it took its public financial accounting responsibilities seriously.[100]  American Apparel also announced a new "financial partner[ship]" with Lion Capital, which Charney and Kowalewski promised would bring experienced financial

---

[93]*Id.*, ¶ 28.

[94]*Id.*

[95]*Id.*

[96]*Id.*

[97]*Id.*, ¶ 29

[98]*Id.*

[99]*Id.*

[100]*Id.*, ¶ 30.

professionals onto American Apparel's board of directors.[101]   American Apparel's agreement with Lion Capital called for Lion Capital to invest $80 million in the company in exchange for security, interest and warrants.[102]   Thereafter, on April 22, 2009, a KeyBanc report stated that the company was "[c]ommitted to best practices.  The question was asked about what management views as a [Wall] Street misperception about the Company, [and] management highlighted the flawed view that the Company is disorganized and unsystematic internally.   Charney emphasized the Company's commitment to conservatism and maintaining best practices."[103]   In response to this news, American Apparel's stock price jumped 7.66%.[104]

Plaintiffs allege, however, that after retaining Deloitte, American Apparel withheld critical financial information from the firm.[105]   Specifically, they assert that defendants withheld monthly sales figures; misrepresented to Deloitte that monthly financial results were unavailable; and concealed from Deloitte the negative trends indicated by the January and February 2010 monthly financial reports.[106]   At some point, Deloitte purportedly learned of the information that had been withheld.  On July 28, 2010, American Apparel announced that six days earlier, Deloitte had resigned as its independent auditor because it was "no longer willing to rely on management's representations due to Deloitte's belief that management withheld . . . the February 2010 monthly financial statements until after the filing of the 2009 10-K and made related misrepresentations."[107]   Defendants also revealed that Deloitte had resigned because "certain information had come to Deloitte's attention that if further investigated [might] materially impact the reliability of either its

---

[101]*Id.*

[102]*Id.*, ¶ 168.

[103]*Id.*, ¶ 30.

[104]*Id.*

[105]*Id.*, ¶ 31.

[106]*Id.*, ¶ 37.

[107]*Id.*

17

previously issued audit report or the underlying consolidated financial statements for the year ended December 31, 2009 included in the Company's 2009 Form 10-K."[108]   Deloitte later withdrew the audit report included in American Apparel's 2009 financial statements, warning investors that it should "not be relied upon."[109]   Deloitte stated that its "unqualified opinion" on the company's financial statements for year-end 2009 was based on incomplete information concerning the impact of the decline in manufacturing on company operations.[110]   On this news, the company's stock price fell 14.36% on unusually heavy volume.[111]

On August 17, 2010, American Apparel revealed additional facts about the Deloitte resignation, stating "[i]t [was] the Company's understanding that [Deloitte's reference to] 'certain information' refer[red] to the Company's financial results for the first quarter of 2010, trends in the Company's business occurring after the first quarter of 2010 and the Company's projected financial results for the remainder of 2010 as of April 30, 2010."[112]   While the company disputed Deloitte's account, the auditing firm stood by its assertion that defendants had committed accounting fraud.  The firm stated it "believe[d] that [it had] requested the February 2010 financial information prior to issuing [its] reports and that management informed [the auditors] that such information was not available," when in fact management had the information and did not want it shared publicly.[113]   Plaintiffs allege that following Deloitte's resignation, the U.S. Department of Justice, the U.S. Attorney's Office for the Central District of California, and the Securities and Exchange Commission all issued subpoenas or began investigations of American Apparel's

---

[108]*Id.*, ¶ 32.

[109]*Id.*

[110]*Id.*, ¶ 36.  Deloitte later revealed, after obtaining the February 2010 financial results, that it would have made a "revision to the [c]ompany's projections as of the date of the [2009 Annual Report]."  (*Id.*)

[111]*Id.*

[112]*Id.*, ¶ 34.

[113]*Id.*

financial reporting practices and internal controls.[114]  Following the controversy, the company's stock fell more than 46% between August 16 and August 19, 2010.[115]

### b.   American Apparel's Debt Covenants with Lion Capital

Plaintiffs also allege for the first time that defendants made false and misleading statements concerning American Apparel's compliance with its credit agreement with Lion Capital.  The agreement was amended on December 31, 2009 to require "the reimbursement of out-of-pocket expenses incurred by [Lion Capital] in connection with the monitoring and oversight of [its] investment."[116]  Such reimbursements had not previously been required more than once a year unless American Apparel was in default on its debt covenants, but Lion Capital was allegedly concerned about American Apparel's financial condition following the massive layoff of manufacturing employees.[117]

On March 25, 2010, Charney stated during a conference call that American Apparel and Lion Capital had reached an agreement to further amend the credit agreement; specifically, he said that Lion Capital had agreed to increase the maximum debt to earnings ratio American Apparel was required to maintain so that the company could make strategic investments that would increase store productivity.[118]  Defendants purportedly told *Women's Wear Daily* that the amendment allowed "American Apparel [to] make new investments in store improvements."[119]  The publication quoted Charney as stating that the amendment "provide[d] [American Apparel] with an enormous amount of room to work with – not that we are going to use it all.  We are going to

---

[114]*Id.*, ¶ 33.

[115]*Id.*

[116]*Id.*, ¶ 189.

[117]*Id.*  The second amended complaint does not specify how frequently American Apparel was required to reimburse Lion Capital under the amended terms of the credit agreement.

[118]*Id.*, ¶¶ 190, 192.

[119]*Id.*, 194.

make strategic investments."[120]

Plaintiffs allege that, because of the company's precarious financial position, American Apparel breached the debt covenants in its credit agreement with Lion Capital by the end of March 2010.[121]   Despite the breach, the company's 2010 Annual Report, issued March 31, 2010, purportedly represented that "[American Apparel] anticipate[d] that based on information currently available, [it would] be in compliance with [its debt] covenants as of March 31, 2010."[122] Defendants affirmed this representation in a May 19, 2010 earnings release, which reported that American Apparel "was in compliance with all covenants under its credit facilities as of March 31, 2010, based on the preliminary financial results for the first quarter of 2010."[123]   The same earnings release also stated, however, that the company would likely be in breach of its debt covenants by June 30, 2010.[124]

### C.    Post-Class Period Revelations

On March 31, 2011 American Apparel filed its 2010 annual report.[125]   Plaintiffs allege the report revealed numerous financial reporting failures during the class period.[126]   It included an "adverse opinion [by American Apparel's new auditor concerning] the effectiveness of the Company's internal control over financial reporting [during the class period] because of the

---

[120]*Id.*

[121]*Id.*, ¶ 198.  Plaintiffs allege that American Apparel's debt to earnings ratio for the twelve months ending March 31, 2010 was 2.04, in violation of the maximum ratio of 2.00 permitted by the debt covenants.  (*Id.*).

[122]*Id.*, ¶ 196.

[123]*Id.*, ¶ 197.

[124]*Id.*, ¶ 202.

[125]*Id.*, ¶ 38.

[126]*Id.*

existence of material weaknesses"[127]   The auditors concluded that during the class period, "the company did not maintain an adequate control environment that fully emphasized the establishment of, adherence to, or adequate communication regarding appropriate internal control over financial reporting."[128]   They also observed that "the Company did not perform adequate independent reviews and maintain effective controls over the preparation of financial statements."[129]   The opinion suggested that if American Apparel could not "implement steps to improve its liquidity position, it [might] need to voluntarily seek protection under Chapter 11 of the U.S. Bankruptcy Code."[130]

In an April 1, 2011, press release, American Apparel revealed that defendant Lion Capital had suddenly removed its two designated directors – Lyndon Lea and Neil Richardson – from the company's board.[131]   After Lea's and Richardson's removal, the company acknowledged that they had departed to eliminate "conflicts of interest" created by Lion Capital's role as one of the company's lenders and creditors.[132]

American Apparel also had a number of high-profile resignations, including board member Keith Miller, audit committee members Mark Samson and Mark Thorton, acting president Tom Casey, and chief business development officer Marty Staff.[133]  These resignations were in addition to the earlier "noisy exit[s]" of former CFO Cieply and former head of human resources

---

[127]*Id.*

[128]*Id.*

[129]*Id.*

[130]*Id.*

[131]*Id.*, ¶ 39.

[132]*Id.*

[133]*Id.*, ¶ 40.  Regarding his resignation, Staff stated: "Dov [Charney] is a one-man band, and I don't think I realized how singular that vision is.  When I joined, I don't think I realized how actively Dov [Charney] manages every part of the company – from design to IT to marketing to finance.  All roads lead through Dov [Charney]."  (*Id.*)

Moreno.[134]

## II.  DISCUSSION

### A.     Legal Standard Governing Motions To Dismiss Under Rule 12(b)(6)

A Rule 12(b)(6) motion tests the legal sufficiency of the claims asserted in the complaint. A Rule 12(b)(6) dismissal is proper only where there is either a "lack of a cognizable legal theory" or "the absence of sufficient facts alleged under a cognizable legal theory." *Balistreri v. Pacifica Police Dept.*, 901 F.2d 696, 699 (9th Cir. 1988).  In deciding a Rule 12(b)(6) motion, the court generally looks only to the face of the complaint and documents attached thereto. *Van Buskirk v. Cable News Network, Inc.*, 284 F.3d 977, 980 (9th Cir. 2002); *Hal Roach Studios, Inc. v. Richard Feiner & Co., Inc.*, 896 F.2d 1542, 1555 n. 19 (9th Cir.1990).

The court must accept all factual allegations pleaded in the complaint as true, and construe them and draw all reasonable inferences from them in favor of the nonmoving party. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007) ("[F]aced with a Rule 12(b)(6) motion to dismiss a § 10(b) action, courts must, as with any motion to dismiss for failure to plead a claim on which relief can be granted, accept all factual allegations in the complaint as true"); see also *Cahill v. Liberty Mutual Ins. Co.*, 80 F.3d 336, 337-38 (9th Cir. 1996); *Mier v. Owens*, 57 F.3d 747, 750 (9th Cir. 1995).  The court need not, however, accept as true unreasonable inferences or conclusory legal allegations cast in the form of factual allegations.  See *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 545 (2007) ("While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do").  Thus, a complaint must "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' . . .  A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*,

---

[134]*Id.*, ¶ 39.

1   129 S. Ct. 1937, 1949 (2009); see also *Twombly*, 550 U.S. at 545 ("Factual allegations must be

2   enough to raise a right to relief above the speculative level, on the assumption that all the

3   allegations in the complaint are true (even if doubtful in fact)" (citations omitted)); *Moss v. United*

4   *States Secret Service* , 572 F.3d 962, 969 (9th Cir. 2009).

5           **B.      Requests for Judicial Notice**

6           Defendants ask that the court take judicial notice of various documents.  Because Rule

7   12(b)(6) review is confined to the complaint, the court typically does not consider material outside

8   the pleadings (e.g., facts presented in briefs, affidavits, or discovery materials) in deciding such

9   a motion.  *In re American Continental Corp./Lincoln Sav. & Loan Securities Litig.*, 102 F.3d

10  1524, 1537 (9th Cir. 1996).  It may, however, properly consider exhibits attached to the complaint

11  and documents whose contents are alleged in the complaint but not attached, if their authenticity

12  is not questioned.  *Lee v. City of Los Angeles*, 250 F.3d 668, 688 (9th Cir. 2001).    In addition,

13  the court can consider  matters that are proper subjects of judicial notice under Rule 201 of the

14  Federal Rules of Evidence.  *Id.* at 688-89; *Branch v. Tunnell*, 14 F.3d 449, 454 (9th Cir. 1994),

15  overruled on other grounds by *Galbraith v. County of Santa Clara*, 307 F.3d 1119 (9th Cir.

16  2002);  *Hal Roach Studios, Inc.*, 896 F.2d at1555 n. 19; see also *Tellabs*, 551 U.S. at 322

17  ("[C]ourts must consider the complaint in its entirety, as well as other sources courts ordinarily

18  examine when ruling on Rule 12(b)(6) motions to dismiss, in particular, documents incorporated

19  into the complaint by reference, and matters of which a court may take judicial notice").[135]  The

20  court is "not required to accept as true conclusory allegations which are contradicted by

21  documents referred to in the complaint."  *Steckman v. Hart Brewing Inc.*, 143 F.3d 1293, 1295

22  (9th Cir. 1998).

23          **1.      SEC Filings**

24          Defendants ask that the court take judicial notice of several of American Apparel's SEC

---

[135]Taking judicial notice of matters of public record does not convert a motion to dismiss into a motion for summary judgment. *MGIC Indemnity Corp. v. Weisman*, 803 F.2d 500, 504 (9th Cir. 1986).

filings.[136]   Courts can take judicial notice of securities offerings and corporate disclosure documents that are publicly available.  See *Metzler Inv. GMBH v. Corinthian Colleges, Inc.*, 540 F.3d 1049, 1064 n. 7 (9th Cir. 2008) ("Defendants sought judicial notice for Corinthian's reported stock price history and other publicly available financial documents, including a number of Corinthian's SEC filings.  In its dismissal order, the court granted Defendants' unopposed requests for judicial notice.  Metzler does not contest the propriety of the noticing of these documents on appeal, which in any event was proper").  In addition, courts may consider documents that are referenced in the complaint under the "incorporation by reference" doctrine.  Here, the complaint refers to American Apparel's annual reports, conference call transcripts, and other documents defendants seek to have the court consider.  *In re Stac Electronics Securities Litigation*, 89 F.3d 1399, 1405 n. 4 (9th Cir. 1996) (affirming the district court's consideration of securities offering documents referenced in the complaint); see also *In re Silicon Graphics, Inc. Securities Litigation*, 183 F.3d 970, 986 (9th Cir. 1999) (holding that the district court properly considered SEC filings under the incorporation by reference doctrine because their contents were alleged in the complaint); *In re Northpoint Communications Group, Inc. Securities Litigation*, 184 F.Supp.2d 991, 994 n. 1 (N.D. Cal. 2001) ("In a securities-fraud suit, judicial notice can be had of documents directly related to documents referenced in the complaint that bear on the adequacy of the disclosure" (citations omitted)).  The court therefore takes notice of the SEC filings defendants have proffered.[137]

---

[136]American Apparel's Request for Judicial Notice ("American Apparel RJN"), Docket No. 150 (Mar. 15, 2013); Lion Capital's Request for Judicial Notice ("Lion Capital RJN"), Docket No. 151 (Mar. 15, 2013).

[137]The court takes judicial notice of the SEC filings only for their existence and contents, and not for the truth of information contained in them.  See *In re Foundry Networks, Inc.*, C 00-4823 MMC, 2003 WL 23211577, *10 n. 11 (N.D. Cal. Feb. 14, 2003) ("Plaintiffs 'object to the request to the extent defendants seek to establish the truth of the contents in the noticed documents,' but raise no objection to the extent the request asks the Court to take notice of the contents of the documents.  Defendants' request is hereby GRANTED to the extent it requests that the Court take judicial notice of the content of such documents"); *Del Puerto Water Dist. v. U.S. Bureau of Reclamation*, 271 F.Supp.2d 1224, 1234 (E.D. Cal. 2003) ("Judicial Notice is taken

## 2. Compliance Certificate

Lion Capital also requests that the court take judicial notice of a May 14, 2010 compliance certificate that American Apparel provided to Lion Capital; in the document, American Apparel represented that it was in compliance with the debt covenants in its agreement with Lion Capital.[138] Lion Capital asserts that the court can properly consider the document under the incorporation by reference doctrine, since it is discussed in plaintiffs' complaint. Plaintiffs oppose the request, arguing that the complaint contains only general references to quarterly and monthly compliance certificates – not the May 14, 2010 certificate specifically. They also assert that the document is not central to their claims, and that it is not authentic.[139] In ruling on a motion to dismiss for failure to state a claim "[a] court may consider evidence on which the complaint 'necessarily relies' if: (1) the complaint refers to the document; (2) the document is central to the plaintiff's claim; and (3) no party questions the authenticity of the copy attached to the 12(b)(6) motion." *Marder v. Lopez*, 450 F.3d 445, 448 (9th Cir. 2006), citing *Branch*, 14 F.3d at 453-54); *Warren v. Fox Family Worldwide, Inc.*, 328 F.3d 1136, 1141 n. 5 (9th Cir. 2003); *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 n. 3 (2d Cir. 2002)); see also *Sanders v. Brown*, 504 F.3d 903, 910 (9th Cir. 2007) ("Review is generally limited to the contents of the complaint, but a court can consider a document on which the complaint relies if the document is central to the plaintiff's claim, and no party questions the authenticity of the document," citing *Warren*, 328 F.3d at 1141 n. 5). Plaintiffs' complaint does not reference the May 14, 2010 compliance certificate. The only mention of such certificates in the complaint is plaintiffs' allegation that "American Apparel was required to provide Lion Capital, within 30 days of the end of each fiscal month, with a 'certificate of a Financial Officer' (a 'Compliance Certificate') . . . certifying as to whether a

---

of the existence and authenticity of the public and quasi public documents listed. To the extent their contents are in dispute, such matters of controversy are not appropriate subjects for judicial notice").

[138]Lion Capital RJN at 3-4.

[139]Opposition to Request for Judicial Notice, Docket No. 153 (May 13, 2013).

Default or Event of Default has occurred."[140]  Plaintiffs include this allegation in support of an assertion that American Apparel knew it was in breach of the debt covenants in its agreement with Lion Capital.

The contents of the May 14, 2010 compliance certificate is not relevant or central to plaintiffs' claim; they assert only that the fact American Apparel was required to provide such certificates indicates that it had to review its compliance with the debt covenants every month and thus must have had had knowledge of its purported breach.  Consequently, the court concludes that the May 14, 2010 certificate was not referenced in the complaint and that it is not central to plaintiffs' claims.  The court declines to consider the document as a result.

## C. Legal Standard Governing the Pleading of Securities Fraud Claims

Rule 9(b) of the Federal Rules of Civil Procedure provides that the "circumstances constituting fraud or mistake shall be stated with particularity." FED.R.CIV.PROC. 9(b).  A securities fraud claim cannot survive a motion to dismiss under Rule 9(b) merely by alleging that certain statements were false. *Metzler*, 540 F.3d at 1070 ("A litany of alleged false statements, unaccompanied by the pleading of specific facts indicating why those statements were false, does not meet this standard"); see also *In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 390 (9th Cir. 2010) ("Plaintiffs must 'demonstrate that a particular statement, when read in light of all the information then available to the market, or a failure to disclose particular information, conveyed a false or misleading impression,' quoting *In re Convergent Technologies Sec. Litig.*, 948 F.2d 507, 512 (9th Cir. 1991)).  Rather, the complaint must allege "why the disputed statement was untrue or misleading *when made.*"  *In re Glenfed Inc. Securities Litigation*, 42 F.3d 1541, 1549 (9th Cir. 1994) (en banc) (emphasis added).

In 1995, Congress passed the Private Securities Litigation Reform Act, 15 U.S.C. § 78u-4, which amended the Securities Exchange Act of 1934.  The PSLRA modified Rule 9(b)'s particularity requirement, "providing that a securities fraud complaint [must] identify: (1) each statement alleged to have been misleading; (2) the reason or reasons why the statement is

---

[140]SAC, ¶ 200.

misleading; and (3) all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1); see *Silicon Graphics*, 183 F.3d at 996.  The statute requires, with respect to pleading that each allegedly misleading statement or omission was made with scienter, that plaintiff "state with particularity . . . facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2).  If the complaint does not contain such allegations, it must be dismissed.  15 U.S.C. § 78u- 4(b)(3)(A).[141]

In enacting the PSLRA, "Congress 'impose[d] heightened pleading requirements in actions brought pursuant to § 10(b) and Rule 10b-5.'" *Tellabs*, 551 U.S. at 320 (citing *Merrill Lynch, Pierce, Fenner & Smith Inc. v. Dabit*, 547 U.S. 71, 81 (2006)).  The PSLRA's requirements "prevent[ ] a plaintiff from skirting dismissal by filing a complaint laden with vague allegations of deception unaccompanied by a particularized explanation stating why the defendant's alleged statements or omissions are deceitful." *Metzler*, 540 F.3d at 1061 (citing *Falkowski v. Imation Corp.*, 309 F.3d 1123, 1133 (9th Cir. 2002)).

### D.    Legal Standard Governing Liability Under Section 10(b) and Rule 10b-5

Rule 10b-5, promulgated by the Securities and Exchange Commission pursuant to section 10(b) of the 1934 Act, makes it unlawful for any person to use "manipulative or deceptive device[s]" in connection with the purchase or sale of securities. 15 U.S.C. § 78j(b).  Specifically, one cannot "(a) . . . employ any device, scheme, or artifice to defraud; (b) . . . make any untrue statement of a material fact or omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; or (c) . . . engage in any act, practice, or course of business which operates or would operate as

---

[141]The PSLRA creates a "safe harbor" for "forward-looking" statements that are immaterial, are limited by "meaningful cautionary statements," or are made without actual knowledge of their falsity. 15 U.S.C. §§ 77z-2(c), 78u-5(c). Such statements include, but are not limited to, statements of future economic performance and management plans and objectives. 15 U.S.C. §§ 77z-2(i), 78u-5(i). This "safe harbor" has much the same effect as the "bespeaks caution" doctrine, which provides that forward-looking representations that contain adequate cautionary language or risk disclosure protect a defendant from securities liability. See, e.g., *Plevy v. Haggerty*, 38 F.Supp.2d 816, 830 (C.D. Cal. 1998).

a fraud or deceit upon any person, in connection with the purchase or sale of any security." 17 C.F.R. § 240.10b-5.

The elements of a section 10(b) or Rule 10b-5 violation are (1) the misrepresentation or omission of a material fact, (2) scienter, (3) reliance (4) in connection with the purchase or sale of a security, (5) economic loss, and (6) loss causation. *Dura Pharmaceuticals, Inc. v. Broudo*, 544 U.S. 336, 341 (2005); see also *Paracor Finance, Inc. v. General Electric Capital Corp.*, 96 F.3d 1151, 1157 (9th Cir. 1996) (en banc); *McCormick v. Fund American Companies, Inc.*, 26 F.3d 869, 875 (9th Cir. 1994).

As noted, the complaint must specify "each statement alleged to have been misleading, [and] the reason or reasons why the statement is misleading." 15 U.S.C. § 78u–4(b)(1). In addition to pleading falsity adequately, the pleading must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. §§ 78u-4(b)(2). "Scienter" refers to "a mental state embracing intent to deceive, manipulate, or defraud." *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 n. 12 (1976). The Ninth Circuit has articulated a "two-part inquiry for scienter: first, [the court must] determine whether any of the allegations, standing alone, are sufficient to create a strong inference of scienter; second, if no individual allegation is sufficient, . . . the court [must] conduct a 'holistic' review of the same allegations to determine whether the insufficient allegations combine to create a strong inference of intentional conduct or deliberate recklessness." *New Mexico State Investment Council v. Ernst & Young*, 641 F.3d 1089, 1095 (9th Cir. 2011) (citing *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 991–92 (9th Cir. 2009)).[142]

The Ninth Circuit has emphasized that "plaintiffs 'must plead, in great detail, facts that constitute strong circumstantial evidence of deliberately reckless or conscious misconduct.'"

---

[142]The court's prior order on defendants' motion to dismiss the consolidated class action complaint explained in detail that Ninth Circuit precedent requires the court to engage in this two-step analysis. See *In re American Apparel, Inc.*, 855 F.Supp.2d at 1077 n. 192. For the reasons stated therein, the court will first address each allegation individually, and thereafter as necessary, analyze them in combination.

*Middlesex Retirement System v. Quest Software Inc.*, 527 F.Supp.2d 1164, 1179 (C.D. Cal. 2007) (quoting *Silicon Graphics*, 183 F.3d at 974); see also *Silicon Graphics*, 183 F.3d at 977 ("recklessness only satisfies scienter under § 10(b) to the extent that it reflects some degree of intentional or conscious misconduct"). The requisite state of mind must be a "'departure from the standards of ordinary care [that] presents a danger of misleading buyers that is either known to the defendant or so obvious that the actor must have been aware of it.'" *Zucco Partners*, 552 F.3d at 991 (quoting *Silicon Graphics*, 183 F.3d at 984). If plaintiffs rely on allegations of recklessness, the pleading standard requires that they "state specific facts indicating no less than a degree of recklessness that strongly suggests actual intent." *Silicon Graphics*, 183 F.3d at 979. Allegations of mere negligence are insufficient. *Glazer Capital Management, LP v. Magistri*, 549 F.3d 736, 748 (9th Cir. 2008) ("At most, it creates the inference that he *should have known* of the violations. This is not sufficient to meet the stringent scienter pleading requirements of the PSLRA"); *Police Retirement Systems of St. Louis v. Intuitive Surgical, Inc.*, No. 10–CV–03451–LHK, 2011 WL 3501733, *7 (N.D. Cal. Aug. 10, 2011) ("[T]he Ninth Circuit defines 'recklessness' as a highly unreasonable omission [or misrepresentation], involving not merely simple, or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it").

"To qualify as 'strong' within the intendment of § 21D(b)(2) . . . an inference of scienter must be more than merely plausible or reasonable – it must be cogent and *at least as compelling as any opposing inference of nonfraudulent intent*." *Tellabs*, 551 U.S. at 314 (2007) (emphasis added). "[C]ourts must consider the complaint in its entirety, as well as other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss. . . . The inquiry . . . is whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Id.* at 322-23 (emphasis original). In determining whether plaintiffs have alleged facts showing a strong inference of scienter, the court must draw all reasonable inferences from the allegations presented, including inferences unfavorable to plaintiffs. *Gompper v. VISX, Inc.*, 298 F.3d 893, 897 (9th

Cir. 2002).   "However, the 'inference that the defendant acted with scienter need not be irrefutable, i.e., of the "smoking-gun" genre, or even the "most plausible of competing inferences." . . . [T]he inference of scienter must be more than merely "reasonable" or "permissible[,]" [however] – it must be cogent and compelling . . . in light of other explanations.'" *Middlesex Retirement System*, 527 F.Supp.2d at 1179 (quoting *Tellabs*, 551 U.S. at 314).

The allegations in the second amended complaint rely heavily on the statements of confidential witnesses.   Before those witnesses' statements can support a strong inference of scienter, they must meet two requirements.   First, "the confidential witnesses whose statements are introduced to establish scienter must be described with sufficient particularity to establish their reliability and personal knowledge."   *Zucco Partners*, 552 F.3d at 995; see also *In re Siebel Systems, Inc. Sec. Litig.*, No. 04-0983, 2005 WL 3555718,*8-9 (N.D. Cal. Dec. 28, 2005) (allegations attributed to a confidential witness "'must be accompanied by enough particularized detail to support a reasonable conviction in the informant's basis of knowledge,'" quoting *In re Metawave Communications Corp.*, 298 F.Supp.2d 1056, 1068 (W.D. Wash. 2003)).   Second, the statements "[that] are reported by confidential witnesses with sufficient reliability and personal knowledge must themselves be indicative of scienter."   *Zucco Partners*, 552 F.3d at 995.

The Ninth Circuit often treats the falsity and scienter analyses as "a single inquiry, because falsity and scienter are generally inferred from the same set of facts."   *In re New Century*, 588 F.Supp.2d 1206, 1227 (C.D. Cal. 2008) (citing *In re Read–Rite Corp.*, 335 F.3d 843, 846 (9th Cir. 2003), abrogated by *Tellabs* on other grounds, as recognized in *South Ferry LP, No. 2 v. Killinger*, 542 F.3d 776 (9th Cir. 2008), and *Ronconi v. Larkin*, 253 F.3d 423, 429 (9th Cir. 2001)).   The court therefore analyzes plaintiffs' falsity and scienter allegations in tandem below.

> **E.   Whether Plaintiffs Have Adequately Pled Knowing Material Misrepresentations and/or Omissions**
>
> > **1.   American Apparel's Employment of Unauthorized Workers and Its Compliance with Federal Immigration Laws**

The court previously concluded that plaintiffs' initial complaint sufficiently pled the falsity

of representations concerning American Apparel's supposed compliance with the immigration laws. It noted that the company had repeatedly stated that it had made "diligent efforts" to ensure compliance, and that it had worked assiduously to "comply with its obligations to establish the employment eligibility of prospective employees under immigration laws." *In re American Apparel I*, 855 F.Supp.2d at 1067. Given the number of employees it was later required to terminate, the court found it implausible to conclude that these statements were not false when made, and that defendants could not invoke the mere "incantation of fraud-by-hindsight" to "defeat an allegation of misrepresentations and omissions that were misleading and false at the time they were made." *In re Bear Stearns Companies, Inc. Sec., Deriv., and ERISA Litig.*, 763 F.Supp.2d 423, 487 (S.D.N.Y. 2011).

The court reiterated its initial holding in its order granting in part and denying in part defendants' motion to dismiss the first amended complaint. The court can see no reason why it should revisit this holding here, as the facts alleged in the second amended complaint on this point are substantively similar to those in the original complaint and the first amended complaint. As the court noted, "[t]he large number of employees terminated following the ICE audit, and the fact that no company would discharge so many employees simultaneously if it felt the results of ICE's audit were wrong cannot be reconciled with statements that the company was making 'diligent' efforts to comply with the immigration laws 'at all times.'" *In re American Apparel I*, 855 F.Supp.2d at 1069.

The original complaint was ultimately dismissed for failure adequately to allege scienter. In reviewing the first amended complaint, however, the court found that plaintiffs had corrected the deficiencies present in the original complaint and concluded that they had adequately alleged that American Apparel made the false statements with scienter. The allegations regarding the company's state of mind in the second amended complaint largely mirror those found in the first amended complaint, and the court sees no reason to deviate from its prior holding. The key to pleading intentional or reckless conduct is pleading facts showing that when defendants made the allegedly false statements, they knew the statements were false, or knew facts "so obvious that they must have been aware" they were misleading the public. *Zucco Partners*, 552 F.3d at 991.

31

The court's prior order noted that the none of the isolated allegations in the first amended complaint allegations led to a strong inference of scienter.  It concluded, however, that "[e]ven if individual allegations of scienter [were] not sufficient to give rise to a 'strong inference' of knowledge or recklessness," it was required to "conduct a 'holistic' review of the same allegations to determine whether the insufficient allegations combine to create a strong inference of intentional conduct or deliberate recklessness."  *In re American Apparel II*, 2013 WL 174119 at *20 (citing *New Mexico State Investment Council*, 641 F.3d at 1095, and *Nursing Home Pension Fund, Local 144 v. Oracle Corp.*, 380 F.3d 1226, 1234 (9th Cir. 2004) ("We find that the totality of the allegations does create a strong inference that Oracle acted with scienter, and we reverse the District Court")).  Under this standard, the court noted, "[v]ague or ambiguous allegations are . . . considered as a part of [the] holistic review . . . [because] the federal courts . . . need not close their eyes to circumstances that are probative of scienter viewed with a practical and common-sense perspective."  *South Ferry LP #2*, 542 F.3d at 784.  For purposes of the holistic review, "[e]ven if a set of allegations may create an inference of scienter greater than the sum of its parts, it must still be at least as compelling as an alternative innocent explanation."  *Zucco Partners*, 552 F.3d at 1006.

The analysis is thus a comparative one.  *Tellabs*, 551 U.S. at 310 ("The inquiry is inherently comparative: How likely is it that one conclusion, as compared to others, follows from the underlying facts?  To determine whether the plaintiff has alleged facts that give rise to the requisite 'strong inference' of scienter, a court must consider plausible nonculpable explanations for the defendant's conduct, as well as inferences favoring the plaintiff").

The court's order on the first amended complaint noted that the sheer magnitude of American Apparel's immigration violations, coupled with the testimony of confidential witnesses, "indicate[d] that American Apparel's compliance problems and shoddy screening practices were endemic even prior to commencement of the ICE audit."  *In re American Apparel II*, 2013 WL 174119 at *21-22; see also  *Snellink v. Gulf Resources, Inc.*, 870 F.Supp.2d 930, 2012 WL 1693979, *9 (C.D.Cal. May 15, 2012) ("Gulf suggests that its offices, directors, and accountants did not have actual knowledge of the alleged falsities.  As discussed above, the magnitude of those

errors suggest that the errors would have been noticed if they were unintentional"). Given this, the court concluded that "it strain[ed] credulity to infer that the company's management remained completely ignorant of American Apparel's immigration compliance problems during the entire pendency of the ICE investigation." *In re American Apparel II*, 2013 WL 174119 at *21. The court thus found that the facts pled suggested an "'extreme departure from the standards of ordinary care, [that] present[ed] a danger of misleading buyers that [was] either known to the defendant[s] or so obvious that the actor[s] must have been aware of it.'" *Middlesex Retirement System*, 527 F.Supp.2d at 1179 (quoting *Silicon Graphics*, 183 F.3d at 984). It found, therefore, that the complaint adequately alleged a securities fraud claim against American Apparel based on statements it had made regarding its compliance with immigration laws.

The court reached a different conclusion respecting plaintiffs' allegations of the individual defendants' scienter, however. It noted that while purportedly actionable misrepresentations were included in American Apparel's January 16, 2008 press release, its 2007 and 2008 annual reports, and its June 30, 2009 press release – all of which stated that the company had diligently worked to comply with immigration laws, and that it had not been in contact with ICE since the January 2008 audit – "[t]he [first amended] complaint [did] not clearly allege . . . which documents Charney and Kowalewski authorized or signed." As a result, the court was "unable to determine from the record . . . whether Charney or Kowalewski can be held responsible for the representations." *In re American Apparel II*, 2013 WL 174119 at *26. The court further observed that plaintiffs had engaged in impermissible "group pleading," because they did not clearly delineate which statements, if any, were made by the individual defendants.[143] *Id.* at *24-

---

[143]Although the Ninth Circuit has not definitively addressed whether group pleading may be adequate in certain instances, courts within the Ninth Circuit have largely concluded that group pleading is not compatible with the PSLRA's requirements. See, e.g., *In re New Century*, 588 F.Supp.2d at 1223-24 ("All of the Circuit courts that have expressly considered whether group pleading is compatible with PSLRA have concluded that it is not"); *In re Hansen Natural Corp. Sec. Litig.*, 527 F.Supp.2d 1142, 1153-54 (C.D. Cal. 2007) (holding that "the group pleading doctrine can no longer be used in pleading cases under the PSLRA," and that "[t]his view is shared by numerous district courts within this circuit"); see also *Petrie v. Electronic Game Card Inc.*, No. SACV 10-00252 DOC (RNBx), 2011 WL 165402, *3 (C.D. Cal. Jan. 12, 2011)

25.

In the second amended complaint, plaintiffs have identified which documents Charney and Kowalewski signed or authorized. Specifically, they allege that Charney signed the 2007[144] and 2008[145] annual reports, as well as the June 30, 2009 press release.[146] They allege that Kowalewski also signed the 2008 annual report.[147]   Courts that have disapproved of group pleading have observed that an individual defendant's signature on a document containing actionable misrepresentations is a sufficient basis upon which to hold that defendant liable. See *Southland Sec. Corp. v. INSpire Ins. Solutions, Inc.*, 365 F.3d 353, 365 (5th Cir. 2004) ("[C]orporate documents that have no stated author or statements within documents not attributed to any individual may be charged to one or more corporate officers provided specific factual allegations link the individual to the statement at issue. *Such specific facts tying a corporate officer to a statement would include a signature on the document* or particular factual allegations explaining the individual's involvement in the formulation of either the entire document, or that specific portion of the document, containing the statement" (emphasis added)); *In re Hansen Natural Corp.*, 527 F.Supp.2d at 1153 (distinguishing among defendants that had "signed annual reports as well as a single Form S-8," and defendants that had not "played any role . . . in the preparation or dissemination of any allegedly false statements"); *Petrie*, 2011 WL 165402 at *3 ("Plaintiffs

---

("Although the Ninth Circuit has yet to squarely address the issue, the majority of district courts within the Circuit to confront the group pleading doctrine post-*Tellabs* have decided that the doctrine did not survive.   The Central District of California, in particular, appears to be unanimous in this conclusion"); *In re Tibco Software Secs. Litig.*, No. C 05-2146 SBA, 2006 WL 1469654, *27 (N.D. Cal. May 25, 2006) ("[C]ourts in this district are increasingly finding that the group pleading doctrine is contrary to the PSLRA"); *In re Nextcard Sec. Litig.*, No. C 01-21029 JF (RS), 2006 WL 708663,*3 (N.D. Cal. Mar. 20, 2006) ("This Court adopts the reasoning of the decisions concluding that the group published pleading doctrine no longer is viable after the PSLRA").

[144]SAC, ¶ 15 n. 10.

[145]*Id.*, ¶ 17 n. 11.

[146]*Id.*, ¶¶ 18 n. 12; 123.

[147]*Id.*, ¶ 17 n. 11.

have alleged no facts linking any of these alleged misrepresentations to Christiansen, Houssels or Farrell. For instance, Plaintiffs do not aver that any of these three Defendants signed any of the above-listed statements or authored the press releases. In fact, the Complaint specifically identifies other defendants as the signatories of the forms at issue").

The individual defendants concede that they signed these documents, which contained purported misrepresentations. They assert, however, that their signatures alone do not show that they "signed the documents with actual knowledge of their alleged falsity."[148] It is true that merely alleging a defendant signed a false statement is insufficient to satisfy the PLSRA's scienter requirement. See *In re Downey Secs. Litig.*, No. CV 08–3261–JFW, 2009 WL 2767670, *9 (C.D. Cal. Aug. 21, 2009) ("[I]f it were true that simply alleging that the Individual Defendants' signatures appearing on various public filings creates a strong inference of scienter, 'scienter would be established in every case where there was an accounting error or auditing mistake made by a publicly traded company, thereby eviscerating the pleading requirements for scienter set forth in the PSLRA,'" quoting *Central Laborers' Pension Fund v. Integrated Electrical Services, Inc.*, 497 F.3d 546, 555 (5th Cir. 2007)). This argument, however, misconstrues the court's earlier conclusion regarding scienter. The court concluded that the statements contained in American Apparel's January 16, 2008 press release, its 2007 and 2008 annual reports, and its June 30, 2009 press release were false and that, based on the totality of the circumstances, *management would have known they were false*; the only outstanding question was whether, in light of the first amended complaint's group pleading, the statements could be attributed to Charney or Kowalewski in addition to the company. The court specifically noted that "it strains credulity to infer that *the company's management* remained completely ignorant of American Apparel's immigration compliance problems." *In re American Apparel II*, 2013 WL 174119 at *21 (emphasis added). The court also noted Charney's heavy involvement in the company and how he "repeatedly emphasized the importance of the company's manufacturing employees in publicizing the company" as further evidence of his scienter. *Id*. at *22. The court therefore granted plaintiffs

---

[148]Charney MTD at 7.

"leave to amend to delineate SEC filings containing actionable misrepresentations, if any, [that Charney and Kowalewski] signed"; it stated that "[s]uch allegations would suffice to state a viable claim against them." *Id*. at *26. The second amended complaint contains such allegations.

Consequently, defendants' motions to dismiss the § 10b and Rule 10b-5 claims against them are denied to the extent the claims are based on purported misrepresentations concerning American Apparel's compliance with the immigration laws.[149] Plaintiffs have adequately alleged that American Apparel made several actionable misrepresentations. They have also now identified specific misrepresentations that can be attributed to Charney and Kowalewski.[150]

### 2. American Apparel's Representations Regarding the Effect of the Work Force Reduction on Its Operations and Profitability

Plaintiffs also allege that defendants misrepresented the effect the termination of as many as 1,800 employees, or one-third of American Apparel's workforce, would have on its operations and profitability. Plaintiffs identify several statements the company made in the months that followed the terminations that they contend were knowingly false. Two of these were made on June 30 and July 1, one in August, and one in November 2009. Plaintiffs assert the statements were false because they suggested that the workforce reduction would not affect company operations, and that American Apparel was well-equipped to compensate for the employees' departure. In its order on defendants' motion to dismiss the initial complaint, the court noted that "[w]hile defendants' statements were certainly optimistic, not enough facts [were] pled to show that they were also false." *In re American Apparel I*, 855 F.Supp.2d at 1070. The court also concluded that the complaint was "devoid of any factual allegations suggesting that when Charney, Kowalewski, and American Apparel predicted . . . the work force reduction would not impact the

---

[149]The court notes that neither Charney or Kowalewski signed all of the documents containing misrepresentations. The purportedly false statements contained in each of the documents are largely the same, however. As a result, this fact makes little practical difference.

[150]Charney and Kowalewski are also potentially liable for misstatements regarding American Apparel's compliance with immigration laws as control persons of the company. This issue is discussed *infra*.

business, they knew or deliberately and recklessly disregarded the fact that the statements were false." *Id.* at 1082.  The court thus found that plaintiffs had failed to plead either falsity or scienter with the requisite level of specificity.

The court found the same deficiencies in plaintiffs' first amended complaint.  Although it incorporated the allegations of the original complaint, the first amended complaint contained new allegations regarding the statements of confidential witnesses who asserted that, given his heavy involvement in all aspects of the company's operations, Charney was aware in real time of the negative effect of the terminations.  *In re American Apparel II*, 2013 WL at *27-28.  Despite these additional allegations, the court concluded that the facts pled in the first amended complaint did not give rise to a compelling inference that defendants' statements were false *when made*, or that the statements were made with knowledge of their falsity or reckless disregard for their truth.  *Id.* at *29.  Thus, "while the first amended complaint ple[d] additional facts that raise[d] a somewhat stronger inference than did the initial complaint of the falsity of defendants' statements concerning the impact the workforce reduction would have on company operations and profitability, and defendants' intent to deceive in making the statements," the court found that "plaintiffs ha[d] failed to plead facts raising a strong inference that defendants' statements were false when made or made with intent to defraud." *Id.* at *30.

To show that forward-looking statements are false, "plaintiffs must prove that [they] were made with 'actual knowledge' that they were false or misleading." *Silicon Graphics*, 183 F.3d at 993 (Browning, J., concurring in part and dissenting in part) (quoting 15 U.S.C. §§ 78u–5(c)(1)(B), 77z–2(c)(1)(B)); *Alaska Elec. Pension Fund v. Adecco S.A.*, 434 F.Supp.2d 815, 823 (S.D. Cal. 2006) ("[A] bare allegation that bad debt reserves were inadequate is insufficient 'because even reasonable predictions turn out to be wrong.  Instead, plaintiffs must allege with particularity facts that show the initial prediction was 'a falsehood,'" quoting *Kane v. Madge Networks N.V.*, CV No. 96–20652(RMW), 2000 WL 33208116, *6 (N.D. Cal. May 26, 2000) (in turn quoting *In re GlenFed, Inc. Sec. Litig.*, 42 F.3d at 1549)); see also *In re Northpoint Communications Group, Inc. Sec. Litig.*, 184 F.Supp.2d 991, 997 (N.D. Cal. 2001) (providing examples of sufficient factual allegations of scienter, such as "'contemporaneous receipt of a

report with information directly at odds with an alleged misrepresentation, . . . and statements by witnesses that they told the actor the true facts before the false statement was made. . .'" (citation omitted)).

In the second amended complaint, plaintiffs plead new allegations detailing the statements of confidential witnesses regarding the impact of the layoffs.  The complaint also realleges the statements of CW2, CW3, CW 5, and CW11 concerning the effect the workforce reduction on production.  As the court previously noted, CW2's and CW11's statements are the most detailed.[151]  The second amended complaint largely mirrors the first amended complaint's pleading of CW2's statements.  It alleges that CW2 was a "manufacturing division controller" from 2008 to mid-2010, who reported to corporate controller Adrian Taylor, who in turn reported to Kowalewski.[152]  CW2's responsibilities included recording financial transactions and compiling financial statements for the manufacturing division on a monthly basis.[153]  CW2 submitted this information to Taylor, who incorporated it into a document summarizing company-wide financial data.[154]  CW2 "believes" that Taylor's responsibilities included "inform[ing] Kowalewski of any

---

[151]CW3's testimony support the accounts of CW2 and CW11, but his/her statements are far less detailed. CW3 was a distribution supervisor at American Apparel from August 2009 to early 2010; he/she started working at the company at the time that many unauthorized workers were being terminated. CW3 "met Charney on several occasions," and opines that "it [is] ridiculous for him to suggest that he did not know about the loss of productivity. . . ." (SAC, ¶ 70.) CW3 does not state why such a statement by Charney would be "ridiculous," and offers no information about the specific time frame during which the problems with replacement workers became evident. The court cannot credit the statements of confidential witnesses who offer little information concerning the bases of their beliefs and opinions. See *Applestein v. Medivation, Inc.*, No. C–10–0998 EMC, 2012 WL 986276, *5 (N.D. Cal. Mar. 22, 2012) (observing that the "Ninth Circuit [has] found that a specific description of the confidential witnesses was alone insufficient," and discounting the statements of confidential witnesses where the complaint "fail[ed] to adequately allege that the confidential witnesses were in a position to have the knowledge they profess").

[152]SAC, ¶ 62.

[153]*Id.*, ¶ 63.

[154]*Id.*

significant variances in the divisions' financials."[155]   He/she states that "the impact of the dismissals of [the] manufacturing employees was evident at the Company in 4Q09," as they led to increased labor costs and slower production.[156]   CW2 also reports that the company was engaged in "a mad rush" to hire replacement workers in June 2009, and that this resulted in "almost double the number of employees in manufacturing positions."[157]   The new hires purportedly lacked experience, and weakened the company's efficiency.[158] CW2 asserts that while payroll increased, productivity decreased, and sales did not keep pace with expenses.[159]   CW2 states that Bailey, American Apparel's COO, "would have been aware of the lack of productivity because American Apparel set production quotas for its manufacturing employees."[160] CW2 also "believes that Charney knew in real time" of the effect of the dismissals because he "was heavily involved in every aspect of American Apparel's operations."[161]   CW2 asserts that the company began violating the debt covenants in its agreement with Lion Capital in the last quarter of 2009 and the first quarter of 2010 as a result of the worker shortage.   He/she reports that American Apparel calculated its gross operating profit on a monthly basis so as not to run afoul of the debt covenants and that monitoring the covenants was one of Kowalewski's "key responsibilities."[162] CW2 describes "a panic at [American Apparel]" during the fourth quarter of 2009 and the first quarter of 2010 because the company's gross operating profit had fallen below lenders'

---

[155]*Id.*

[156]*Id.*, ¶ 66.

[157]*Id.*, ¶ 65.

[158]*Id.*

[159]*Id.*

[160]*Id.*, ¶ 65.

[161]*Id.*, ¶ 66.

[162]*Id.*, ¶ 68.

requirements.[163]

CW11 was a quality assurance supervisor from 2003 to 2010, responsible for inspecting the cutting room floor.[164] CW11 reported directly to Bailey; his/her position required that CW11 be on the manufacturing room floor to inspect completed products.[165] In CW11's observation, new employees were generally less productive and less efficient than terminated workers; as a result, they generated fewer products and the products were of lower quality.[166] CW11 states that the "defect rate in completed products" was about two to three percent prior to the workforce reduction, and "may have risen . . . to eight percent" after the terminations.[167] CW11 also reports that the decrease in quantity and increase in defect rates were documented in a quality control system that generated regular reports for Bailey.[168]

The second amended complaint also alleges statements by CW15, an "internal financial reporting manager" for American Apparel from October 2009 to 2011.[169] CW15 was purportedly responsible for consolidating the monthly financial statements of American Apparel's three divisions – wholesale, retail, and international – d providing the information to Taylor.[170] He asserts that Kowalewski had "read-only access to the monthly financial information from the

---

[163]Id.

[164]Id., ¶ 89.

[165]Id.

[166]Id.

[167]Id., ¶ 90.

[168]Id. CW11 also states that a majority of his/her staff was laid off, but the complaint does not indicate why a layoff of quality control employees is relevant in assessing the impact of the workforce reduction. In fact, this testimony might provide a separate explanation for the decline in product quality; if there were fewer quality control employees, presumably it was harder to detect product defects while the manufacturing process was ongoing.

[169]Id., ¶ 97.

[170]Id.

divisions," and that he attended monthly financial meetings in which the company's gross margins, efficiency, and production costs were discussed.

As in the first amended complaint, CW2 and CW11 describe a period of turmoil at American Apparel following the workforce reduction. Their statements suggest that despite Charney's and Kowalewski's rosy predictions, American Apparel had substantial difficulty compensating for the loss of so many experienced workers. Nonetheless, the allegations in the second amended complaint do not adequately plead falsity and scienter. First, as with the earlier complaints, neither CW2 nor CW11 asserts that Charney or Kowalewski saw the signs of disruption they observed firsthand. Nor does either assert that he/she knows the information was conveyed to Charney or Kowalewski prior to the time they made their predictions. As the court previously noted, "[t]he most CW2 can say is he/she 'believed' that Taylor was advising Kowalewski of the impact of the workforce reduction. This does not suffice to plead that the CFO had access to adequate information that he understood the impact of the workforce reduction and turned a blind eye to it nonetheless." *In re American Apparel II*, 2013 WL 174119 at *28. The second amended complaint largely repeats verbatim the allegations found deficient in the first amended complaint, asserting only that CW2 states he/she "believes" it was Taylor's responsibility to share significant variances in the manufacturing division's financials with Kowalewski.[171]

The second amended complaint does allege additional statements by CW2 concerning American Apparel's obligations to its lender, Lion Capital. CW2 asserts that the debt covenants in American Apparel's credit agreement with Lion Capital required that it maintain a "minimum gross operating profit," and that monitoring the debt covenants was "one of Kowalewski's key responsibilities."[172] CW2 states that the negative impact of the workforce reductions "caused

---

[171]*Id.*, ¶ 63.

[172]*Id.*, ¶ 68.

[American Apparel] to begin running afoul of its debt covenants in 4Q09 and 1Q10."[173]  This allegedly caused a "panic at [American Apparel] during 4Q09 and 1Q10."[174]

These allegations – and plaintiffs' allegations generally – fail to take into account the timing of the allegedly fraudulent predictions.   As the court noted previously, the purported misrepresentations occurred within a finite time period, which began on June 30, 2009 with release of the company's Form 8-K and the subsequent investor conference call; this was just after the workforce reduction had commenced.   The final alleged misrepresentation regarding the impact of the workforce reduction was made during a conference call four months later, on November 10, 2009.   American Apparel ultimately disclosed the negative impact of the mass terminations in March 2010.   Even when CW2's testimony regarding American Apparel's breach of the debt covenants is accepted as true, this does not demonstrate that predictions made months earlier were fraudulent.   Stated differently, even if defendants knew of the breaches when they occurred in the fourth quarter of 2009 and/or first quarter of 2010, this does show that they knew that future breaches would occur when they made predictions in the second and third quarters of 2009.[175]  While the November 2009 statement was made during the fourth quarter of 2009, CW2's statements are vague as to whether the debt covenant breaches occurred in that quarter, the first quarter of 2010, or both;[176] nor, if the breaches occurred during the fourth quarter of 2009, does CW2 state when within the quarter they occurred.   Finally, CW2 does not state when it became apparent that a breach was inevitable.   The fact that the terminations occurred on a rolling basis through September 2009, with an additional group of employees being discharged in October

[173]*Id.*

[174]*Id.*, ¶ 69.

[175]The complaint does not state American Apparel's fiscal year.   According to its SEC filings, however, it appears that American Apparel operates on a traditional calendar year.   (See American Apparel RJN, Exh. 20 (Form 10-Q, referring to the fiscal year ending on "December 31, 2009")).   Presumably, "4Q09" therefore refers to October 2009 through December 2009.

[176]SAC, ¶ 68 (stating that American Apparel "*beg[a]n running afoul* of its debt covenants in 4Q09 and 1Q10" (emphasis added)).

2009, suggests the possibility that the full effect of the layoffs had not yet been felt in November 2009.  Coupled with the lack of temporal specificity in CW2's statement, the allegations simply do not give rise to a compelling inference that Kowalewski made a knowingly false statement in November 2009.[177]

As in the first amended complaint, moreover, CW11 does not address either Charney's or Kowalewski's knowledge.  He/she states only that he/she attended meetings in which Bailey was present, and that during these meetings the decrease in production and higher defect rate were discussed.[178]  Nothing in the complaint links Bailey's knowledge of possible production issues to Charney or Kowalewski, as there are no allegations that Bailey communicated the information to those defendants.  CW11, moreover, does not detail when the meetings at which the decrease in production rate and increase in the defect rate were discussed took place; while it is undisputed that defendants eventually became aware of production problems, absent factual allegations that reveal they knew of the issues *prior to making their predictions*, the complaint does not give rise to a compelling inference of scienter.  As a result, the court cannot infer that either Charney or Kowalewski had access to the information known to the confidential witnesses prior to making their predictions and knew the predictions were false.  See *In re Siebel Systems*, 2005 WL 3555718 at *13 (observing that none of plaintiff's sources had "first hand knowledge of what the individual defendants allegedly knew.  None of the sources were in a meeting with defendants or

---

[177]The only additional statement attributed to CW2 on this subject in the second amended complaint is his/her assertion that "Bailey would have been aware of the lack of productivity" because certain production quotas were not met.  (*Id.*, ¶ 65).  This allegation does not address how the individuals making the alleged misrepresentations – Charney and Kowalewski – would have learned the company had failed to meet its quotas.  The second amended complaint contains no allegations concerning Bailey's communications with Charney or Kowalewski, nor any allegation about Bailey's general job responsibilities such that there is a compelling inference that Bailey shared information concerning the failure to meet production quotas with Charney and Kowalewski prior to the time they made the statements at issue.  The only allegations regarding Bailey's communications with defendants pertain to the company's I-9 review.  (See e.g. *id.*, ¶ 82 ("According to CW9, Moreno and Bailey would have been updating Defendant Charney regularly through the Company's I-9 review process").

[178]*Id.*, ¶ 90.

personally overheard a conversation of any of the defendants. . ."); see also *In re Verifone Holdings, Inc.*, No. C 07–6140 MHP, 2011 WL 1045120, *14 (N.D. Cal. Mar. 22, 2011) (observing that the "confidential witnesses did not report to [CFO] . . . and none claims to have had any interactions with him regarding the events at issue.  Consequently, it would be difficult for them to allege scienter with respect to [CFO]; they fail to do so here").

The statements of CW5 similarly fail to demonstrate scienter.  CW5 was a "resource assignor" from November 2007 to early 2010, responsible for reviewing sales trends and analyzing inventory stock levels.[179]  He/she "estimate[d] that the new employees were only producing half as much as the employees who [had been] terminated."[180]  CW5, however, does not allege the time frame during which it became evident that the new employees were not as productive as the terminated workers.  He/she also does not state how much more quickly clothing had previously gotten to market or compare that with the rate at which clothes were delivered in 2009 and 2010.  As a consequence, the court cannot determine whether the delay was so significant that management would have known of it.  The most concrete statement CW5 offers is that American Apparel was still delivering swimwear and summer attire to retail stores in September 2009.[181]  This fact, however, does not support an inference that the June and July 2009 statements were fraudulent, as they were made several months prior to September.[182]

Furthermore, allegations detailing CW15's statements about monthly financial reports to which Kowalewski had access do not cure the deficiencies the court noted in prior pleadings.  As stated in the court's prior order, "[g]eneral references to reports defendants may or may not have received do not aid plaintiffs, as the complaint contains no information concerning the content of

---

[179]*Id.*, ¶ 72.

[180]*Id.*, ¶ 73.

[181]*Id.*, ¶¶ 73, 159.

[182]Only one alleged misrepresentation was made after September 2009, during the third quarter 2009 earnings conference call on November 10, 2009.  Whether CW5's statement supports an inference that the November 10 statements were knowingly false is discussed *infra*.

the reports, and no allegations that Charney and Kowalewski reviewed reports containing damning information." *In re American Apparel II*, 2013 WL 174119 at *28 (citing *Lipton v. Pathogenesis Corp.*, 284 F.3d 1027, 1036 (9th Cir. 2002) (holding that allegations that "defendants had access to internal data demonstrating a decline in sales . . ." were insufficient to demonstrate scienter); *Kuehbeck v. Genesis Microchip Inc.*, C 02-5344 JSW, 2005 WL 1787426, *10 (N.D. Cal. July 27, 2005) ("[U]nlike in *Oracle*, Ms. Kuehbeck has not identified specific internal reports that would have provided Defendants with particularized and detailed information about Genesis' sales and whether they were declining, as a result of the alleged problems"); and *In re Autodesk, Inc. Sec. Litig.*, 132 F.Supp.2d 833, 844 (N.D. Cal. 2000) (allegations that defendants had knowledge given their "hands on" positions at the company and the fact that internal reports explicating the problems existed were insufficient to give rise to a strong inference of scienter absent specific allegations of "the contents of the reports or . . . how the contents contradicted defendants' public statements")); compare *In re Northpoint Communications Group*, 184 F.Supp.2d at 997 (observing that "circumstantial evidence" may be sufficient to plead scienter, such as "contemporaneous receipt of a report with information directly at odds with [the] alleged misrepresentation," or "statements by witnesses that they told the actor the true facts before the false statement was made").

At most, the second amended complaint adds general allegations concerning the content of the reports purportedly made available to Kowalewski; specifically, CW15 stated that the reports contained "monthly financial information" from the wholesale, retail, and international divisions of American Apparel.[183] This allegation fails to detail the contents of the reports sufficiently that the court can infer the contents of the reports were "directly at odds" with Kowalewski's public statements regarding the impact of the workforce reduction.   See *Wozniak v. Align Tech., Inc.*, 850 F.Supp.2d 1029, 1042 (N.D. Cal. 2012) (concluding that a complaint failed to allege scienter because "[a]lthough plaintiff refer[red] to the existence of sales and shipment data and ma[de] a general assertion about what the data showed, plaintiff allege[d] no

---

[183]*Id.*, ¶ 97.

45

hardnumbers or other specific information" in the report).   More significantly, the second amended complaint still fails to allege that Kowaleski had anything more than "read-only access" to the reports and received consolidated financial statements for all three of American Apparel's divisions in a binder.   Access to reports, without more, is insufficient to demonstrate scienter. See *Lipton*, 284 F.3d at 1036; *Police Retirement Systems of St. Louis v. Intuitive Surgical, Inc.*, No. 10–CV–03451–LHK, 2012 WL 1868874, *19 (N.D. Cal. May 22, 2012)   ("The 'particularity' requirement of the PSLRA cannot be satisfied by a mere conclusory assertion that Defendants had access to . . . the information"); *In re Washington Mut., Inc. Securities, Derivative & ERISA Litigation*, 694 F.Supp.2d 1192, 1218 (Oct. 27, 2009)   (noting that defendant's "access to the [Financial] Report which was circulated to him," without more, was "insufficient to show scienter").   CW15 asserts that Kowalewski participated in monthly meetings at which he was told "whether gross margins were off due to efficiency, product mix or overhead."[184]   This statement is too ambiguous to give rise to a strong inference of scienter, however, since efficiency – which presumably includes worker efficiency, productivity and defect rates – is only one of three possible explanations Kowalewski may have received for any decline in American Apparel's gross margin.

Additionally, CW15 was not hired by American Apparel until October 2009; this is several months after three of the four purportedly false predictions regarding the effect of the worker terminations were made.   The complaint pleads no facts suggesting that CW15 knew the contents of reports prepared prior to his arrival at the company, that he knows the individual defendants' access to the reports prior to that time, or that he knows what they were told in meetings about gross margins or other indicators of financial performance.   For all of these reasons, the allegations regarding Kowalewski's access to financial reports are insufficient to raise a compelling inference that he knew his projections regarding the impact of the layoffs were false when made.

The court also reiterates its earlier holding that the alleged misrepresentations plaintiffs

---

[184]*Id.*

identify are themselves not suggestive of falsity or scienter, whether examined individually or in the context of a holistic review. The court addressed this issue in detail in its prior orders, see *In re American Apparel I*, 855 F.Supp.2d at 1080-82; *In re American Apparel II*, 2013 WL 174119, at *29-30, and the second amended complaint does not plead additional facts that alter the court's view. As the court noted previously, the alleged misrepresentations occurred within a finite time frame, which began on June 30, 2009 with the release of the company's Form 8-K and the subsequent investor conference call; this was just after the workforce reduction had taken place. The predictions offered in the Form 8-K and during the July 1 call were couched in terms of defendants' "present belief." During an August 13, 2009 earnings conference call, Kowalewski allegedly asserted that the ICE investigation would have no material impact on the company, because American Apparel could mitigate the impact of a workforce reduction by increasing the hours of existing workers.[185] On the same call, however, he acknowledged that the effect of the terminations was "difficult to estimate."[186]

Both in the Form 8-K and during the July and August conference calls, defendants framed their optimistic statements as predictions about the future, while acknowledging that the ultimate effect of the workforce reduction had yet to be felt. Plaintiffs' allegations of falsity are insufficient insofar as they are intended to suggest that defendants should have known the ultimate impact of the ICE investigation, since "even reasonable predictions [can] turn out to be wrong. Instead, plaintiffs must allege with particularity facts that show the initial prediction was a falsehood." *In re Downey Sec. Litig.*, 2009 WL 2767670 at *5 (quoting *Alaska Elec. Pension Fund*, 434 F.Supp.2d at 823); *In re PetSmart, Inc. Sec. Litig.*, 61 F.Supp.2d 982, 993 (D. Ariz. 1999) ("[D]efendants' lack of clairvoyance simply does not constitute securities fraud").

Plaintiffs argue that their complaint contains allegations concerning a conference call on November 10, 2009, in which defendants purportedly asserted that the workforce reduction was having no adverse effect on the company; they contend this statement was not a forward-looking

---

[185]*Id.*, ¶ 128.

[186]*Id.*, ¶ 129.

prediction, but rather a false statement regarding the current impact of the reduction on American Apparel's bottom line.[187]   The November 2009 call took place after the reduction in force was complete; as noted, however, it is not clear from plaintiffs' allegations that the full impact of the terminations had been felt at that time.   Viewed in context, moreover, Kowalewski's remarks are not as unequivocally positive as plaintiffs suggest.   Kowalewski stated:

> "[W]e said back in July [2009] [that] we didn't think [the workforce reduction] was going to have a material impact to our financial results.   And one of the reasons was because we had been operating with a higher number of workers than maybe we would have needed under normal circumstances.   So we do think some of the head count has improved our overhead situation, because we have more workers working shorter work weeks and working more hours per week; but as I mentioned in my remarks, *a lot of the workers that we lost were some of our most efficient people.* If you look at it on a year over year basis versus where we were last year when we were hiring a lot of people, *there was a lot of training cost that the Company bore,* so I think on a year over year basis the efficiency in labor is probably pretty comparable."[188]

Kowalewski also acknowledged that "[m]any of [the laid off] workers had worked for the [c]ompany for as long as 10 years and had been some of our best."[189]   Thus, Kowalewski did not state in unqualified terms that the reduction had had no impact on the company's bottom line.   He referenced the company's initial prediction that the layoffs would have no material impact because they would trim payroll, and said the company had lowered its overhead costs in that regard.   He qualified that statement, however, noting that ". . . a lot of the workers that we lost were some of our most efficient people."   He impliedly acknowledged, therefore, that the workforce reduction had had an impact on production efficiency.   See *Iron Workers Local No. 25 Pension*

---

[187]*Id.*, ¶¶ 132-33; Charney MTD Opp. at 5-6.

[188]*Id.*, ¶ 132 (emphasis added).

[189]*Id.*, ¶ 131.

1   *Fund v. Oshkosh Corp.*, No. 08–C–797, 2010 WL 1287058, *19 (E.D. Wis. Mar. 30, 2010)

2   (dismissing a Rule 10b-5 claim, and noting that "[i]t is important, too, to recognize that the

3   company's disclosures were not universally bullish, and its reasons for optimism were concrete

4   and particularized rather than reflections of knee-jerk egotism or quixotic sunniness").

5   Essentially, of Kowalewski reported that the company was facing some reduction in efficiency,

6   but noted that labor efficiency would be comparable to the prior year, because in 2008, the

7   company had hired a large number of workers and incurred substantial training costs.  Stated

8   differently, Kowalewski represented that different factors had impacted labor efficiency in 2008

9   and 2009, and thus year-over-year the level of efficiency would likely be comparable.  He did not

10  reiterate the July prediction that the reduction in force would not materially affect the company's

11  productivity.

12      Plaintiffs' complaint contains no allegations concerning American Apparel's labor

13  efficiency in 2008; it is impossible, therefore, to determine whether Kowalewski's statement was

14  accurate or inaccurate.  In fact, the only allegations plaintiffs offer concerning American Apparel's

15  2008 performance suggest the company was struggling then as well.  Plaintiffs cite a second

16  quarter 2008 earnings call, for example, in which Charney acknowledged that the hiring and

17  training of new workers was "having a diminishing effect [on] the bottom line."[190]  Similarly, the

18  company noted in its first quarter 2008 call that its "[g]ross profit was [ ] impacted by increased

19  costs due to the hiring of a significant number of additional production employees to support the

20  continued growth of the company," and that "there's a little bit of an issue there when you hire

21  workers that are not initially as efficient."[191]  Thus, it appears that Kowalewski's comparison of

22  the company's 2009 labor efficiency to its 2008 labor efficiency cannot be understood as a glowing

23  endorsement of the company's performance; rather, it would appear to be an acknowledgment

24  that, as in 2008, the company had labor efficiency issues that were impacting its overall

25

26  _____

27      [190]*Id.*, ¶ 145.

28      [191]*Id.*, ¶ 143.

performance.[192]   As a consequence, based on the facts plaintiffs have alleged, the court cannot conclude that Kowalewski's statement was false.[193]

Even if the court were to find that the falsity of the statement had been adequately alleged, moreover, it would find that plaintiffs have not alleged facts giving rise to an inference that Kowalewski knew at the time he spoke that the company's labor efficiency was worse than it had been in 2008.   Although plaintiffs allege that defendants knew that "the terminations had negatively impacted the [c]ompany's operations" by the fourth quarter of 2009,[194] they do not plead sufficient facts to give rise to a compelling inference that this is so.[195]   There are no

---

[192]Plaintiffs' complaint also contains no allegations refuting Kowalewski's statement that, as of November 2009, American Apparel's labor costs were lower than in 2008, because there were fewer employees on payroll, and training costs were less. While American Apparel had to hire a large number of replacement workers in the second quarter of 2010, eliminating the costs savings associated with a smaller workforce, plaintiffs do not allege that defendants knew in November that hiring additional employees would be necessary.

[193]This conclusion is bolstered by American Apparel's SEC filings.  The company's 2009 annual report, for example, compares its performance in 2009 and 2008.  The report states that "[o]perating expenses for the fourth quarter of 2009 were $77.2 million, or 48.8% of net sales, as compared to $70.2 million, or 48.2% of net sales for the prior year period."  (American Apparel RJN, Exh. 21 at 280).  The fact that the ratio of operating expenses to net sales differed by only 0.6% from the prior year supports an inference that Kowalewski's statement that labor efficiency was "probably pretty comparable" was not false when made.

[194]*Id.*, ¶ 155.

[195]As noted above, CW5 states that as of September 2009, the company's production was delayed, since it was still shipping summer attire and swimwear to retail stores that month.  This allegation, also included in the first amended complaint, does not address the scale of the production delays.  CW5 does not state, for example, when the company normally stops shipping summer attire, whether it was still shipping to many retail stores or only a few, or the quantity of summer attire being delivered to stores compared with clothes designed for the fall season.  Had plaintiff alleged that American Apparel did not ship summer attire *until* September, the court might well view the allegation differently, as it strains credulity to believe that management would not know that retail outlets were not selling the company's summer line until the end of summer. As CW5 states only that American Apparel was *still* delivering summer clothing in September, however, the inference of scienter is weaker, particularly since it is unaccompanied by allegations that the delay represented a significant departure from the company's normal shipping cycle. Furthermore, Kowalewski conceded in his November 10 statement that the company had lost some

allegations that show Kowalewski knew the company would be forced to hire additional workers in the second quarter of 2010, thereby eliminating the decrease in labor costs achieved by reducing the size of the workforce.

The most concrete allegation plaintiffs offer concerning defendants' knowledge is that defendants "worked in the same building [as] the manufacturing facilities," and necessarily saw the impact of the reduction in force.[196]  As the court has noted, however, such an allegation is insufficient to give rise to a "strong inference" of scienter.  *In re American Apparel I*, 855 F.Supp.2d at 1078-79 (citing *Zucco Partners*, 552 F.3d at 1000–01 ("Allegations that Digimarc's management had access to the purportedly manipulated quarterly accounting numbers, or that the management analyzed the inventory numbers closely, do not support the inference that management was in a position to know that such data was being manipulated"); *Glazer Capital*, 549 F.3d at 748 ("The mere fact that GE was able to discover the FCPA violations does not create a direct inference that Magistri personally knew about the violations.  At most, it creates the inference that he should have known of the violations.  This is not sufficient to meet the stringent scienter pleading requirements of the PSLRA"); *Metzler*, 540 F.3d at 1068 ("As this court has noted on more than one occasion, corporate management's general awareness of the day-to-day workings of the company's business does not establish scienter – at least absent some additional allegation of specific information conveyed to management and related to the fraud")).

Furthermore, as the court previously noted, competing inferences can be drawn from the facts alleged.  It is plausible to infer that, when Kowalewski stated that labor efficiency was comparable to 2008 in early November 2009, the company was still absorbing and evaluating the full effect of the workforce reduction, and that complete information about how severe its impact would be had not yet emerged.  Kowalewski may have believed in November 2009 that any short-term drop in production would be offset by future increased efficiency due to the reduction in

---

of its most efficient workers, a tacit acknowledgment that the company had not escaped from the workforce reduction unscathed.

[196]*Id.*, ¶ 138.

overhead expenses.   In fact, the second amended complaint does not clearly allege when defendants became aware of declining production and increased costs.   It pleads, for example, CW2's statement that "the impact of the workforce terminations was increasingly evident at the Company by 4Q09, and that the workforce reduction's effects had become so acute by 4Q09 that the [c]ompany began running afoul of its debt covenants."[197]   As noted, this allegation does not make clear whether these effects were apparent from the beginning of the fourth quarter of 2009 – i.e., October 2009 – or at some later point in the fourth quarter.[198]   What is clear is that American Apparel hired large numbers of workers in the second quarter of 2010, well after Kowalewski's November 2009 remarks; in a Form 8-K issued August 17, 2010, the company announced that it had hired 1,600 new manufacturing workers during the second quarter of that year.[199]   The fact that a significant number of employees were added two quarters after Kowalewski made his remarks strengthens the inference that the company's production problems were not immediately apparent to defendants, and that it was not until later in 2010 – when defendants disclosed the impact of the reduction and hired a large number of replacement workers – that they realized the materially adverse effect that the reduction in force was having on production.   Based on the facts alleged, the court cannot determine whether these impacts were known *prior* to Kowalewski's statements on November 10, 2009.[200]

---

[197]*Id.*, ¶ 155.

[198]This lack of temporal precision runs throughout the complaint.   Plaintiffs repeatedly allege that production issues arose "within a few months" of the workforce reduction.  (See, e.g., *id.*, ¶¶ 24, 95, 141).   As noted, however, the workforce reduction occurred over several months, from June to October 2009.   The phrase "within a few months" thus provides little concrete information that supports an inference defendants knew by November 2009 that material problems had arisen.

[199]*Id.*, ¶ 27.

[200]Plaintiffs do allege that American Apparel's monthly financial records began to reflect low productivity beginning in "July or August 2009;" as noted, however, there are no allegations that give rise to a compelling inference that defendants knew these figures at the time they made the alleged misrepresentations.  (*Id.*, ¶ 154).   The disjunctive pleading "July or August 2009" is also problematic, as two of the alleged misrepresentations regarding the effect of the terminations

While the company had an incentive to downplay the full impact of the reduction, the complaint does not clearly allege when the full effects of the reduction were evident, how they were made known to the individual defendants, or the contents of reports that management reviewed.  It is clear that Charney's and Kowalewski's overly-optimistic predictions in the summer of 2009 later proved incorrect; the fact that predictions are wrong is not the same as "alleg[ing] with particularity facts that show the initial prediction was a falsehood," however.  *Alaska Elec. Pension Fund*, 434 F.Supp.2d at 823.  Based on the allegations in the complaint, it is plausible to infer that, when the full effects of the reduction became evident, and the company had had sufficient time and opportunity to analyze them, it disclosed the problems to the public in its March 2010 annual report.  Stated differently, the facts alleged are susceptible of the interpretation that rather than making false statements to conceal the impact of the layoffs, American Apparel was scrambling to compensate for the workforce reduction by hiring and training new workers, and remained optimistic about those efforts while cautioning that its statements were based on present belief. Ultimately, of course, the company was not able to compensate for the loss of the terminated workers, and had to acknowledge that it had underestimated the effect of the workforce reduction on operations.

----

were made in June and July 2009 and one in mid-August.  If the reports did not reflect increased costs and lower productivity until the end of August 2009, then even if plaintiffs had adequately alleged that defendants knew the contents of the reports, it is not clear that Charney and/or Kowalewski should have known prior to that time that their optimistic predictions were false. See *In re Splash Tech. Holdings Inc. Sec. Litig.*, 160 F.Supp.2d 1059, 1072 (N.D. Cal. 2001) ("[T]he complaint must allege that the 'true facts' arose prior to the allegedly misleading statement.  This requirement helps guard against pleading fraud by hindsight and helps prevent providing a complaint passageway through the pleading stage merely because it alleges that the allegedly fraudulent statements conflict with the current state of facts" (citations omitted)).  Moreover, no details regarding the contents of the reports are alleged; given the qualified nature of Kowalewski's November 10 statements, the court cannot conclude that his statements were at odds with the reports.  Allegations that the reports reflected low productivity in July and/or August 2009 do not necessarily  conflict with Kowalewski's statement, since Kowalewski acknowledged that the loss of experienced workers who were more efficient had impacted the company's labor efficiency.  (*Id.*, ¶ 132.)  Absent additional allegations, the fact that he compared the workforce reduction's impact on labor efficiency with the impact that the hiring and training of a significant number of employees had had in 2008 does not make the statement knowingly false. .

Finally, even if the inference of fraud plaintiffs advocate were plausible, it is not *more* plausible or compelling than the competing inference. The complaint simply does not demonstrate that the most compelling inference to be drawn from the facts is that defendants knew their predictions would eventually be shown to be unfounded. See *In re Splash Tech. Holdings Inc. Sec. Litig.*, 160 F.Supp.2d at 1072 ("[T]he complaint must allege that the 'true facts' arose prior to the allegedly misleading statement. This requirement helps guard against pleading fraud by hindsight and helps prevent providing a complaint passageway through the pleading stage merely because it alleges that the allegedly fraudulent statements conflict with the current state of facts" (citations omitted)). A later statement can suggest that a defendant had contemporaneous knowledge of the falsity of his statement, if the later statement directly contradicts or is inconsistent with the earlier one. *Yourish v. Cal. Amplifier*, 191 F.3d 983, 996-97 (9th Cir. 1999). "'It is clearly insufficient[, however,] for plaintiffs to say that a later, sobering revelation makes an earlier, cheerier statement a falsehood.'" *Id.* at 997 (alterations omitted).

Plaintiffs assert that defendants knew the difficulties to which the workforce reduction would give rise because American Apparel had previously made statements regarding the challenges associated with training new employees. Specifically, during an August 2008 conference call, Charney stated that "it takes years training . . . [new workers]," and that "[a]bsorbing all the new workers [was] an issue."[201] Plaintiffs assert defendants' prior experience makes it "implausible" that they believed there would be no adverse impacts from the 2009 workforce reduction. The court was not persuaded by this argument previously, and sees no reason to revisit its earlier conclusion. The 2008 statements regarding the challenges associated with training new employees do not necessarily contradict defendants' post-ICE investigation statements about the company's ability to compensate for staffing reductions with surplus inventory and lower overhead costs. Charney made the statements eight months to a year before he was faced with having to replace 1,500 workers. His comments do not suggest that there were no strategies defendants could develop to deal with training issues, and do not take into account

---

[201] *Id.*, ¶ 145.

defendants' belief that a reduced workforce would lead to efficiencies.  Finally, Charney's 2008 remarks do not speak to whether defendants legitimately believed that they could avoid a downturn in company profitability following the ICE audit through labor cost savings or whether they believed that hiring large numbers of new workers would not be required.  Moreover, the company properly stated in SEC filings that the ultimate effect of the staffing reduction was uncertain, and that the situation was still developing.  The complaint does not allege facts, such as defendants' "contemporaneous receipt of a report with information directly at odds with [the] alleged misrepresentation," or "statements by witnesses that they told the actor the true facts before the false statement was made." *In re Northpoint Communications*, 184 F.Supp.2d at 997; see also *Ronconi*, 253 F.3d at 433 (affirming dismissal because "alleging in substance that [defendant] underestimated the difficulties it would face if it fired 300 salespeople does not make out a fraud case").  Moreover, the content of the alleged misrepresentations makes clear that a primary reason defendants were optimistic about the aftermath of the workforce reduction is that they believed they had too many workers to start with.[202]  Thus, defendants' earlier statements about the costs associated with hiring and training new employees do not render their post-investigation predictions false.  Rather, the competing inference – i.e., that defendants made positive predictions precisely because they believed they could avoid the cost of hiring replacement workers – is more compelling when the allegations of the complaint are considered as a whole.

Plaintiffs also allege that defendants "had been closely tracking inventory" and knew that American Apparel retail stores were not adequately stocked with the company's best-selling products.  As a consequence, they assert, defendants' predictions regarding surplus inventory were

---

[202]See, e.g., *id.*, ¶ 22 (noting Kowalewski stated that, prior to the layoffs, American Apparel "had been operating with a higher number of workers than maybe we would have needed under normal circumstances.  So we do think some of the head count has improved our overhead situation"); ¶ 20 (noting Kowalewski asserted that "[t]o the extent that the [c]ompany may need to hire replacement workers, the [c]ompany presently believes it would only need to hire for a fraction of those employees that would be terminated").

knowingly false.[203]  This conclusion, however, is not supported by particularized facts.  Plaintiffs rely primarily on CW13, a district manager at American Apparel from March 2008 to March 2010, who was responsible for "retail displays and visual merchandising."[204]  CW13 states that, "within a few months of the dismissals," he/she began to receive complaints from retail store employees about inventory shortages.  Plaintiffs assert the combination of allegations that defendants closely tracked inventory and allegations that stores reported inventory shortages not long after the workforce reduction demonstrates that the predictions that surplus inventory would mitigate the effects of the layoff were false.[205]  CW13's statements, however, do not demonstrate that defendants knew of inventory shortages at the time they made their predictions.  As noted, the workforce reduction was not fully complete until October 2009.[206]  Accordingly, CW13's testimony that the inventory shortages were apparent "within a few months of the dismissals" does not show that defendants knew of inventory shortfalls in June, July, or August, when several of the alleged misrepresentations concerning the impact of the layoffs were made; nor does it suffice to give rise to an inference that defendants knew the adverse impact of the employee terminations by the November 10, 2009 conference call, as it is unclear whether November 10 can be said to be "within a few months" of the bulk of the layoffs.  Thus, the fact that defendants may have closely monitored inventory does not mean that their statements regarding surplus inventory were false when made, as plaintiffs allege no facts suggesting that defendants knew of inventory shortages at the time they made their predictions.[207]

---

[203]*Id.*, ¶ 151.

[204]*Id.*, ¶ 94.

[205]*Id.*, ¶ 95.

[206]*Id.*, ¶ 134 (noting that "almost all" of the terminated employees were gone by "September 2009, with a smaller number being terminated by October").

[207]Plaintiffs also allege that defendants' representations regarding surplus inventory were reckless because defendants had previously acknowledged that American Apparel's success was based not just on having sufficient inventory, but on "having the right inventory, and the [right] composition of inventory."  (*Id.*, ¶ 140).  This fact does not impact the court's determination,

Ultimately, even when viewed holistically, the complaint contains no facts suggesting that, at the time they predicted the workforce reduction would not impact operations or profits, Charney, Kowalewski, and American Apparel knew or deliberately and recklessly disregarded the fact that the statements were false. See *Metzler*, 540 F.3d at 1066 ("To meet [the scienter] pleading requirement, the complaint must contain allegations of specific contemporaneous statements or conditions that demonstrate the intentional or the deliberately reckless false or misleading nature of the statements *when made*") (emphasis added). The June and July 2009 representations were made just as the layoffs were announced and prior to completion of the reduction in force; they were at most rosy predictions about the future. The August 2009 representation was made while the layoffs were in progress and, based on plaintiffs' own allegations, may have been before the first monthly financial report that showed an impact on productivity was produced. The August statement, moreover, was qualified; Kowalewski said that he did not believe would not adversely impact the company, but acknowledged that its effect was difficult to estimate. The November 2009 representation is the only statement made after the layoffs were complete; even it was made shortly after the last workers had left, and possibly before the full impact of the reduction in force was evident. The statement, moreover, was not an unequivocal representation that the company would suffer no negative impact as a result of the layoffs. It was a qualified statement that the impact of the reduction in force on labor efficiency would probably not be worse than the impact of the upsurge in hiring and training of new employees in 2008 had been.

In sum, while the second amended complaint pleads some additional facts and the statements of another confidential witness, it fails to allege facts giving rise to a strong inference

---

because it is not evident from the content of the alleged misrepresentations that defendants' predictions were based solely on the cumulative amount of inventory the company had stockpiled. Rather, statements that they believed surplus inventory would mitigate the adverse effects of the layoffs could well have been based on their belief that they had surplus inventory of the company's most popular items. This inference is supported by statements Charney made prior to the ICE investigation, in which he claimed that American Apparel kept "deep inventories in the right place[s]." (*Id.*)

that defendants' statements concerning the impact of the reduction in force were false or made with intent to defraud.

### 3.   American Apparel's Financial Statements, Accounting Practices and Internal Controls

Plaintiffs also contend that defendants' repeated assertions that they were making efforts to improve American Apparel's financial systems and internal controls were false, and that the company knowingly issued false financial statements in its 2009 annual report. The court previously concluded that many of defendants' representations on this subject were "couched in aspirational terms," and were simply too vague to be actionable. *In re American Apparel I*, 855 F.Supp.2d at 1072; see also *In re Impac Mortg. Holdings*, 518 F.Supp.2d 1083, 1096 (C.D. Cal. 2008) ("In stating that he 'continue[d] to expect solid loan acquisitions and originations,' Defendant Tomkinson was making a forward-looking statement of optimism regarding loan production. Because such a statement is not capable of objective verification, it is properly characterized as a statement of "mere puffing'"); *In re West Seal, Inc. Sec. Litig.*, 518 F.Supp.2d 1148, 1168 (C.D. Cal. 2007) ("Other statements that have been rejected by previous courts [as corporate puffery or predictions and forecasts that could not be objectively verified] include: (1) "[w]e're the leader in a rapidly growing market," "[w]e have the convergence of the health care trends," and "[w]e have an extremely broad product line," (2) "business couldn't be better," "it's a great time for a company like ours," and "we already have a sizable lead over our competition," (3) claims of "industry leading" growth, growth that "positions us beautifully," "measurable progress," "continuing improvements," "accomplishments we have achieved," expressions of pride in staff, and "outstanding retail results," and (4) "strong," "robust" "well positioned," "solid" and "improved" (internal citations omitted)): see also *In re Cutera Sec. Litig.*, 610 F.3d 1103, 1111 (9th Cir. 2010) ("When valuing corporations, however, investors do not rely on vague statements of optimism like "good," "well-regarded," or other feel good monikers. This mildly optimistic, subjective assessment hardly amounts to a securities violation"). The court reiterates this holding here.

The second amended complaint realleges the statements of CW12, and emphasizes the

opinion of the company's former auditor, Deloitte & Touche, that American Apparel had withheld information from it.  Plaintiffs' allegations concerning information obtained from CW12 are largely unchanged from those found in the first amended complaint.  Plaintiffs assert that CW12 was a "contract cost accountant" from December 2007 to March 2008, who worked on the company's 2007 year-end close and its 2007 annual report.[208]  CW12 states that he/she "worked directly with Kowalewski and had direct interaction with Charney and Bailey,"[209] and recalls participating in "several internal conference calls."  CW12 states that "Charney argued with Cieply and American Apparel's outside auditors, Marcum, regarding how to record costs."[210]  Charney allegedly "wanted to write off certain expenses" and "reacted angrily" when Marcum told him the write-offs would not be GAAP compliant.[211]  CW12 also reports that American Apparel was "not properly tracking its manufacturing costs for 20 to 30 percent of its items and, as a result, was underreporting costs."[212]  Bailey purportedly "reacted angrily" when presented with this information.[213]  CW12 asserts that following these interactions, he/she was terminated.[214]

Charney stated on May 13, 2008, that the company was trying to build a "world class financial team," and sought to "pursue a strict corporate orthodoxy as far as financial issues."[215]  As the court has twice discussed, however, these vague, forward-looking, aspirational statements do not constitute actionable misrepresentations.  *In re American Apparel I*, 855 F.Supp.2d at 1072-73; *In re American Apparel II*, 2013 WL 174119 at *30-31.  Even if they did, moreover,

---

[208]SAC, ¶ 92.

[209]*Id.*

[210]*Id.*

[211]*Id.*

[212]*Id.*

[213]*Id.*

[214]*Id.*, ¶ 153.

[215]*Id.*, ¶ 184.

nothing in CW12's testimony contradicts Charney's assertions.  As the court previously noted, CW12 does not describe what occurred after the conference calls in which Charney "reacted angrily" to Marcum's refusal to write off expenses.  *In re American Apparel II*, 2013 WL 174119 at *31 ("While CW12 described Charney's conflicts with Marcum during conference calls, he/she does not state what transpired after the calls.  Did Charney succeed in persuading Marcum to write off expenses in violation of GAAP?  Did Marcum's position win out?  The complaint is silent on these matters").  The second amended complaint pleads no new facts that describes what occurred.  Rather, it is silent regarding events that followed the conference calls.  Cf. *In re Hansen Natural Corp.*, 527 F.Supp.2d at 1153 (declining to credit assertions that a company had violated GAAP absent allegations as to "which line items of the [financial] statements were false, the amount by which [they] were misstated, what provisions of GAAP were violated, how those provisions were violated, and who was involved in the alleged GAAP violations").

Similarly, although pleading that CW12 told Bailey the company was underreporting costs, the complaint contains no factual allegations as to what transpired after the report was made.  Although plaintiffs imply, without alleging, that CW12 was terminated for bringing the matter to Bailey's attention, they do not plead that American Apparel failed to take corrective action after learning of the problems, or cite any specific instance in which manufacturing costs were underreported.[216]  Thus, CW12's statements do not demonstrate that American Apparel knowingly failed to comply with GAAP or misrepresented or failed to disclose accounting violations.  Consequently, they are not sufficient to transform Charney's aspirational statements into misrepresentations that constitute securities fraud.

The second amended complaint also reiterates allegations, contained in both the original and first amended complaint, that Kowalewski said in a December 24, 2008 email that the

---

[216]The second amended complaint alleges only that "shortly after [his/her] encounter with Bailey[, in which he/she reported the improper tracking of costs,] CW12 was dismissed from the [c]ompany."  (*Id.*, ¶ 93).  No other details regarding the underreporting are provided.

company "almost went bankrupt last Friday."[217]  In dismissing the original complaint, the court observed that this allegation was insufficient to plead either falsity or scienter, as no facts were alleged indicating the statement was true when made, and no details were provided regarding the nature of Kowalewski's concerns about the company's financial viability.  See *In re American Apparel I*, 855 F.Supp.2d at 1083 n. 214.  The first amended complaint did not remedy these defects; it relied primarily on the brief statement of CW1, who asserted that he often worked directly with Charney and Kowalewski, and learned in late 2008 that American Apparel was close to filing for bankruptcy.  *In re American Apparel II*, 2013 WL 174119 at *31.  The court noted that CW1 was a customer service supervisor, and that the first amended complaint pled "no information concerning his/her job responsibilities, no facts suggesting that he/she was in a position to know about the company's overall financial condition, nor any information as to why he/she thought the company was on the verge of bankruptcy in late 2008."  *Id*.  Consequently, the court concluded that CW1's statement shed no additional light on the truth of Kowalewski's statement and failed to raise a strong inference of scienter.

The second amended complaint alleges no new facts concerning CW1.  It states that CW1 "often worked directly with Charney and Bailey," and that he "learned that the [c]ompany was close to filing for bankruptcy in late 2008."[218]  This conclusory assertion provides no facts as to how or why CW1 came into possession of this information.  Nor are any facts alleged as to why CW1 believed American Apparel was on the verge of bankruptcy.  The second amended complaint fails to correct the deficiencies noted in the prior complaint, and thus fails to state a claim based on Kowalewski's 2008 reference to near-bankruptcy.

Finally, the second amended complaint includes a series of allegations regarding American Apparel's relationship with its auditor, Deloitte, and the accuracy of its 2009 annual report.  The complaint alleges that by early 2010, the company was in "desperate need of additional financing

---

[217]*Id.*, ¶ 186.

[218]*Id.*, ¶ 187.

and covenant waivers."[219]  Plaintiffs assert that, since it would have been difficult for American Apparel to obtain financing and waivers if its auditor had included a "going concern" or other qualification in its report based on its analysis of the company's financial condition, defendants deliberately withheld adverse information from Deloitte, and the financial statements included in American Apparel's 2009 annual report were false and misleading as a result.[220]  Plaintiffs contend that defendants told Deloitte they did not have financial information for February 2010, when in fact they had such data.

On March 31, 2010, Deloitte signed an audit report that did not include a "going concern" qualification.  Less than two months later, American Apparel issued an earnings press release, which stated that the company would likely go into default on its debt obligations the following month.[221]  Following that announcement, on July 22, 2010, Deloitte purportedly resigned as the company's auditor, stating it had advised American Apparel that "certain information ha[d] come to [its] attention[ ] that if further investigated [might] materially impact the reliability of either its previously issued audit report or the underlying consolidated financial statements for the year ended December 31, 2009. . . ."[222]  The complaint alleges that Deloitte resigned in part because it was "no longer willing to rely on [American Apparel] management's representations due to Deloitte's belief that [American Apparel's] management [had] withheld . . . the February 2010 monthly financial statements [from Deloitte] until after the filing of the 2009 [annual report]."[223] American Apparel later stated that Deloitte "disagree[d] with [its] conclusion that the results shown in the February 2010 monthly financial statements would not have required a revision to the Company's projections as of the date of the 10-K filing and the issuance of Deloitte's

---

[219]*Id.*, ¶ 206.

[220]*Id.*

[221]*Id.*, ¶ 202.

[222]*Id.*, ¶ 216.

[223]*Id.*

reports."[224]

Deloitte's disclosures cast doubt on the accuracy of the company's 2009 annual report. This is especially true when the allegations are reviewed "holistically." *Matrixx Initiatives, Inc. v. Siracusano*, 131 S.Ct. 1309, 1324 (2011). While the complaint does not disclose the exact nature of Deloitte's concerns, other than the company's failure to provide the February 2010 financial statements in a timely fashion, the fact that American Apparel's auditor felt compelled to resign and publicly challenge the company cannot be easily discounted, as it represents strong circumstantial evidence that the 2009 annual report was not accurate.

The question remains, however, whether the complaint sufficiently alleges that the 2009 annual report contained specific inaccuracies that were known to defendants at the time the report was filed with the SEC. The court's prior order noted that because the first amended complaint failed to detail "the inaccuracies in the financial statements, the types of information defendants purportedly withheld, and the knowledge or participation of individual defendants in the decision to withhold the information," it failed to state a claim. *In re American Apparel II*, 2013 WL 174119 at *33. The court observed that the more compelling inference to be drawn from the allegations was that "defendants were merely incompetent, ignorant of applicable financial standards, or mistaken about the information the auditors sought." *Id.*

The second amended complaint alleges that the financial statements contained in the 2009 annual report were false because the auditor who issued an unqualified opinion on the financial statements did not have data that was available concerning the company's February 2010 results, and because, had such information been given to it, it might have included a going concern qualification in its audit report and/or required modification of the company's 2010 projections.[225] Plaintiffs allege that defendants knew the 2009 annual report would be misleading because they in fact had access to the February 2010 financial results, and those results showed the impact of

---

[224]*Id.*, ¶ 218.

[225]*Id.*, ¶¶ 35, 212. Plaintiffs allege that Deloitte requested the financial data for both January and February 2010 while conducting the 2009 audit. There are no allegations that plaintiffs withheld January data.

the workforce reduction on American Apparel's costs and productivity.

The second amended complaint remedies the deficiencies in earlier complaints.  It alleges details, for example, about the information Deloitte requested from American Apparel.  It pleads that Deloitte requested the company's operating results for February 2010, so that it could "compare American Apparel's actual monthly results . . . to the [c]ompany's projected results."[226] It also provides more detail concerning the purported inaccuracies in the 2009 annual report.  The complaint alleges that under generally accepted auditing standards, an auditor "has a responsibility to evaluate whether there is substantial doubt about the entity's ability to continue as a going concern."[227]   The auditor's evaluation should be "based on his or her knowledge of relevant conditions and events that exist at *or have occurred prior to the date of the auditor's report*."[228] An auditor must look for "negative trends," "working capital deficiencies," and "labor difficulties" in making a "going concern" evaluation.[229]

Plaintiffs allege that because Deloitte was not given American Apparel's February 2010 financial results, its "going concern" analysis was incomplete and misleading.  They assert that Deloitte subsequently resigned because it believed that American Apparel withheld the February 2010 data until after the 2009 annual report was filed.  Following its resignation, Deloitte publicly stated that the company's 2009 financial statements might "not be reliable," and that it had discovered information "that if further investigated [might] materially impact" the 2009 audit report.[230]

As the court previously noted, Deloitte's "resignation alone does not adequately allege the falsity of defendants' statements."  *In re American Apparel I*, 855 F.Supp.2d at 1083 n. 217.

---

[226]*Id*., ¶ 35.

[227]*Id*., ¶ 209.

[228]*Id*. (emphasis added).

[229]*Id*., ¶ 210.

[230]*Id*., ¶ 217.

Plaintiffs, however, have now alleged additional facts regarding pertinent auditing standards, as well as Deloitte's specific concerns about the accuracy of the 2009 report.  Viewed holistically, allegations that Deloitte was responsible for evaluating American Apparel's prospective financial position based on currently available data, coupled with Deloitte's statements that it believed a review of the February 2010 data might have required "a revision to [American Apparel's] projections as of the date of the 10-K filing and the issuance of Deloitte's reports,"[231] are sufficient to state a claim that the 2009 annual report was materially misleading.[232]

Thus, the court must examine whether plaintiffs have adequately alleged scienter with respect to the misleading nature of the report.  "[T]he mere publication of inaccurate accounting figures, or a failure to follow GAAP, without more, does not establish scienter."  *DSAM Global Value Fund v. Altris Software, Inc.*, 288 F.3d 385, 390 (9th Cir. 2002).  Rather, plaintiffs must allege facts that give rise to a compelling inference that defendants knew the 2009 annual report was false.  In the factual scenario presented here, this requires an allegation that defendants

---

[231]*Id.*, ¶ 219.

[232]At the hearing, defendants argued that whether Deloitte would have issued a "going concern" qualification had it reviewed American Apparel's February 2010 financial results prior to finalizing its report on the 2009 audit is speculative.  Plaintiffs allege, however, that Deloitte clearly stated that the annual report might need revision in light of the company's February 2010 results; whether this indicates that Deloitte believed a "going concern" qualification would have been warranted, or that Deloitte would have required revisions to financial projections is immaterial, since in either event, the 2009 annual report would have contained misleading omissions or inaccuracies.

An auditor conducts a "going concern" analysis to "paint an accurate picture of the audited firm's financial condition."  *Johnson Bank v. George Korbakes & Co., LLP*, 472 F.3d 439, 443 (7th Cir. 2006).  By allegedly withholding adverse financial data, American Apparel percluded Deloitte from painting an accurate picture of the company's financial condition.  The fact that Deloitte later warned investors that its audit should not be trusted suggests that Deloitte was not simply speculating that information in the 2009 annual report was flawed or inaccurate, but rather that it believed it was misleading in light of February 2010 financial data.  As alleged by plaintiffs, the claim is not mere conjecture.  They have pled sufficient facts with particularity – e.g., the particular information withheld from Deloitte and Deloitte's public response – that they have stated a viable claim.  More specific details about the misstatements, and the particular amendments Deloitte would have made, can be developed through discovery.

knowingly lied to Deloitte when, in response to its request for February 2010 financial results, they said they did not have the data, and that they did so to preclude Deloitte from issuing a going concern qualification and/or from reporting that the company was not meeting 2010 projections.

Plaintiffs have pled a number of additional facts with regard to defendants' possession of American Apparel's February 2010 financial results at the time Deloitte requested them.  They first allege that defendants must have had access to the February 2010 financial results when Deloitte requested them because American Apparel was obligated to provide monthly data to its lender, Lion Capital, within thirty days of month-end under the terms of the credit agreement.[233]  They also allege that American Apparel had a practice of compiling a monthly sales report "two to three weeks after the end of each month," citing statements by CW2 and CW15.[234]  These reports were purportedly provided to "the entire [c]ompany."[235]  Finally, plaintiffs allege that American Apparel compiled "daily sales reports," which reflected the prior day's sales by retailer.[236]  CW8, a "logistics manager" for American Apparel, states that these reports "contained the financial information . . . Deloitte said it had requested."[237]  CW8 states that the daily sales reports were circulated to everyone in the accounting department, and were also provided to Charney and Kowalewski.[238]  In combination, these allegations raise a compelling inference that American Apparel possessed February 2010 financial results prior to March 31, 2010 – the date Deloitte issued its report.

Thus, the court must examine whether plaintiffs have adequately alleged that American Apparel knowingly withheld the data from Deloitte in order to publish what they knew to be false

---

[233]*Id.*, ¶ 176.

[234]*Id.*, ¶ 215.

[235]*Id.*

[236]*Id.*, ¶ 78.

[237]*Id.*

[238]*Id.*, ¶ 214.

or misleading financial statements in the 2009 annual report.  Plaintiffs allege that, under generally accepted auditing standards, the management of a company must give the company's independent auditor a letter stating that the auditor possessed "all relevant, material information prior to issuing its report."[239]  This letter "should be signed by those members of management with overall responsibility for financial and operating matters."[240]  It strains credulity that Deloitte, an experienced auditing firm, would issue a final audit report on American Apparel's 2009 financial statements with obtaining a management representation letter.  Moreover, when it resigned, Deloitte stated that "management [had] informed [it] that [February 2010] information was not available."[241]  Coupled with allegations indicating that the data was available prior to or by March 31, 2010, the allegation that American Apparel represented to Deloitte it did not have the February 2010 financial results, suffices to plead that American Apparel misled Deloitte.

Although it is not necessary to identify motive to plead that a strong inference of scienter is plausible, *Matrixx Initiatives, Inc.*, 131 S.Ct. at 1324, plaintiffs offer a cogent theory about defendants' motive in withholding the February 2010 results until after Deloitte issued its audit report.  They assert American Apparel was concerned that giving the auditors February 2010 financial data would have led Deloitte to issue a going concern qualification, which would have made it difficult, if not impossible, to secure financing the company desperately needed.  The company acknowledged a few months after February 2010 – in a May 2010 earnings press release – that it was likely to go into default within a few months, and that this could affect its "ability to continue operations as a going concern."[242]  This suggests the company's purported fears were well founded, and that it may have withheld information from Deloitte to buy a few more months in which to turn things around.  The fact that American Apparel was in a period of turmoil in

[239]*Id.*, ¶ 213.

[240]*Id.*

[241]*Id.*, ¶ 212.

[242]*Id.*, ¶ 202.

early 2010 and may have needed outside capital is strong evidence that the company acted with fraudulent intent when it allegedly withheld information from its auditor.  See *In re Portal Software, Inc. Securities Litigation*, No. C-03-5138 VRW, 2005 WL 1910923, *12 (N.D. Cal. Aug. 10, 2005) (an allegation that "defendants were motivated to inflate artificially [their company's] stock price in the short term . . . and obtain much-needed operating capital does allege facts of a palpable motive for fraud," as it goes beyond "the generic desire to raise capital which can be attributed to every company"); *S.E.C. v. Spiegel, Inc.*, No. Civ.A. 03 C 1685, 2003 WL 22176223, *22 (N.D. Ill. Sept. 15, 2003) (noting that a "going concern opinion" is "universally dreaded by corporate management"); see also *WPP Luxembourg Gamma Three Sarl v. Spot Runner, Inc.*, 655 F.3d 1039, 1052 (9th Cir. 2011) (the "continued infusion of investment capital" when a company had minimal operating income and was experiencing huge losses was relevant in examining fraudulent intent).

Viewed holistically, allegations that American Apparel had the requested data, distributed it to the "entire [c]ompany," affirmatively represented to Deloitte that it did not have the data available, and had a strong motive to withhold the information, are sufficient, in combination, to raise a compelling inference that the company knowingly misled Deloitte and issued an annual report that contained what it knew to be misleading financial statements.  This is particularly true given Deloitte's assertion that it believed American Apparel "withheld . . . the February 2010 monthly financial statements until after the filing of the 2009 10-K and made related misrepresentations,"[243] and American Apparel's acknowledgment that Deloitte would have required it to revise its 2010 projections had it had access to the data before it signed its audit report.  American Apparel does not suggest an alternate inference that can be drawn from these alleegd facts, and the court cannot discern an inference that would be more compelling than the inference that American Apparel acted fraudulently.  Based on the facts alleged concerning the company's internal financial reporting and reporting to its lender, its contrary representation to Deloitte, and the company's possible motive for concealing the February 2010 results, the court

---

[243]*Id.*, ¶ 216.

concludes that plaintiffs have adequately pled that American Apparel published knowingly false financial statements.  See *In re MannKind Securities Actions*, 835 F.Supp.2d 797, 812 (C.D. Cal. 2011) (finding that allegations of falsity and motive were sufficient to plead scienter).

The court reaches a different conclusion, however, with respect to plaintiffs' claim that the individual defendants knowingly withheld the requested information.  As the court noted in its prior order, plaintiffs must plead the "knowledge or participation of individual defendants in the decision to withhold the information" to allege fraudulent intent adequately.  *In re American Apparel II*, 2013 WL 174119 at *33.  The second amended complaint does not allege facts indicating that Charney or Kowalewski knew that information Deloitte had requested had been withheld or that they participated in the decision to withhold it.  The most concrete allegation regarding the their participation in the withholding of information is an allegation that, under general accepted auditing standards, an outside auditor must obtain a management letter stating that all relevant information has been shared with it before signing its audit report.[244]  Plaintiffs do not allege that Charney or Kowalewski signed the management letter; as a consequence, the court cannot determine whether they participated in withholding information.  Plaintiffs allege only that management letters are "normally" signed by "the chief executive officer and chief financial officer *or others with equivalent positions in the entity*."[245]

Under the PSLRA, this generalized allegation is insufficient to state a plausible claim against Charney and Kowalewski.  See *id.* at *26 ("The complaint does not clearly allege . . . which documents Charney and Kowalewski authorized or signed, and the parties did not seek judicial notice of the documents in question.  Consequently, the court is unable to determine from the record on this motion whether Charney or Kowalewski can be held responsible for the representations").  The court cannot assume from the fact that CEOs and CFOs often sign management letters that both Charney and Kowalewski signed the letter given to Deloitte or knowingly participated in withholding information.  See *Cheung v. Keyuan Petrochemicals, Inc.*,

---

[244]*Id.*, ¶ 213.

[245]*Id.*

No. CV 11–9495 PSG, 2012 WL 5834894, *6 (C.D. Cal. Nov. 1, 2012) (concluding an allegation that individual defendants "'must have signed' false management representation letters submitted to Keyuan's auditors because they were top management at the company" were "insufficient under the heightened pleading standards of the PSLRA").[246]

In sum, the court finds that the second amended complaint alleges sufficient facts to raise a compelling inference that American Apparel knowingly withheld financial information from its auditor so that it could publish false or misleading financial statements in its 2009 annual report.[247] American Apparel's motion to dismiss plaintiffs' claim based on the withholding of February 2010 financial information and publication of false or misleading financial statements in its 2009 annual report is denied.[248]   Charney's and Kowalewski's motion to dismiss this claim is granted.

---

[246]Plaintiffs do allege that Charney and Kowalewski signed the purportedly misleading 2009 annual report.  Such an allegation does not adequately plead scienter absent additional allegations that they signed with knowledge the report contained inaccuracies.  See *In re Downey Sec. Litig.*, 2009 WL 2767670 at *9 ("[I]f it were true that simply alleging that the Individual Defendants' signatures appearing on various public filings creates a strong inference of scienter, 'scienter would be established in every case where there was an accounting error or auditing mistake made by a publicly traded company, thereby eviscerating the pleading requirements for scienter set forth in the PSLRA").  Without concrete allegations showing that Charney and Kowalewski participated in the purported decision to withhold information from Deloitte, their signatures on the annual report do not alone establish scienter.

[247]Defendants argue that the inference they knowingly withheld information is weak, because on March 25, 2010, six days prior to the release of the 2009 annual report, American Apparel publicly acknowledged the negative impact of the workforce reduction.  (SAC, ¶ 161).  The March 25 press release, however, focused on American Apparel's 2009 fourth quarter earnings; it did not address the company's performance in the first quarter of 2010.  Deloitte presumably received the information concerning fourth quarter earnings discussed in the March 25 press release in connection with the audit, but concluded that, had it also had the February 2010 data, it would have required revised 2010 projections.  The fact that the company acknowledged its poor results in the fourth quarter of 2009 does not override the inference that it withheld 2010 data suggesting that its financial performance had deteriorated further.  It is at least as likely that American Apparel believed the February 2010 data, viewed in conjunction with the just-released 2009 fourth quarter earnings, would damage its ability to obtain much-needed capital from outside sources.

[248]The second amended complaint also alleges that defendants failed to report they were in breach of the debt covenants in American Apparel's credit agreement with Lion Capital.  (SAC,

### F.      Sufficiency of Count II: Violation of Section 20(a) of the 1934 Act

Section 20(a) imposes joint and several liability on persons who directly or indirectly control a violator of the securities laws.  The section provides:

---

¶¶ 189-198).  They assert that the company's 2009 annual report stated that based on information then available, it "anticipate[d]" that it would be in compliance with the debt covenants as of March 31, 2010.  *Id.*, ¶ 196.) They also allege that in a May 19, 2010 earnings release, American Apparel stated that "the [c]ompany was in compliance with all covenants under its credit facilities as of March 31, 2010."  (*Id.*, ¶ 197).  Plaintiffs contend this statement was false, because as of March 31, American Apparel was in breach of the requirement than it maintain an earnings to debt ratio no greater than 2:1.  (*Id.*, ¶ 198).  Defendants dispute plaintiffs' figures; they assert that they plaintiffs the ratio "us[ing] a Consolidated Adjusted [Earnings Before Interest, Taxes, Depreciation, and Amortization ("EBITDA") that is] different from the Consolidated EBITDA defined in the agreement with Lion Capital."  (American Apparel MTD at 5).  Defendants assert that, if the correct calculation is used, they did not breach the debt covenants in March 2010, and did not make a material misrepresentation regarding their compliance.

The court need not resolve which accounting metric is correct, because, as defendants note, plaintiffs' claim based on the alleged breach fails for a separate reason: plaintiffs' failure to allege loss causation.  Put succinctly, a plaintiff must show that there is a "'causal connection between the material misrepresentation and the loss.'"  *McGuire v. Dendreon Corp.*, C 07-800 MJP, 2008 WL 1791381, *10 (W.D. Wash. Apr. 18, 2008) (quoting *Dura Pharmaceuticals*, 544 U.S. at 342).  A plaintiff must "plead loss causation by alleging that the stock price fell after the truth of a misrepresentation about the stocks was revealed."  *Weiss v. Amkor Technology, Inc.*, 527 F.Supp.2d 938, 946 (D. Ariz. 2007) (citing *Dura Pharmaceuticals*, 544 U.S. at 342).  Here, the alleged March 31, 2010 breach of the debt covenants was never disclosed to the public – precisely because American Apparel disputes such a breach occurred.  Thus, there has never been a drop in stock price or loss associated with the purported May 2010 misrepresentation.  Plaintiffs argue that the May 19, 2010 release – the same release that purportedly misrepresented the company's compliance with the debt covenants as of March 31 – also disclosed the breach.  This argument is unavailing; while plaintiffs allege that the May 19 release disclosed that American Apparel would likely be in violation of its debt covenants by June 30, 2010 (SAC, ¶¶ 37, 202), they also allege that the earnings release stated that "the Company was in compliance with all covenants under its credit facilities as of March 31, 2010, based on the preliminary financial results for the first quarter of 2010."  (*Id.*, ¶ 197.)  Thus, the May 2010 release did not disclose that the company had been in violation as of March 31, 2010.  Moreover, it is logically impossible for a release both to conceal a covenant breach and simultaneously reveal the breach.  If the May 19 release in fact disclosed that American Apparel had breached the debt covenants of as of March 31, then there would be no actionable misrepresentation.

In short, without a causal link between the representation and a decline in stock price, the alleged covenant breach cannot form the basis for a securities fraud claim.  To the extent that plaintiffs' claim is based on concealing debt covenant breaches, the claim is denied.

1       "Every person who, directly or indirectly, controls any person liable under any

2       provision of this chapter or of any rule or regulation thereunder shall also be liable

3       jointly and severally with and to the same extent as such controlled person . . . is

4       liable, unless the controlling person acted in good faith and did not directly or

5       indirectly induce the act or acts constituting the violation or cause of action." 15

6       U.S.C. § 78t(a).

7 A *prima facie* case of control person liability requires evidence (1) that a primary violation of the

8 securities laws occurred and (2) that defendant directly or indirectly controlled the person or entity

9 committing the primary violation. See, e.g., *Howard v. Everex Systems, Inc.*, 228 F.3d 1057,

10 1065 (9th Cir. 2000); *Paracor Finance*, 96 F.3d at 1161. Plaintiffs need not prove the individual

11 defendant's scienter or "culpable participation" in the alleged wrongdoing. *Id.* (quoting *Arthur*

12 *Children's Trust v. Keim*, 994 F.2d 1390, 1396 (9th Cir. 1993)). "Section 20(a) claims may be

13 dismissed summarily . . . [however,] if a plaintiff fails to adequately plead a primary violation of

14 section 10(b)." *Zucco*, 552 F.3d at 990.

15       To allege control person liability, plaintiffs "must plead . . . that defendants exercised 'a

16 significant degree of day-to-day operational control, amounting to the power to dictate another

17 party's conduct or operations.'" *In re McKesson HBOC Secs. Litig.*, 126 F.Supp.2d 1248, 1277

18 (N.D. Cal. 2000); see also *Lilley v. Charren*, 936 F.Supp. 708, 716 (N.D. Cal. 1996)

19 ("[P]laintiffs must allege facts showing that each defendant possessed the actual power to control

20 the person primarily liable"). Lenders are generally not treated as "control persons" under the

21 securities laws. See *Paracor Finance*, 96 F.3d at 1162 (courts "have been very reluctant to treat

22 lenders as controlling persons of their borrowers"). The fact that a company has representatives

23 on another company's board, and that it holds a minority stock interest are also insufficient to

24 establish control person liability. See *In re Gupta Corp. Securities Litigation*, 900 F.Supp. 1217,

25 1243 (N.D. Cal. 1994) (defendant's "position as a minority shareholder . . . with an agent on the

26 board does not establish control person liability"); *O'Sullivan v. Trident Microsystems*, No. C

27 93-20621 RMW (EAI), 1994 WL 124453, *18 (N.D. Cal. Jan. 31, 1994) (the fact that a

28 defendant owned 9.5% of a defendant's stock and had a representative on the board were

insufficient to state a claim for control person liability).

Control person liability is "an intensely factual question." *Howard*, 228 F.3d at 1065. "'The traditional indicia of control are: having a prior lending relationship, owning stock in the target company, or having a seat on the board.'" *Batwin v. Occam Networks, Inc.*, No. CV 07-2750 CAS (SHx), 2008 WL 2676364, *25 (C.D. Cal. July 1, 2008) (quoting *In re Surebeam Corp. Sec. Litig.*, No. 03 CV 1721JM(POR), 2005 WL 5036360, *25 (S.D. Cal. Jan. 3, 2005)).[249]  Plaintiff allege that Lion Capital is a control person of American Apparel due, *inter alia*, to its lending relationship with the company, its ownership of a sizable block of American Apparel stock, and its placement of individuals on the American Apparel board.  Plaintiffs also allege that, in addition to being directly liable for each of the alleged misstatements and omissions, Charney and Kowalewksi are secondarily liable as control persons.

### 1.     Lion Capital's Liability for Alleged Misrepresentations Concerning American Apparel's Compliance with the Immigration Laws

Plaintiffs allege that Lion Capital became a control person of American Apparel in March

---

[249]Although allegations of fraud and scienter must satisfy heightened pleading requirements, district courts in the Ninth Circuit have concluded that because fraud is not a necessary element of a control person claim, the pleading of such a claim need only meet the requirements of Rule 8(a). See *Teamsters Local 617 Pension and Welfare Funds v. Apollo Group, Inc*, 690 F.Supp.2d 959, 967-68 (D. Ariz. 2010) (observing that there was a split in authority on the subject, but stating that "[i]n more recent years . . . the weight of district court authority within this Circuit" has held that control person liability claims are subject to Rule 8, not Rule 9(b)); see also *In re Countrywide Fin. Corp. Sec. Litig.*, 588 F.Supp.2d 1132, 1201 (C.D. Cal. 2008) (stating that "although the circumstances of the primary violators' fraud must be pled with particularity under Rule 9(b) [and the PSLRA], the control element is not a circumstance that constitutes fraud and therefore need not be pled with particularity,'" quoting *In re LDK Solar Sec. Litig.*, No. C 07-05182 WHA, 2008 4369987, *12 (N.D. Cal. Sept. 24, 2008)); *Fouad v. Isilon Systems, Inc.*, No. C07-1764 MJP, 2008 WL 5412397, *12 (W.D. Wash. Dec. 29, 2008) (applying "Rule 8['s] notice pleading standard" to plaintiffs' control person claims); *Siemers v. Wells Fargo & Co.*, No. C 05-04518 WHA, 2006 WL 2355411, *14 (N.D. Cal. Aug. 14, 2006) ("The control exerted by [defendant] is not a circumstance that constitutes fraud.  Plaintiff is only required to assert fraud with particularity as to primary violations.  At the control-person level, liability exists irrespective of the control person's scienter").  The court adopts the reasoning of these courts and concludes that the pleading of control person liability need not meet the more exacting requirements of Rule 9(b).

2009; if so, some of the disclosures in the March 2009 annual report are attributable to it, including statements that American Apparel had not been in regular contact with ICE since the January 2008 audit.  To support this control person claim, plaintiffs allege that on March 16, 2009, American Apparel announced that it had entered into a private financing agreement with Lion Capital that involved more than $80 million in secured second lien notes.[250]   In conjunction with this infusion of credit, the parties entered into financing agreements that gave Lion Capital the right to fill two seats on American Apparel's board, as well as to appoint an additional person denominated a "board observer."[251]   The financing agreements also purportedly entitled Lion Capital to a twenty percent ownership stake in the company.[252]  Lion Capital allegedly had access to "significant non-public material information about American Apparel," and was entitled to "visit and inspect [American Apparel's] properties, to discuss its affairs, finances and condition with its officers and independent accountants, . . . and to examine . . . its books and records."[253]

Like the first amended complaint, the second amended complaint fails to acknowledge the significance of certain critical facts.  Notably, as the court has previously observed, Lion Capital did not actually fill its two seats on the board of directors until October 2009, late in the class period and after most of the alleged misrepresentations were made.[254]  Given the crucial role that board membership plays in establishing control person liability, this fact casts serious doubt on any claim that Lion Capital exercised the requisite degree of control over American Apparel's affairs prior to October 2009.  See *Apollo Group, Inc.*, 690 F.Supp.2d at 979 ("[T]he court agrees with [defendant's] assertion that 'officers and directors' cannot be found 'liable as control persons

---

[250]SAC., ¶ 168.

[251]*Id.*, ¶ 170.

[252]*Id.*, ¶ 169.

[253]*Id.*, ¶ 175.

[254]*Id.*, ¶ 183.

under Section 20(a) for alleged violations that took place before they assumed their positions'"").[255]

The court has concluded that the complaint states a claim against the primary defendants for making knowingly false representations concerning American Apparel's immigration compliance. Defendants first made these representations in early 2008, long before Lion Capital had any control over American Apparel's operations; they continued to make them until the middle of 2009, a few months after American Apparel had entered into a relationship with Lion Capital. As the misrepresentations concerning immigration compliance were made in SEC filings, the applicable standard is whether "the [alleged control] person managed the company on a day-to-day basis and was involved in the formulation of financial statements, which is sufficient to 'presume control over the transactions giving rise to the alleged securities violation.'" *S.E.C. v. Todd*, 642 F.3d 1207, 1223 (9th Cir. 2011) (quoting *Howard*, 228 F.3d at 1065).

The court previously noted that plaintiffs had failed to allege that, "as of March 2009, Lion Capital controlled [American Apparel] or its actions *regarding immigration compliance*." *In re American Apparel II*, 2013 WL 174119 at *36 (emphasis added). Plaintiffs argue that the second amended complaint corrects this deficiency, as it highlights several areas in which Lion Capital exercised control. Specifically, plaintiffs contend the complaint alleges that as a minority shareholder and lender, Lion Capital had access to the company's internal financial information and operations, received regular financial reports, placed "onerous restrictions" on the company's business as part of the credit agreement, and made statements indicating an intent to "influence" American Apparel's business direction. Plaintiffs have not, however, pled sufficient facts to state a plausible claim that Lion Capital exercised control over American Apparel's immigration compliance during the period in question.

It is true that some courts have held that the mere fact a person or entity holds a minority

---

[255]Plaintiffs also allege that Lion Capital had authority to designate a "board observer," who was permitted to attend board meetings but who could not vote. (*Id.*, ¶ 170). The complaint, however, does not state when Lion Capital designated a board observer; it alleges only that in May 2010, one of Lion Capital's designated board members resigned his position but remained the "board observer." (*Id.*, ¶ 183). It is not clear if this was the first board observer or whether others had previously served.

interest in a company is sufficient to show control over the company.  See *In re Refco, Inc. Sec. Litig.*, 503 F.Supp.2d 611, 638 (S.D.N.Y.  2007) (observing that allegations of minority ownership have been held "sufficient to survive a motion to dismiss, because it was not implausible that plaintiffs could develop a record that could support a finding of control").  Lion Capital owned approximately 18% of the outstanding shares of American Apparel once the credit agreement was executed.  While under other circumstances the court might agree with that conclusion, given the timing of the crucial events in this case, and the "intensely factual" nature of control person analysis, the court cannot find that plaintiffs have adequately pled a control person claim on this basis alone.  Plaintiffs' allegations concerning misrepresentations regarding immigration compliance for the most part concern statements made long before American Apparel entered into a credit agreement with Lion Capital.  There is only a three to four month overlap between Lion Capital's acquisition of an ownership interest in American Apparel and defendants' alleged misrepresentations concerning immigration compliance.  Notably, the company's representations concerning immigration compliance did not change once it entered into the credit agreement; rather, the post-agreement statements mirror the statements made before Lion Capital became involved with American Apparel.  This is strong circumstantial evidence that Lion Capital did not exercise control over the individuals making the statements at issue.  See *Jacobs v. Coopers & Lybrand, LLP*, No. 97 CIV. 3374(RPP), 1999 WL 101772, *18 (S.D.N.Y. March 1, 1999) (dismissing a control person claim against an individual who "was a director for [only] 29 days before he signed the 10–K form [containing misrepresentations]," because "it is not logical to presume" that a director who was at the company for such a short interval would "exert control over those who wrote the material misstatements the form contained").  The mere fact that Lion Capital was a minority shareholder, therefore, does not demonstrate control as respects the alleged immigration compliance misrepresentations.

Plaintiffs do not explain how Lion Capital's role as a lender – namely, its access to American Apparel's financial records and the restrictions it placed on American Apparel's operations – demonstrates the type of control necessary for liability under § 20(a).  As the Ninth Circuit has observed, courts have generally been "very reluctant to treat lenders as controlling

persons of their borrowers." *Paracor Finance, Inc.*, 96 F.3d at 1162 (citing *Metge v. Baehler*, 762 F.2d 621, 631-32 (8th Cir. 1985); *Schlifke v. Seafirst Corp.*, 866 F.2d 935, 948-50 (7th Cir. 1989)). Furthermore, courts have held that standard loan terms are "insufficient to establish the control that is required to establish controlling person liability." *Gray v. First Winthrop Corp.*, 776 F.Supp. 504, 511 (N.D. Cal. 1991) ("As evidence of control, plaintiffs argue that, under the terms of the loan, GEPT had the right to approve leases, set rental rates, input management contract decisions, control secondary financing, acquire a 50% interest in the partnership, and control the use of the Partnership's Reserve Account. However, such terms in a loan agreement, by themselves, do not sufficiently demonstrate elements of control"); see also *Metge*, 762 F.2d at 631-32 (concluding that a lender to a primary violator was not a "controlling person" despite the fact that it was the borrower's primary lender, had the ability to foreclose on loans, held 17-18% of the borrower's stock, and held a controlling block of its subsidiary's stock). Plaintiffs allege no facts demonstrating how the restrictions Lion Capital placed on American Apparel gave it control over the company's management or policies as of March 2009.

Plaintiffs cite a statement by Lion Capital in an SEC filing on March 23, 2009 that it "[might] seek to influence [American Apparel's] management or the [b]oard with respect to [its] business and affairs . . . and [that] the directors designated by [Lion Capital] [might] have influence over the corporate activities of [American Apparel]."[256] Even viewed in the light most favorable to plaintiffs, this statement suggests only a possible intention to exercise control at some point in the future, e.g., when Lion Capital appointed directors to the American Apparel board. See *Gray*, 776 F.Supp. at 511 ("[The] facts do not show that GEPT had control over Winthrop at the time of the offering. Rather, at most they may evidence elements of *future* control"). It is notable that Lion Capital's statement references the influence that the *directors* it designated might exert; these directors were not yet on the board at the time the alleged misrepresentations concerning immigration compliance were made. Consequently, this statement does not show that Lion Capital controlled American Apparel at the time the company allegedly made

---

[256]SAC, ¶ 171.

misrepresentations regarding its compliance with immigration laws.[257]

### 2.    Lion Capital's Liability for the Allegedly Misleading Financial Statements Contained in the 2009 Annual Report

Plaintiffs have also adequately alleged that American Apparel knowingly withheld information from Deloitte and published false or misleading financial statements and projections in the its 2009 annual report.  The report was filed on March 31, 2010, several months after Lion Capital designated two individuals to serve as American Apparel board members.  Considering the totality of plaintiffs' allegations, the court concludes that they have sufficiently alleged that Lion Capital was a control person at the time the report was filed.

It is significant in this regard that the allegedly misleading 2009 report was signed by both of Lion Capital's designated board members.[258]  Numerous courts have found that a director's signature on a misleading financial report is sufficient to demonstrate control over the misrepresentation, because "[i]t . . . comport[s] with common sense to presume that a person who signs his name to a report has some measure of control over those who write the report."  *Jacobs v. Coopers & Lybrand, LLP*, No. 97 CIV. 3374(RPP), 1999 WL 101772, *18 (S.D.N.Y. Mar. 1, 1999).  See *In re Charles Schwab Corp. Securities Litigation*, 257 F.R.D. 534, 555 (N.D. Cal. 2009) ("Where a board member is alleged to have signed the registration statements at issue, . . .

---

[257]Plaintiffs also argue that Lion Capital executed a reciprocal voting agreement with Charney, in which Charney and Lion Capital agreed to vote his or its shares in favor of the other's reelection to the board.  Plaintiffs do not articulate how this evidences the control necessary to hold Lion Capital secondarily liable.  There are no allegations that Lion Capital had exercised its power under the voting agreement to manipulate or control American Apparel's management or policies; in fact, there are no allegations that a board election occurred between March 2009 and the final representation regarding immigration compliance, such that Lion Capital ever acted under the voting agreement.  The mere fact that such a voting agreement exists is insufficient to demonstrate control.  See *Dartley v. ErgoBilt Inc.*, No. CIV. A. 398CV1442M, 2001 WL 313964, *1 (N.D. Tex. Mar. 29, 2001) ("The Court finds that Troutman's status as a major shareholder and a party to the voting agreement at issue does not, without more, create control person liability.  Troutman's right to replace Mr. Glenn, under circumstances that did not arise, and his obligation to vote for designated directors, with other parties to the voting agreement, did not constitute that control which would automatically trigger § 15 or § 20(a) liability").

[258]SAC, ¶ 196 n. 44.

1    . courts have presumed that the director exercised actual authority and control, at least over the

2    contents of and/or release of those statements"); *In re Amgen Inc. Securities Litigation*, 544

3    F.Supp.2d 1009, 1037 (C.D. Cal. 2008) ("While an individual's status as an officer or director

4    of the issuing corporation is insufficient, standing alone, to demonstrate the exercise of control

5    . . . , persuasive authority indicates that an officer or director who has signed financial statements

6    containing materially false or misleading statements qualifies as a control person"); *In re

7    Metropolitan Securities Litigation*, 532 F.Supp.2d 1260, 1296 (E.D. Wash. 2007) ("While an

8    individual's status as an officer or director of the issuing corporation is insufficient, standing

9    alone, to demonstrate the exercise of control, an officer or director who has signed an SEC filing

10   does exercise control"); *In re Alstom SA Securities Litigation*, 406 F.Supp.2d 433, 487 (S.D.N.Y.

11   2005) ("[C]ourts have held that officer or director status alone does not constitute control. . . .

12   In contrast, if that same officer or director has signed financial statements containing materially

13   false or misleading statements, courts have held that control as to the financial statements is

14   sufficiently pled," collecting cases). The court agrees with the rationale of these decisions. Lion

15   Capital's board designees could control whether the 2009 annual report containing purportedly

16   false or misleading financial statements was filed; stated differently, they could have prevented

17   such filing by declining to sign the annual report. Accordingly, the presence of Lion Capital

18   designees on the American Apparel board, coupled with those directors' signatures on the 2009

19   annual report, is sufficient at the pleading stage to state a claim under § 20.[259]

20   _____

21   [259]At the hearing, Lion Capital's attorney argued that the company's designated board

22   members did not sit on American Apparel's audit committee, and thus did not exercise control

23   over the financial reports at issue. While some courts have noted that a director's membership

     on the audit committee increases the likelihood that that director exercised control for purposes

24   of § 20 liability, see, e.g., *In re Metropolitan Securities Litig.*, 532 F.Supp.2d at 1297

25   ("persuasive authority indicates that audit committee members, including outside directors, who

     sign SEC filings qualify as control persons," no court has *required* that a plaintiff plead not only

26   that a director signed a financial report, but that he or she was a member of the audit committee

     to plead a cognizable control person claim. Rather, courts focus on the fact that absent the

27   director's signature, the financial report cannot be issued. As a consequence, they conclude that

     the director has control over whether the statements in the report are made. In *In re Alstom SA

28   Securities Litig.*, 406 F.Supp.2d at 487, for example, the court noted that "courts have held that

Furthermore, the complaint alleges additional facts demonstrating that Lion Capital exercised control over American Apparel at the time the 2009 annual report was file. First, the allegation that Lion Capital intended to "influence [American Apparel's] management or the [b]oard with respect to [its] business and affairs . . . and [that] the directors designated by [Lion Capital] [might] have influence over the corporate activities of [American Apparel],"[260] is more significant when plaintiffs' claim concerning the 2009 annual report is considered because, unlike with the allegedly false immigration compliance representations, the 2009 annual report that purportedly contained false financial statements was filed after Lion Capital's board designees became directors. It was thus possible at that time for Lion Capital to exert influence through these its directors. See *In re Immune Response Sec. Litig.*, 375 F.Supp.2d 983, 1041 (S.D. Cal. 2005) (allegations that defendants "had power to influence, and exercised their power and

officer or director status alone does not constitute control for the purposes of Section 20(a) liability," but that "if that same officer or director has signed financial statements containing materially false or misleading statements, courts have held that control as to the financial statements is sufficiently pled." In a later part of the opinion, the court separately analyzed whether "membership on an audit committee, by itself," is sufficient to show control; it concluded it was not. *Id*. at 489. By first concluding that a director who signs a financial statement is a control person, and then separately reviewing the impact of that director's membership on the audit committee, the court tacitly endorsed the view that a director need not be on the audit committee to be deemed a control person if he or she signed a misleading financial report. The court did observe that "an outside director and an officer such as a CEO or COO occupy very different positions in relation to the day-to-day management and operation of the company," and thus courts may "require more allegations to plead control by an outside director or some figure other than an internal officer." *Id*. at 488 n. 51. The fact that the outside director signed a financial report, however, is such an additional allegation. See *In re Charles Schwab Corp. Securities Litig.*, 257 F.R.D. at 555 (finding that "independent trustees," who played a role "similar to that of outside directors," could be held liable as control persons because they were "alleged to have signed the registration statements at issue"); see also *In re Washington Mutual, Inc. Securities, Derivative & ERISA Litigation*, 259 F.R.D. 490, 509 (W.D. Wash. 2009) (noting that two outside director defendants did not serve on the audit committee, but finding nonetheless that plaintiffs had adequately alleged that they were control persons based, *inter alia*, on their "signing the Offering Documents"). Finally, as discussed *infra*, plaintiffs do not rely solely on the fact that Lion Capital designated board members; there are several other indicia of control alleged, such that plaintiffs' § 20 claim is sufficient to survive at the pleadings stage.

[260]SAC, ¶ 171.

1   influence, were sufficient to state a claim for control person liability).  The complaint also alleges

2   that Charney acknowledged Lion Capital's influence, stating that through its board members, Lion

3   Capital was going to be involved in "management decisions as far as strategic issues."[261]  This

4   acknowledgment of Lion Capital's control, coupled with the fact that its board designees signed

5   the 2009 report, are sufficient to survive a motion to dismiss.[262]

6          Stated differently, several of "the traditional indicia of control" were present by the time

7   American Apparel filed its 2009 annual report.  American Apparel had a signficant lending

8   relationship with Lion Capital.  Lion Capital owned a large block of American Apparel stock,

---

[261]*Id.*, ¶ 181.

[262]Lion Capital argues that even if its designated board members could be deemed to be control persons, their control cannot be attributed to Lion Capital.  (Lion Capital Opp. at 16).  In support of this argument, it cites *In re Global Crossing Ltd. Sec. Litig.*, No. 02 Civ. 910(GEL), 2005 WL 1907005, *3 (S.D.N.Y. Aug. 8, 2005).  There, the court dismissed control person claims against Softbank and Microsoft, each of which had designated directors to sit on the Global Crossing board.  The court noted that plaintiffs did not allege the extent of the "power that Microsoft or Softbank had over[these directors], after they had exercised their power to appoint," and thus the claim failed.  *Id*. at *13.  Lion Capital's argument is unavailing.  First, in contrast to *In re Global Crossing*, plaintiffs here allege that Lion Capital intended to influence American Apparel's management and exert control over American Apparel's strategic decision-making through its designated directors on American Apparel's board.  This suffices plausibly to allege that Lion Capital controlled its designated board members after they were appointed, and used them to influence American Apparel's business decisions.  Second, the *In re Global Crossing* court modified its holding in a subsequent decision.  In *In re Global Crossing, Ltd. Sec. Litig.*, No. 02 Civ. 910(GEL), 2005 WL 2990646 (S.D.N.Y. Nov. 7, 2005), the court revisited its prior ruling.  It acknowledged that it had  previously held that Microsoft and Softbank could not be deemed control persons simply because they had designated individuals to sit on Global Crossing's board, but concluded that under the liberal pleading standard of Rule 8(a) , such an allegation was adequate to state a plausible claim of control.  *Id*. at *8.

Here, the court cannot agree that once it designated board members, Lion Capital abdicated all control over American Apparel.  Such a conclusion would be at odds with Lion Capital's public statements, and given the significant investment Lion Capital had in American Apparel, most probably with reality. The reason Lion Capital was given two seats on American Apparel's board was to ensure that it would be able to influence the company's business decisions and safeguard its investment.  Any conclusion that Lion Capital did not control the decisions of the board members it designated would ignore the reason it negotiated for seats on the board in the first place.

constituting 18% of the outstanding shares.   Lion Capital had designated two members of American Apparel's board, who had been seated and who signed the 2009 annual report containing the allegedly misleading financial statements.   See *No. 84 Employer-Teamster Joint Council Pension Trust Fund v. America West Holding*, 320 F.3d 920, 945 (9th Cir. 2003) (noting that "'the traditional indicia of control,' such as having a prior lending relationship, owning stock in the target company, or having a seat on the board, were present," and concluding that plaintiffs had adequately alleged control person liability).

### 3.      Whether Charney and Kowalewski are Liable as Control Persons

Plaintiffs also allege that Charney and Kowalewski were control persons of American Apparel at all relevant times.   In their motion to dismiss, Charney and Kowalewski make a cursory argument that, because plaintiffs have not adequately pled a primary violation, their § 20 claim fails as well.[263]   They also assert that plaintiffs fail to allege that either Charney or Kowalewski exercised actual control over the alleged violations.[264]   This argument is unavailing.

As detailed, plaintiffs have sufficiently alleged that American Apparel made fraudulent statements.   The question thus is whether Charney and Kowalewski were control persons at the time of the alleged misstatements.   "Where plaintiffs limit their allegations to a narrowly defined group of corporate officers who are 'charged with the day-to-day operations of a public corporation,' . . . it may be 'reasonable to presume that these officers had the power to control or influence the particular transactions giving rise to the securities violation,' and to find that status alone is sufficient."   *In re Turbodyne Technologies, Inc. Securities Litigation*, No. CV99-00697 MMM (BQRx), 2000 WL 33961193, *11 (C.D. Cal. Mar. 15, 2000) (quoting *Wool v. Tandem Computers, Inc.*, 818 F.2d 1433, 1441 (9th Cir. 1987)); see also *Lilley v. Charren*, 936 F.Supp. 708, 717 (N.D. Cal. 1996) ("[S]tatus alone may be sufficient when plaintiffs limit their fraud allegations to a narrowly-defined group of corporate officers").   Here, in addition to Charney's status as chief executive officer, president, and chairman of the board of directors,

---

[263]Charney MTD at 24.

[264]*Id.*

82

1  plaintiffs allege in detail that he exercised a significant amount of control over the company.  For

2  example, plaintiffs allege that American Apparel's former chief business development officer

3  stated that "Dov [Charney] is a one-man band . . . [who] actively . . . manages every part of the

4  company – from design to IT to marketing to finance.  All roads lead through Dov."[265]

5       Plaintiffs also allege that Charney had a " strong desire to maintain total control over the

6  Company's affairs," and cite a 2006 *New York Times* article noting that Charney "is known for

7  exercising strict . . . control over the retailer's operations."[266]   See *Flaxel v. Johnson*, 541

8  F.Supp.2d 1127, 1139 (S.D. Cal. 2008) ("Given Johnson's pervasive involvement as chairman,

9  president, and CFO, he was the person controlling [the company] in every material respect"

10  (internal quotation marks omitted)).  Furthermore, Charney's relationship with the company also

11  has several of the traditional indicia of control.  He allegedly owned "over 50 percent" of the

12  outstanding shares of American Apparel stock.[267]   He is also the chief executive officer, president,

13  and chairman of the board of directors.  In this capacity, he signed reports that purportedly

14  contained material misstatements, such as the 2007,[268] 2008,[269] and 2009 annual reports,[270] as well

15  as the June 30, 2009 press release.  Charney thus exercised control over the company's issuance

16  of these communications, and qualifies as a control person under § 20.  *In re Charles Schwab*

17  *Corp. Securities Litig.*, 257 F.R.D. at 555 ; *In re Amgen Inc. Securities Litig.*, 544 F.Supp.2d at

18  1037; *Jacobs*, 1999 WL 101772 at *18.

19       Similarly, plaintiffs adequately allege that Kowalewski, as CFO and director, was a control

20  person at all relevant times.  Like Charney and the Lion Capital board designees, Kowalewski

22  [265]SAC, ¶ 40.

23  [266]*Id.*, ¶ 100.

24  [267]*Id.*, ¶ 168.

26  [268]SAC, ¶ 15 n. 10.

27  [269]*Id.*, ¶ 17 n. 11.

28  [270]*Id*, ¶ 4 n. 2.

1  allegedly signed several financial reports that contained fraudulent statements, including the 2008

2  and 2009 annual reports.[271]   See *In re Metropolitan Securities Litig.*, 532 F.Supp.2d at 1296

3  ("While an individual's status as an officer or director of the issuing corporation is insufficient,

4  standing alone, to demonstrate the exercise of control, an officer or director who has signed an

5  SEC filing does exercise control. . . .  The rationale underlying the conclusion that [board]

6  members exercise control over the documents they sign would apply with even greater force to

7  a former CFO"); see also *S.E.C. v. Das*, No. 8:10CV102, 2011 WL 4375787, *6 (D. Neb. Sept.

8  30, 2011) ("As the CFOs who signed and certified the statements, Das and Dean were the persons

9  with ultimate authority and control over the content of the statements and whether and how they

10  were communicated"); *In re Alstom SA Securities Litig.*, 406 F.Supp.2d at 501 ("A CFO who

11  signs financial statements can be presumed to have control over those who make the statements").

12      Plaintiffs also allege that Kowalewski, as CFO, "had ultimate authority" over the

13  company's allegedly fraudulent financial reports.[272]  More specifically, they assert that he had the

14  power to "control the contents of American Apparel's reports to the SEC, press releases and

15  presentations to securities analysts, money and portfolio managers and institutional investors, i.e.

16  the market," and that he "personally attested" to the documents' accuracy.[273]  Plaintiffs also allege

17  that Kowalewski had "direct and supervisory involvement in the day-to-day operations of the

18  [c]ompany," and therefore had the power to "influence the particular transactions giving rise to

19  the securities violations" alleged.[274]  As pled, therefore, Kowalewski exercised control over the

20  purportedly fraudulent communications, rendering him liable for statements contained therein.

21  See *In re Marvell Technology Group Ltd. Securities Litigation*, No. C–06–06286 RMW, 2008 WL

22  _____

23      [271]*Id.*, ¶¶ 53, 115 n. 25.

24      [272]*Id.*, ¶ 53.

25      [273]*Id.*, ¶ 54.  Plaintiffs allege a litany of financial reports over which Kowalewski exercised
26  control as American Apparel's CFO, including the "2008 Annual Report; 1Q09 10-Q; 2Q09
    10-Q; 3Q09 10-Q; 2009 Annual Report; May 11, 2010 Form NT 10-Q; May 19, 2010 Form 8-K;
27  and July 28, 2010 Form 8-K."  (SAC, ¶ 53.)

28      [274]*Id.*, ¶ 248.

84

4544439, *13 (N.D. Cal. Sept. 29, 2008) ("Hervey as Vice-President of Finance and CFO had the power to control Marvell's financial reporting and the setting of controls over the granting of options. In light of the allegations of control that . . . Hervey had over Marvell's . . . financial reporting, the Section 20(a) claims survive defendants' motion to dismiss"); *In re CV Therapeutics, Inc.*, No. C 03–03709 SI, 2004 WL 1753251, *11 (N.D. Cal. Aug. 5, 2004) ("The complaint alleges that 'Speigelman, as CFO, was responsible for financial reporting and communications with the market' . . . [and] signed documents filed with the SEC. . . . The Court will allow plaintiffs to proceed on a theory of 'control person' liability"); *In re Metawave Communications Corp. Securities Litigation*, 298 F.Supp.2d 1056, 1087 (W.D. Wash. 2003) ("Plaintiffs argue that Fuhlendorf was responsible for financial reporting and ordered accounting adjustments. . . . Plaintiffs have sufficiently pled that . . . Fuhlendorf exercised actual power or control over any primary violators based on [his] position[ ] as . . . CFO"); see also *Adams v. Kinder-Morgan, Inc.*, 340 F.3d 1083, 1109 (10th Cir. 2003) ("[T]he two identified, actionable claims of securities fraud relate specifically to official reports of the company's financial performance. As Kinder-Morgan's chief financial officer, it is reasonable to infer that McKenzie had at least indirect control over the KM's financial reporting"); *In re Nature's Sunshine Products Securities Litigation*, 486 F.Supp.2d 1301, 1314 (D. Utah 2007) ("Huff, as CFO responsible for the financial reporting which is the subject matter of the alleged primary violation, is a control person"). As the purported misstatements appeared in documents Kowalewski allegedly signed and over which he allegedly exercised final control, plaintiffs have adequately pled that Kowalewski is a control person under § 20.

Given the allegations of control that plaintiffs have made, Charney's and Kowalewski's cursory argument that plaintiffs have not adequately their liability as control persons fails.

### III.  CONCLUSION

For the reasons stated, defendants' motions to dismiss are granted in part and denied in part. Plaintiffs have adequately alleged that American Apparel and the individual defendants made representations regarding the company's immigration compliance that were both false when made

and made with scienter.  Similarly, they have adequately alleged that American Apparel made knowing misrepresentations in the financial statements included in its 2009 annual report. Plaintiffs have not adequately alleged that defendants' purported statements concerning the effect of the workforce reduction necessitated by the ICE audit were false or made with scienter.  Nor have they adequately alleged that statements regarding the company's dedication to ensuring strong financial controls and adhering strictly to financial accounting requirements constituted actionable misrepresentations.  Finally, plaintiffs have not adequately alleged that defendants Charney and Kowalewski knew or participated in making the misrepresentations alleged in the financial statements included in the 2009 annual report, or that defendants concealed a debt covenant breach.  Plaintiffs have, however, adequately alleged a control person claim against Charney and Kowalewski with respect to the company's statements regarding its compliance with immigration laws and with respect to the allegedly misleading financial statements included in the company's 2009 annual report.  They have also adequately pled a control person claim against Lion Capital with respect to the allegedly misleading financial statements in the 2009 annual report.  They have failed adequately to allege a control person claim against Lion Capital based on American Apparel's purported immigration compliance misrepresentations.

In its order dismissing the first amended complaint, the court granted leave to amend but noted that "[t]o the extent that plaintiffs fail to cure any deficiencies noted in this order, . . . [it would] dismiss their [amended] claims with prejudice." *In re American Apparel II*, 2013 WL 174119 at *37.  Plaintiffs have now had three opportunities to plead their claims; despite detailed orders identifying the deficiencies in their pleading, they have failed to remedy the problems noted in certain of their claims.  The court concludes that any further effort to plead the claims would be futile. See *Telesaurus VPC, LLC v. Power*, 623 F.3d 998, 1003 (9th Cir. 2010) ("A district court may deny a plaintiff leave to amend . . . if the plaintiff had several opportunities to amend its complaint and repeatedly failed to cure deficiencies"); *Garza v. BNSF Railway Co.*, No. 1:12cv032 DLB,  2012 WL 4036454, *6 (E.D. Cal. Sept. 12, 2012) ("Plaintiffs repeatedly have failed to cure the deficiencies in their harassment claim against BNSF.  Plaintiffs will not be given further leave to amend this claim").  Accordingly, to the extent the court dismisses plaintiffs'

claims, it does so with prejudice.  Defendants American Apparel, Charney, Kowalewski and Lion

Capital are directed to file an answer within twenty (20) days of the date of this order.


DATED: August 8, 2013

_____
MARGARET M. MORROW
UNITED STATES DISTRICT JUDGE